## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EASTERN BAND OF CHEROKEE INDIANS )
88 Council House Loop )
Cherokee, NC 28719 )
)
Plaintiff, )
)
vs. )          Civil Action No. 1:20-cv-757
)
UNITED STATES DEPARTMENT OF THE INTERIOR )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)
UNITED STATES BUREAU OF INDIAN AFFAIRS )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)
DAVID BERNHARDT, in his official capacity as )
Secretary of the United States Department of the Interior )
1849 C Street, N.W. )
Washington, D.C. 20240, )
)
TARA KATUK MAC LEAN SWEENEY, in her official )
capacity as Assistant Secretary for Indian Affairs )
1849 C Street, N.W. )
Washington, D.C. 20240, and )
)
R. GLEN MELVILLE, in his official capacity as Acting )
Regional Director for the Bureau of Indian Affairs Eastern )
Regional Office )
545 Marriott Drive Suite 700 )
Nashville, TN 37214, )
)
Defendants. )

## COMPLAINT

Plaintiff the Eastern Band of Cherokee Indians ("EBCI") brings this action to protect and

preserve the EBCI's sovereign cultural authority over lands, religious sites, burials, and cultural

patrimony within traditional Cherokee treaty territory. Several federal laws are in place to protect

the inherent right of Tribal Nations to assert their sovereign cultural authority over lands within their treaty territory. Defendants *ulta vires* actions have violated nearly all of them.

On March 12, 2020, Defendant Assistant Secretary Tara Sweeney took final agency action and signed her Decision ("March 12 Decision") instructing Defendant Eastern Region Acting Director Glen Melville to "immediately acquire the land into trust" at the Kings Mountain Site, in Cleveland County, North Carolina, for Catawba Indian Nation ("Catawba"), a Tribe headquartered in South Carolina. *See* Ex. A. The land at issue, the Kings Mountain Site, sits squarely within Cherokee's treaty territory.

Federal laws, specifically the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 300101 *et seq*., prohibit any and all federal agencies from taking "final agency action" with regards to lands within a Tribal Nation's traditional treaty territory until and unless that federal agency has consulted in good faith with the Tribal Nation's Tribal Historic Preservation Officer ("THPO") regarding the Nation's cultural patrimony, sacred sites, and burials located within the territory.

Defendants Department of the Interior ("DOI") and Bureau of Indian Affairs ("BIA") know this. Defendants routinely engage in good faith consultation with the EBCI's THPO concerning final agency actions Defendants are considering undertaking in Cherokee treaty territory in what today constitutes North Carolina. *See* Declaration of Russell Townsend, Eastern Band of Cherokee Indians Tribal Historic Preservation Officer, March 16, 2020 ("Townsend Decl.), ¶ 6.

This time, however, Defendants did not. Instead of abiding their trust duties and obligations under federal law to consult with the EBCI concerning the issues and concerns the EBCI raised with regards to Defendants' proposed final agency action (*see* Ex. B), Defendants

ran roughshod over the APA, NEPA, and the NHPA and took final agency action on March 12, 2020, without issuing a Final Environmental Assessment ("Final EA") or Finding of No Significant Impact ("FONSI"), in direction violation of the APA and NEPA.

Defendants' failure to abide by the routine procedural requirements in the APA, NEPA, and the NHPA come with profound consequences. If Defendants are not enjoined from taking further action on this final agency action, and if Defendant Acting Regional Director Glen Melville is permitted to take the Kings Mountain Site into trust for Catawba, "the land will fall under the sovereign governance of the Catawba Nation, and the EBCI THPO will lose the right to consultation on and protection of Cherokee religious and cultural sites." Townsend Decl., ¶ 21. The threat of this irreparable injury warrants the Court's immediate imposition of injunctive relief.

Defendants' actions are shocking since Defendants routinely comply with federal law and engage in good faith consultation with Tribal Nations concerning any potential final agency action Defendants are considering undertaking within a particular Tribal Nation's treaty territory. Here, however, Defendants issued the Draft Environmental Assessment ("Draft EA") on the land acquisition on December 19, 2019—prior to any invitation to the EBCI to consult in the process. The EBCI issued its formal comments on the Draft EA on January 22, 2020, *see* Ex. B., listing numerous significant concerns and highlighting serious deficiencies in the Draft EA. Ordinarily, Defendants would sincerely respond to concerns of this nature and engage in a good faith consultation process. *See* Townsend Decl., ¶ 12 ("Having worked with the BIA for many years on these issues, concerns such as those raised in the EBCI comments would trigger a process where the BIA would work with me, as the EBCI THPO, to conduct a cultural survey on the land at issue so we could determine whether religious or cultural items were present at the site."). That did not happen.

The reasons this did not happen are largely political—albeit unlawful. Defendants have faced enormous political pressure to find a way—no matter the legal barriers—to take land into trust for Catawba in North Carolina for gaming purposes. And while Defendant Assistant Secretary Sweeney's March 12 Decision achieves this political purpose, it does so in direct violation of governing federal law.

Defendants' rushed, flawed, outcome determinative process has resulted in a final agency action that violates the plain language of federal law. Congress—the branch of the federal government with exclusive authority over Indian affairs—has stated explicitly that "[t]he Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) shall not apply to the [Catawba] Tribe." The Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993 ("1993 Settlement Act"), Pub.L. No. 103–116, § 14, 107 Stat. 1118, 1136 (1993). Federal courts interpreting the plain language of the 1993 Settlement Act have concluded the words in the 1993 Settlement mean what they say they mean. *See TOMAC v. Norton*, 193 F. Supp. 2d 182, 194 n.8 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006). Defendants, therefore, are without the requisite statutory authority to exercise *any* discretion with regards to taking land into trust for Catawba for gaming purposes under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. *2701 et seq.*, unless or until Congress amends, replaces, or rescinds the 1993 Settlement Act.

This same federal law, the 1993 Settlement Act, also eliminated the BIA's authority to take land into trust for Catawba under the Indian Reorganization Act ("IRA"), Sec. 5, 25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465) which Defendants erroneously and arbitrarily rely on in the March 12 Decision.

Plaintiff, therefore, seeks judicial intervention to overturn the *ultra vires*, arbitrary, and capricious actions of Defendant U.S. Department of the Interior ("DOI"), Defendant U.S. Bureau

of Indian Affairs ("BIA"), Defendant DOI Secretary David Bernhardt, Defendant Assistant

Secretary for Indian Affairs Tara Sweeney, and Defendant Acting Regional Director R. Glen

Melville, and furthermore, to enjoin Defendants from engaging in further conduct contrary to

federal law, as well as Defendants' trust duties and obligations to the EBCI. The EBCI

challenges the March 12 Decision and seeks an order permanently enjoining Defendants from

transferring this parcel of land into trust status for Catawba, and, alternatively, ordering

Defendants to properly carry out procedural and substantive responsibilities that protect

Cherokee cultural resources and the environment.

## PARTIES

1.      Plaintiff the Eastern Band of Cherokee Indians is a federally-recognized Tribal

Nation with its headquarters located on the Qualla Boundary, the Eastern Band Cherokee

Reservation, at 88 Council House Loop, Cherokee, North Carolina, 28719

2.      Defendant Department of the Interior ("Interior" or "DOI") is a federal executive

department of the United States government, which was established by Congress and charged

with responsibility for managing and administering certain federal authorities and obligations

related to Indian Tribes.

3.      Defendant Bureau of Indian Affairs is an agency within the U.S. Department

of the Interior with delegated responsibilities for the administration and management of certain

federal authorities and obligations related to Indian Tribes.

4.      Defendant David Bernhardt is the Secretary of the United States Department of the

Interior, whose office is located at 1849 C Street, N.W., Washington D.C., 20240. In his capacity

as Secretary, Congress has authorized and delegated responsibilities in the 1993 Settlement Act

and other laws to carry out federal administration of tribal lands acquisition and programs. The

Secretary has delegated his authority to take lands into trust to the Assistant Secretary for Indian

Affairs by Part 209, Chapter 8 of the Departmental Manual. He is sued in his official capacity only.

5.      Defendant Tara Katuk Mac Lean Sweeney is the Assistant Secretary for Indian Affairs, whose office is located at 1849 C Street, N.W., Washington D.C., 20240. The Assistant Secretary has direct line authority over the Buruea of Indian Affairs ("BIA") Regional Offices, including the Eastern Region. She is sued in her official capacity only.

6.      Defendant R. Glen Melville is the Acting Regional Director for the Eastern Regional Office of the BIA, whose office is located at 545 Marriott Drive, Suite 700, Nashville, Tennessee, 37214. Director Melville oversees the transfer of title from fee simple to tribal trust and has been directed to "immediately" take the lands in North Carolina into trust upon completion of ministerial tasks. He is sued in his official capacity only

## JURISDICTION AND VENUE

7.      This Court has subject matter and personal jurisdiction over Plaintiff's claims as they present civil actions arising under the laws of the United States (28 U.S.C. § 1331), are brought by a federally recognized Indian Tribe wherein the matter in controversy arises under federal law (28 U.S.C. § 1362), and are premised upon legal wrongs committed by a federal agency under the APA, 5 U.S.C. §§ 702, 706. This case challenges the legality of Department decisions and actions based on the 1993 Settlement Act, IRA, NEPA, NHPA, and IGRA and the federal regulations implementing them.

