## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EASTERN BAND OF CHEROKEE INDIANS    )
88 Council House Loop               )
Cherokee, NC 28719                  )
                                    )
Plaintiff,                          )
                                    )
vs.                                 )    Civil Action No. 1:20-cv-00757
                                    )
UNITED STATES DEPARTMENT OF THE INTERIOR  )
1849 C Street, N.W.                 )
Washington, D.C. 20240,             )
                                    )
UNITED STATES BUREAU OF INDIAN AFFAIRS    )
1849 C Street, N.W.                 )
Washington, D.C. 20240,             )
                                    )
DAVID BERNHARDT, in his official capacity as  )
Secretary of the United States Department of the Interior  )
1849 C Street, N.W.                 )
Washington, D.C. 20240,             )
                                    )
TARA KATUK MAC LEAN SWEENEY, in her official  )
capacity as Assistant Secretary for Indian Affairs  )
1849 C Street, N.W.                 )
Washington, D.C. 20240, and         )
                                    )
R. GLEN MELVILLE, in his official capacity as Acting  )
Regional Director for the Bureau of Indian Affairs Eastern  )
Regional Office                     )
545 Marriott Drive Suite 700        )
Nashville, TN 37214,                )
                                    )
Defendants.                         )

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff, the Eastern Band of Cherokee Indians ("EBCI"), under Federal Rule of Civil

Procedure 65(a)-(b), respectfully asks this Court to enter a temporary restraining order ("TRO")

enjoining the Defendant United States Department of the Interior ("DOI"), Defendant United States Bureau of Indian Affairs ("BIA"), Defendant DOI Secretary David Bernhardt, Defendant Assistant Secretary for Indian Affairs Tara Sweeney, and Defendant Acting BIA Eastern Regional Office Director R. Glen Melville from taking 16.57 acres of land into trust at the Kings Mountain Site, in Cleveland County, North Carolina, for the benefit of the Catawba Indian Nation ("Catawba"), a Tribe headquartered in South Carolina.

Plaintiff requests this TRO to preserve the status quo and prevent irreparable harm until a full and complete hearing on Plaintiff's motion for preliminary injunction can be held. On March 12, 2020, Defendant Assistant Secretary Sweeney signed her Decision instructing Defendant Regional Office Director Melville to "immediately acquire the land into trust" for Catawba. Eastern Band of Cherokee Indians' Complaint, dated March 12, 2020 ("Compl."), Ex. A. "This decision constitutes a final agency action under 5 U.S.C. § 704." *Id.*

An injunction is necessary and appropriate to enjoin Defendants from immediately acquiring this land into trust because the Kings Mountain Site is located within aboriginal Cherokee territory, and as a result, implicates the EBCI's rights, as a sovereign Tribal Nation under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"), the National Environmental Protection Act, 42 U.S.C. § 4321 *et seq.* ("NEPA"), and the National Historic Preservation Act, 54 U.S.C. § 300101 *et seq.* ("NHPA"), to protect and preserve Cherokee cultural sites, patrimony, and resources. Defendant BIA has taken final agency action and intends for Defendant Regional Office Director Melville to take these 16.57 acres of land into trust for a Tribe located in South Carolina "immediately"—without any regard for the federal law that requires Defendants to engage in good faith consultation with the EBCI regarding its ancestral ties to the lands at issue in this action.

2

Plaintiff will more than likely succeed on the merits of Plaintiff's claims because Defendant Assistant Secretary Sweeney issued the March 12 Decision, constituting "final agency action," without completing the environmental, historical, and cultural review processes mandated by the APA, NEPA, and NHPA. To date, the final Environmental Assessment has *not* been published—and it certainly has not been shared with the EBCI, as required by federal law. Nor has a Finding of No Significant Impact ("FONSI") been issued. Without a legitimate FONSI, federal law precludes Defendants from circumventing the NEPA's requirement that Defendants undertake the creation of an Environmental Impact Statement ("EIS"). Although Defendants seek to "immediately" take the final action of transferring this land in Cherokee aboriginal territory into trust for another Tribe, federal law clearly precludes them from doing so. Plaintiff will more than likely succeed on the merits of Plaintiff's claims.

Temporary injunctive relief is necessary to prevent irreparable harm. Once the agency completes its final agency action and transfers this land into trust for a separate Tribal Nation, the federal laws that previously protected the EBCI's sovereign right to preserve and repatriate cultural patrimony and/or human remains found on these 16.57 acres will be completely lost. For instance, the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 *et seq*., protects the rights of Tribal Nations to repatriate the human remains of their ancestors when found on state or local county or municipal lands. This law, however, does not apply to the lands of a separate sovereign Tribal Nation. As soon as the BIA transfers these 16.57 acres of land into trust for a separate Tribal Nation, the EBCI will lose all the rights the EBCI currently maintains under the NAGPRA, as well as the NHPA, to protect and preserve cultural patrimony located at the Kings Mountain Site. The loss of a sovereign's right to engage in consultation concerning the proper procedures to protect cultural patrimony and resources

located within a Tribal Nation's ancestral territory constitutes an irreparable harm that cannot be undone.

