**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EASTERN BAND OF CHEROKEE
INDIANS,

         Plaintiff,

    v.

UNITED STATES DEPARTMENT OF THE
INTERIOR, et al.,

         Defendants,

    and

THE CATAWBA INDIAN NATION,

         Defendant-Intervenor.

Civil Action No. 20-cv-00757-JEB

**THE CATAWBA INDIAN NATION'S OPPOSITION TO**
**THE EASTERN BAND OF CHEROKEE INDIANS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ..................................................................................................... 1

STATEMENT ............................................................................................................ 4

    A.    The Catawba Indian Nation ...................................................................... 4

    B.    The Nation's Litigation And Settlement With South Carolina ................. 7

    C.    The Nation's Land-Into-Trust Application ............................................... 9

    D.    This Lawsuit ............................................................................................ 12

APPLICABLE STANDARDS ................................................................................ 12

ARGUMENT ........................................................................................................... 13

I.    THE EASTERN BAND'S IRREPARABLE-HARM ARGUMENT BORDERS
    ON FRIVOLOUS ................................................................................................ 13

II.    THE EASTERN BAND IS NOT LIKELY TO SUCCEED ON ANY OF ITS
    CLAIMS ........................................................................................................... 18

    A.    NEPA ....................................................................................................... 18

    B.    NHPA ...................................................................................................... 21

        1.    Interior complied with its regulatory obligations
            under NHPA ................................................................................ 21

        2.    The Eastern Band's contrary arguments lack merit ................... 25

    C.    APA ......................................................................................................... 29

        1.    Interior was authorized to take the land into trust
            for the Nation under section 5 of the IRA ................................. 29

            a.    Section 4(b) of the Settlement Act authorizes
                IRA land-into-trust acquisitions ......................................... 29

            b.    Section 9(a) of the Settlement Act separately
                authorizes IRA land-into-trust acquisitions ....................... 30

c.    The settlement agreement does not foreclose the
application of section 5 of the IRA to the Nation ...........................35

2.    Interior's conclusion regarding gaming eligibility on
the Kings Mountain site is correct and, in any event,
irrelevant to Interior's land-into-trust decision .............................36

3.    *Chevron* deference and the Indian canon confirm the
validity of Interior's construction of the Settlement Act ............................38

III.    THE REMAINING FACTORS DO NOT SUPPORT THE EXTRAORDINARY
RELIEF OF A PRELIMINARY INJUNCTION........................................................................40

A.    Balance Of Equities .....................................................................................................40

B.    Public Interest ..............................................................................................................42

IV.    EVEN IF AN INJUNCTION WERE WARRANTED, EXEMPTING THE EASTERN
BAND FROM THE BOND REQUIREMENT WOULD NOT BE APPROPRIATE..............................44

CONCLUSION...................................................................................................................................45

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Adams v. District of Columbia*, 285 F. Supp. 3d 381 (D.D.C. 2018) .............................................12

*Ambach v. Bell*, 686 F.2d 974 (D.C. Cir. 1982)....................................................................40, 43

*\*American Association for Homecare v. Leavitt*, 2008 WL 2580217 (D.D.C. June 30, 2008) ...........................................................................................................................15

*\*Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987)..........................................15

*Arkansas Dairy Cooperative Association, Inc. v. USDA*, 573 F.3d 815 (D.C. Cir. 2009) ..................................................................................................................................12

*Bartko v. U.S. Department of Justice*, 2015 WL 13673371 (D.D.C. Mar. 12, 2015)...................13

*Board of Education v. Mergens*, 496 U.S. 226 (1990) ................................................................34

*Caddo Nation of Oklahoma v. Wichita & Affiliated Tribes*, 2016 WL 3080971 (W.D. Okla. May 31, 2016) ......................................................................................................26

*California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ....................................................36

*Catawba Indian Tribe of South Carolina v. State of South Carolina*, 865 F.2d 1444 (4th Cir. 1989) (en banc)...........................................................................................7

*Catawba Indian Tribe of South Carolina v. State of South Carolina*, 978 F.2d 1334 (4th Cir. 1992) (en banc)...........................................................................................7

*Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564 (Fed. Cir. 1993) .............................................................................................................................7

*\*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)..........13, 14, 17

*Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ..................................................................................................................................39

*City of Tempe v. FAA*, 239 F. Supp. 2d 55 (D.D.C. 2003) ..........................................................13

*\*CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ..................................................................................................................................13

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) .....................................................................39

*Coit Independence Joint Venture v. Federal Savings & Loan Insurance Corp.*, 489 U.S. 561 (1989)..............................................................................................................38

*Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d 552 (D.C. Cir. 2016) ............................................................................................39

*\*Connecticut ex rel. Blumenthal v. U.S. Department of the Interior*, 228 F.3d 82 (2d Cir. 2000) ............................................................................................33, 34, 39

*Connecticut v. U.S. Department of the Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018) .......................................................................................................................40

*Digital Mentor, Inc. v. Ovivo USA, LLC*, 2018 WL 993944 (W.D. Wash. Feb. 21, 2018) .......................................................................................................................16

*Diné Citizens Against Ruining Our Environment v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010) ................................................................................................19

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149 (10th Cir. 2001) ..........................................................................................................15

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ............................................43

*Elk Associates Funding Corp. v. U.S. Small Business Administration*, 858 F. Supp. 2d 1 (D.D.C. 2012) ..........................................................................15

*Elliot v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996) ............................................................44

*Federal Prescription Service, Inc. v. American Pharmacy Association*, 636 F.2d 755 (D.C. Cir. 1980) ............................................................................................44

*Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332 (D.D.C. 2017) ......................15

*Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332 (6th Cir. 1991) ............................................................................................38

*Friends of Animals v. U.S. Bureau of Land Management*, 232 F. Supp. 3d 53 (D.D.C. 2017) ............................................................................................15

*Fund for Animals v. Norton*, 281 F. Supp. 2d 209 (D.D.C. 2003) ................................15

*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112 (D.D.C. 2015) ............................................................................................17

*Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280 (2010) ............................................................................37

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002) .......................................18

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ..............................................................37

*Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989) ........................................................37

*Henke v. Department of the Interior*, 842 F. Supp. 2d 54 (D.D.C. 2012) .....................................13

*Johnson v. Panetta*, 953 F. Supp. 2d 244 (D.D.C. 2013) ................................................17

*Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013) ................................................................................................38

*Liberty Maritime Corp. v. United States*, 928 F.2d 413 (D.C. Cir. 1991) ....................................30

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ................................................................................................17

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ................................................................13

*McMillan Park Committee v. National Capital Planning Commission*, 968 F.2d 1283 (D.C. Cir. 1992) ................................................................................22

*Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883 (7th Cir. 2000), *amended on denial of rehearing*, 209 F.3d 1032 (7th Cir. 2000) ...................................45

*Michigan Catholic Conference & Catholic Family Services v. Burwell*, 755 F.3d 372 (6th Cir. 2014) ................................................................................................16

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) ................................................39

*Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67 (D.D.C. 2001) ..................................13

*Narragansett Indian Tribe v. Warwick Sewer Authority*, 334 F.3d 161 (1st Cir. 2003) ................................................................................................28

*National Kidney Patients Association v. Sullivan*, 958 F.2d 1127 (D.C. Cir. 1992) ...................44

*National Parks Conservation Association v. U.S. Forest Service*, 2016 WL 420470 (D.D.C. Jan. 22, 2016) ................................................................................15

*Native Ecosystems Council & Alliance for the Wild Rockies v. U.S. Forest Service*, 2011 WL 4015662 (D. Idaho Sept. 9, 2011) .......................................................16

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................12

*Pogliani v. U.S. Army Corps of Engineers*, 306 F.3d 1235 (2d Cir. 2002) .................................20

*Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*, 755 F. Supp. 2d 1104 (S.D. Cal. 2010) .............................................................16

*Russello v. United States*, 464 U.S. 16 (1983) ................................................................32

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, — F. Supp. 3d —, 2020 WL 1065406 (D.D.C. Mar. 5, 2020) ................................................................39, 40

*Save Strawberry Canyon v. Department of Energy*, 613 F. Supp. 2d 1177 (N.D. Cal. 2009)......................................................................................................15

*South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498 (1986)....................................4, 6, 7

*Stand Up for California! v. U.S. Department of the Interior*, 919 F. Supp. 2d 51 (D.D.C. 2013) ................................................................................................17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4 (D.D.C. 2016) ................................................................................................25

*Stanford v. United States*, 2014 WL 2574492 (E.D. Ky. June 9, 2014) ........................................38

*United States v. Dann*, 470 U.S. 39 (1985)..................................................................................28

*United States v. Harris*, 13 F.3d 555 (2d Cir. 1994)....................................................................26

*United States v. Maria*, 186 F.3d 65 (2d Cir. 1999) ....................................................................26

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001) .............................................31

*\*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)....................12, 13, 14, 43

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)........................................................14

**STATUTES**

5 U.S.C. §706................................................................................................................................29

25 U.S.C.
  §1724................................................................................................................................34
  §2703................................................................................................................................30
  §3002................................................................................................................................17

42 U.S.C. §4332............................................................................................................................18

54 U.S.C. §306108........................................................................................................................21

Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §500 *et seq.*)..................................................................2

Catawba Indian Claims Settlement Act, 1993 S.C. Act No. 142...................................................8

\*Catawba Indian Tribe of South Carolina Land Claims Settlement Act, Pub. L. No. 103-116, 107 Stat. 1118 (1993) ...................................................... *passim*

Catawba Tribe of South Carolina Division of Assets Act, Pub. L. No. 86-322, 73 Stat. 592 (1959)..................................................................................................6

*Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988)
(codified as amended at 25 U.S.C. §2701 *et seq.*) ............................................................11

*Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified as
amended at 25 U.S.C. §461 *et seq.*) ....................................................................6

Maine Indian Claims Settlement Act, Pub. L. No. 96-520, 94 Stat. 1785 (1980) .......................34

Mohegan Nation of Connecticut Land Claims Settlement Act, Pub. L. No. 103-77,
108 Stat. 3501 (1994)............................................................................................33

Native American Graves Protection and Repatriation Act, Pub. L. No. 101-601,
104 Stat. 3048 (1990) (codified at 25 U.S.C. §3001) .......................................................16

National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 852 (1970)
(codified as amended at 42 U.S.C. §4321 *et seq.*) ............................................................2

National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966)
(codified as amended at 16 U.S.C. §470 *et seq.*) ..............................................................2

S.C. Code Ann.
§27-16-40 ...............................................................................................................8
§27-16-90 ...............................................................................................................8
§27-16-100 .............................................................................................................8
§27-16-110 .............................................................................................................8

## RULES AND REGULATIONS

Federal Rule of Civil Procedure 65 ..................................................................................44

25 C.F.R.
Part 151 ..................................................................................................................9
§292.2 ...................................................................................................................30
§292.7 .............................................................................................................11, 29
§292.11 .................................................................................................................29

*36 C.F.R.
§800.2...................................................................................................22, 25, 26
§800.3.............................................................................................22, 23, 24, 27

40 C.F.R.
§1501.3.................................................................................................................19
§1501.4...........................................................................................................18, 19
§1506.6...........................................................................................................19, 20

43 C.F.R.
§10.2.....................................................................................................................17
§10010.60.............................................................................................................20

*Land Acquisitions; Catawba Indian Nation, Kings Mountain Parcel, North
Carolina*, 85 Fed. Reg. 17,093 (Mar. 26, 2020) ................................................................11