8.      Venue is proper in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1391(b) and (e)(2) because the United States and federal officers acting in their official capacities and under color of legal authority are Defendants, and substantial parts of the events giving rise to these claims occurred in the District.

9.      The United States has waived its sovereign immunity from suit in 5 U.S.C. § 702.

10.     The March 12, 2020 Decision declares that it is a final agency action subject to judicial review under the APA, 5 U.S.C. § 704, *see* Ex. A, and in accordance with 40 C.F.R. § 1500.3, the NEPA claims involve actions that will result in irreparable injury to the EBCI.

## STATEMENT OF FACTS

### A. *EBCI and Its Treaty and Historical Territory*

11.     The EBCI is a federally-recognized Tribal Nation based in Cherokee, North Carolina.

12.     With about 15,000 tribal citizens, the EBCI is comprised of the descendants of Cherokees who resisted forced federal removal from the Cherokee territory by finding refuge in the Great Smoky Mountains, as well as Cherokees who made the walk on the Trail of Tears to the Indian Territory (now Oklahoma) then returned to their homeland in North Carolina.

13.     Before contact with non-Indians, the Cherokee lived in and governed the southeastern part of what is now the United States, in the states of North Carolina, South Carolina, Alabama, Georgia, Kentucky, Tennessee, and Virginia.

14.     Today, the Qualla Boundary is the home of the EBCI. Comprising about 57,000 acres land, the Qualla Boundary is held in trust by the federal government and is located next to the Great Smoky Mountains National Park.

15.     The EBCI has tenaciously fought to preserve its separate history, culture, language, and sovereignty. Because of this commitment, the EBCI continues to have fluent speakers of the Cherokee language, continues to collect plants in its territory—both on and off reservation—for food and medicine, and continues cultural practices that have existed since time immemorial.

16.     The EBCI also has fought to protect from disturbance Cherokee remains and items of cultural patrimony within Cherokee treaty and traditional lands.

17.     The EBCI, primarily through its Tribal Historical Preservation Officer ("THPO"), relies on NHPA and NEPA requirements to protect Cherokee patrimony within the Cherokee historical territory. The EBCI THPO consults with federal agencies, private organizations and companies, and individuals to ensure NHPA and NEPA compliance, reviewing between 2,500 and 5,000 cultural resource consultation requests per year. Townsend Decl., ¶ 6.

18.     Through the Cherokee Treaty of July 20, 1777, the Cherokees agreed to cede certain lands in present-day North Carolina to the Commissioners from the State of North Carolina. The 1777 Treaty cession area includes present-day Cleveland County, North Carolina.

19.     The 1884 Royce Map of Cherokee Land Sessions (Ex. G), which was relied upon by the federal Indian Claims Commission in adjudicating the EBCI's claims against the United States, also demonstrates that present-day Cleveland County is located within the Cherokee historical and treaty territory. *Eastern Band of Cherokee Indians v. United States*, 28 Ind. Cl. Comm. 386 (1972).

20.     Because Cleveland County is within the Cherokee historical and treaty territory, federal agencies, as a matter of course, contact the EBCI and the two other federally recognized Cherokee Tribes now based in Tahlequah, Oklahoma–the United Keetoowah Band of Cherokee Indians ("UKB"), and the Cherokee Nation—to protect Cherokee cultural resources.

21.     The EBCI continues to exercise cultural sovereignty over the Cleveland County area—which borders South Carolina—through cultural resource protection through the EBCI THPO. Townsend Decl., ¶ 4.

### B. Catawba Agrees to No Trust Lands or Gaming Outside of South Carolina

22.     After decades of protracted litigation between Catawba and the State of South Carolina concerning Catawba land claims, Congress passed the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993 ("1993 Settlement Act"), which (1) approved,

ratified, and confirmed the Settlement Agreement voluntarily entered into between Catawba and South Carolina; (2) authorized and directed the Secretary to implement the terms of such Settlement Agreement; (3) authorized certain actions and appropriations for implementing provisions of the Settlement Agreement and the 1993 Settlement Act; (4) removed the cloud in titles in the State of South Carolina resulting from Catawba's land claims; and (5) restored the trust relationship between Catawba and the United States. 1993 Settlement Act § 2.

23.     The 1993 Settlement Act incorporated the Agreement in Principle ("Settlement Agreement") (Ex. E) entered into between Catawba and the State of South Carolina, as well as the South Carolina's Catawba Indian Claims Settlement Act ("State Act"), both explicitly and by reference. The 1993 Settlement Act specifically affords the Settlement Agreement and the State Act treatment as federal law. 1993 Settlement Act § 4(a)(2) ("the Settlement Agreement and the State Act are approved, ratified, and confirmed by the United States to effectuate the purposes of this Act, and shall be complied with in the same manner and to the same extent as if they had been enacted into Federal law.").

24.     The 1993 Settlement Act was controversial at the time of its passage due to the restrictive nature of the Act, with BIA officials expressing concerns about limitations within the Act. The BIA Eastern Region Director testified that the Settlement Act:

> [D]iminishes the Department's authority and its ability to discharge its duty as
> trustee. The bill would relinquish much of the Secretary's authority to the State
> with regard to trust land transactions. It mandates the Secretary to seek the approval
> of State and local governments in administering its trust responsibilities to the
> tribes. . . The bill would also restore the federal relationship to the tribe, but would
> only partially reinstate the tribal status. It would subordinate the tribe to State,
> County, and city authority, while limiting tribal authority and jurisdiction.[1]

25.     Among other things, the 1993 Settlement Act affirmed the State Act and Settlement

---

[1] *Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993: Hearing on S. 1156 Before the Senate Comm. on Indian Affairs*, 103rd Cong. 341, at 269 (1993).

Agreement that restored the federal-Tribe relationship for purposes of eligibility for federal programs, created a Catawba-specific process for trust land acquisition and excluded the general IRA process, and specifically replaced the generally applicable tribal gaming statute—IGRA— with a Catawba "games of chance" law.[2]

26.     Nevertheless, Catawba indicated that they understood the restrictive nature of the 1993 Settlement Act and accepted the restrictions.[3] This sentiment was echoed by the attorney who represented Catawba in settlement negotiations, Don Miller, with the Native American Right Fund ("NARF"). Specifically, Miller stated that the "particular circumstances" of Catawba warranted Congressional approval:

> [T]he manner in which the parties' agreement divides and allocates the respective jurisdictional powers of the Tribe and State and Federal governments reflects the particular circumstances of the Catawba Tribe and its non-Indian neighbors. These allocations are . . . the wishes of the Catawba Tribe as expressed by an overwhelming vote of support for the settlement agreement.[4]

### C. State Act and Settlement Agreement Incorporated as Federal Law

27.     With the enactment of the 1993 Settlement Act, Congress "approved, ratified, and confirmed" the Settlement Agreement and the State Act. *Id.* § 4(a)(2). Further, the 1993 Settlement Act incorporates the Settlement Agreement and State Act into federal law, directing that they "shall be complied with in the same manner and to the same extent as if they had been enacted into Federal law." *Id.*

28.     Underscoring the importance of applying the State Act and Settlement Agreement in the same manner as if they had been enacted into Federal law, Congress repeated this point in Section 15 of the 1993 Settlement Act the sets forth "General Provisions":

---

[2] *Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993: Hearing on H.R. 2399 Before the Subcomm. on Native American Affairs*, 103rd Cong. 34, at 195 (1993).
[3] *Id.* at 211.
[4] *Id.* at 193.

Consistent with the provisions of section 4(a)(2), the provisions of South Carolina Code Annotated, section 27-16-40, and section 19.1 of the Settlement Agreement are approved, ratified, and confirmed by the United States, and shall be complied with in the same manner and to the same extent as if they had been enacted into Federal law.5

29.     Giving additional weight to federal incorporation of specific South Carolina law provisions, Congress explicitly acknowledged and validated the exclusion of IRA fee-to-trust authority in the Settlement Agreement and State Act. H.R. Rep. No. 103-257, at 20 (1993) ("The Committee substitute . . . incorporates by reference taxation provisions, *limitations on the applicability of the Indian Child Welfare Act and the Indian Reorganization Act contained in the Settlement Agreement and State Act*.") (emphasis added).

### D. The 1993 Settlement Act Eliminates the Applicability of Section 5 of the Indian Reorganization Act to Catawba Trust Land Acquisitions

30.     The 1993 Settlement Act limits Catawba land acquisitions to Reservation and Non-Reservation acquisitions and provides a process unique to Catawba for each of these acquisition types. 1993 Settlement Act §§ 12-13.