Immediate injunctive relief is likewise in the public interest as numerous courts have concluded that requiring federal agencies to abide the procedural requirements in the APA, NEPA, and NHPA necessarily serve the public interest. Finally, injunctive relief will not impose significant hardship on Defendants. Enjoining Defendants from taking this land into trust, at this time, and requiring Defendants to fulfill their trust duties and obligations under federal law is no hardship at all; it is the law.

This motion is supported by the Plaintiff's Complaint and accompanying exhibits, as well as the Declaration of Russ Townsend, acting Tribal Historic Preservation Officer for the EBCI. Plaintiff also relies upon its Statement of Points and Authorities in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, filed contemporaneously herewith.

The undersigned counsel hereby certifies that Partner of Pipestem Law, Wilson Pipestem, provided notice of this Motion for Temporary Restraining Order to counsel for Defendants by calling with Kyle Scherer, Acting Principal Deputy Assistant Secretary for the Department of Interior, by telephone at the following telephone number (202) 208-7163 at 4:52pm on March 17, 2020. Plaintiff's counsel received no answer and left a voicemail. Mr. Pipestem also provided notice by phone conversation to Annette Tarnawsky, Attorney-Advisor at the Department of the Interior Office of the Solicitor in Knoxville, Tennessee. A copy of this motion and the accompanying documents have been emailed to:

kyle.scherer@bia.gov

Plaintiff further moves for a waiver of security required under Fed. R. Civ. P. 65(c), or for a nominal security, on the grounds that Defendants will suffer no significant harm by being restrained from immediately taking the Kings Mountain Site into trust for Catawba.

*        *        *

WHEREFORE, Plaintiff requests that this Court:

1. Issue a temporary restraining order enjoining Defendant United States Department of the Interior, Defendant United States Bureau of Indian Affairs, Defendant DOI Secretary David Bernhardt, Defendant Assistant Secretary for Indian Affairs Tara Sweeney, and Defendant Acting BIA Eastern Regional Office Director R. Glen Melville from taking 16.57 acres of land into trust at the Kings Mountain Site, in Cleveland County, North Carolina, for the benefit of Catawba, a Tribe headquartered in South Carolina;

2. Issue the temporary restraining order without hearing on Monday, March 17, 2020, or as soon thereafter as possible;

3. Set specific date and time, by agreement of the parties or by order of the Court, for a full and complete hearing on Plaintiff's Motion for Preliminary Injunction after allowing a sufficient period of time to conduct discovery;

4. Issue a Preliminary Injunction enjoining Defendant United States Department of the Interior, Defendant United States Bureau of Indian Affairs, Defendant DOI Secretary David Bernhardt, Defendant Assistant Secretary for Indian Affairs Tara Sweeney, and Defendant Acting BIA Eastern Regional Office Director R. Glen Melville from taking 16.57 acres of land into trust at the Kings Mountain Site, in Cleveland County, North Carolina, for the benefit of Catawba, a Tribe headquartered in South Carolina; and

5. Grant Plaintiff's attorneys' fees and any such further relief as the Court deems just and proper.

Dated this 17th day of March, 2020.

By: /s/ Mary Kathryn Nagle
Mary Kathryn Nagle, D.C. Bar No. 1033507
Wilson Pipestem, D.C. Bar No. 456312
Abi Fain, OBA No. 31370
Pipestem Law, P.C.
320 S. Boston Ave., Suite 1705
Tulsa, OK 74103
918-936-4705 (Office)

mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com

*Attorneys for Plaintiff Eastern Band of*
*Cherokee Indians*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| EASTERN BAND OF CHEROKEE INDIANS | ) | |
| 88 Council House Loop | ) | |
| Cherokee, NC 28719 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:20-cv-757 |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, D.C. 20240, | ) | |
| | ) | |
| UNITED STATES BUREAU OF INDIAN AFFAIRS | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, D.C. 20240, | ) | |
| | ) | |
| DAVID BERNHARDT, in his official capacity as | ) | |
| Secretary of the United States Department of the Interior | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, D.C. 20240, | ) | |
| | ) | |
| TARA KATUK MAC LEAN SWEENEY, in her official | ) | |
| capacity as Assistant Secretary for Indian Affairs | ) | |
| 1849 C Street, N.W. | ) | |
| Washington, D.C. 20240, and | ) | |
| | ) | |
| R. GLEN MELVILLE, in his official capacity as Acting | ) | |
| Regional Director for the Bureau of Indian Affairs Eastern | ) | |
| Regional Office | ) | |
| 545 Marriott Drive Suite 700 | ) | |
| Nashville, TN 37214, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Plaintiff Eastern Band of Cherokee Indians ("EBCI"), under Federal Rule of Civil Procedure 65(a)-(b), respectfully asks this Court to enter a temporary restraining order ("TRO") enjoining the Defendant U.S. Department of the Interior ("DOI"), Defendant U.S. Bureau of Indian Affairs ("BIA"), Defendant DOI Secretary David Bernhardt, Defendant Assistant Secretary for Indian Affairs Tara Sweeney, and Defendant Acting BIA Eastern Regional Office Director R. Glen Melville from taking 16.57 acres of land into trust at the Kings Mountain Site, in Cleveland County, North Carolina, for the benefit of the Catawba Indian Nation ("Catawba"), a Tribe headquartered in South Carolina, until this Court is able to hold a hearing and rule on Plaintiff's Motion for Preliminary Injunction.