## OTHER AUTHORITIES

Catawba Indian Nation:  Trust Acquisition and Mixed-Use Entertainment
Complex, http://www.catawbanationclevelandcountyea.com (visited Apr.
3, 2020) ..........................................................................................................................20

Indian Affairs (@USIndianAffairs), Twitter (Mar. 13, 2020, 7:50 PM),
https://twitter.com/USIndianAffairs/status/1238613491893899264 ...............................21

Indian Claims Commission, *Final Report* (1978), *available at*
https://www.narf.org/nill/documents/icc_final_report.pdf .............................................28

U.S. Department of Interior, Bureau of Indian Affairs, Acquisition of Title to
Land Held in Fee or Restricted Fee Status (Fee-To-Trust Handbook) (June
28, 2016), https://www.bia.gov/sites/bia.gov/files/assets/public/raca/
handbook/pdf/Acquisition_of_Title_to_Land_Held_in_Fee_or_Restricted
_Fee_Status_50_OIMT.pdf ............................................................................................20

U.S. Department of Interior, Press Release:  Indian Affairs Announces Two
Historic Decisions Taking Into Trust Tribal Lands Under New Guidance
(Mar. 13, 2020), https://www.bia.gov/as-ia/opa/online-press-release/indian-
affairs-announces-two-historic-decisions-taking-trust-tribal ...................................... 20-21

U.S. Library of Congress, *Indian Land Areas Judicially Established*,
https://www.loc.gov/resource/g3701e.ct008649/?r=0.13,0.297,1.093,0.436,0
(visited Apr. 3, 2020) .....................................................................................................28

## INTRODUCTION

For over two decades, the Eastern Band of Cherokee Indians has enjoyed a monopoly on casino gaming in western North Carolina, reaping billions of dollars in revenue from its two casinos—money that has improved life tremendously for the Band and its members.  Yet for ten years now, the Band has taken almost every step imaginable to deny the Catawba Indian Nation the same opportunity to use gaming to alleviate the widespread poverty and other crippling hardships that afflict *its* members.  This lawsuit, and this preliminary-injunction motion, are the latest such steps.

The Eastern Band's motion, however (like each of its underlying claims), is patently without merit.  The Band asks this Court to enjoin a decision by the Interior Department and its officials to take a parcel of land in North Carolina into trust for the Nation, and to deem that land eligible for gaming once in trust.  But in a thorough decision, the federal defendants (hereafter Interior) explained that the Nation had met the requirements for both a discretionary taking of land into trust and for gaming on that trust land.  Among other things, Interior explained both that the Nation is, as noted, severely distressed economically (a fact largely attributable to South Carolina unlawfully dispossessing the Nation of almost 150,000 acres of its aboriginal lands in the 1840s), and that permitting the Nation to develop a casino complex on the land will provide much-needed revenue, employment opportunities, and cultural expression for the Nation's approximately 3,400 members.  That, in turn, will facilitate the Nation's economic self-sufficiency and self-determination, which is the overarching goal of federal Indian law today.

To block these improvements for the Nation at such an early point in this lawsuit, the Eastern Band must satisfy the familiar four-factor test for injunctive relief—a test that is demanding because a preliminary injunction is an extraordinary form of relief, one that should be

rarely granted.  The Band cannot meet even one of the test's four factors.  To begin with, it fails to demonstrate an indisputable *sine qua non* of preliminary injunctive relief:  likely, great, and imminent irreparable harm if an injunction is not granted.  The Band concedes in its motion papers that its alleged injury if the motion is denied would be purely procedural.  And it is well established, under both Supreme Court precedent and the consensus view of other judges on this Court, that purely procedural injury is not irreparable, because it could be fully remedied at final judgment.

Although this Court need go no further to deny a preliminary injunction, the Eastern Band also does not show that it will likely succeed on the merits of any of its claims, another prerequisite to obtain an injunction.  The Band brings claims under three federal laws:  the Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §551 *et seq.*) (hereafter APA); the National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966) (codified as amended at 16 U.S.C. §470 *et seq.*) (hereafter NHPA); and the National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. §4321 *et seq.*) (hereafter NEPA).  Far from being likely to succeed, each of those claims manifestly fails.

The NEPA claim, for example, rests largely on the assertion that Interior failed to prepare either a final environmental assessment (EA) or a finding of no significant impact (FONSI).  That is simply wrong; both documents are being filed with the Court today.  The NHPA claim is just as flawed:  The Band asserts that Interior violated NHPA regulations by not consulting it about historic properties on the land at issue.  But Interior did consult the Band—asking it to advise on whether it believed there were historic properties on the land—and Interior moved forward with its decision only after receiving no response from the Band for six weeks.  The

Band thus easily had a "reasonable opportunity" to express its views, which is what NHPA regulations require. As for the Band's APA claim, it rests primarily on the notion that a 1993 statute (approving the settlement of litigation brought by the Nation) prohibits Interior from taking land into trust for the Nation outside South Carolina. But the statute's plain text defeats that argument; the statute states that, "[n]otwithstanding any other provision of law," the Nation "shall be eligible for all benefits and services furnished to federally recognized Indian tribes"— one of which is having land taken into trust for the purpose of a tribe's economic development. Other provisions of the 1993 law further refute the Band's arguments. And even if the act were ambiguous, the ambiguity would have to be resolved in Interior's and the Nation's favor, under both principles of agency deference and the Indian canon of construction.

Finally, the Eastern Band cannot satisfy either of the two remaining requirements for preliminary injunctive relief. First, the balance of equities tips sharply toward the Nation, because whereas the Band will suffer no concrete injury in the absence of a preliminary injunction, the Nation would be grievously harmed if an injunction issued, confined to ongoing economic hardship. In particular, delaying development of the Nation's casino until final judgment would likely cost the Nation $70 million and deprive hundreds of tribal members of gainful employment. Second, the Band fails to overcome Interior's finding that a preliminary injunction would be in the public interest, in that the Nation's casino will boost the local economy by almost $500 million and create thousands of new jobs in the surrounding area. That finding is why the leader of the North Carolina county where the casino will be located has submitted a declaration articulating her opposition to an injunction. In short, the public interest would be powerfully disserved by granting the extraordinary relief the Band seeks.

The Eastern Band's motion for a preliminary injunction should be denied.

## STATEMENT

### A.      The Catawba Indian Nation

The Catawba Indian Nation is a federally recognized tribe, and currently "the only federally recognized tribe in South Carolina." Dkt. 1-2 (hereafter Approval Letter) at 14. It has about 3,400 members, with over 250 living in North Carolina. Ex. B (hereafter Harris Decl.) ¶5.

The Nation's connection to the southeastern United States dates back centuries: Its "aboriginal territory [was] in what is now North and South Carolina," *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 500 (1986), and its members have resided on that land since before English settlement, *see* Approval Letter 14.

Today, the Catawba—like many tribes, bands, and nations—faces significant economic challenges. Two economic figures, in particular, underscore its dire circumstances. First, the Nation's unemployment rate is 13.8%, more than triple the rates in North Carolina and South Carolina (4.2% and 4.3%, respectively). Approval Letter 12. Second, the Nation has a median household income of $33,029, 40% below the equivalent figures for the Carolinas. *Id.*

The Nation's economic woes have engendered significant hardship. Lacking much tax revenue, the Nation relies largely on the U.S. government for funding. Approval Letter 12. Because that funding varies year-over-year, however, *id.*, the Nation has been forced to take several steps deleterious to its members. For instance, the Nation has had to reduce after-school programs for its youth, lay off staff who offered critical trauma and support services for crime victims, and transfer portions of its fee land to a local school district to compensate the district for educating tribal children. *Id.* The Nation also lacks funds to develop a tribal-justice system, including tribal courts and law enforcement. *Id.* Nor can the Nation maintain its roads, because federal funding provides a small fraction of the money needed. *Id.* at 12-13.

Seeking to overcome these economic challenges, the Nation has undertaken numerous efforts "to establish business ventures to produce revenue."  Approval Letter 12.  "[B]ut none have produced substantial or stable sources of revenue."  *Id.*  One reason for this is a lack of land on which the Nation may pursue such opportunities.  *Id.* at 27.  In particular, "[t]he Nation's current land trust base of 1,012 acres is subject to development restrictions" stemming from a settlement between the Nation and South Carolina over several of the Nation's land claims, and legislation implementing the settlement.  *Id.*

That settlement—which is central to this litigation, and detailed in the next subsection— arises out of disputes tracing back centuries.  "Significant encroachment by settlers on the Nation's lands began around the 1730s."  Approval Letter 14.  In 1760, the Carolina colonies and the Nation signed the Treaty of Pine Tree Hill, under which (as Congress explained in 1993) the Nation "ceded vast portions of its aboriginal territory in the present States of North and South Carolina in return for guarantees of being quietly settled on a 144,000-acre reservation," Catawba Indian Tribe of South Carolina Land Claims Settlement Act, Pub. L. No. 103-116, §2(a)(4)(A), 107 Stat. 1118, 1118 (1993) (hereafter Settlement Act).  Soon thereafter, the Nation entered into the 1763 Treaty of Augusta with Great Britain, essentially ratifying the terms of the Treaty of Pine Tree Hill.  Approval Letter 14.

Although the Nation then fought alongside the colonists during the Revolutionary War (earning the recognition of George Washington), Approval Letter 15, those efforts did not lead to a harmonious relationship between the Nation and the new country it had helped in the struggle for independence.  In the ensuing decades, after settlers had leased much of the Catawba's treaty land, they "began petitioning South Carolina to arrange a [new] treaty by which the Nation would cede its claims to the leased land."  *Id.*  In 1840, the Nation and South Carolina signed the

Treaty of Nation Ford, *id.*, under which the Nation conveyed to South Carolina its 144,000 acres in exchange for South Carolina's promise to spend $5,000 to buy a new reservation (in addition to cash payments), *South Carolina*, 476 U.S. at 501.

Although South Carolina immediately seized the Nation's land, it did not fulfill its end of the bargain. The state spent "only $2,000 instead of $5,000 to purchase" land for the promised new reservation. *South Carolina*, 476 U.S. at 501. That land, moreover, consisted of only 630 acres, *see* Approval Letter 15, and "it was not actually 'new' land because it was located within the original 144,000-acre tract," *South Carolina*, 476 U.S. at 501.

"Towards the end of the nineteenth century, the Nation began seeking federal assistance in bringing claims against South Carolina for the unlawful conveyance of its reservation lands." Approval Letter 16. The Interior Department, unhelpful for many decades, eventually agreed to assist. *See id.* at 16-18. In 1942, it approved an agreement between itself, South Carolina, and the Nation, under which South Carolina acquired 3,434 acres of land near the Nation's existing reservation and conveyed it in trust to the United States for the Nation. *Id.* at 17. The United States further "agreed to make annual contributions of available sums for the welfare of the Tribe and to assist the Tribe with education, medical benefits, and economic development." *South Carolina*, 476 U.S. at 502. Shortly thereafter, the Nation organized under the Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §461 *et seq.*) (hereafter IRA). *See South Carolina*, 476 U.S. at 502-503.

These positive developments for the Nation were short-lived. In 1959, as part of the "termination era," Congress enacted the Catawba Tribe of South Carolina Division of Assets Act, Pub. L. No. 86-322, 73 Stat. 592 (repealed 1993). This law terminated the trust relationship between the United States and the Nation, lifted federal restrictions on alienation of the Nation's

federal reservation, and distributed tribal assets.  Approval Letter 18.  That left the Nation with only the 630-acre reservation in South Carolina.  *Id.* at 18 n.122.