31.     For Reservation acquisitions, the Act makes clear that the BIA's "general land acquisition regulations" at 25 C.F.R. Part 151 do not apply to Catawba. 1993 Settlement Act § 12(m). And the 1993 Settlement Act extends this prohibition more broadly through its incorporation of, and reference to the Settlement Agreement. Specifically, the 1993 Settlement Act provides that "[i]f the Tribe so elects, it may organize under the Act of June 18, 1934 (25 U.S.C. 461 *et seq.*; commonly referred to as the 'Indian Reorganization Act' ("IRA")). The Tribe

---

5 1993 Settlement Act § 15(e) (affirming South Carolina Code Annotated, section 27-16-40 and Settlement Agree § 19.1, which authorize the application of South Carolina law, generally, to Catawba, its members, and any lands or natural resources owned by the Tribe, and any land or natural resources or property "held in trust by the United States" for the Tribe.).

shall be subject to such Act *except to the extent such sections are inconsistent with this Act*."
1993 Settlement Act § 9(a) (emphasis added).

32.    To determine what sections of the IRA are *inconsistent* with the 1993 Settlement Act,
Congress added guideposts in § 10 of the Settlement Act that direct back to the Settlement
Agreement and the State Act. Congress elaborated that "[a]ll matters involving tribal powers,
immunities, and jurisdiction, whether criminal, civil, or regulatory, shall be governed by the
terms and provisions of the Settlement Agreement and the State Act, unless otherwise provided
in this Act." 1993 Settlement Act § 10(1). More specific to the application of the IRA, Congress
determined that regardless of whether Catawba organizes under the IRA, Catawba is still
authorized to exercise authority only to the extent consistent with the Settlement Agreement and
the State Act. *See id.* at § 10(4).

33.    The Settlement Agreement leaves no ambiguity or discretion as to which provisions
of the IRA are consistent with the 1993 Settlement Act, authorizing Catawba to "organize under
the Indian Reorganization Act, 25 U.S.C. Sections 461 - 479, (IRA) and [to] adopt and apply to
the Tribe any of the following provisions to the extent they are consistent with this Agreement:
Sections 461, 466, 469, 470, 470a, 471, 472, 472a, 473, 475a, 476, 477, 478, 478a , and 478b."
Settlement Agreement § 9.1, Ex. E.

34.    Section 9.1 of the Settlement Agreement explicitly omitted the IRA provisions
applicable to Catawba is Section 5 of the IRA (formerly codified at 25 U.S.C. § 465), the general
fee-to-trust authority, in the Settlement Agreement's list of the IRA sections that *would* be
applicable to Catawba. Ex. E, § 9.1

35.    Applying Section 5 of the IRA, despite its omission from the list of applicable IRA
Provisions identified by Settlement Agreement § 9.1., is inconsistent with the 1993 Settlement
Act itself. Section 15 of the 1993 Settlement Act outlines General Provisions, and specifically

requires "the provisions of South Carolina Code Annotated, section 27-16-40, and section 19.1 of the Settlement Agreement . . . [to] be complied with in the same manner and to the same extent as if they had been enacted into Federal law." 1993 Settlement Act § 15(e). South Carolina Code Annotated, section 27-16-40 provides:

> The Catawba Tribe, its members, lands, natural resources, or other property owned by the Tribe or its members, *including land, natural resources, or other property held in trust by the United States or by any other person or entity for the Tribe, is subject to the civil, criminal, and regulatory jurisdiction of the State* [of South Carolina], its agencies, and political subdivisions other than municipalities, and the civil and criminal jurisdiction of the courts of the State to the same extent as any other person, citizen, or land in the State, except as otherwise expressly provided in this chapter or in the federal implementing legislation. S.C. Code Ann., section 27-16-40 (emphasis added).

Likewise, section 19.1 of the Settlement Agreement provides:

> Except as expressly otherwise provided in the implementing legislation, the Tribe and its members, any lands or natural resources owned by the Tribe, and any land or natural resources held in trust by the United States or by any other person or entity for the Tribe, shall be subject to the laws of the State and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land in the State. Settlement Agreement § 19.1 (emphasis added).

Ex. E, § 19.1. The State Act and the Settlement Agreement illustrate that Congress intended all lands held in trust by the United States for Catawba to come under the jurisdiction of South Carolina. Accordingly, the BIA is not authorized to operate beyond the terms provided in Sections 12 and 13 of the 1993 Settlement Act for the purpose of acquiring land in trust for Catawba. To acquire land under Section 5 of the IRA outside of South Carolina is entirely inconsistent with the 1993 Settlement Act § 15(e) that explicitly gives the full force and effect of federal law to the provisions of the State Act and Settlement Agreement which state any land or property held in trust by the United States for Catawba is to be under South Carolina jurisdiction.

### E.  Indian Gaming Regulatory Act Does Not Apply to Catawba

36.     In agreeing to the 1993 Settlement Act, State Act, and Settlement Agreement,

Catawba voluntarily relinquished any right to gaming under the IGRA. In the 1993 Settlement Act, § 14(a), Congress states in plain terms: "INAPPLICABILITY OF THE INDIAN GAMING REGULATORY ACT.—The Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) shall not apply to the [Catawba] Tribe." The Settlement Agreement at Section 16.1 mirrors the language of the federal statute: "Inapplicability of the Indian Gaming Regulatory Act. The Indian Gaming Regulatory Act, 25 U.S.C. Section 2701 et. seq., shall not apply to the [Catawba] Tribe."

37.     After establishing that the generally-applicable Indian gaming statute does not apply to Catawba, the 1993 Settlement Act—through incorporation of the State Act and Settlement Agreement—established the governance of South Carolina law over Catawba "games of chance," both "on and off reservation."

38.     The 1993 Settlement Act at Section 14(b) states:

> The Tribe shall have the rights and responsibilities set forth in the Settlement Agreement and the State Act with respect to the conduct of games of chance. Except as specifically set forth in the Settlement Agreement and the State Act, all laws, ordinances, and regulations of the State, and its political subdivisions, shall govern the regulation of gambling devices and the conduct of gambling or wagering by the Tribe on and off the Reservation.

39.     The Settlement Agreement also says South Carolina law applies to Catawba gambling:

> This Agreement, and the implementing legislation passed pursuant to this Agreement, and all laws, ordinances, and regulations of the State of South Carolina, and its political subdivisions, shall govern the regulation of gambling devices and the conduct of gambling or wagering by the Tribe on and off reservation . . . .

Ex. E, Settlement Agreement § 16.1.

40.     Finally, the State Act says that South Carolina law, not federal law, governs Catawba "games of chance": "[A]ll laws, ordinances, and regulations of the State, and its political subdivisions, shall govern the regulation of gambling devices and the conduct of gambling or wager by the Tribe on and off the Reservation." S.C. Code Ann. SECTION 27-16-110.

41.     Accordingly, any provisions typically afforded by IGRA do not extend to Catawba under any circumstances. That is, the 1993 Settlement Act does not provide the Secretary any discretion related to Catawba gaming decisions. Rather, any gaming by Catawba is dictated by South Carolina law. *See TOMAC v. Norton*, 193 F. Supp. 2d 182, 194 n.8 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006) ("When Congress intends to prohibit a tribe from gaming activity, it says so affirmatively. *See, e.g.,* Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub.L. No. 103–116, § 14, 107 Stat. 1118, 1136 (1993)."); *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998) ("The Catawba Indians . . . regained lands through legislative settlement[] in which they accepted general state jurisdiction over tribal lands. *See* 25 U.S.C. § 941b(e), m(c) . . . . The Catawba Indians' . . . settlement act[] specifically provide[s] for exclusive state control over gambling. *See id*. § 941l(a).").

### F.  *Catawba's Land Into Trust Application*

42.     No part of the Catawba Reservation is located outside of South Carolina.

43.     On August 30, 2013, Catawba submitted a mandatory trust application pursuant to the 1993 Settlement Act to the BIA demanding that the Department transfer 16.57 acres of original Cherokee aboriginal land in North Carolina, known as the "Kings Mountain Site," into trust for the purpose of constructing an off-reservation casino and mixed-use entertainment complex. *See* March 12, Decision 37, Ex. A.

44.     The sole reason Catawba, based in South Carolina, has indicated it wants to acquire land in North Carolina is to find a more accommodating legal environment to build a casino. EBCI Resolution, Ex. F.

45.     On March 23, 2018, the Deputy Secretary of the Interior denied the application,

concluding that the mandatory trust authority of the 1993 Settlement Act did not extend to areas located outside of South Carolina.

46.    On September 17, 2018, Catawba submitted a discretionary application pursuant to Section 5 of the Indian Reorganization Act, 25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465), and implementing regulations at 25 C.F.R. Part 151, requesting an off-reservation acquisition. Catawba also requested a determination on whether the Site is eligible for gaming. *Id.*

47.    On May 1, 2019, the EBCI—through Principal Chief Richard Sneed—provided testimony to the Senate Committee on Indian Affairs during a hearing on a bill introduced by South Carolina's U.S. Senator Lindsey Graham, which would address the 1993 Settlement Act's prohibition on the application of IGRA to Catawba and would explicitly authorize the BIA to take the Kings Mountain Site into trust for Catawba for the purpose of building a casino—thus applying Section 20 of IGRA, alone, to Catawba.