Plaintiff requests this TRO to preserve the status quo and prevent irreparable harm until a full and complete hearing on whether a preliminary and/or permanent injunction should issue preventing Defendants from taking this parcel of land into trust.

Lacking a final, published Environmental Assessment ("Final EA") and Finding of No Significant Impact ("FONSI") required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., before commencing with a "major federal action,"[1] on Thursday, March 12, 2020, Defendant Assistant Secretary Sweeney signed her Decision ("March 12 Decision") instructing Defendant Acting Regional Director Melville to "immediately acquire the land into trust" for Catawba for gaming purposes, in flagrant violation of the text of the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993 ("1993 Settlement Act"), Pub.L. No. 103–116, 107 Stat. 1118, 1136 (1993). *See* Eastern Band of Cherokee Indians Complaint, March 16, 2020 ("Compl."), Ex. A. Not only does the March 12 Decision—a final agency action

---

[1] 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.18(a).

for purposes of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706—violate the explicit terms of the 1993 Settlement Act, it flouts the procedural protections of both the NEPA and the National Historic Preservation Act ("NHPA"), 54 U.S.C. § 306108, and threatens irreparable harm to the EBCI because the Kings Mountain Site is located squarely within the treaty and historical territory of the EBCI. Thus, this final agency action, which demands immediacy, runs a significant risk of jeopardizing Cherokee cultural patrimony and resources. Defendants should be enjoined from carrying out Assistant Secretary Sweeney's order in the March 12 Decision that the Kings Mountain Site be taken into trust "immediately."

Federal law protects and preserves the cultural patrimony and resources of federally recognized Tribes, such as the EBCI. In this instance, however, Defendants have blatantly failed to abide by the normal and routine procedures outlined in the APA, NEPA, and NHPA that require Defendants to make a reasonable and good faith effort to identify any Indian Tribes that might attach religious and cultural significance to a historic property in the area that may be affected by the undertaking and invite them to be consulting parties. Furthermore, Defendants are required to engage in good faith consultation with the EBCI prior to taking any final agency action with regards to lands where the EBCI maintains historical ties. The EBCI specifically raised its concerns directly with Defendants in comments formally submitted to Defendant BIA on January 22, 2020, concerning the agency's draft Environmental Assessment ("Draft EA"). *See* Compl., Ex. B. Instead of considering these comments and consulting with the EBCI, Defendants have pushed through a final agency decision on the matter without even completing or publishing a Final EA or a FONSI. This not only violates federal law, it infringes upon the EBCI's inherent right, as a sovereign Tribal Nation, to be consulted with regards to cultural concerns within the borders of the EBCI's treaty and historical territory.

The EBCI's claim for injunctive relief, therefore, more than satisfies the requisite elements. *See Whitaker v. Thompson*, 248 F. Supp. 2d 1, 7-8 (D.C. Cir. 2002) (to qualify for injunctive relief the plaintiff must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) that the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and third parties; and (4) that granting the preliminary injunction would be in the public interest.").

In addition to violating the EBCI's right to engage in good faith consultation as a sovereign Tribal Nation under the APA, NEPA, and NHPA, Defendants' March 12 Decision constitutes an arbitrary and capricious agency action that plainly violates federal law, specifically the 1993 Settlement Act. That Act eliminated the BIA's authority to take land into trust for Catawba under the Indian Reorganization Act ("IRA"), Sec. 5, 25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465), and the Act further prohibits the application of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, to Catawba. As a federal agency—or employees thereof—Defendants do not have the constitutional authority or power to circumvent Congress' clear direction in the 1993 Settlement Act. On its face, the final agency action undertaken by Defendants runs contrary to federal law, and accordingly, Plaintiff's claims in the Complaint—when taken as a whole—present an overwhelming likelihood of success on the merits.

Without question, Defendants' unlawful acts threaten irreparable harm. The EBCI's claim to the Kings Mountain Site is not based on a "treaty lost to history" Ex. A, 9 n.46, but rather, is a claim grounded in a well-documented, legitimate treaty, the Cherokee Treaty of July 20, 1777. Without this Treaty—signed by the U.S. President and ratified by the Senate—the

State of South Carolina could not exist. And although the EBCI no longer exerts jurisdiction over the Kings Mountain Site, federal law—specifically the NHPA—dictates that if a federal agency is considering taking any "major federal action" with regards to this site, the EBCI must be consulted in *good faith*. Once Acting Regional Director Melville acts to take this land into trust, however, the EBCI will have, irreversibly, lost this right to consult. If injunctive relief is not immediately entered, the EBCI will lose its right as a sovereign Tribal Nation to conduct an archeological survey to ensure that Cherokee cultural patrimony and resources are not harmed in construction of Catawba's casino. Although federal laws like the NHPA and the Native American Graves Protection and Repatriation Act ("NAGPRA"), 25 U.S.C. § 3001 *et seq*., protect the EBCI's right to protect the remains and cultural patrimony of the Tribe's ancestors— once that land is transferred into trust, the EBCI will have no recourse no matter what remains or cultural resources are discovered or disturbed at the Kings Mountain Site. This threat of irreparable harm necessitates the imposition of immediate injunctive relief.