### B.     The Nation's Litigation And Settlement With South Carolina

In 1980, after trying but failing to obtain a legislative settlement of its claims to its historical lands in South Carolina, the Nation sued South Carolina in federal court, setting off over a decade of litigation that ultimately made its way to the Supreme Court.  *See South Carolina*, 476 U.S. 498; *see also, e.g.*, *Catawba Indian Tribe of South Carolina v. State of South Carolina*, 865 F.2d 1444 (4th Cir. 1989) (en banc); *Catawba Indian Tribe of South Carolina v. State of South Carolina*, 978 F.2d 1334 (4th Cir. 1992) (en banc); *Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564 (Fed. Cir. 1993).  In 1992, however, the Nation, South Carolina, and the United States agreed to a comprehensive settlement of the Nation's claims, a resolution that encompassed federal recognition of the Nation and the restoration of its trust status.  As relevant here, this settlement is reflected in three documents.

First, the Nation and South Carolina executed a fifty-page "agreement in principle," intended to "settle[] the claims and suits pending in" court concerning the Nation's land claims against the state.  *See* Dkt. 1-6 at §3.1.  This settlement agreement provided that, upon its ratification and the passage of local, state, and federal implementing legislation, the Nation would dismiss with prejudice its relevant pending lawsuits.  *See id.* §6.4.  In return, South Carolina would transfer title to the Nation's existing reservation to Interior, *id.* §14.1, and also pay (along with the United States) into a trust fund established in part to permit the Nation to acquire additional land, *id.* §5.  The agreement also set out procedures by which such land purchases in South Carolina could take place.  *Id.* §§14-15.  With respect to reservation land, section 14 provided that the Nation would generally be required to obtain the consent of existing

landholders, the state, and any local authorities before asking Interior to take land into trust. *Id.* §14.  Under section 15, meanwhile, the Nation could acquire non-reservation land without such approval, but any such land would be "subject to the laws, ordinances, taxes, and regulations of" South Carolina. *Id.* §15.2.  Finally, the agreement provided that any gaming operation conducted by the Nation "on and off the reservation" would be governed by South Carolina law (as modified by the agreement and state implementing legislation) rather than federal law. *Id.* §16.1.

Second, Congress enacted a federal law, the Settlement Act, to implement the aspects of the settlement that required congressional approval.  This statute formally "restored" the "trust relationship between the [Nation] and the United States," Settlement Act §4(a)(1), and it made the Nation and its members "eligible for all benefits and services furnished to federally recognized Indian tribes and their members," *id.* §4(b).  The law also allowed the Nation to organize under the IRA (a statute that allows Interior to take land into trust on behalf of tribes), specifically providing that the Nation would be "subject to [the] Act." *Id.* §9(a).  And the Settlement Act adopted the land-acquisition and gaming provisions of the settlement agreement described above. *Id.* §§12-14.

Third, South Carolina enacted the Catawba Indian Claims Settlement Act, 1993 S.C. Act No. 142.  This statute provided that the Nation would be "subject to the civil, criminal, and regulatory jurisdiction of the State … to the same extent as any other person, citizen, or land in the State, except as otherwise expressly provided."  S.C. Code Ann. §27-16-40.  It also implemented both the procedures set out in the settlement agreement for the Nation's acquisition of new land and the rules that would govern the Nation's conduct of gaming activities within South Carolina. *See id.* §§27-16-90, -100, -110.

### C.    The Nation's Land-Into-Trust Application

Roughly a decade ago, the Nation—seeking to generate much-needed revenue and economic development for its people—decided to develop a casino and mixed-use entertainment complex on a 16.57-acre parcel of land in Cleveland County, North Carolina.  Approval Letter 2. That land, known as the Kings Mountain site, is 34 miles from the Nation's headquarters in South Carolina, *id.*, and within the Nation's aboriginal lands, *id.* at 9.  The complex is expected to generate $72 million in income in its first year of operations, growing to $150 million in the fifth year.  *Id.* at 36.  The development will also create 2,600 direct employment opportunities. *Id.* at 27.  And it will provide an important cultural benefit to the Nation, by including a gift shop where native artwork and handcraft is sold.  *Id.* at 36.  "The on-site gift shop will enable the Nation to provide its members with a commercial outlet to help preserve and share the [Nation's] unique artistic and cultural heritage."  *Id.*  That is particularly valuable to the Nation, because although the Nation's "pottery tradition" is of "vital importance … to the expression of Catawba identify," tribal artisans currently "struggle to support themselves on their craft alone."  *Id.*

The Nation first submitted a land-into-trust application for the Kings Mountain site to the Secretary of Interior in 2013.  Approval Letter 2.  That application was withdrawn five years later, shortly before a replacement application was submitted in September 2018.  *See id.*  This second application asked the secretary to take the land into trust for the Nation's benefit "pursuant to the Department's land acquisition regulations at 25 C.F.R. Part 151."  *Id.*  It also asked for a determination of whether the land, once in trust, would be eligible for gaming.

As part of its consideration of the Nation's second application, Interior engaged in a consultation process with respect to historic properties on and environmental impact to the Kings Mountain site.  Of particular relevance here, Interior contacted North Carolina's State Historic

Preservation Office (SHPO), which responded that that office was not aware of any historical resources on the site.  *See* Dkt. 1-4 at 2.  Interior then prepared a draft EA, concluding that the Nation's project would have no significant environmental impact; the draft was posted online and published in three local newspapers.  Approval Letter 31.  (Interior also notified the Eastern Band about the draft EA directly.  *See* Final EA at Ex. M, p.8.[1])

In its comments on the draft EA, the Band objected to Interior's failure to consult with it about whether historical properties important to the Band were located on the Kings Mountain site.  *See* Dkt. 1-3 at 1-2.  Eight days later, Interior wrote to Russell Townsend, the Band's Tribal Historic Preservation Officer (THPO), noting the North Carolina SHPO's views and asking the Band to "verify … that the proposed project will not impact any specific sites having potential religious or cultural significance to the Eastern Band."  Dkt. 1-4 at 1.  Six weeks after sending this letter, Interior had received no response from the Band.

At that point—which was also 18 months after the Nation had filed its second land-into-trust application—Interior acted, granting the application on March 12, 2020.  Approval Letter 37.  In its decision letter, Interior concluded both that it had authority under section 5 of the IRA to grant the Nation's application (deeming that authority undisturbed by the Settlement Act), and that the application satisfied the requirements in Interior's IRA regulations for taking land into trust.  *Id.* at 23-27.  These requirements include "that acquisition of the Site in trust will facilitate tribal self-determination and economic development," *id.* at 13, that the Nation "needs additional land … because its existing land base and tribal ventures are unable to meet the needs of the Nation," *id.* at 11, and "that the construction, maintenance, and operation of the gaming and entertainment facility will provide a major boost to the Nation," *id.* at 37.

---

[1] The Final EA is being submitted with Interior's opposition to the Eastern Band's motion.

Interior further concluded that the Kings Mountain site would be eligible for gaming once in trust, because the Nation satisfied the "restored-lands exception" to the general prohibition on Indian gaming established by the Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §2701 *et seq.*) (hereafter IGRA). *See* Approval Letter 3; *see also* 25 C.F.R. §292.7 (addressing the restored-lands exception). The Nation met the exception, Interior explained, for two reasons. First, the Nation is a "restored tribe," meaning that it "was federally recognized at one time," had "lost its government-to-government relationship," and was subsequently "restored to federal recognition" through the Settlement Act. Approval Letter 3-5, 18. Second, the Kings Mountain site constitutes "restored lands," because the Nation has both modern and historical connections to it, and because the Nation timely submitted its discretionary land-into-trust application. *Id.* at 5-11.

Finally, Interior concluded that taking the Kings Mountain site into trust was consistent with both NEPA and NHPA. In its final EA—completed in March 2020, along with the required FONSI—Interior concluded that because the Nation agreed to use certain best practices and undertake enumerated mitigation measures, its proposed entertainment complex would have a "less than significant" impact across several environmental dimensions. Approval Letter 31. The EA also concluded that the complex's impact on cultural resources would be "less than significant," in light of the SHPO's report that it had no knowledge of any historic properties potentially impacted by the gaming development. *Id.* at 33.

Notice of Interior's grant of the Nation's application was published in the Federal Register. *See Land Acquisitions; Catawba Indian Nation, Kings Mountain Parcel, North Carolina*, 85 Fed. Reg. 17,093 (Mar. 26, 2020).

### D.      This Lawsuit

Five days after Interior approved the Nation's application, the Eastern Band filed this action, challenging that decision as violating three laws:  NEPA, NHPA, and the APA.  *See* Dkt. 1 at ¶¶88-164.  The Band seeks a declaration that Interior's decision is unlawful, an injunction against the land being taken into trust, and other relief.  *See id.* at 43.

The Eastern Band also moved for a temporary restraining order (TRO) and a preliminary injunction against the Kings Mountain site being taken into trust.  Dkt. 2.  The Nation then filed a motion to intervene, Dkt. 7, which the Court granted, and the parties agreed that the Band would withdraw its TRO request in return for a delay of the transfer of the land into trust for up to 45 days so that this Court could consider the preliminary-injunction request, Dkt. 8.

## APPLICABLE STANDARDS

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  As the Supreme Court has explained (in discussing the analogous test governing stays), "[t]he first two factors … are the most critical."  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Both the D.C. Circuit and this Court have accordingly held that where movants "have shown no likelihood of success on the merits[,] … th[e] court need not proceed to review the other three preliminary injunction factors."  *Arkansas Dairy Cooperative Association, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009); *accord Adams v. District of Columbia*, 285 F. Supp. 3d 381, 388 (D.D.C. 2018) (Boasberg, J.).  Similarly, the D.C. Circuit has explained that "[a] movant's failure to show any irreparable harm is … grounds for refusing to issue a preliminary injunction, even if the other

three factors … merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Similarly, this Court has held that "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without [even] considering the other factors." *Henke v. Department of the Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (Boasberg, J.) (citing *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

More generally, the Supreme Court has repeatedly admonished that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (emphasis added); *see also, e.g.*, *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). Precedent in this district is (not surprisingly) to the same effect, providing that "[b]ecause preliminary injunctions are extra-ordinary forms of judicial relief, courts should grant them sparingly." *City of Tempe v. FAA*, 239 F. Supp. 2d 55, 59 (D.D.C. 2003) (citing *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 73 (D.D.C. 2001)).

## ARGUMENT

### I. THE EASTERN BAND'S IRREPARABLE-HARM ARGUMENT BORDERS ON FRIVOLOUS

For the reasons given below in Part II, the Eastern Band is not likely to succeed on the merits with any of its three claims. But this Court need not wade through any of those claims in order to resolve the Band's motion. As just noted, both the D.C. Circuit and this Court have held that a preliminary injunction can be denied without even addressing any of the three other factors if the movant fails to demonstrate irreparable harm. That is the situation here.

As this Court has recognized, "[t]he irreparable injury requirement erects a very high bar for a movant." *Bartko v. U.S. Department of Justice*, 2015 WL 13673371, at *2 (D.D.C. Mar. 12, 2015) (Boasberg, J.); *accord, e.g.*, *Chaplaincy*, 454 F.3d at 297 ("This court has set a high

standard for irreparable injury."). To clear this high bar, a movant must "demonstrate that

irreparable injury is *likely* in the absence of an injunction"; injunctive relief is unavailable when

a movant shows "only … a possibility of irreparable harm." *Winter*, 555 U.S. at 22. Moreover,

the injury "must be … great" and "[t]he moving party must show '[t]he injury complained of is

of such *imminence* that there is a "clear and present" need for equitable relief to prevent

irreparable harm.' " *Chaplaincy*, 454 F.3d at 297 (second alteration in original) (quoting

*Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). Also, "the injury

must be beyond remediation," i.e., there must be little or no "possibility that adequate

compensatory or other corrective relief will be available at a later date, in the ordinary course of

litigation." *Id.* at 297-298.