48.    Upon information and belief, Senator Graham and other elected and appointed officials supportive of the casino developer—former member of Graham's campaign finance committee Wallace Cheves—brought undue political influence on DOI and other federal officials in their quest to obtain BIA approval of a casino in North Carolina.

49.    In December 2019, the BIA published a Draft Environmental Assessment ("Draft EA") online on a non-governmental website (http://catawbanationclevelandcountyea.com) for the transfer of the Kings Mountain Site into federal trust status for Catawba for the purpose of building and operating a casino and entertainment complex. The Draft EA listed Catawba as Applicant, and the Department of the Interior, BIA, Eastern Region Office as Lead Agency. The EBCI was not among parties consulted prior to the Draft EA. The BIA also published Notices of

Availability for the EA in the *Charlotte Observer*, on December 22, 2019, *Gaston Gazette* on December 28, 2019, and *Shelby Star* on January 3, 2020.

50.     On December 23, 2019, EBCI Principal Chief Richard Sneed received an email from David Lambert with the BIA's Eastern Regional Office Natural Resources Department saying the Eastern Regional Office Natural Resources Department is "requesting your review and comments on this draft Environmental Assessment for the King's Mountain site."

51.     The Draft EA states that Catawba's casino development project will be a massive construction undertaking, including a casino and mixed-use entertainment complex totaling approximately 195,000 square feet (sf). The gaming area will consist of 75, 128 sf with approximately 1,796 electronic gaming machines and 54 table games. The facility will also include a 940-seat restaurant, a small retail space . . . , and 2,130 parking spaces.

52.     Although the Draft EA assessed the development of the Kings Mountain Site, it makes no mention of the Site being within historic Cherokee treaty or historic lands.

53.     Despite acknowledging that the EBCI would likely be interested in the Draft EA, the BIA did not attempt to invite the EBCI to consult on the project beyond offering public comments after the Draft EA was published. *See* Ex. C. At no point before the preparation of the Draft EA did the BIA extend an offer to consult, or attempt to engage in any consultation with the three federally-recognized Cherokee Tribes—the EBCI, the UKB, or the Cherokee Nation— as required by § 106 of the NHPA, which is incorporated into NEPA—to "make a reasonable and good faith effort to identify any Indian tribes . . . that might attach[] religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties." 36 C.F.R. § 800.3(f)(2).

54.     The BIA failed to make a good faith or reasonable effort to involve the EBCI as an interested Tribe under the NHPA.

55.     To date, the BIA has not published a Final EA, Finding of No Significant Impact ("FONSI"), Environmental Impact Statement ("EIS"), or a statement about why an EIS is not appropriate.

56.     On January 22, 2020, the EBCI submitted formal comments ("EBCI Comments") to the BIA Eastern Regional Office alerting the BIA to significant deficiencies in the Draft EA and requesting that the deficiencies be addressed through the preparation of an EIS. EBCI Comments 1, 6. Ex. B. The EBCI Comments specifically identified several deficiencies in the published Draft EA:

    a.   **The Draft EA fails to protect Cherokee cultural resources:** "Because the 16.57 acres . . . is located within the Cherokee aboriginal and historic territory, the Department of the Interior owes legal trust responsibilities to the EBCI to protect Cherokee lands, assets, and cultural resources . . . [A]ny attempt to consult with the EBCI, as required by § 106 of the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA), is noticeably absent from the EA." Ex. B, 1.

    b.   **The Draft EA fails to consider alternatives in South Carolina:** "Because the lands would encroach on Cherokee aboriginal and historical territory, and the Department lacks the requisite legal authority to take lands into trust in North Carolina for the Catawba . . . , the Department must fully assess whether alternative locations for Catawba land acquisitions in South Carolina would be more appropriate." Ex. B, 2.

    c.   **The Draft EA fails to properly assess impacts on biological resources:** "[W]etlands or waters of the U.S. on adjacent properties are disclosed in the Natural Resources Technical Memo. The EA does not discuss the potential for the

off-site improvements, including the stormwater detention basin, utility

extensions and roadway improvements to affect these resources." Ex. B, 2.

d.  "The EA does not disclose the details of the field survey for dwarf-flowered

heartleaf, including when it was conducted, who conducted the survey, and what

methods were used. A proper survey report should accompany the document." Ex.

B, 2.

e.  "A proper evaluation of potential impacts to migratory birds should consider trees

within 500 feet of both on and off-site construction activities. Mitigation such as

pre-construction surveys should be included to ensure avoidance." Ex. B, 2.

f.  **The Draft EA fails to disclose relevant consultation information:** "The EA

does not identify basic details regarding . . . consultation, including how they

were consulted and when they were consulted. Without this information, it is

unclear whether the document includes the relevant expertise and review of

applicable resource agencies with jurisdiction over the site." Ex. B, 3.

g.  **The Draft EA fails to assess the impacts of tin prospecting on the site:** "The

EA mentions throughout the document that tin prospecting occurred onsite but

fails to elaborate further on what activities took place and what impacts this may

have had on the site." Ex. B, 3.

h.  **The Draft EA includes unsubstantiated statements on land resources:** "For

example, the EA states . . . that the 'NPDES General Construction Permit

requirements would reduce any potential adverse impacts to less than significant.'

The EA does not explain what thresholds were considered, what impacts would

be reduced, or how the permit requirements would reduce these impacts." Ex. B,

3.

i.  **The air quality assessments in the Draft EA are insufficient:** "The EA does
    not analyze the construction or operational emissions that would result from the
    project . . . Air quality modeling should be conducted for both mobile and
    stationary emissions during construction and operation for criteria pollutants and
    disclosed within the document." Ex. B, 4.

j.  **The London & Associates Economic Impact Study is not provided:** "We
    request a copy of the Economic Impact Study prepared by London &
    Associates . . . The lack of inclusion of this document goes against the purposes of
    an open public review process under NEPA and its implementing regulations."
    Ex. B, 4.

k.  **The Hazardous Materials/Phase I and II assessments are out of date:** "The
    Phase I ESA was completed in 2013 and is considered out of date, particularly for
    a financial transaction which could represent a new liability to the federal
    government." Ex. B, 4.

l.  **The Draft EA does not address impacts to public services and utilities:** "The
    EA does not quantify impacts to law enforcement or fire protection agencies . . .
    the EA should quantify the additional number of staff and/or equipment that
    would be needed to provide service to the project while maintaining response
    times to existing homes and businesses." Ex. B, 4.

m.  "[T]he EA makes no consideration of the significant jurisdictional limitations the
    Catawba Indian Nation would have in North Carolina under the terms of the
    Catawba Indian Tribe of South Carolina land Claims Settlement Act of 1993." Ex.
    B, 5.

n.  **The Cumulative Impacts/Climate Change analysis is insufficient:** "The EA does not analyze the greenhouse gas emissions from construction or operations that would result from the project but makes an unsubstantiated conclusion that effects would be less than significant. Emissions modeling should be conducted to disclose the cumulative contribution of the project to greenhouse gas emissions." Ex. B, 5.

o.  **The analysis on indirect effects is insufficient:** "The EA concludes that off-site traffic mitigation and wastewater collection improvements would have no significant impacts. The EA provides no evidence for this finding such as biological or cultural survey reports which cover the full extent of these improvements." Ex. B, 5.

p.  "The EA mentions that an electrical substation would be developed near the project site but fails to identify the location or the potential impacts of this substation." Ex. B, 5.

q.  "The EA mentions that electrical and natural gas line extensions will be needed but fails to disclose their locations and connection points." Ex. B, 6.

r.  "The EA states that 'all stormwater would be retained on site' (pg. 29) however, Figure 9 of Appendix B shows a detention basin located west of the project site. Either the EA project description is incorrect, or the off-site basin has not been analyzed in the EA**.**" Ex. B, 6.

s.  **The Draft EA is improperly formatted:** "The document is not formatted in accordance with the standards of Section 508 of the Rehabilitation Act of 1973. For example, PDF bookmarks are missing, and many do not work." Ex. B, 6.

    t.   **The Department must require an environmental impact statement (EIS):**

        "An EA is insufficient to assess the impacts on the environment and impacted

        parties. As a result, the EBCI demands that the deficiencies in the document be

        addressed through the preparation of an Environmental Impact Statement (EIS)."

        Ex. B, 6.

57.     As the EBCI's Tribal Historic Preservation Officer ("THPO"), Mr. Russell

Townsend, noted: "I was surprised to learn of this Draft EA because the BIA would typically

consult with me and other Cherokee THPOs prior to the release of a draft EA for lands within the

Cherokee treaty and historical territory." Townsend Decl., ¶ 9.

58.     The fact that BIA did not reach out to the EBCI *prior* to drafting, creating, and

publishing the Draft EA was indeed surprising, since, as Mr. Townsend explained:

> As part of government-to-government consultation, the BIA consults with the
> EBCI THPO multiple times per week on various projects in the Cherokee
> traditional aboriginal territory. The BIA typically reaches out early to us in the
> process, so we can participate in the development of research design and scopes of
> work, not simply review completed documents.