For reasons described in greater detail below, this Court must grant the EBCI's request for immediate injunctive relief until a decision can be made on the EBCI's motion for a full preliminary injunction pending the outcome of this litigation.

## II.   ARGUMENT

### a.   Plaintiff Has Demonstrated a Substantial Likelihood of Success on the Merits

Defendants' failure to comply with the plain language of both the NHPA and the NEPA render this Court's granting of Plaintiff's motion for a temporary restraining order both necessary and appropriate. The NEPA requires the agency to "take a 'hard look' at the environmental consequences before taking a major action," *Baltimore Gas & Electric Co. v. NRC*, 462 U.S. 87, 97–98 (1983) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21

(1976)), as the "judiciary must see that this legal duty is fulfilled." *Foundation for Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985). Thus, although the "agency commencing federal action has the initial and primary responsibility for ascertaining whether an EIS is required," *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002 (D.C. Cir. 1979), the "courts must determine that this decision accords with traditional norms of reasoned decisionmaking, and that the agency has taken the 'hard look' required by NEPA." *Foundation on Economic Trends*, 756 F.2d at 151. Here, Defendants have not only failed to take a "hard look," but rather, have hardly taken a look at all.

Here, Defendants took final agency action *without publishing a Final EA or a FONSI*. This is patently violative of federal law, and requires the provision of immediate injunctive relief before Defendants take any further unlawful action. *See* 40 C.F.R. §§ 1501.3, 1501.4(a)-(c), 1508.9 (under the Council on Environmental Quality ("CEQ") regulations, where an agency declines to prepare a full-fledged EIS, it must at least prepare an EA along with a Finding of No Significant Impact, explaining its reasons for not issuing an EIS). Defendants cannot avoid undertaking an EIS where they have failed to publish a Final EA detailing *why* an EIS is not necessary.

In addition to explaining why an EIS is or is not required, the Final EA, currently missing in this case, also serves other fundamental functions under the NEPA. Under governing CEQ regulations, the EA must include at least some "discussion[] of the need for the proposal, of alternatives as required by section 102(2)(E)[of the NEPA], of the environmental impacts of the proposed action, and alternatives …." 40 C.F.R. § 1508.9. Importantly, the agency's obligation to address these matters in an EA is "independent of the question of environmental impact statements, and operative even if the agency finds no impact … For nonsignificant impact does

6

not equal no impact; so if an even less harmful alternative is feasible, it ought to be considered." *River Road Alliance, Inc. v. Corps of Engineers*, 764 F.2d 445, 452 (7th Cir. 1985). Defendant BIA's failure to complete and publish a Final EA and FONSI prior to taking agency action, therefore, renders the BIA's final agency action unlawful for failing to undertake the alternatives analysis and consideration that the NEPA mandates.

Plaintiff, therefore, is also likely to succeed on its claim under the NEPA that Defendants failed to consider any alternatives to taking land into trust within the treaty and historical territory of the EBCI. *See Coalition on Sensible Transportation, Inc. v. Dole*, 642 F. Supp. 573, 593 (D.D.C. 1986), *aff'd*, 826 F.2d 60 (D.C. Cir. 1987) (concluding that the NEPA requires an agency to take a "hard look at the alternatives and explain[] its reasons for rejecting them"). Here, Defendants have not published a Final EA discussing and/or dismissing alternatives. This alone constitutes harm since as soon as "the decision has been made without meaningful consideration of a reasonable alternative, the harm envisioned by NEPA has been done." *Dine Citizens Against Ruining Our Environment v. Klein*, 747 F. Supp. 2d 1234, 1256 (D. Colo. 2010).

Defendants have further violated the NEPA by failing to provide adequate notice, or *any* notice, of their "Finding of No Significant Impact" or "FONSI."  Under federal law, "[m]ere publication of the FONSI is not [] sufficient." *Id.* at 1261. Here, Defendants have not only failed to publish their FONSI—they have not even completed it. Because the statute is procedural in nature, federal courts "will set aside agency actions that are adopted 'without observance of procedure required by law.'" *Natural Res. Def. Council v. U.S. Forest Serv*., 421 F.3d 797, 810 n.27 (9th Cir. 2005) (quoting 5 U.S.C. § 706(2)(D)).

Moreover, Plaintiff will likely succeed on its claim that Defendants violated the NHPA since the law requires Defendants to make a "reasonable and good faith effort" to identify Indian Tribes who may attach "religious and cultural significance" to properties that may be affected by the proposed undertaking and invite them to participate as consulting parties in the Section 106 process, under the clear language of the governing regulations. 36 C.F.R. § 800.3(f)(2). The NHPA's implementing regulations explicitly place a duty and responsibility on the federal agency, stating that "[i]t is the responsibility of the agency official to make a reasonable and good faith effort to identify Indian tribes and Native Hawaiian organizations that shall be consulted in the section 106 process. Consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues." 36 C.F.R. § 800.2(c)(2)(ii)(A).