  The Eastern Band does not come close to satisfying these demanding standards. Its

motion and supporting memorandum assert principally that without a preliminary injunction, it

will suffer irreparable harm in the form of lost consultation rights under section 106 of NHPA.

For example, the Band states (Memo. 15) that without an injunction, it "will have lost its

sovereign right … to engage in NHPA § 106 consultation." Similarly, the Band contends

(Memo. 14) that absent an injunction, its "right to partake in the cultural resources review and

mitigation development *process* will be irreparably lost" (emphasis added). And likewise, the

Band quotes (Memo. 15) its THPO's claim that "[i]f the Kings Mountain site is taken into

trust … the [Band's] THPO will lose the right to consultation on and protection of Cherokee

religious and cultural sites," Dkt. 1-1 (hereafter Townsend Decl.) ¶21.

  As a matter of law, any loss of consultation rights under NHPA cannot constitute

irreparable harm. The Band concedes (Memo. 15) that such an injury is purely "procedural."

And judges in this district have consistently refused to "base a finding of 'irreparable injury' on a

procedural violation standing alone," *American Association for Homecare v. Leavitt*, 2008 WL 2580217, at *5 (D.D.C. June 30, 2008) (Urbina, J.), because "any putative procedural violation ... [could] be remedied by a decision on the merits," *Elk Associates Funding Corp. v. U.S. Small Business Administration*, 858 F. Supp. 2d 1, 31 (D.D.C. 2012) (omission and alteration in original) (Kollar-Kotelly, J.); *see also, e.g.*, *Fisheries Survival Fund v. Jewell*, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (Chutkan, J.); *Friends of Animals v. U.S. Bureau of Land Management*, 232 F. Supp. 3d 53, 67 (D.D.C. 2017) (Cooper, J.); *National Parks Conservation Association v. U.S. Forest Service*, 2016 WL 420470, at *11 (D.D.C. Jan. 22, 2016) (Mehta, J.); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (Sullivan, J.).  This consensus flows from *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531 (1987), where the Supreme Court reversed the Ninth Circuit's holding that a bare procedural violation, unaccompanied by any substantive injury, is presumed to inflict irreparable harm, deeming that holding "contrary to traditional equitable principles," *id.* at 545.

Against this phalanx of binding or in-district precedent, the Eastern Band cites (Memo. 15-16) three out-of-circuit cases.  But none of the three involved purely procedural injury; in each, there were findings of concrete injury that could not be remedied at final judgment.  In one case, for example, there were findings that "denying … injunctive relief would result in … loss of reputation, good will, marketing potential, and ability to meet … contractual obligations to programmers and lifetime subscribers," and that "no remedy could repair th[is] damage." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156-1157 (10th Cir. 2001).  In another, the court found that "environmental harm will … occur[]" in the absence of a preliminary injunction.  *Save Strawberry Canyon v. Department of Energy*, 613 F. Supp. 2d 1177, 1189-1190 (N.D. Cal. 2009).  And in the third, the court found there would be "loss or

damage" to "historic properties" absent a preliminary injunction. *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010). These cases therefore do not support the proposition—again, a proposition the Supreme Court has rejected—that purely procedural injury can constitute irreparable harm.

To be sure, portions of the declaration attached to the Eastern Band's complaint hint at the possibility of *non*-procedural injury, insinuating that there are "human made stone tools" or "human remains" on the Kings Mountain site, and that the Nation's proposed gaming complex could harm those. Townsend Decl. ¶¶17-18. But no actual argument about non-procedural injury—or actual evidence of it—appears in the Band's motion or supporting memorandum; those papers, again, present the Band's claim of irreparable injury as the loss of "a procedural right," Memo. 15; *see also id.* at 16 (stating, after discussing the alleged procedural injury, that "*[t]his* threat of irreparable injury warrants the provision of immediate injunctive relief" (emphasis added)). Because alleged non-procedural injury is "not raised in the motion for a preliminary injunction," any such injury "waived for purposes of the preliminary injunction." *Michigan Catholic Conference & Catholic Family Services v. Burwell*, 755 F.3d 372, 396 n.14 (6th Cir. 2014) (subsequent history omitted); *accord, e.g.*, *Digital Mentor, Inc. v. Ovivo USA, LLC*, 2018 WL 993944, *7 (W.D. Wash. Feb. 21, 2018); *Native Ecosystems Council & Alliance for the Wild Rockies v. U.S. Forest Service*, 2011 WL 4015662, at *10 n.10 (D. Idaho Sept. 9, 2011).[2]

---

[2] The Band's motion does offhandedly assert (at 3) that if the land goes into trust, the Band will lose its rights under the Native American Graves Protection and Repatriation Act, Pub. L. No. 101-601, 104 Stat. 3048 (1990) (codified at 25 U.S.C. §3001) (hereafter NAGPRA). That loss will occur, according to the Band, because NAGPRA (a law never cited in the Band's complaint) purportedly applies "on state or local county or municipal lands," but not "to the lands of a separate sovereign Tribal Nation." Mot. 3. But the Band never quotes or even cites any actual provision or language in NAGPRA or its regulations, nor provides any other authority (or logic)

Lastly, to the extent the Eastern Band means to suggest that the procedural harm alleged here *would* be irreparable because the taking of the land into trust could not be undone, that is incorrect.  In *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012), the Supreme Court held that even after land has been taken into trust, courts can entertain a suit "seek[ing] to divest the Federal Government of title to the land," *id.* at 214.  And since that decision, the Interior Department has averred in litigation—before another judge of this Court—that it "will take … land out of trust if ordered to do so by the Court."  *Stand Up for California! v. U.S. Department of the Interior*, 919 F. Supp. 2d 51, 82 (D.D.C. 2013).  Thus, if the Band were to prevail at the end of this litigation, "corrective relief w[ould] be available," *Chaplaincy*, 454 F.3d at 297, namely, vacatur of the decision approving the Nation's application and removal of the land from trust status, after which any necessary consultation could occur.

In sum, the Eastern Band—faced with the D.C. Circuit's and this Court's demanding irreparable-harm standard—asserts harm that is admittedly purely procedural and therefore insufficient under both Supreme Court precedent and (if more were needed) a long string of cases in this district.  By itself, this glaring failure to establish irreparable harm warrants denial of the preliminary-injunction motion.  *See supra* pp.12-13.

---

to support its assertion.  Such a " 'perfunctory and undeveloped argument[], … unsupported by pertinent authority,' " is " 'waived.' "  *Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 126-127 (D.D.C. 2015) (Boasberg, J.) (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013)).  The Band's NAGPRA argument, moreover, is itself framed as involving procedural injury.  *See* Mot. 3-4 (stating, after citing NAGPRA, that "[t]he loss of a sovereign's right to engage in *consultation* concerning the proper *procedures* to protect cultural patrimony and resources … constitutes an irreparable harm" (emphasis added)).  In any event, the Band is wrong that NAGPRA will not apply if the land goes into trust.  By its terms, NAGPRA applies on "Federal or tribal lands," 25 U.S.C. §3002(a), and its implementing regulations define "tribal lands" as including "allotments held in trust … by the United States," 43 C.F.R. §10.2(f)(2)(i).  The Band thus will not lose any rights under NAGPRA if the land goes into trust—and hence that law does nothing to support the Band's irreparable-harm argument.

## II.    THE EASTERN BAND IS NOT LIKELY TO SUCCEED ON ANY OF ITS CLAIMS

The Eastern Band asserts (Memo. 5-13) that it is likely to succeed on the merits of its claim that Interior's approval of the Nation's land-into-trust application violated three laws: NEPA, NHPA, and the APA.  In reality, success is not likely on any of these claims.

### A.    NEPA

Under NEPA and its implementing regulations, an agency considering undertaking a "major Federal action[]," 42 U.S.C. §4332(C), must prepare an environmental impact statement (EIS) unless the agency determines—after completing an environmental assessment—that no "'significant' environmental impacts might result from the proposed … action," *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002).  In that event, the agency must instead "[p]repare a finding of no significant impact."  40 C.F.R. §1501.4(e).  That is what happened here.

The Eastern Band's motion does not challenge Interior's decision to forgo an EIS.  The Band instead alleges two related NEPA violations.  First, the Band contends (*e.g.*, Memo. 6-7) that Interior failed to "prepare" (or "complete") either a final EA or a FONSI, and therefore "failed to consider any alternatives to taking the land into trust."  Second, the Band asserts (*e.g.*, Memo. 6) that Interior failed to "publish" the EA and FONSI.  Each assertion fails.[3]

1.    The Eastern Band's claim that Interior did not prepare a final EA or FONSI and thus did not consider alternatives is factually wrong in both respects.  As an initial matter, both the FONSI—which is dated same day as Interior's approval letter—and the final EA are attached

---

[3] The Eastern Band's complaint also alleges (¶151) that Interior's draft EA is plagued by twenty "fundamental[] flaw[s]."  That is wrong, but it is also irrelevant here because the Band makes no similar claim in its preliminary-injunction motion or supporting memorandum, instead focusing entirely on the alleged failures to complete or publish the EA and to consider alternatives.  Any alleged flaws in the EA are thus waived for purposes of the Band's motion.  *See supra* p.16 (citing cases).

to the opposition that the federal defendants are filing contemporaneously.  Moreover, contrary to the Band's claim that Interior "fail[ed] to undertake the alternatives analysis … that the NEPA mandates," Memo. 7, the EA lays out three alternatives to taking the land into trust, *see* Final EA at 19-22, and it analyzes those alternatives' impact across *twelve* different environmental categories, including land and water resources, air quality, noise, and cultural resources, *see id.* at 28-65.  The Band is demonstrably unlikely to succeed with this claim.

2.      Equally without merit is the Eastern Band's claim that Interior violated NEPA by not publishing the final EA or FONSI.  The regulations the Band cites (Memo. 6, 10) do not require publication of either document.  *See* 40 C.F.R. §§1501.3-1501.4.  In fact, NEPA regulations do not even require the publication of "environmental impact statements, the comments received, [or] any underlying documents."  *Id.* §1506.6(f).  Those materials need only be made "available to the public pursuant to the provisions of the Freedom of Information Act." *Id.*  Since an EA and a FONSI are less significant documents under NEPA than an EIS, it makes sense that—again, as shown by the very regulations the Eastern Band cites—they likewise are generally not subject to any publication requirement.