Townsend Decl., ¶ 10.

59.     Mr. Townsend himself, as the EBCI's THPO, has identified numerous inconsistencies

and errors in the Draft EA. Specifically, he has noted that "contrary to the information in the

Draft EA, State of North Carolina site files show that there is evidence of an archeological

investigation on the Kings Mountain Site." Townsend Decl. ¶ 17.

60.     On January 31, 2020, Chet McGee, the Regional Environmental Scientist for the

BIA emailed EBCI's THPO, Mr. Townsend, to share the Draft EA that had previously been

published on a non-governmental website.

61.     The EBCI's THPO expected the BIA to engage in good faith consultation after

receiving the EBCI's January 22 Comments to address the issues raised therein. As Mr.

Townsend explains: "Having worked with the BIA for many years on these issues, concerns such

as those raised in the EBCI comments would trigger a process where the BIA would work with

me, as the EBCI THPO, to conduct a cultural survey on the land at issue so we could determine

whether religious or cultural items were present at the site." Townsend Decl., ¶ 12.

62.     Mr. McGhee's email on January 31, 2020 attached a letter from Acting Director,

Eastern Region, R. Glen Melville stating: "we would like to verify with your office that the

proposed project will not impact any specific sites having potential religious or cultural

significance to the Eastern Band of Cherokee Indians." Acting Director Melville's letter did not

address any of the significant impacts already communicated by the EBCI in the EBCI

Comments, or an expected time for a response. Ex. C.

63.     Notably, the January 30, 2020 letter from Acting Director Melville omitted the

specific statutes that govern land acquisition for Catawba. *See* Ex. C.

64.     The January 30, 2020 letter did not list NEPA, NHPA, or the 1993 Settlement Act,

nor did the letter mention any kind of "consultation." *See* Ex. C.

65.     The January 30, 2020 letter states that the North Carolina State Historic Preservation

Office reviewed the project and "was not aware of any historic resources in the area of the

project." However, the EBCI THPO was able to identify at least one archaeological site within

the project location recorded in the North Carolina State Archaeological Site Inventory that

should have triggered, at a minimum, an archaeological survey to determine the nature and

extent of the archaeological material on the site. Townsend Decl., ¶ 17.

66.     Mr. McGhee's January 31 email, attaching the January 30 letter from Acting Director

Melville, did not respond to, acknowledge, or address any of the concerns the EBCI raised in the

EBCI Comments. *See* Townsend Decl., ¶ 14 (noting that the letter itself, "did not respond to,

acknowledge, or address any of the concerns EBCI raised in the January 22 comments, and did not have a date for an expected response.").

67.     No one from the BIA ever informed anyone at the EBCI that Defendants were moving forward with *final agency action* and that Defendants would not, in this instance, work with the EBCI's THPO to conduct the cultural survey that ordinarily the parties would collaboratively undertake.

68.     Without the good faith consultation process guaranteed by the NHPA, the EBCI THPO is unable to determine whether this final agency action will destroy or harm Cherokee religious or cultural sites. *See* Townsend Decl. ¶ 17 ("This information should have triggered an archeological survey to determine the nature and extent of the archeological material on the site . . ."); *id.* ¶ 15 (informing Mr. Chet McGhee, of the BIA, that "Until we receive the data about the site, we cannot determine whether Cherokee religious or cultural sites exist at the site.").

### G.  The Department's March 12, 2020 Decision

69.     On March 12, 2020—ignoring the IRA and IGRA prohibitions and without engaging in proper tribal consultation and without publishing a Final EA, FONSI, or EIS—Defendant Tara Sweeney, Assistant Secretary for Indian Affairs, signed and issued a Decision permitting the transfer of the Kings Mountain Site into trust for Catawba and allowing the operation of tribal gaming, constituting a final agency action for purposes of judicial review. March 12 Decision, Ex. A.

### H.  The March 12 Decision Relies on Laws that Do Not Apply to Catawba

70.     The March 12 Decision flagrantly violates statutes that prohibit Catawba trust land acquisition and its gaming eligibility approval—namely, the 1993 Settlement Act, Section 5 of the IRA, and IGRA. But the Department also willfully violates NEPA and NHPA procedural requirements.

71.     The Assistant Secretary's Decision is foundationally flawed in four ways:

a.     The Decision interprets the 1993 Settlement Act as explicitly affirming the applicability of Section 5 of the Indian Reorganization Act to Catawba, and the Assistant Secretary's broad sweeping authority to apply Section 5 of the IRA to Catawba outside of South Carolina, including 25 C.F.R Part 151;

b.     The Decision interprets Catawba's restoration under the Indian Gaming Regulatory Act rather than by the limitations outlined in the 1993 Settlement Act;

c.     The Decision applies the Indian Gaming Regulatory Act and 25 C.F.R. Part 292 regulations to Catawba, despite the 1993 Settlement Act's explicit prohibition of any application of IGRA to Catawba;

d.     The Decision utilizes the March 10, 2020 *Carcieri* m-opinion to analyze Catawba's right to have land in trust for gaming purposes, effectively expanding the authority and rights of the Catawba in contradiction to Congress's clear language in the 1993 Settlement Act.

72.     The Assistant Secretary's March 12, 2020 Decision marks a radical departure from what Congress intended, and how this Court has consistently interpreted the 1993 Catawba Settlement Act. Indeed, the Decision reflects the first time the 1993 Catawba Settlement Act has been interpreted in a way other than prohibitive for Catawba's ability to take land into trust and engage in gaming. The 1993 Settlement Act does not support the Assistant Secretary's conclusion in her March 12 Decision that she has broad sweeping authority to take land into trust for Catawba outside of South Carolina. To support her assertion, the Assistant Secretary points only to the explicit terms within the 1993 Settlement Act, providing analysis in a vacuum that ignores Congress's call to treat the terms of the State Act and Settlement Agreement as federal law. The Assistant Secretary arbitrarily and erroneously draws parallels between the 1993

Settlement Act and the Connecticut Indian Land Claims Settlement Act and the Maine Indian

Claims Settlement Act. These separate acts of Congress, however, cannot be used to displace the

clear congressional intent behind the 1993 Settlement Act. Congressional intent concerning the

1993 Settlement Act is reflected in Committee hearings and reports on the measure, and that

intent establishes that the 1993 Settlement Act is unique and developed as a result of

complexities unique to Catawba and South Carolina.[6]

73.     Picking and choosing from the 1993 Settlement Act and Settlement Agreement,

the Assistant Secretary has issued a land into trust Decision that omits key, controlling

provisions, all for the sake of reaching a predetermined outcome. Specifically, the Assistant

Secretary asserts that "[t]hrough the Settlement Act, Congress broadly extended the benefits of

the IRA, including the land-acquisition provisions contained in Section 5 of the IRA to the

Nation," but omits that the Settlement Agreement specifically articulates the provisions of the

IRA that *do* apply to Catawba—provisions that do not include Section 5.

74.     The Assistant Secretary provides no analysis as to why IGRA and 25 C.F.R. Part 292

apply to Catawba's land into trust application when the 1993 Settlement Act broadly asserts that

"[t]he Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) shall not apply to the Tribe,"

(1993 Settlement Act § 14(a)).

75.     The Assistant Secretary provides no explanation about how Catawba has any

---

[6] H.R. Rep. No. 103-257, at 22 (1993) ("The Committee notes that this legislation creates an unprecedented jurisdictional scheme between the State of South Carolina and the Catawba Indian tribe which is unique in Federal Indian law. The Committee understands that the Catawba Tribe has compromised certain principles in an effort to reach this settlement. The Committee views the Catawba as a unique situation . . . . Other tribes should view this as a South Carolina-Catawba specific bill and not as a model that the Committee in any way recommends or endorses.").

rights outside of South Carolina when their restoration, through the 1993 Settlement Act, specifically limits any special jurisdiction Catawba might have otherwise had through its restoration to the terms specifically outlined by the 1993 Settlement Act and the State Act. 1993 Settlement Act § 4(e) ("This Act shall not be construed to empower the Tribe with special jurisdiction or to deprive the State of jurisdiction other than as expressly provided by this Act or by the State Act. The jurisdiction and governmental powers of the Tribe shall be solely those set forth in this Act and the State Act.").

76.     The Assistant Secretary's action to take land into trust in North Carolina for Catawba, and to authorize the acquisition for gaming purposes, is an unlawful, *ultra vires*, rushed attempt, unsupported by controlling law, and forecloses any opportunity for meaningful consultation with the EBCI where the EBCI can assert its opposition to the proposed acquisition, outline its legal support, and ultimately, protect its historical territory.

77.     In response, the EBCI now seeks a declaration from this Court that the Assistant Secretary's March 12 Decision is unlawful—that agency action is contrary to federal law and arbitrary and capricious.