Here, consultation did not commence early in the planning process. In fact, meaningful consultation did not occur at all. As the March 12 Decision articulates, "[t]he BIA made the EA available for state and local governments, resource agencies, and public review on December 22, 2019, for a comment period ending on January 22, 2020." Ex. A, 31. The BIA, however, did not consult with the EBCI at all while conducting the EA, and the March 12 Decision completely fails to consider the BIA's duty to consult with Indian Tribes. The consultation process was completely bypassed, and the BIA has gone straight from receiving comments from Tribal Nations, such as the EBCI, to its *final* agency action—attempting to circumvent the part of the process where the BIA must engage in good faith consultation with Tribal Nations to address the deficiencies and issues in the Draft EA.

As the EBCI's Tribal Historic Preservation Officer ("THPO"), Mr. Russell Townsend, noted: "I was surprised to learn of this Draft EA because the BIA would typically consult with

me and other Cherokee THPOs prior to the release of a draft EA for lands within the Cherokee treaty and historical territory." Declaration of Russell Townsend, Eastern Band of Cherokee Indians Declaration, March 16, 2020 ("Russell Decl."), ¶ 9. The fact that BIA did not reach out to the EBCI *prior* to drafting, creating, and publishing the Draft EA was indeed surprising, since, as Mr. Townsend explained:

> As part of government-to-government consultation, the BIA consults with the EBCI THPO multiple times per week on various projects in the Cherokee traditional aboriginal territory. The BIA typically reaches out early to us in the process, so we can participate in the development of research design and scopes of work, not simply review completed documents.

Townsend Decl., ¶ 10. Nonetheless, the EBCI issued formal comments on the Draft EA on January 22, 2020, *see* Compl., Ex. B, raising serious concerns with the procedural and substantive flaws in the Draft EA. As Mr. Townsend explains: "Having worked with the BIA for many years on these issues, concerns such as those raised in the EBCI comments would trigger a process where the BIA would work with me, as the EBCI THPO, to conduct a cultural survey on the land at issue so we could determine whether religious or cultural items were present at the site." Townsend Decl., ¶ 12. That did not happen.

The BIA did send a formal, pro forma letter to Mr. Townsend on January 31, 2020 (Compl., Ex. C), but the email attaching the letter, and the letter itself, "did not respond to, acknowledge, or address any of the concerns EBCI raised in the January 22 comments, and did not have a date for an expected response." Townsend Decl., ¶ 14. To be sure, no one from the BIA ever informed anyone at the EBCI that Defendants were moving forward with *final agency action* and that Defendants would not, in this instance, work with the EBCI's THPO to conduct the cultural survey that ordinarily the parties would collaboratively undertake.

Instead, the BIA is seeking to move forward with final agency action—and take this land into trust—without having ever consulted with the EBCI regarding its comments and concerns with the Draft EA. Not only has the BIA failed to engage in good faith consultation, the BIA has elected to move forward with final agency action *without* publishing a Final EA or issuing a FONSI. This violates the plain letter of the law of both the NEPA and the NHPA, and as a result, there can be no question that Plaintiff's claims present a high likelihood of success on the merits. *See* 40 C.F.R. §§ 1501.3, 1501.4(a)-(c), 1508.9 (under CEQ regulations, where an agency declines to prepare a full-fledged EIS, it must at least prepare an EA along with a Finding of No Significant Impact, explaining its reasons for not issuing an EIS).

The fact that "courts must play a cardinal role in the realization of NEPA's mandate is beyond dispute." *Foundation on Economic Trends v. Heckler*, 756 F.2d 143, 151 (D.C. Cir. 1985). For the aforementioned reasons, Plaintiff's claims under the APA, NEPA, and NHPA are demonstrably meritorious, and Plaintiff has therefore established the requisite likelihood of success to justify the granting of its motion for temporary restraining order.

Plaintiff is likewise more than likely to succeed on its additional claims brought in the complaint. For instance, Plaintiff has also brought a claim under the APA, asserting that Defendants' March 12 Decision is arbitrary, capricious, and an abuse of discretion because it directly violates federal law. The Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993 ("1993 Settlement Act") provides no authority to the Assistant Secretary of the Interior to take lands into trust for Catawba in North Carolina, provides no authority to take lands into trust for Catawba pursuant to Section 5 of the IRA, and explicitly prohibits the application of the Indian Gaming Regulatory Act and the Part 292 regulations to Catawba. *See* Compl. ¶¶ 90-99. Specifically, the 1993 Settlement Act limits Catawba land acquisitions to

10

Reservation and Non-Reservation acquisitions and provides a process unique to Catawba for each of these acquisition types. Compl. ¶ 30. The 1993 Settlement Act does not authorize any procedures additional to those in Sections 12 and 13 of the 1993 Settlement Act. Compl. ¶¶ 30-35. For Reservation acquisitions, the Act makes clear that the BIA's land acquisition regulations at 25 C.F.R. Part 151 do not apply to Catawba. 1993 Settlement Act § 12(m).