The lone case the Eastern Band cites for its failure-to-publish argument—*Diné Citizens Against Ruining Our Environment v. Klein*, 747 F. Supp. 2d 1234 (D. Colo. 2010)—provides no support.  Indeed, on the very page of *Diné Citizens* that the Band cites (*see* Memo. 7), the court recognized that publication of a FONSI is required only in "certain limited circumstances," 747 F. Supp. 2d at 1261 (citing 40 C.F.R. §1501.4).  And those "limited circumstances," 40 C.F.R. §1501.4(e)(2), are where "[t]he proposed action is … one which normally requires the preparation of an environmental impact statement," and where "[t]he nature of the proposed action is … without precedent," *id.* §1501.4(e)(2)(i), (ii).  Neither circumstance is alleged here—

an omission that the Second Circuit has held by itself precludes any likelihood-of-success finding, *see Pogliani v. U.S. Army Corps of Engineers*, 306 F.3d 1235, 1240 & n.5 (2d Cir. 2002) (per curiam).  In any event, no such allegation would be credible:  Taking land into trust is not on the Interior Department's list of proposed actions that "will normally require the preparation of an EIS."  43 C.F.R. §10010.60(a).  Nor, obviously, is taking land into trust an action "without precedent."  *See generally* U.S. Department of Interior, Bureau of Indian Affairs, Acquisition of Title to Land Held in Fee or Restricted Fee Status (Fee-To-Trust Handbook) (June 28, 2016), https://www.bia.gov/sites/bia.gov/files/assets/public/raca/handbook/pdf/Acquisition_of_Title_to_Land_Held_in_Fee_or_Restricted_Fee_Status_50_OIMT.pdf.[4]

In short, the Eastern Band identifies no legal obligation to publish the final EA or FONSI here.  And while that failure alone means that the Band cannot show a likelihood of success on this claim, it is worth noting that, despite the lack of any obligation, Interior strove to ensure that the public had access to key materials addressing the environmental implications of the land-into-trust proposal and decision.  For example, in December 2019, Interior published notices of the draft EA's availability in several local newspapers, and also made the draft available online, at Catawba Indian Nation:  Trust Acquisition and Mixed-Use Entertainment Complex, www.catawbanationclevelandcountyea.com.  Approval Letter 31.  Interior has likewise made the final EA and FONSI available online, at the same website.  And it announced its land-into-trust decision on the Department's website and Twitter account.  U.S. Department of Interior, Press Release: Indian Affairs Announces Two Historic Decisions Taking Into Trust Tribal Lands

---

[4] Notice of the availability of EAs and FONSIs must also be published in the Federal Register if the proposed federal action has "effects of national concern."  40 C.F.R. §1506.6(b)(2).  The Eastern Band has not asserted that Interior's decision here has national effects, nor would any such assertion be plausible as to a decision to take into trust 16.57 acres of undeveloped land within the boundaries of a single state (indeed, a single county).

Under New Guidance (Mar. 13, 2020), https://www.bia.gov/as-ia/opa/online-press-release/indian-affairs-announces-two-historic-decisions-taking-trust-tribal; Indian Affairs (@USIndianAffairs), Twitter (Mar. 13, 2020, 7:50 PM), https://twitter.com/USIndianAffairs/status/1238613491893899264.  The Eastern Band's complaints about lack of publication are thoroughly insubstantial.

### B.  NHPA

The Eastern Band's NHPA claim fares no better.  The gist of that claim is that Interior failed to consult with the Band regarding the possibility of historic properties on the Kings Mountain site.  Two undisputed points doom that claim.  First, Interior *did* consult with the Band, inquiring in writing whether the Band had any basis to disagree with the North Carolina SHPO's representation that there were no known historic properties on the land.  *See* Dkt. 1-4 at 1.  Second, the Band offered no response to Interior's inquiry for *six weeks* (at which point Interior approved the Nation's application):  no substantive answer to Interior's question, no inquiry about the deadline for an answer (or request for more time), not even an acknowledgment of Interior's letter and promise of a response (or lack of one), nothing.  *See* Final EA, Ex. M, at 7.  While the Band insists that it was entitled to vastly more expansive forms of consultation, it cites nothing creating such an entitlement—and having sat on its hands for six weeks when it *was* consulted, the Band should not be heard now to complain about its need for urgent equitable relief.  Put simply, the Band cannot show that it will likely succeed on its "no-consultation" claim when Interior did undertake such consultation and the Band refused to participate.

### 1.  *Interior complied with its regulatory obligations under NHPA*

Section 106 of NHPA provides that before approving an "undertaking," a federal agency "shall take into account the effect of the undertaking on any historic property."  54 U.S.C. §306108.  The Advisory Council on Historic Preservation has promulgated "regulations

implementing the NHPA," regulations that "command substantial judicial deference." *McMillan Park Committee v. National Capital Planning Commission*, 968 F.2d 1283, 1287-1288 (D.C. Cir. 1992). Those regulations require that the responsible "agency official … consult with any Indian tribe … that attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. §800.2(c)(2)(ii). When such consultation is required, it consists of "provid[ing] the Indian tribe … a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects." *Id.* §800.2(c)(2)(ii)(A). And to ensure that the agency can afford any interested tribe that "reasonable opportunity," *id.*, the agency must "make a reasonable and good faith effort to identify any Indian tribes … that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties," *id.* §800.3(f)(2).

Interior complied with these obligations here. On January 31, 2019, it contacted the North Carolina SHPO to begin the section 106 process. *See* Dkt. 1-4 at 2. That was certainly a reasonable and good faith step, because North Carolina has jurisdiction over the Kings Mountain site. And the SHPO responded that it "ha[d] conducted a review of the [Kings Mountain] project and [was] aware of no historic resources which would be affected by the project." *Id.*

The Eastern Band has not asserted that Interior had any reason to doubt the accuracy of the SHPO's assertion, i.e., any reason to think the SHPO had conducted an inadequate review, was not being forthcoming, or was in any other way not fully qualified to opine correctly on the presence or absence of historic resources on the Kings Mountain site that would be affected by the Catawba's proposed development. Nor does the record otherwise suggest that Interior had

any such reason.  Hence, once it had received the SHPO's response, Interior had satisfied its

obligation "to make a reasonable and good faith effort to identify any Indian tribes … that might

attach religious and cultural significance *to historic properties in the area of potential effects*."

36 C.F.R. §800.3(f)(2) (emphasis added).  If there are no "historic properties in the area of

potential effects," *id.*—as the SHPO reported—then there obviously cannot be any tribes "that

might attach religious and cultural significance" to such properties, *id.*

Furthermore, twelve weeks before issuing its final decision, Interior informed the public,

in the draft EA, of its finding that although (of course) "previously unknown archaeological or

paleontological resources could be encountered during construction," "no historic properties,

known archeological sites or cultural materials are currently located within" the Kings Mountain

site.  *See* Ex. A-1 at 36.  Interior made that draft "available for state and local governments,

resource agencies, and public review on December 22, 2019, for a comment period ending on

January 22, 2020."  Approval Letter 31.  It also published notices of availability for the EA in

three North Carolina newspapers, and made the draft EA available online.  *Id.*  And as noted, it

notified the Eastern Band about the draft EA directly.  *See* Final EA, Ex. M, p.8.  This wide-

spread publication of Interior's finding and request for comment on it further shows Interior's

"reasonable and good faith effort to identify any Indian tribes … that might attach religious and

cultural significance to historic properties in the area," 36 C.F.R. §800.3(f)(2).

Even that, though, does not describe the extent of Interior's reasonable and good faith

efforts.  On the last day of the period for comments on the draft EA, the Eastern Band submitted

a letter providing comments.  *See* Dkt. 1-3.  The letter, however, did not claim that any Eastern

Band historic properties were in fact located on the Kings Mountain site.  Instead, it criticized

Interior's consultation *process*, stating that "to date, no effort has been made, and no invitation

has been sent, inviting the [Eastern Band] to consult over this proposed federal action."  *Id.* at 2.

Interior responded on January 30, 2020—just eight days after receiving the Eastern

Band's comments—by sending the Band's THPO a letter soliciting the Band's input.  Dkt. 1-4 at

1.  "BIA is currently working to identify, analyze and document any potentially significant

impacts associated with" the Nation's application and associated plan to develop a gaming

complex, the letter explained, and was specifically seeking by sending the letter "to verify with

your office that the proposed project will not impact any specific sites having potential religious

or cultural significance to the Eastern Band."  *Id.*  The letter further disclosed that North

Carolina's SHPO had "reviewed the project and was not aware of any historic resources in the

area of the project."  *Id.*  Nevertheless, "BIA [was] very interested in hearing from your office

regarding this project."  *Id.*  This was still another "reasonable and good faith effort to identify

any Indian tribes … that might attach religious and cultural significance to historic properties in

the area of potential effects," 36 C.F.R. §800.3(f)(2).  Together with Interior's prior efforts

(outlined above), it fully satisfied the agency's obligation under that regulation.

In any event, the purpose of the identification obligation is simply to ensure that

interested entities have an opportunity to provide input, via consultation.  Identification, in other

words, is not an end in itself but a means to guarantee that those with an interest can be heard.

There is thus no basis to vacate an agency decision when the relevant entity was in fact identified

and given that opportunity.

That is the situation here, because Interior's January 30 letter also satisfied the agency's

obligation to consult, i.e., to "provide[] the Indian tribe … [with] a *reasonable opportunity* to

identify its concerns about historic properties, [and] advise on the identification and evaluation of

historic properties, including those of traditional religious and cultural importance," 36 C.F.R. §800.2(c)(2)(ii)(A) (emphasis added). Again, the letter asked the Eastern Band explicitly to advise on whether it was aware of any historic properties in the site, stating that the BIA "is very interested in hearing from your office regarding this project." Dkt 1-4 at 1. And Interior did not approve the Nation's land-to-trust application until six weeks after sending the letter—weeks in which the Band, as noted, did not respond in any way. Six weeks is more than a "reasonable opportunity" for the Band to identify any concerns with Interior's conclusion that there were no historic properties on the site that would be affected by the Nation's project. That is particularly true given that the Band has never asserted that it could not have responded in six weeks, nor explained why it did not respond in that time.

"Section 106 … is often described as a 'stop, look, and listen' provision." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4, 8 (D.D.C. 2016) (Boasberg, J.). Here, Interior first looked to, and listened to, the relevant government office (the North Carolina SHPO) regarding whether there were historic resources on the Kings Mountain site that might be affected by the project. It then made a finding based on the SHPO's response, but demonstrated that it was open to revising that finding, if appropriate, by sharing it with the public and inviting comment. And when the Band complained about not being consulted directly, Interior did consult, i.e., "stopped" and "looked" to the Band for feedback. After six weeks of "listening," however, Interior heard only silence, so it moved forward. That is not a violation of NHPA; certainly the Band cites no case finding such a violation under remotely similar circumstances.

### 2.    *The Eastern Band's contrary arguments lack merit*

In attacking the lawfulness under NHPA of Interior's conduct, the Eastern Band first asserts (Memo. 8) that the agency "completely bypassed" the consultation process by going "straight from receiving comments from … the EBCI … to its final agency action—attempting

to circumvent the part of the process where the BIA must engage in good faith consultation with Tribal Nations to address *the deficiencies and issues in the Draft EA*" (emphasis added).  But the Eastern Band's letter commenting on the draft EA did not assert any substantive "deficiencies" in the draft's statement that the site lacked historic properties; it instead protested the lack of consultation with the Band.  *See* Dkt. 1-3 at 2 ("BIA has failed to fulfill its duty to … consult with the EBCI.").  And as explained, when Interior responded promptly by reaching out to ask the Band if it was aware of any historic properties on the site, the Band gave no answer for six weeks.  The failure here was thus not Interior's lack of consultation or willingness to address the possibility of historic properties on the site.  The failure was the Eastern Band's unwillingness (or inability) to identify any historic properties on the site in a timely fashion.[5]

The Eastern Band also asserts (Memo. 8) that Interior's consultation came too late, quoting a regulatory provision that states that "[c]onsultation should commence early in the planning process," 36 C.F.R. §800.2(c)(2)(ii)(A).  But "should" is not "shall."  *See United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999); *United States v. Harris*, 13 F.3d 555, 559 (2d Cir. 1994).  The provision imposes no legally enforceable obligation on Interior and thus provides no basis to vacate Interior's decision.  *See Caddo Nation of Oklahoma v. Wichita & Affiliated Tribes*, 2016 WL 3080971, at *9 (W.D. Okla. May 31, 2016) ("Plaintiff has not demonstrated that the [relevant entity] failed to consult … under NHPA.  While the [relevant entity] may not have executed its Section 106 duties perfectly, the Caddo Nation was offered the opportunity to participate but did not take it.").  That is especially the case given that another NHPA regulation

---

[5] After Interior issued its land-into-trust decision, the Band suggested for the first time that there may in fact be historical properties on the site.  *See, e.g.*, Townsend Decl. ¶¶17-18.  That much-belated suggestion—in addition to being wholly unsupported—obviously does nothing to show that the Band did not have a "reasonable opportunity to identify its concerns about historic properties," 36 C.F.R. §800.2(c)(2)(ii)(A).

expressly contemplates that consulting parties will be identified not only at the outset but also "as the section 106 process moves forward."  36 C.F.R. §800.3(f).