78.     The EBCI also seeks injunctive relief. It requests that this Court permanently enjoin the BIA from taking the land into trust pursuant to the Assistant Secretary's March 12 Decision, and from imposing Section 5 of the IRA, 25 C.F.R. Part 151, IGRA and 25 C.F.R. Part 292 in conjunction with Catawba's current efforts to acquire land into trust in North Carolina for gaming purposes, and any future Catawba application for land into trust in North Carolina for any purpose.

### I.   *The March 12 Decision Does Not Comply With the Laws the BIA Applied to the Decision*

79.     In addition to the foundational flaws, the March 12 Decision falls far short of

complying with the APA, NEPA, and the NHPA.

    a.  The March 12 Decision does not include any mention of tribal consultation under § 106 of the NHPA.

    b.  The March 12 Decision does not consider at all the fact that the Kings Mountain Site is located within Cherokee aboriginal lands.

    c.  The March 12 Decision does not consider the EBCI, UKB, and the Cherokee Nation's significant cultural and historical ties to the Kings Mountain Site.

    d.  The March 12 Decision does not at all consider the EBCI's January 22, 2020 Comments alerting the BIA to substantial deficiencies in the Draft EA.

    e.  The March 12 Decision claims that a "final" EA was completed in March 2020, but the final EA has not been published or provided to the EBCI. At the time of the filing of this Complaint, the EA website still only contains the "draft" EA.

80.    Simply put, the Assistant Secretary's imposition of inapplicable laws and regulations to Catawba is contrary to law, arbitrary, capricious, and constitutes an abuse of discretion.

81.    The Assistant Secretary's issuance of a Decision before the Final Environmental Assessment and Finding of No Significant Impact have been published, and before any meaningful consultation with the EBCI has occurred, constitutes bad faith.

82.    On March 16, 2020, surprised that Defendants had moved forward with final agency action in issuing the March 12 Decision without responding to the issues raised in the EBCI's January 22 Comments, the EBCI's THPO, Mr. Townsend, sent a letter to Mr. McGhee at the BIA, noting that the EBCI has ongoing "concerns with the NEPA and Section 106 review and documentation for the King's Mountain Land-to-Trust Project." Ex. D.

83.    Mr. Townsend expressed the EBCI's concerns "that nowhere in the public NEPA

documentation is there mention of consultation including Tribal Nations with Traditional Territory or ceded lands at the project location." Ex. D. Mr. Townsend informed the BIA that the March 12 Decision "is concerning, because the EBCI submitted a letter with questions about the draft EA in January but has not received a response to date. Additionally, there has not been consultation for the 106 review." Ex. D.

84.     Mr. Townsend is particularly concerned that Defendants have arbitrarily abandoned their obligation to undertake an archeological survey at the Kings Mountain Site, *before* undertaking final agency action. As Mr. Townsend explained: "There appears to be no documentation supporting this, and according to our records there actually is an archaeological site recorded within the project location listed in the NC State Archaeological Site Inventory. Additionally, there is no evidence of an archaeological survey at this location in those records, and that should have triggered an archaeological survey be conducted to determine the nature and extent of the recorded archaeological site." Ex. D.

85.     Mr. Townsend noted that "[u]ntil we receive the data about the site, we cannot determine whether Cherokee religious or cultural sites exist at the site." Ex. D.

86.     Mr. Townsend concluded with: "In conclusion, the BIA has not made a reasonable or good faith effort to consult with the EBCI or other nations with traditional territory in Cleveland County as set forth by NHPA (Article 52 and 36 CFR 800). Additionally, the Section 106 review was not adequately addressed in the supporting documentation. Consultation with the Eastern Band and other Tribal Nations with an interest in the area should "commence early in the planning process, in order to identify and discuss relevant preservation issues" (800.2) and this did not occur." Ex. D.

87.     If injunctive relief is not imposed to maintain the status quo, the EBCI will be

irreparably harmed because the EBCI will have lost its sovereign right, as a Tribal Nation, to

engage in NHPA § 106 consultation concerning a major federal action within traditional

Cherokee homeland. *See* Townsend Decl. ¶ 21 ("If the Kings Mountain site is taken into trust for

the Catawba Nation, the land will fall under the sovereign governance of the Catawba Nation,

and the EBCI THPO will lose the right to consultation on and protection of Cherokee religious

and cultural sites.").

### CLAIMS FOR RELIEF

**COUNT I: Violation of the Administrative Procedure Act through *Ultra Vires* Conduct
Prohibited by Congress in the Catawba Indian Tribe of South Carolina Land Claims
Settlement Act of 1993, Specifically: Applying IRA § 5, 25 C.F.R. Part 151 to Catawba's
Request for Land Into Trust)**

88.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

89.     The BIA, as it relates to Catawba, may only exercise

authority in a manner consistent with the Catawba Indian Tribe of South Carolina Lands Claims

Settlement Act of 1993 ("1993 Settlement Act"). *See* 1993 Settlement Act § 4(a)(2)

("Restoration of the Federal Trust Relationship and Approval, Ratification, and Confirmation of

the Settlement Agreement.--On the effective date of this Act the Settlement Agreement and the

State Act are approved, ratified, and confirmed by the United States to effectuate the purposes of

this Act, and shall be complied with in the same manner and to the same extent as if they had

been enacted into Federal law.").

90.     The Catawba Indian Tribe of South Carolina land Claims Settlement Act of 1993

provides no authority to the Assistant Secretary of the Interior to take lands into trust for

Catawba in North Carolina, provides no authority to take lands into trust for Catawba pursuant to

Section 5 of the IRA.

91.     The Assistant Secretary's imposition of the IRA § 5 and 25 C.F.R. Part 151 to

Catawba's land into trust application affords the Assistant Secretary and the BIA authority that the terms of the 1993 Settlement Act prohibit. *See* 1993 Settlement Act § 12(m).

92.     The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdictions, authority, or limitations[.]" 5 U.S.C. § 706(2)(A)-(C). The Act further demands courts to "compel agency action [that is] unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

93.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a Declaratory judgment that the Assistant Secretary is without the statutory authority to use the IRA § 5, 25 C.F.R Part 151, to take land into trust in North Carolina for Catawba, and in doing so, has abused her discretion under the APA. Plaintiff is also entitled to a permanent injunction preventing the Assistant Secretary of the Interior and the BIA's Acting Regional Director for the Eastern Region from putting the North Carolina land into trust for Catawba.

**COUNT II: Violation of the Administrative Procedure Act through *Ultra Vires* Conduct Prohibited by Congress in the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Specifically: Applying IGRA and 25 C.F.R. Part 292 to Catawba's Request for Land Into Trust)**

94.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

95.     The BIA, as it relates to Catawba, may only exercise authority in a manner consistent with the Catawba Indian Tribe of South Carolina Lands Claims Settlement Act of 1993 ("1993 Settlement Act"). *See* 1993 Settlement Act § 4(a)(2) ("Restoration of the Federal Trust Relationship and Approval, Ratification, and Confirmation of the Settlement Agreement.--On the effective date of this Act the Settlement Agreement and the State Act are approved, ratified, and confirmed by the United States to effectuate the purposes of

31

this Act, and shall be complied with in the same manner and to the same extent as if they had been enacted into Federal law.").

96.     The Catawba Indian Tribe of South Carolina land Claims Settlement Act of 1993 provides no authority to the Assistant Secretary of the Interior to take lands into trust for Catawba in North Carolina, provides no authority to take lands into trust for Catawba pursuant to Section 5 of the IRA, and provides no authority to apply IGRA and the Part 292 regulations to Catawba.

97.     The Assistant Secretary's imposition of IGRA and the Part 292 regulations to Catawba's land into trust application affords the Assistant Secretary, and the BIA, authority that the terms of the 1993 Settlement Act prohibits. *See* 1993 Settlement Act § 14(a).

98.     Because the stated purpose of the Part 292 regulations which the agency used to qualify the Kings Mountain Site as "restored lands" is to promulgate regulations for the agency to determine applicable exceptions to IGRA's requirements, and the 1993 Memorandum of Cooperation between the State of South Carolina and Catawba Nation as well as the 1993 Settlement Act specifically state IGRA shall not apply to the Tribe as a condition of the Tribe's restoration as a Tribal Nation, it is arbitrary and capricious for the agency to consider the Tribe's claim to restored lands under 25 C.F.R. Part 292.

99.     In addition to constituting an arbitrary and capricious agency action because the 1993 Settlement Act expressly prohibits the agency action, the March 12 Decision fails to comport with the guidelines articulated for the four mandatory requirements for the Restored Lands Exception in § 292.7.

100.     The agency arbitrarily and capriciously found Catawba's request to acquire lands in

32

trust at the Kings Mountain Site met all criteria of the Restored Lands Exception. Specifically, the agency arbitrarily and capriciously found the Site met the criteria of restored lands in § 292.11 and necessarily, the requirements of § 292.12 regarding historical connection to the land.

101.    In support of its determination, the agency cites to Catawba's continuous use and occupancy of lands within the vicinity of the Site. Ex. A, 9.