In its March 12 Decision, Defendants BIA and Assistant Secretary Sweeney erroneously assert that Congress only intended for this limitation to apply to the BIA's authority to take land into trust in South Carolina—but not *North Carolina*. *See* Compl., Ex. A, 13. The agency's myopic reading of the 1993 Settlement Act, however, could not be more arbitrary and contrary to the plain letter of the law. Nowhere in the 1993 Settlement Act did Congress define the limitations on the BIA's authority as dissipating at the North Carolina-South Carolina border. Instead, the plain language of the 1993 Settlement Act makes clear that the IRA may only be applied to Catawba to the extent that the IRA provisions applied are consistent with the terms of the Act—terms that grant the State of South Carolina jurisdiction over all Catawba land, natural resources and property held in trust by the United States. *See* 1993 Settlement Act §§ 4(a)(2) and 15(e) (affording the Agreement in Principle ("Settlement Agreement")  entered into between the Catawba and the State of South Carolina and the South Carolina State Act ("State Act") the full force and effect of federal law—and specifically the Acts' provisions authorizing South Carolina jurisdiction over Catawba trust lands). Accordingly, applying Section 5 of the IRA to take land into trust in North Carolina is inconsistent with the dictates of the 1993 Settlement Act, a fact underscored by the terms of the Settlement Agreement, which outlines the applicable provisions of the IRA—provisions that do not include § 5 (formerly codified as 25 U.S.C. § 465). *See* Settlement Agreement § 9.1. Congressional intent to this effect is clear. The House Natural

Resources Committee explained in its Report on the 1993 Settlement Act that the Act requires

full compliance "with the Settlement Agreement and State Act prior to seeking Secretarial

approval to place land in trust."[2]

Furthermore, Defendants' attempt to utilize IGRA to take this land into trust for gaming

purposes also flagrantly violates the plain language of the statute. Section 14 of the 1993

Settlement Act states that "the Indian Gaming Regulatory Act *shall not apply* to the [Catawba]

tribe . . . ." (emphasis added). The limitation on IGRA-based gaming is on the Tribe itself, not

simply lands in South Carolina. Defendants, however, rely explicitly on IGRA as the basis for

Defendants' authority to take the Kings Mountain Site into trust for Catawba—despite Congress'

clear statement that Defendants are not authorized to do so. In fact, this Court has previously

cited the 1993 Settlement Act as an example of Congress prohibiting a Tribe from IGRA-based

gaming. *TOMAC v. Norton*, 193 F. Supp. 2d 182, 194 n.8 (D.D.C. 2002), *aff'd sub nom.*

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006)

("When Congress intends to prohibit a tribe from gaming activity, it says so affirmatively. *See,*

*e.g.*, Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub.L. No.

103–116, § 14, 107 Stat. 1118, 1136 (1993).").

And as the D.C. Circuit Court of Appeals has already concluded, the 1993 Settlement

Act's prohibition of any application of IGRA to Catawba transferred authority generally held by

the BIA to the State of South Carolina to oversee. *Narragansett Indian Tribe v. Nat'l Indian*

*Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998) ("The Catawba Indians' . . . settlement

act[] specifically provide[s] for exclusive state control over gambling."). The Fourth Circuit, in a

case where Catawba was a party, also ruled that South Carolina law controls. *Catawba Indian*

[2] H.R. Rep. No. 103-257, at 20 (1993).

*Tribe of S.C. v. City of N. Myrtle Beach*, 217 F.3d 837 (4th Cir. 2000) (concluding that "the federal implementing legislation expressly delegated regulatory authority over the Tribe's gambling operations to the State of South Carolina and its political subdivisions").[3]

To be sure, "a court sitting in equity cannot ignore the judgment of Congress, deliberately expressed in legislation." *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (internal quotation marks and citations omitted). And as a result, "[a] district court cannot . . . override Congress' policy choice, articulated in a statute . . ." *Id.* Allowing Defendants to rewrite the 1993 Settlement Act in this manner would undermine Congress's exclusive authority over the status of reservations and would ultimately impede Congress' ability to pass legislation governing them. *See United States v. Lara*, 541 U.S. 193, 200 (2004) ("the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [][this Court has] consistently described as 'plenary and exclusive.'") (internal citation and quotation marks omitted).

Combined with the failure to comply with the APA, NHPA, and NEPA, Defendants' arbitrary, capricious and ultra vires actions, in direct violation of a congressional statute (the 1993 Settlement Act), sufficiently demonstrate the requisite likelihood of success on the merits to warrant this Court's intervention and imposition of injunctive relief.

---

[3] Relevant legislative history only confirms the federal courts' plain reading of the statute. The House Natural Resources Committee Report concerning the 1993 Settlement Act states:

> The Indian Gaming Regulatory Act shall not apply. The Tribe is authorized to establish two high stakes bingo games under the terms of state bill. One must be within the claim area, the other facility must have the approval of the county and any municipality in which located. The Committee substitute renames Section 14 to read Games of Chance. Language from the original bill's section 16 is inserted with no changes.