Next, the Eastern Band contends (Memo. 9) that Interior's January 30, 2020 letter was "pro forma" because it did not "address any of the concerns EBCI raised in the January 22 comments."  That is flatly wrong.  As noted, the Band's comment letter complained that the Band had not been consulted.  *See* Dkt. 1-3 at 2, *quoted supra* p.26.  Interior's letter responded directly to that concern, inquiring whether the Band was aware of any historic properties on the site.  The Band's attempt to belittle and dismiss the letter as "pro forma" is therefore unavailing.

The Eastern Band also protests (Memo. 9) that the January 30 letter was insufficient because (1) it "did not have a date for an expected response," (2) "no one from the BIA ever informed anyone at the EBCI that Defendants were moving forward with final agency action" and (3) Interior did not say that it "would not, in this instance, work with the EBCI's THPO to conduct the cultural survey that ordinarily the parties would collaboratively undertake."  The simple answer is that none of those three things is required by NHPA regulations, or by any other authority the Band cites.  Neither the Band's inflated sense of entitlement nor its kitchen-sink approach of throwing out every grievance it can think of in hopes something sticks does anything to suggest an actual violation of law.[6]

In any event, the Band's three complaints about the letter are insubstantial.  First, the lack of a due date in Interior's January 30 letter might be a problem if Interior had acted the next day or shortly thereafter.  But again, Interior did not act for six weeks—during which time the Eastern Band did not respond (a failure that, as noted, the Band has utterly failed to explain).

---

[6] Another example is the Band's repeated claim (Memo. 5, 16) of a "right" to conduct an archeological survey on the Kings Mountain site, over which it admits it "no longer exerts jurisdiction," Memo. 5.  The Band cites nothing creating such a right.

Second, the letter does in fact make clear that Interior was moving toward final agency action, stating that Interior was "reviewing an application from the Catawba Indian Nation" to place the Kings Mountain site "into federal trust." Dkt. 1-4 at 1. And third, there was no basis for Interior to inform the Band that it was not undertaking a survey, as the Band had not requested one. Moreover, "[w]here no historic property has been identified, the Tribe has no basis under the NHPA to demand particular actions by the [government]." *Narragansett Indian Tribe v. Warwick Sewer Authority*, 334 F.3d 161, 168 (1st Cir. 2003).

Finally, the Eastern Band claims (*e.g.*, Mot. 3) that the Kings Mountain site is within its "aboriginal territory." *See also* Memo. 3. To the extent the Band is suggesting that Interior thus had reason to believe the Band might have had an interest in identifying historic properties on the site, that suggestion is meritless because the site is *not* within the Band's aboriginal territory. At the end of its decades-long effort to "determin[e] the merits of native American claims," *United States v. Dann*, 470 U.S. 39, 45 (1985), the Indian Claims Commission, or ICC, included in its final report a map showing each area of land that a tribe had shown it "exclusively occupied and used … for a long time," ICC, *Final Report* 127 (1978), *available at* https://www.narf.org/nill/documents/icc_final_report.pdf. The map—entitled "Indian Land Areas Judicially Established," *id.*, and available at the Library of Congress's website, *see* https://www.loc.gov/resource/g3701e.ct008649/?r=0.13,0.297,1.093,0.436,0—shows that the Cherokee territory does not extend east to Cleveland County. Although the Band's complaint attaches (as Exhibit G) a different map known as the Royce Map, the ICC report explained (at 127 n.1) that that map shows "lands ceded" by Indians, and that "often the cessions did not match the true ownership." The ICC map, by contrast, "is a positive expression of land determined to have been owned." *Id.* If anything, it further undercuts rather than supports the Band's claim of any NHPA violation.

C.    APA

For its final likelihood-of-success argument, the Eastern Band asserts that it will likely succeed on its claim that Interior violated the APA in approving the Nation's land-into-trust application.  Specifically, the Band argues (Memo. 10-13) that it is likely to establish that Interior acted "contrary to law," 5 U.S.C. §706(2)(A), in two ways:  by applying section 5 of the IRA and its implementing regulations to take the land into trust, and by concluding that the land, once in trust, will be eligible for gaming under IGRA and its implementing regulations.  Each argument lacks merit.  *See infra* Part II.C.1-2.  In fact, each lacks merit even without applying two interpretive rules that support Interior's statutory interpretations:  *Chevron* deference and the Indian canon of construction.  Once those rules are applied, there is no doubt that the Band's APA claim is not likely to succeed.  *See infra* Part II.C.3.[7]

1.    *Interior was authorized to take the land into trust for the Nation under section 5 of the IRA*

According to the Eastern Band (Mot. 4), Interior violated the APA by taking the land into trust under section 5 of the IRA because "the 1993 Settlement Act … eliminated the BIA's authority to take land into trust for Catawba under the Indian Reorganization Act."  *See also, e.g.*, Memo. 10.  That is manifestly wrong.

a.    Section 4(b) of the Settlement Act authorizes IRA land-into-trust acquisitions

To reject the Band's argument that the Settlement Act precludes any IRA land acquisition for the Nation, the Court need go no further than section 4(b) of the statute.  That provision states

---

[7] In its complaint (¶¶99-107), the Eastern Band makes the additional claim that even if Interior could apply IGRA to the Nation's land-into-trust application, it acted unlawfully in concluding that the Nation's application qualified for IGRA's "restored lands" exception, *see* 25 C.F.R. §§292.7, 292.11.  But the Band does not argue in its motion or supporting memorandum that it is likely to succeed on this additional claim, so it has waived reliance on that claim for purposes of its motion.  *See supra* p.16 (citing cases).

that "the Tribe and its members shall be eligible for all benefits and services furnished to federally recognized Indian tribes and their members because of their status as Indians." One such benefit and service, of course, is having land taken into trust under section 5 of the IRA. *See, e.g.*, 25 U.S.C. §2703(4)(B) (referring to lands "held in trust by the United States *for the benefit* of any Indian tribe" (emphasis added)); 25 C.F.R. §292.2 (similarly referring to "land that has been taken, or will be taken, in trust for the benefit of an Indian tribe").

Section 4(b), moreover, states that it applies "[n]otwithstanding any other provision of law." Hence, even if there were other language in the Settlement Act supporting the Band's argument (and as explained below there is not), the argument would still fail because that language would be trumped by section 4(b). As the D.C. Circuit has repeatedly explained, the phrase "[n]otwithstanding any other provision of law" reflects an intent to "supersede all other laws"—and indeed that a "clearer statement is difficult to imagine." *Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991) (citing cases).

Interior cited section 4(b) in granting the Nation's application. *See* Approval Letter 22. Yet the Eastern Band never even mentions the provision. That silence is telling.

> b.    Section 9(a) of the Settlement Act separately authorizes IRA land-into-trust acquisitions

While no more is needed to show that the Eastern Band's IRA argument is meritless, section 9(a) of the Settlement Act also refutes that argument. Section 9(a) states that the Nation "shall be subject to [the IRA] except to the extent [its] sections are inconsistent with this Act." This language—which "parallels [language] found in … statutes" that the Supreme Court and Interior have determined "extended the IRA to particular tribes," Approval Letter 22—means that the application of section 5 to the Nation is authorized unless such an application is inconsistent with the Settlement Act. No such inconsistency exists.

The Eastern Band's contrary argument (Memo. 10-11) rests on sections 12, 13, and 15(e) of the Settlement Act.  Sections 12 and 13 establish procedures by which the Nation can acquire (respectively) reservation and non-reservation land in South Carolina.  Specifically, section 12 provides that the Nation can generally expand its reservation to tracts of land within certain "zones"—all of which are in South Carolina.  Settlement Act §12(c); *see also* Dkt. 1-6 at §§14.3-14.5.  Section 13, meanwhile, permits the Nation to acquire "non-reservation properties," but provides that "State law" (that is, South Carolina law) will govern on such land.  Settlement Act §13(b); *see also* Dkt. 1-6 at §15.2.  And section 15(e) expressly "approv[es]" and "ratifi[es]" section 19.1 of the settlement agreement, which provides that "any land … held in trust by the United States … for the Tribe[]" "shall be subject to the laws of the State and the civil and criminal jurisdiction of the courts of the State."  Because these sections are limited to land in South Carolina, the Eastern Band argues that the Act overall must limit the Nation to acquiring land in that state—that is, the Act must *bar* the Nation from acquiring land in any other state.

Nothing in the Settlement Act justifies that enormous leap.  Again, sections 12 and 13 *authorize* land acquisitions in South Carolina (under the enumerated conditions); that does nothing to show that they (or other provisions of the Act) *prohibit* any land acquisitions by the Nation outside that state.  There is assuredly no express statutory language imposing such a prohibition.  And that alone is fatal to the Eastern Band's argument, because a nationwide prohibition would be a far reaching (and extremely Draconian) step.  Such an unusual change to the established IRA land-into-trust regime requires clear congressional language, because "Congress … does not … hide elephants in mouseholes," *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).  That is particularly true when, as here, there is no clear rationale for the "elephant": The Eastern Band offers no explanation for why Congress would

have deemed it appropriate to bar the Nation from having land taken into trust anywhere outside South Carolina.  There is no such explanation.

Nor is there simply a lack of clear statutory language to support the Eastern Band's argument; there is significant contrary textual and contextual evidence.

As to text, there are several places in the Settlement Act where Congress expressly adopted a geographic scope beyond South Carolina.  For example, in section 3(9), the statute defines the Nation's "service area" to be not just South Carolina but also six North Carolina counties (including Cleveland County, where the Kings Mountain site is located).  Similarly, sections 6(a) and 6(d)(1)—which, respectively, ratify the Nation's land transfers and extinguish its aboriginal title—each do so as to "lands located anywhere within the United States."  The absence of any similar language in sections 12, 13, and 15(e) specifying a scope beyond South Carolina indicates that Congress intended for those provisions to apply only in that state, because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983).

As to context, the Act's primary purpose was—as its title indicates—to settle a decade of litigation between the Nation and South Carolina over land within that state.  *See supra* p.8.  Congress made multiple findings in the statute regarding that litigation (*see* §2(a)(5), (7)), and also made clear that a central purpose of the law was to approve the settlement of that litigation (*see* §2(b)(1), (4)).  Given that purpose, it makes sense that the act would address only the Nation's entitlement to (and the procedures by which it could claim) land in South Carolina.  That is especially so given that "North Carolina … was not a party to the settlement agreement,"

Approval Letter 26.  The parties (and Congress) therefore had no reason to address the Nation's ability to acquire land there (much less any other state).