102.    Section 292.12(b) defines "significant historical connection" in part as land located "within the boundaries of the tribe's last reservation under a ratified or unratified treaty." 25 C.F.R. § 292.12(b).

103.    The agency relies entirely on Catawba's Memorandum which states the Kings Mountain Site "*may* be located within the boundaries of the Nation's last reservation in North Carolina under the 1760 Treaty of Pine Hill" to satisfy the treaty provisions of 25 C.F.R. § 292.12(b). Ex. A, 9 n.46. (emphasis added). Furthermore, Catawba's claims to any historic or aboriginal territory is not permitted, as Catawba, in their 1993 Settlement Act, relinquished any and all claims to aboriginal title, rights and claims. 1993 Settlement Act § 6.

104.    The agency itself arbitrarily refers to the 1760 Treaty as "lost to history," and does not provide any other documentation to support Catawba's assertion of historical ties to Cherokee ancestral homeland. Ex. A, 9 n.46.

105.    Further, Defendants erroneously refer to the Kings Mountain Site as "*likely* within the Nation's last reservation in North Carolina" to constitute "further evidence" of a "significant historical connection. Ex. A, 9 n.46. This is insufficient to satisfy the regulatory requirements. As stated in the EBCI January 22 Comments, Catawba cannot demonstrate "significant historical connection" under the regulations in lands which are located in the historic territory of the EBCI and the Cherokee Nation. Ex. B.

106.    It is arbitrary and capricious for the agency to find that Catawba demonstrated

"*significant* historical connection" under 25 C.F.R. § 292.12(b) based on a treaty lost to history that no one can read, review, or substantiate.

107.     The EBCI, the UKB, and the Cherokee Nation assert more than simple "aboriginal ties" to the Site in question. The three Tribes have well-documented ties to the area in question, based upon a treaty.

108.     The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdictions, authority, or limitations[.]" 5 U.S.C. § 706(2)(A)-(C). The Act further demands courts to "compel agency action [that is] unlawfully withheld or unreasonably delayed." Id. § 706(1).

109.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Assistant Secretary is without the statutory authority to apply IGRA, and 25 C.F.R. Part 292, to Catawba's request that Defendants take land into trust on Catawba's behalf and authorize that trust acquisition for gaming purposes. In doing so, the Assistant Secretary has abused her discretion under the APA. Plaintiff is also entitled to a permanent injunction preventing the Assistant Secretary of the Interior and the BIA's Acting Regional Director for the Eastern Region from putting the North Carolina land into trust for gaming purposes for Catawba.

**COUNT III: Violation of the Administrative Procedures Act through Arbitrary and Capricious Action, Interpreting Ambiguity and Broad Authority in the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993 That Does Not Exist**

110.     Plaintiff incorporates by reference the allegations in the preceding paragraphs.

111.     The Assistant Secretary's decision to apply Section 5 of the IRA to Catawba is inconsistent with the terms of the 1993 Settlement Act, which requires "[a]ll properties[—not just South Carolina properties—]acquired by the Tribe [][to] be acquired subject to the terms and

conditions set forth in the *Settlement Agreement,*" (1993 Settlement Act § 12(f)) (emphasis added), which does not permit the application of Section 5 of the IRA to Catawba for the purpose of Catawba acquiring land in trust. *See* Settlement Agreement § 9.1. (outlining the sections of the IRA that are consistent with the terms of the Settlement, sections that do not include § 5.).

112.    The Assistant Secretary's March 12 Decision to take non-contiguous land into trust for Catawba pursuant to 25 C.F.R. Part 151 ignores the terms and conditions of the 1993 Settlement Act, which specifically prohibit the application of 25 C.F.R. Part 151, (1993 Settlement Act § 12(m)), for the purpose of taking non-contiguous tracts of land into "Reservation status" for Catawba. 1993 Settlement Act § 12(d).

113.    The Assistant Secretary's decision to apply IGRA and IGRA's implementing regulations, 25 C.F.R. Part 292, to justify approving Catawba's land acquisition for gaming purposes directly violates the 1993 Settlement Act, which specifically prohibits the application of IGRA to Catawba, generally. 1993 Settlement Act § 14(a) ("Inapplicability of Indian Gaming Regulatory Act.--The Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) shall not apply to the Tribe.").

114.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Assistant Secretary's imposition of  the IRA § 5, 25 C.F.R Part 151, IGRA, and 25 C.F.R. Part 292, for the purpose of taking land into trust in North Carolina for Catawba, and authorizing that trust acquisition for gaming purposes, is arbitrary and capricious. Plaintiff is also entitled to a permanent injunction preventing the Assistant Secretary of the Interior and the BIA's Acting Regional Director for the Eastern Region from putting the Kings Mountain Site into trust for Catawba.

## Count IV: Violation of the APA and the NHPA

115.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

116. The APA requires a court to set aside an agency's actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

117. The Defendants' failure to provide adequate notice and consult with the EBCI constitutes an arbitrary and capricious action that violates the NHPA and, as a result, the APA.

118. Section 106 of the NHPA, 56 U.S.C. § 306108, requires that agencies of the United States, "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property."

119. Prior to approval of a federal undertaking, the agency must: (a) identify the "historic properties" within the area of potential effects; (b) evaluate the potential effects that the undertaking may have on historic properties; and (c) resolve the adverse effects through the development of mitigation measures. 36 C.F.R. §§ 800.4; 800.5; 800.6.

120. The regulations implementing the NHPA recognize and honor the government-to-government relationship the United States maintains with Indian Nations, and consequently, in implementing the NHPA, the regulations establish a framework through which consulting with local Indian Nations is not optional, but instead, is mandatory.

121. Consultation with an Indian Tribe must recognize the government-to-government relationship between the Federal Government and the Tribe, and the consultation should be conducted in a manner "sensitive to the concerns and needs of the Indian Tribe . . ." 36 C.F.R. § 800.2(c)(2)(ii).

122. Consultation should provide the Tribe with "a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on

the undertaking's effects on such properties, and participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii)(A).

123.    Tribal consultation should be conducted concurrently with NEPA analyses, as historic and cultural resources are expressly included among the factors to be considered under NEPA's own requirements. 36 C.F.R. § 800.8.

124.    The regulations acknowledge that Indian Tribes have special expertise in identifying historic properties. See 36 C.F.R. § 800.4 (c)(1) ("The agency official shall acknowledge that Indian tribes . . . possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them.")

125.    In initiating the § 106 process, Defendants were required to make a "reasonable and good faith effort" to identify Indian Tribes who may attach "religious and cultural significance" to historic properties that may be affected by the proposed undertaking and invite them to participate as consulting parties in the § 106 process. 36 C.F.R. § 800.2(c)(2)(ii) (A)-(D); § 800.3(f)(2).

126.    Defendants were also required to consult with interested parties, including Indian Tribes, in the identification of potentially affected historic properties. To satisfy the requirement of reasonable, good faith efforts to determine potential adverse effects, Defendants were required to gather information from a variety of sources, including a review of "existing information on historic properties within the area of potential effects." 36 C.F.R. § 800.4(a)(2).

127.    Defendants were required to "[s]eek information" from "consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area and identify issues relating to the undertaking's potential effects on historic properties." 36 C.F.R. § 800.4(a)(3).

128.    In addition, the governing regulations required Defendants to "[g]ather information

from any Indian tribe . . . to assist in identifying properties, including those located off tribal

lands, which may be of religious and cultural significance to them . . . recognizing that an Indian

tribe . . . may be reluctant to divulge specific information regarding the location, nature, and

activities associated with such sites." 36 C.F.R. § 800.4(a)(4).

129.    Defendants' obligation to make a reasonable and good faith effort may include

"background research, consultation, oral history interviews, sample field investigation, and field

survey." 36 C.F.R. § 800.4(b)(1).

130.    Defendants must "take into account" "the nature and extent of potential effects on

historic properties, and the likely nature and location of historic properties within the area of

potential effects." 36 C.F.R. § 800.4(b)(1). The area of potential effects is defined as "the

geographic area or areas within which an undertaking may directly or indirectly cause alterations

in the character or use of historic properties." 36 C.F.R. § 800.16(d).

131.    The NHPA regulations also establish criteria for determining an adverse effect on a

historical site.

132.    An adverse effect is found when an undertaking may alter, directly or indirectly, any

of the characteristics of a historic property. Adverse effects may include reasonably foreseeable

effects caused by the undertaking that may occur later in time, be farther removed in distance or

be cumulative. 36 C.F.R. § 800.5(a)(1).

133.    After applying these and other considerations, if and when Defendants make a finding

of no adverse effect, Defendants are required to notify the consulting parties of that finding and

provide them with specific documentation sufficient to review the finding. 36 C.F.R. § 800.5(b)

and (c).

134.    Despite the aforementioned laws and governing regulations, Defendants did not make

reasonable efforts to consult with the EBCI in good faith during the environmental review process encompassing the historic preservation analysis.