H.R. Rep. No. 103-257, at 21 (1993).

**b. Plaintiffs Will Incur Irreparable Harm if the Injunction is Denied**

Absent preliminary injunctive relief, the Kings Mountain Site will "immediately" be put into trust. *See* Compl., Ex. A, 37. If injunctive relief is not provided, and if Defendants are permitted to carry out their planned course of conduct—in direct violation of governing federal law—Plaintiff EBCI's sovereign right to partake in the cultural resources review and mitigation development process will be irreparably lost. The EBCI's January 22, 2020 Comments on the Draft EA raise serious issues that—as of the issuance of the March 12 Decision—remain unaddressed. *See* Compl., Ex. B. For instance, on January 22, 2020, the EBCI told Defendants:

> Because the 16.57 acres proposed for federal trust acquisition is located within the Cherokee aboriginal and historic territory, the Department of the Interior owes legal trust responsibilities to the EBCI to protect Cherokee lands, assets, and cultural resources. As one example, any attempt to consult with the EBCI, as required by § 106 of the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA), is noticeably absent from the EA. . . . A request for records review and comments was submitted to the NC State Historic Preservation Office (SHPO), who has authority over non-tribal lands, but contacting a State SHPO in no way abdicates the duty under the NHPA and NEPA to consult with the Indian Tribe or Tribes with historic ties to the land, in this instance, the EBCI. Specifically, § 106 of the NHPA, which is incorporated into NEPA, requires the agency—here, the Bureau of Indian Affairs—to "make a reasonable and good faith effort to identify any Indian tribes . . . that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties." 36 C.F.R. § 800.3(f)(2). Accordingly, the BIA has failed to fulfill its duty to make "a reasonable and good faith effort" to consult with the EBCI since, to date, no effort has been made, and no invitation has been sent, inviting the EBIC to consult over this proposed federal action.

Compl., Ex. B, 1-2. The EBCI went on to address numerous other deficiencies with Defendants' Draft EA, stating that the "EBCI demands that the deficiencies in the document be addressed through the preparation of an Environmental Impact Statement (EIS)." *Id.*

Instead of preparing a full EIS, and without addressing the issues and concerns raised in the EBCI's January 22 Comments (Compl., Ex. B), Defendants rushed full speed ahead to

complete their final agency action, and on March 12—having *never* published a Final EA or a FONSI—Defendants issued their official Decision ordering that the Kings Mountain Site be taken into trust.

This is significant since, "[c]ontrary to the information in the Draft EA, State of North Carolina site files show that there is evidence of an archeological investigation on the Kings Mountain Site." Townsend Decl. ¶ 17. However, without the good faith consultation process guaranteed by the NHPA, the EBCI THPO is unable to determine whether this final agency action will destroy or harm Cherokee religious or cultural sites. *See* Townsend Decl. ¶ 17 ("This information should have triggered an archeological survey to determine the nature and extent of the archeological material on the site . . ."); *id.* ¶ 15 (informing Mr. Chet McGhee, of the BIA, that "Until we receive the data about the site, we cannot determine whether Cherokee religious or cultural sites exist at the site.").

If injunctive relief is not imposed to maintain the status quo, the EBCI will be irreparably harmed because the EBCI will have lost its sovereign right, as a Tribal Nation, to engage in NHPA § 106 consultation concerning a major federal action within traditional Cherokee homelands. *See* Townsend Decl. ¶ 21 ("If the Kings Mountain site is taken into trust for the Catawba Nation, the land will fall under the sovereign governance of the Catawba Nation, and the EBCI THPO will lose the right to consultation on and protection of Cherokee religious and cultural sites.").

Although this is a procedural right in nature, courts have routinely held that the loss of this procedural right—through the APA, NEPA, and NHPA—constitutes irreparable harm. *Save Strawberry Canyon v. Dep't of Energy*, 613 F. Supp. 2d 1177, 1187 (N.D. Cal. 2009) (finding that, due to the alleged NEPA violations, the plaintiff was "virtually certain to suffer irreparable

procedural injury absent an injunction"). Here, the irreparable harm is the failure of the BIA to engage in good faith consultation with the EBCI since "if the tribe hasn't been adequately consulted and the project goes ahead anyway, this legally-protected procedural interest [will] effectively be lost." *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010). Such a harm would indeed be irreparable as no "effective monetary remedy . . . would [] adequate[ly]" compensate the EBCI for the loss of its right to undertake a cultural survey and engage in government-to-government consultation regarding Cherokee cultural resources and cultural patrimony within the EBCI's original homeland. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001).

This threat of irreparable injury warrants the provision of immediate injunctive relief.

### c.   The Threatened Harm to Plaintiff Outweighs any Harm to Defendants If and When the Injunction is Granted

In comparison to the harm described above, the imposition of injunctive relief will impose very little—if any—harm on Defendants. Enjoining Defendants from pushing through an arbitrary and capricious final agency action that runs afoul of the APA, NEPA, and NHPA's fundamental guiding principles and effectively rewrites federal law beyond the scope of congressional intent is not a cognizable harm Defendants can claim.