Interior's reading of the Settlement Act as not limiting the Nation's land acquisitions outside South Carolina is—as Interior explained (Approval Letter 25-26)—consistent with case law interpreting similar statutes.  Like the Catawba Settlement Act, the Mohegan Nation of Connecticut Land Claims Settlement Act, Pub. L. No. 103-77, 108 Stat. 3501 (1994) "provide[d] a mechanism" by which the tribe in question could "add property to its reservation" with the use of settlement funds, but was silent on whether Interior could exercise its ordinary IRA land-into-trust authority with respect to property not acquired with settlement funds.  *See Connecticut ex rel. Blumenthal v. U.S. Department. of the Interior*, 228 F.3d 82, 87 (2d Cir. 2000).  When Interior attempted to exercise that authority to take such property into trust for the tribe, Connecticut sued, arguing (as the Eastern Band does here) that the statute should be read to provide an exclusive mechanism for the tribe to acquire property.  *Id.*  The Second Circuit disagreed.  It explained that the Connecticut Settlement Act was not "intended to settle once-and-for-all the extent of the [tribe]'s sovereignty"; rather, the law "emerged from the specific land dispute arising out of … lawsuits filed by the Tribe."  *Id.* at 90.  And the law's findings, the court stated, reflected this "more parochial" purpose:  Congress found that the pendency of the lawsuit had "placed a cloud on the titles to much of the land in the" affected area, and desired to "remove all clouds on titles resulting from" the suit.  *Id.*  "Nothing in the Act," the Second Circuit expounded, "indicates that Congress intended to establish the outermost boundaries of the Tribe's sovereign territory."  *Id.*  The Catawba Settlement Act reflects the same "parochial" intent—to settle a pending lawsuit—and it makes almost identical findings.  *See* Settlement Act §2(b)(4) (Act was intended "to remove the cloud on titles *in the State of South Carolina*"

(emphasis added)).  It, too, should not be read to establish an "outermost boundar[y]" on the Nation's land, *Blumenthal*, 228 F.3d at 90.

That conclusion is strengthened, as the Second Circuit observed, by the fact that when Congress intends to "prohibit the [Interior] Secretary from taking into trust *any* lands outside of specifically designated" territory, it knows how to do so.  *Blumenthal*, 228 F.3d at 90 (emphasis added).  The Maine Indian Claims Settlement Act, Pub. L. No. 96-520, 94 Stat. 1785 (1980), broadly prohibited Interior from taking land into trust anywhere in Maine on behalf of the relevant tribes, except for delineated plots.  And it did so in express language, stating that "[e]xcept for the provisions of [the Act], the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians … in the State."  25 U.S.C. §1724(e).  "The absence of an analogous provision in the [Connecticut] Settlement Act," the Second Circuit explained, confirmed that that statute "was not meant to eliminate the Secretary's power under the IRA" to take land into trust in contexts not governed by the law.  *Blumenthal*, 228 F.3d at 90.  So too here:  The fact that no provision in the Catawba Settlement Act expressly bars the Nation from seeking to acquire trust land outside South Carolina, or bars Interior from taking possession of such land on the Tribe's behalf, "confirms that the Settlement Act was not meant to" limit the Nation's rights in the extreme way the Eastern Band suggests.  *Id.*[8]

---

[8] Largely ignoring the myriad foregoing points, the Eastern Band invokes (Memo. 11-12 & n.2) the Settlement Act's legislative history, citing a committee report that shows (according to the Band) that the Nation understood it would be limited to acquiring land through the mechanisms in sections 12 and 13.  But even putting aside that "reliance on legislative history is hazardous at best," *Board of Education v. Mergens*, 496 U.S. 226, 242 (1990), the report actually shows only that the Nation (and South Carolina) understood that the procedures in sections 12 and 13 differ from those in the IRA.  The report in no way suggests that the Nation (or anyone else) believed the Settlement Act would govern the Nation's acquisition of land *outside* South Carolina.  In fact, as documents that Interior reviewed during the land-into-trust application process make clear, the key officials involved in negotiating the Settlement Act understood that neither it nor the settlement agreement would restrict the Nation's ability to take land into trust in North

In short, application of section 5 of the IRA to acquire land outside South Carolina for the Nation is not inconsistent with anything in the Settlement Act. Section 9(a) of the statute therefore authorizes Interior to use its section 5 authority to take such land into trust for the Nation.

           c.       The settlement agreement does not foreclose the application of section 5 of the IRA to the Nation

The Eastern Band next argues (Memo. 11) that "applying Section 5 of the IRA to take land into trust in North Carolina is" unlawful because section 9.1 of the settlement *agreement* (not the Settlement Act) "outlines the applicable provisions of the IRA—provisions that do not include § 5." Specifically, section 9.1 states that the Nation may "organize under the Indian Reorganization Act … and may adopt and apply to the [Nation] any of the following [IRA] provisions to the extent they are consistent with this Agreement," followed by a list of those provisions. Section 9.1 does not help the Band, for three independent reasons.

First, for the reasons just explained above regarding the Settlement Act, the settlement agreement applies only in and to South Carolina, save where a different scope is specified (which it is not in section 9.1). Any limitations in section 9.1 therefore do not apply to land acquisitions in North Carolina.

Second, contrary to the Eastern Band's assumption, the list of IRA provisions in section 9.1 is not exclusive; section 9.1 does not say that the Nation may "adopt and apply" *only* those provisions. The Band is not free to insert language that is not there.

Third, if section 9.1's list were exclusive and applied outside South Carolina, then it would conflict with section 9(a) of the Settlement Act, which as explained provides that the

---

Carolina. *See, e.g.*, Ex. A-2 at ¶12 (Interior Secretary Lujan stating that "those of us reviewing the Act knew that … the Tribe could fully exercise its sovereignty by acquiring land into trust in North Carolina."); Ex. A-3 at ¶10 (Chairperson Clark stating that he "understood … that the Tribe would be able to take land into trust in North Carolina pursuant to the Act."); Ex. A-4 at 1 (Rep. Richardson) (similar); Ex. A-5 at ¶6 (General Counsel Trotter) (similar).

*entire* IRA applies to the Nation (save where application of that law conflicts with the Settlement

Act, an exception that as discussed is not implicated by the application of section 5). And

section 15(b) of the Settlement Act states that "[i]n the event of a conflict between the provisions

of this Act and the Settlement Agreement, the terms of this Act shall govern."

*     *     *

Section 4(b) of the Settlement Act—again, never addressed by the Eastern Band—and

section 9(a) each separately authorize Interior to take land outside South Carolina into trust for

the Nation, and nothing in the settlement agreement does (or could) require a contrary result.

The Eastern Band is not likely to succeed on the merits of this aspect of its APA claim.

> 2.     *Interior's conclusion regarding gaming eligibility on the Kings Mountain site is correct and, in any event, irrelevant to Interior's land-into-trust decision*

The Eastern Band separately argues (Memo. 12-13) that Interior violated the Settlement

Act (and hence the APA) in concluding that the Kings Mountain site, once in trust, will be

eligible for gaming under IGRA and its implementing regulations. That is wrong for the reasons

explained in the balance of this subsection, but even if it were right, there would be no basis to

disturb Interior's decision to take the land into trust. That decision is separate from the decision

regarding gaming eligibility; neither decision depends on the other. And if IGRA *is* inapplicable

to the land once placed into trust, then the Nation would be entitled to conduct gaming activity

on the land under the Supreme Court's decision in *California v. Cabazon Band of Indians*, 480

U.S. 202 (1987).

All that aside, the Eastern Band's IGRA argument fails for the same reason as its IRA

argument: The Settlement Act and the settlement agreement do not restrict the Nation's

activities outside of South Carolina. *See supra* Part II.C.1.

The primary basis for the Eastern Band's contrary claim is section 14(a) of the Settlement Act, which states that IGRA "shall not apply to the [Nation]." The Band argues (Memo. 12) that because this provision applies to "the Tribe itself," it must bar the application of IGRA to *any* land taken into trust on behalf of the Nation anywhere in the United States. But again, this argument proceeds from the premise that the Settlement Act and the settlement agreement impose nationwide restrictions on the Nation's operations, rather than merely established procedures by which the Nation could operate *within* South Carolina. As discussed, that premise is infirm. *See supra* Part II.C.1.

Indeed, the very next provision of the Settlement Act, section 14(b), shows that the act made IGRA inapplicable only in South Carolina. Section 14(b) states that the "laws, ordinances, and regulations of the State"—South Carolina—"shall govern the regulation of gambling devices and the conduct of gambling or wagering by the [Nation] on and off the Reservation." *See also* Dkt. 1-6 at §16.1. That provision must be limited to gaming *in* South Carolina, or else South Carolina law would govern (for example) a casino the Nation chose to open in Las Vegas or Atlantic City. As Interior concluded, that would be an absurd result. Approval Letter 26. In fact, it would be unconstitutional, because "the Commerce Clause … precludes the application of a state statute to commerce that takes place wholly outside of the State's borders." *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989) (omission in original) (quotation marks omitted).

Nor can the Eastern Band retreat to the argument that sections 14(a) and 14(b) have different scopes, with the latter applying only in South Carolina but the former applying nation-wide. As the Supreme Court has repeatedly explained, "[c]ourts have a 'duty to construe statutes, not isolated provisions.' " *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513

U.S. 561, 568 (1995)).  Hence, "unless the text clearly indicates otherwise, adjacent subsections

on similar topics presumably have the same scope."  *Stanford v. United States*, 2014 WL

2574492, *3 (E.D. Ky. June 9, 2014) (Thapar, J.) (citing *Kellogg Brown & Root Services, Inc. v.

United States*, 728 F.3d 1348, 1366 (Fed. Cir. 2013)); *accord Franklin Federal Savings Bank v.

Director, Office of Thrift Supervision*, 927 F.2d 1332, 1339 (6th Cir. 1991) (interpreting a

statutory provision in part through "an analysis of nearby provisions" (citing *Coit Independence

Joint Venture v. Federal Savings & Loan Insurance Corp.*, 489 U.S. 561, 573-574 (1989))).  As

explained, section 14(b) of the Settlement Act can apply only to gaming in South Carolina.

There is no basis, textual or otherwise, for giving the immediately preceding provision a

monumentally broader scope.

Finally, the Eastern Band cites (Memo. 12-13) statements by courts that the Settlement

Act *was* intended to prohibit the Nation from engaging in gaming activity under IGRA.  But

setting aside that these statements are plainly dictum, the Nation does not dispute that section 14

prohibits it from engaging in gaming activity in South Carolina, save as authorized by the

settlement agreement and South Carolina law.  The question is whether section 14 prohibits the

Nation from engaging in gaming activity in *any* state.  None of the cases that the Band cites

addresses that question, and hence none provides any support for the Band's IGRA argument.

### 3.    Chevron *deference and the Indian canon confirm the validity of Interior's construction of the Settlement Act*

For the reasons just discussed, the Eastern Band's statutory-interpretation arguments all

lack merit.  But at most, those arguments show ambiguity in the Settlement Act regarding

Interior's authority to take the land into trust and to permit gaming on it.  Any such ambiguity,

however, dooms the Band's APA argument, because that ambiguity must be resolved in the

Nation's favor, under both agency-deference principles and the Indian canon of construction.

Under *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984), an agency decision is entitled to deference if it rests on a "permissible" interpretation of a federal statute that Congress "has authorized [the agency] to implement," *Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016). That is the situation here regarding the Settlement Act: Congress expressly authorized the Interior Department "to implement the terms of the Settlement Agreement," Settlement Act §2(b)(2), a directive that encompasses implementation of the Settlement Act, *see Blumenthal*, 228 F.3d at 93 (deferring to Interior's interpretation of an ambiguous land-claim settlement act).