135.    Defendants failed to consult with Plaintiff in good faith during the environmental review process, and as a result, Defendants' actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

136.    The only effort Defendants made to engage in consultation was the emailing of a single letter on January 30, 2020. Ex. C. Nothing in this letter indicated that the BIA had read, considered, or any way reviewed the concerns the EBCI raised in its official comments to the Draft EA, submitted on January 22, 2020. Ex. B.

137.    Following the January 30, 2020 letter, Defendants never called an elected leader, the THPO, or any employee at the EBCI or sent a representative to the tribal headquarters to follow up with a good faith attempt to consult.

138.    The mailing of one single letter does not, alone, satisfy Defendants' obligation to engage in good faith consultation, and thus Defendants' failure to engage in good faith consultation constitutes an arbitrary and capricious abuse of discretion, one that is not in accordance with law in violation of the APA.

139.    The EBCI reached out in good faith to voice its concerns about Defendants' EA and proposed land acquisition.

140.    Defendants acted arbitrarily and capriciously and with abuse of discretion by choosing not to consult with any of the impacted Tribal Nations regarding the land acquisition and choosing to ignore the EBCI's good faith attempt to consult.

141.    Defendants acted arbitrarily and capriciously and with abuse of discretion by issuing a Decision permitting the "immediate transfer" of aboriginal Cherokee lands into trust status for Catawba without ever publishing a Final EA, FONSI, or EIS.

142.     As a result, the ECBI never had a chance to exercise its sovereign right to protect Cherokee cultural patrimony and cultural resources, including potential burials, and now faces the imminent threat of losing access to its aboriginal territory forever.

143.     As a result of the allegations in this Complaint, Defendants have violated NHPA (56 U.S.C. § 306108) and the APA (5 U.S.C. § 706(2)(A)).

### Count V: Violation of the APA and the NEPA

144.      Plaintiff incorporates by reference the allegations in the preceding paragraphs.

145.     The APA requires a court to set aside an agency's actions if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

146.     NEPA's procedural requirements are triggered where a federal agency engages in a "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

147.     Pursuant to the Council on Environmental Quality's implementing regulations, federal agencies may comply with NEPA by preparing either an environmental impact statement ("EIS") or an environmental assessment ("EA").  40 C.F.R.  § 1501.4.

148.     An EA is a public document containing information relating to the need for the proposed action being considered, other alternatives, the environmental impact of the proposal and its alternatives, and a listing of agencies and persons consulted. 40 C.F.R. § 1508.9(b).

149.     Although an EA is less burdensome than an EIS, it still represents a meaningful analysis of the potential environmental impacts of a proposed action.

150.     If Defendants determined that an EIS is not necessary, NEPA and its

implementing regulations require Defendants to issue a "Finding of No Significant Impact." 40

C.F.R. § 1508.27. Defendants have failed to publish either a Final EA or a FONSI, despite taking

final agency action on March 12, 2020. *See* Ex. A.

151.    Defendants' Draft EA is fundamentally flawed for the reasons outlined in EBCI's

January 22 Comments, as well as the paragraphs above, in this Complaint.

152.    Defendants' Draft EA does not satisfy Defendants' obligations under NEPA because

the Draft EA lists no Tribes with whom Defendants consulted, in violation of 40 C.F.R. §

1508.9(b).

153.    Defendants' failure to consult with the EBCI in preparing the Draft EA is arbitrary,

capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

154.    Defendants' failure to publish a Final EA or a FONSI demonstrates their failure to

comply with the mandate that NEPA documentation present the public and the decision maker

with a "hard look" at the impacts of the federal action.

155.    NEPA and its implementing regulations require that federal agencies take a "hard

look" at environmental impacts of proposed projects and measures to mitigate these

environmental impacts. Agencies are required to develop, discuss in detail, and identify the

likely environmental consequences of proposed mitigation measures. 40 C.F.R. § 1508.25(b); 40

C.F.R. § 1502.14(f); 40 C.F.R. § 1502.16(h); 40 C.F.R. § 1505.2(c).

156.    Defendants issued a Draft EA that contained *no* alternative courses of action. The

omission of these alternatives from the Draft EA (there is no Final EA to speak of) failed to

comply with the mandate that NEPA analysis and documentation be based on a reasonable range

of alternatives. 42 U.S.C. §§4332(C)(iii) & (E).

157.    NEPA requires that agencies consider, evaluate and disclose to the public

"alternatives" to the proposed action and "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of resources." 42 U.S.C. §§ 4332(C)(iii), (E).  NEPA's implementing regulations require federal agencies to "rigorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. §1502.14. Additionally, the evaluation of alternatives must constitute a "substantial treatment," presenting the impacts of the alternatives in comparative form "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and public." *Id.*

158.    The "alternatives" section is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14.

159.    Defendants' decision to consider *no* alternatives in preparing their Draft EA is arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA.

160.    NEPA regulations require that a Finding of No Significant Impact be made "available to the affected public" and that the public and other affected agencies shall be involved in NEPA procedures. 40 C.F.R. §§ 1501.4(e)(1), 1506.6.

161.    Adequate notice requires a meaningful effort to provide information to the public affected by Defendants' actions. "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." 40 C.F.R. §§1500.1(b), 1506.6(b)(1) ("In all cases the agency shall mail notice to those who have requested it on an individual action."). NEPA implementing regulations additionally provide extensive public involvement requirements. *Id.* at §1506.6.

162.    Defendants' failure to publish either a Final EA or a FONSI establishes that Defendants have failed to provide adequate public notice.

163.    NEPA's regulations require Defendants to "send the FONSI notice . . . *to the*

*appropriate tribal,* local, State and Federal agencies . . . ." 24 C.F.R. § 58.43(a) (emphasis

added). Defendants have failed to do so.

164.    Defendants violated NEPA and its implementing regulations, acted arbitrarily and

capriciously, abused their discretion, failed to act in accordance with law and therefore violated

the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests:

1. The Court declare that Defendants violated the APA and the 1993 Settlement Act by applying Section 5 or the Indian Reorganization Act and accompanying regulations, as well as the Indian Gaming Regulatory Act and its accompanying regulations, when the 1993 Settlement Act states explicitly the BIA and Defendants are without the authority to do so;

2. The Court declare that Defendants violated the APA and NHPA §106 consultation process by failing to engage in good faith consultation with the EBCI and that these actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A);

3. The Court declare that Defendants violated the APA and NEPA and its implementing regulations by failing to consult with the EBCI, failing to consider reasonable alternatives, and failing to provide complete and publish a Final EA and FONSI prior to taking final agency action, and that these actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law in violation of the APA, 5 U.S.C. § 706(2)(A);

4. The Court issue a Preliminary Injunction enjoining Defendant United States Department of the Interior, Defendant United States Bureau of Indian Affairs, Defendant DOI Secretary David Bernhardt, Defendant Assistant Secretary for Indian Affairs Tara Sweeney, and Defendant Acting BIA Eastern Regional Office Director R. Glen Melville from taking 16.57 acres of land into trust at the King Mountain Site, in Cleveland County, North Carolina, for the benefit of Catawba, a Tribe headquartered in South Carolina;

5. The Defendants, their agents and employees, be ordered to initiate and conduct good faith consultation with the EBCI;

6. The Defendants be ordered to complete an Environmental Impact Statement;

7.  The Defendants be assessed the costs of this action;

8. That attorneys' fees be awarded to Plaintiff as authorized under 54 U.S.C. § 307105 for claims brought under the NHPA through the APA; and

9. The Plaintiff have such other and further relief as the Court deems just.

Respectfully submitted this 17th day of March, 2020.

By: /s/ Mary Kathryn Nagle

Wilson Pipestem (OBA No. 16877)
Mary Kathryn Nagle (OBA No. 33712)
Abi Fain (OBA No. 31370)
Pipestem Law, P.C.
320 S. Boston Ave., Suite 1705
Tulsa, OK 74103
918-936-4705 (Office)
wkpipestem@pipestemlaw.com
mknagle@pipestemlaw.com
afain@pipestemlaw.com

*Attorneys for Plaintiff Eastern Band of Cherokee Indians*

## CERTIFICATE OF SERVICE

I, Mary Kathryn Nagle, certify that a true and correct copy of the above and foregoing was served this 17th day of March, 2020, via U.S.P.S. certified mail, to the following:

UNITED STATES DEPARTMENT OF THE INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240

UNITED STATES BUREAU OF INDIAN AFFAIRS
1849 C Street, N.W.
Washington, D.C. 20240

DAVID BERNHARDT
Secretary of the U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

TARA KATUK MAC LEAN SWEENEY
Assistant Secretary for Indian Affairs
1849 C Street, N.W.
Washington, D.C. 20240

R. GLEN MELVILLE
Acting Regional Director
BIA Eastern Regional Office
545 Marriott Drive Suite 700
Nashville, TN 37214

WILLIAM BARR
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

CIVIL PROCESS CLERK
United States Attorney's Office, District of Columbia
555 Fourth Street, N.W.,
Washington, D.C. 20530.

By: /s/ Mary Kathryn Nagle
Mary Kathryn Nagle