Thus, if Defendants' final agency action were to be "halted, at all, [such an injunction] would only be temporary," *Georgia Gazette Pub. Co. v. U.S. Dep't of Def.,* 562 F. Supp. 1004, 1011 (S.D. Ga. 1983), as Defendants could resume their final agency action following compliance with the NEPA and NHPA's procedural requirements. In contrast, the threatened harm to the EBCI absent an injunction would be permanent, and thus "the harm suffered by the plaintiff from the arbitrary and capricious agency action is of greater significance . . ." *Id.*

In light of these circumstances, the potential harm to the Plaintiff greatly outweighs any adverse consequences to Defendants resulting from issuance of the temporary restraining order and/or preliminary injunction.  Defendants' only harm would be cost associated with delay in moving forward with its final agency action. Such harm is inadequate to tip the scales in their favor as Defendants alone are responsible for their own failure to comply with the procedural requirements in the APA, NHPA, and NEPA; indeed they "have 'jumped the gun' . . . by . . . anticipat[ing] a pro forma result. . . [and are thus] largely responsible for their own harm." *Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002).

The balance of harms, therefore, weighs heavily in Plaintiff's favor.

### d.  Issuance of an Injunction Would Serve, Not Harm, the Public Interest

Finally, injunctive relief will serve the public interest. The goal of protecting and preserving lands and tribal cultural resources is consistent with the expressions of public policy embodied in both the NEPA and NHPA, and therefore is not contrary, but instead fully supports, the public interest. *See* Section 1(b)(4) of NHPA, Pub. L. No. 89-665, *as amended by* Pub. L. No. 96-515.  It is also within the public interest for federal agencies to be held to their consultation obligations regarding historical and cultural sites, and for parties affected by federal actions on federal lands to have a voice in the decision-making process—particularly where those interested parties are federally-recognized Tribes.

The very purpose of the NEPA is to ensure that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Thus, the public is plainly benefitted if it is permitted to participate in the NEPA process, and it is injured if such participation is not allowed.

17

Indeed, public interest is harmed where the federal government's fiduciary duty to consult with Indian Nations is not carried out or fully effectuated, as was the case here. *See, e.g., Pit River Tribe v. United States Forest Service*, 469 F.3d 768, 788 (9th Cir. 2006) ("Because we conclude that the agencies violated both NEPA and NHPA during the leasing and approval process, it follows that the agencies violated their minimum fiduciary duty to the Pit River Tribe when they violated the statutes.").

Here, the public interest would best be served by the granting of Plaintiff's requested temporary restraining order and ordering Defendants to engage in good faith consultation with the EBCI as required by federal law and undertake the preparation of a full and complete EIS.

## III.   REQUEST FOR WAIVER OF SECURITY

Plaintiff respectfully requests a waiver of the security under Fed. R. Civ. P. 65(c), or, in the alternative, for a nominal security. As demonstrated above, issuance of a temporary restraining order and/or a preliminary injunction would not result in any harm—financial or otherwise—to Defendants that would necessitate security.

Further, where, as here, the overwhelming balance of hardships rests on Plaintiff and not Defendants, security is generally not required. *See Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996). The Court should waive security or, in the alternative, require only nominal security from Plaintiff.

Dated this 17th day of March, 2020.

 /s/ Mary Kathryn Nagle
Mary Kathryn Nagle, D.C. Bar No. 1033507
Wilson Pipestem, D.C. Bar No. 456312

18

Abi Fain, OBA No. 31370
Pipestem Law, P.C.
320 S. Boston Ave., Suite 1705
Tulsa, OK 74103
918-936-4705 (Office)
mknagle@pipestemlaw.com
wkpipestem@pipestemlaw.com
afain@pipestemlaw.com

*Attorneys for Plaintiff Eastern Band of
Cherokee Indians*

## CERTIFICATE OF SERVICE

I, Mary Kathryn Nagle, certify that a true and correct copy of the above and foregoing was served this 18th day of March, 2020, via U.S.P.S. certified mail to the following:

UNITED STATES DEPARTMENT OF THE INTERIOR
1849 C Street, N.W.
Washington, D.C. 20240

UNITED STATES BUREAU OF INDIAN AFFAIRS
1849 C Street, N.W.
Washington, D.C. 20240

DAVID BERNHARDT
Secretary of the U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

TARA KATUK MAC LEAN SWEENEY
Assistant Secretary for Indian Affairs
1849 C Street, N.W.
Washington, D.C. 20240

R. GLEN MELVILLE
Acting Regional Director
BIA Eastern Regional Office
545 Marriott Drive Suite 700
Nashville, TN 37214

WILLIAM BARR
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

CIVIL PROCESS CLERK
United States Attorney's Office, District of Columbia
555 Fourth Street, N.W.,
Washington, D.C. 20530

By: /s/ Mary Kathryn Nagle
Mary Kathryn Nagle