Separately, under the Indian canon of construction, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also Confederated Tribes*, 830 F.3d at 558. Here, the Settlement Act was enacted to "promote [the Nation's] self-determination and economic self-sufficiency" and was enacted "in recognition of the United States['s] obligation to the [Nation]." Settlement Act §2(a)(1), (7). The "principles of equitable obligations … applicable to the trust relationship between the United States and the Native American people" that animate the Indian canon, *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001), thus militate strongly in favor of a reading of the Settlement Act that favors the Nation.

Application of the Indian canon is not affected by the fact that the opposing party is also an Indian tribe. The Settlement Act was enacted for the benefit of the Nation, not the Eastern Band, and as another judge in this district recently explained, "[i]t would be strange to construe a statute against the only Tribe it seeks to benefit simply because another Indian tribe objects." *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, — F. Supp. 3d —, 2020 WL 1065406, at *21 (D.D.C. Mar. 5, 2020). This decision also explains that other case law declining to apply

the Indian canon where there were tribes on both sides involved disputes over how to interpret generally applicable Indian statutes like IRA or IGRA, not (as here) a statute enacted for the specific benefit of one tribe. *See id.* (citing *Connecticut v. U.S. Department of the Interior*, 344 F. Supp. 3d 279, 314 (D.D.C. 2018)).

Applying the Indian canon and *Chevron* deference leaves no doubt that Interior did not act unlawfully in approving the Nation's land-into-trust application and deeming the land eligible for gaming once taken into trust. To take just one example, in light of section 14(b) of the Settlement Act (and case law holding that adjacent provisions are construed harmoniously), there is no serious argument that section 14(a) of the statute *unambiguously* makes IGRA inapplicable to the Nation throughout the country, rather than just in South Carolina. Hence, the application of *Chevron* deference and the Indian canon (indeed, either one would suffice) requires the Court to uphold Interior's interpretation in the Nation's favor. The same is true for the Eastern Band's other statutory arguments; the Band cannot show that the Settlement Act unambiguously has any of the meaning the Band ascribes to it. The Band's APA claim (like its NEPA and NHPA claims) is therefore not likely to succeed.

## III.    THE REMAINING FACTORS DO NOT SUPPORT THE EXTRAORDINARY RELIEF OF A PRELIMINARY INJUNCTION

### A.    Balance Of Equities

Although the Eastern Band argues (Memo. 17) that "[t]he balance of harms … weighs heavily in [its] favor," that argument does not take account of the harm to the Nation, because the Nation was not yet a party at the time the Band filed its motion. Once the harm to the Nation is considered—as now it must be, *see Ambach v. Bell*, 686 F.2d 974, 987 (D.C. Cir. 1982) (per curiam)—the balance indisputably tips decisively in defendants' favor.

As explained, *see supra* pp.13-17, the Eastern Band will suffer no significant harm if its motion is denied; should it ultimately prevail in this litigation, Interior can be ordered to engage in the consultation that the Band claims was required.  By contrast, an injunction would inflict tremendous harm on the Nation, delaying even longer the opening of the entertainment complex that is expected to generate substantial revenues for the Nation—just as the Band's two casinos, as explained at the outset, have generated substantial revenues for it over the two decades that it has enjoyed a gaming monopoly in the area.

The Nation badly needs those revenues.  As explained, *see supra* p.4, household income among its members is low and unemployment is high.  And the Nation's ability to assist those in need is severely limited by the Nation's limited funds.  Indeed, during the nearly seven years that its two land-into-trust applications were pending, the Nation (striving for a reliable funding source) expended significant resources navigating Interior's rigorous review process, causing the Nation to slip further into debt.  Harris Decl. ¶¶6, 10.  In 2017, moreover, the Nation had to transfer virtually all of the land that it held in fee simple to the local school district to compensate the district for educating tribal children.  *Id.* ¶6.  And in 2018, the Nation shuttered its modest bingo hall in South Carolina—after incurring a million-dollar debt—because it was impossible to obtain any profit given the mandatory 10% fee that South Carolina imposes on the Nation's *gross* bingo revenues.  *Id.* ¶7.

Now, with Interior's approval finally in hand, the Eastern Band seeks to impose more delay—likely another year or more.  That will push back the time when the Nation can provide its members the desperately needed services that gaming revenue will fund:  expanded access to health care, affordable housing, a K-12 school and scholarship programs, job training, a robust Justice Department, repair and upkeep of crumbling infrastructure, and more.  Harris Decl. ¶9.a.

The harm to the Nation from having to wait still longer for these core societal needs is enormous. Indeed, even one more year of delay would depress the net present value of the Nation's financial benefit from the casino development by approximately $70 million. *Id.* ¶13.

The Nation's project could even be jeopardized entirely by a preliminary injunction, which would have "a chilling effect," "bringing to a halt almost all of the pre-development and development activities necessary for the construction of a multi-hundred-million-dollar facility." Harris Decl. ¶10. And during the time the injunction would be in place, it is possible "that economic and financial circumstances will change in a manner that will make it more difficult for the project to move forward." Ex. C (hereafter Allen Decl.) ¶7. A cancellation of the project would be devastating for the Nation, leaving it saddled with crushing debt, and few if any realistic prospects to pay off that debt—let alone to improve the lives of its members. Given all these facts, and the lack of any cognizable harm to the Eastern Band if an injunction is denied, it is clear that the balance of harms weighs heavily in favor of denying the Band's motion.

### B.    Public Interest

The Eastern Band contends (Memo. 17) that the final preliminary-injunction factor supports injunctive relief because it is "within the public interest for federal agencies to be held to their consultation obligations," as "embodied in both the NEPA and NHPA." In other words, the Eastern Band contends, "the public interest would best be served by … ordering Defendants to engage in good faith consultation … as required by federal law." *Id.* at 18. To begin with, however, the Band cites not one case to support this argument—despite having represented in its cover motion (at 4) that "numerous courts have concluded that requiring federal agencies to abide the procedural requirements in the APA, NEPA, and NHPA necessarily serve[s] the public interest." That aside, the Band's argument conflates the likelihood-of-success factor with the public-interest factor. As the Supreme Court has explained, the public interest can "require[]

denial of … injunctive relief" even where the plaintiff has "established a likelihood of success on the merits." *Winter*, 555 U.S. at 23-24.  To satisfy this factor, then, the Band must point to some public interest *beyond* compliance with the laws under which it has sued.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 392-393 (2006) ("[T]his Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.").  It has failed to do so.

Moreover, the Band simply ignores the substantial benefits to the public that (as Interior found) the project will provide.  Specifically, Interior concluded—after consulting with numerous state, county, and local officials in North Carolina (including the governor)—that the Nation's planned entertainment complex will "result in a variety of benefits to the regional economy, including increases in overall economic output and employment opportunities." Approval Letter 28.  Those employment opportunities include approximately 1,640 "one-time employment opportunities" during the construction phase, approximately 2,600 new jobs to operate the facility, and approximately 1,000 indirect jobs created by the project overall.  *Id.* at 28-29.  And those jobs are expected to increase spending in Cleveland County by approximately $428 million.  *Id.* at 29.  Finally, the project will generate significant tax revenue for state and local governments.  *Id.*  All this explains why the chair of the Cleveland County's Board of Commissioners (the county's governing body) is submitting a declaration to this Court in opposition to the Band's motion, articulating the benefits the Nation's project will bring to her community and hence the harm that an injunction would impose on the public.  *See* Allen Decl.

The D.C. Circuit has recognized that a court "must respect the decision of the Secretary as reflecting the best interests of the public in his expert judgment."  *Ambach*, 686 F.2d at 987.

This same deference to Interior's determination of the public benefits—all of which would be delayed by an injunction—is warranted here.

## IV.  EVEN IF AN INJUNCTION WERE WARRANTED, EXEMPTING THE EASTERN BAND FROM THE BOND REQUIREMENT WOULD NOT BE APPROPRIATE

Finally, the Eastern Band argues (Memo. 18) that if a preliminary injunction issues, the Court should excuse the Band from posting any security (or at most require a nominal security). But Federal Rule of Civil Procedure 65(c) provides that "[a] court may issue a preliminary injunction … *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party … wrongfully enjoined." (emphasis added). And as the D.C. Circuit has recognized, this provision (like its counterpart in Rule 62(d)) means that a "bond should be the requirement in normal circumstances," with exceptions allowed only in "unusual circumstances." *Federal Prescription Service, Inc. v. American Pharmacy Association*, 636 F.2d 755, 760 (D.C. Cir. 1980). Indeed, another circuit has concluded that "the instances in which a bond may not be required are so rare that the requirement is almost mandatory." *Elliot v. Kiesewetter*, 98 F.3d 47, 59 (3d Cir. 1996). Even if there were any basis to issue a preliminary injunction, there are no "unusual circumstances" here that would warrant waiving a bond. To the contrary, a bond is particularly appropriate here given the weakness of the Band's claims, because one purpose of the bond requirement is the "deterrence of flimsy claims," *National Kidney Patients Association v. Sullivan*, 958 F.2d 1127, 1134 (D.C. Cir. 1992).

The Eastern Band offers two grounds (Memo. 18) for its waiver request: first, that a preliminary injunction "would not result in any harm … to Defendants," and second, that "the overwhelming balance of hardships rests on Plaintiff and not Defendants." Each point is wrong. As to the first, the Nation has already shown that it would suffer significant harm from having to wait months if not years longer before the land can be taken into trust. *See supra* pp.41-42. And

as to the second, even if an extreme imbalance of the equities in a plaintiff's favor suffices to overcome the presumption in favor of imposing a bond, there is assuredly no extreme imbalance here. The Eastern Band faces no irreparable harm, *see supra* pp.13-17, whereas the harms the Nation would suffer from a preliminary injunction are real and concrete, far exceeding the purely procedural injury the Band says it would suffer absent interim injunctive relief.

In discussing the amount of security that is appropriate if a preliminary injunction issues, the Seventh Circuit has rightly explained that "[w]hen setting the amount of security," "district courts should err on the high side." *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000), *amended on denial of rehearing*, 209 F.3d 1032 (7th Cir. 2000) (per curiam). That is because "[a]n error in setting the bond too high … is not serious" given that any party later seeking to recover on the bond would have to prove their actual damages. *Id.* Conversely, however, "an error in the other direction produces irreparable injury, because the damages for an erroneous … injunction cannot exceed the amount of the bond." *Id.*

In this case, even if the litigation concludes in only a year, the Nation projects—based on its business plan, and assuming a conservative 10 percent discount rate—that the issuance of a preliminary injunction would decrease the net present value of the Nation's financial benefit from the casino development by approximately $70 million. Harris Decl. ¶13. And even if that already-conservative estimate were reduced by 50 percent (a large reduction, particularly given the case law just cited holding that district courts setting bonds should err on the high side), that would make the appropriate bond amount $35 million. That, the Nation submits, is the minimum bond that would be appropriate if this Court concluded that the Eastern Band has satisfied the stringent standards that apply to the extraordinary relief of a preliminary injunction.

## CONCLUSION

The motion for a preliminary injunction should be denied.

Dated:  April 3, 2020

Respectfully submitted,

/s/ Daniel S. Volchok
Daniel S. Volchok (#497341)
Arpit K. Garg (#1033861)
Alex Hemmer (#198279)
Samuel M. Strongin (#240970)
Amy C. Lishinski (#1620295; D.D.C.
  admission pending)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
E-mail:  daniel.volchok@wilmerhale.com