UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EASTERN BAND OF CHEROKEE INDIANS,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*,<br><br>Defendants,<br><br>and<br><br>THE CATAWBA INDIAN NATION,<br><br>Defendant-Intervenor. | Civil Action No. 20-757 (JEB) |

## MEMORANDUM OPINION

Seeking to improve its economic prospects, in September 2018, the Catawba Indian Nation asked the Bureau of Indian Affairs, a part of the Department of the Interior, to take a 16-acre parcel of land in North Carolina into trust so that the Nation could build a casino and entertainment complex there. After nearly a year and a half of studies, meetings, and other regulatory processing, the agency agreed to the acquisition. Immediately following that decision, Plaintiff Eastern Band of Cherokee Indians filed this suit against Interior, BIA, and several agency officials, asserting that Interior's action violated a host of federal statutes and regulations.

On the same day it filed its Complaint, the EBCI moved this Court to preliminarily enjoin the transfer of land. Interior — joined by the Catawba as an Intervenor — maintains that the

1

circumstances here do not merit that extraordinary form of relief.  Finding that Plaintiff has not established irreparable harm, the Court agrees and will thus deny the EBCI's Motion for a Preliminary Injunction.

**I.      Background**

The Catawba is the only federally recognized Indian tribe in the state of South Carolina.  See ECF No. 1-2 (DOI Approval Letter) at 14.  It has about 3,400 members, "over 250 of whom live in North Carolina."  ECF No. 12-7 (Declaration of William Harris), ¶ 5.  Today, the Nation faces significant economic challenges.  Its unemployment rate, for example, hovers around 13.8%, more than three times the corresponding rates in North and South Carolina.  See Approval Ltr. at 12.  Further, its median household income — roughly $30,000 — is about 30% below the equivalent figures for the Carolinas.  Id.; Harris Decl., ¶ 5.  Given that it lacks a sustainable revenue stream, the Nation cannot adequately provide financial assistance to its members.  See ECF No. 13-1 (Final Environmental Assessment) at ECF p. 7.  To do so, it must rely on federal and state governments for funding.  Id.; Harris Decl., ¶ 6.

Seeking to stimulate its economic development, the Catawba developed a plan "to construct a casino and mixed-use entertainment complex" on a 16.57-acre parcel of land it agreed to purchase in Cleveland County, North Carolina.  See Approval Ltr. at 2; see also ECF No. 19 (Catawba Apr. 17, 2020, Notice) at 1 (explaining that Nation has enforceable option to purchase such parcel).  That land, known as the Kings Mountain site, is 34 miles from the Nation's headquarters in South Carolina and sits within its aboriginal lands.  See Approval Ltr. at 2, 9.  In its business plan, the Nation estimated that the complex would generate $72 million in income in its first year of operation, rising to $150 million in year five.  Id. at 36.  The

development, moreover, is expected to create "2,600 direct employment opportunities." Id. at 27.

On September 17, 2018, the Catawba filed an application with Interior, requesting that it take the Kings Mountain site into trust for the Nation's benefit. Id. at 1–2; see generally Indian Reorganization Act, 25 U.S.C. §§ 5101 et seq.; 25 C.F.R. Part 151. It also asked for a determination of whether the land, once in trust, would be eligible for gaming pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq. See Approval Ltr. at 1; see also 25 C.F.R. Part 292 (applicable regulations).

In considering the Nation's application, Interior assessed the project's compliance with myriad statutes — most relevant here, the National Environmental Policy Act and the National Historic Preservation Act. Broadly speaking, NEPA mandates that agencies evaluate the potential environmental impact of any "major Federal action," including the taking of land into trust for the benefit of a tribe. See 42 U.S.C. § 4332; 25 C.F.R. § 151.10(h). On top of that, the NHPA requires consideration of the project's effects on "historic properties" — that is, "[p]roperty of traditional religious and cultural importance to an Indian tribe." 54 U.S.C. §§ 302706, 30038, 306108; see 36 C.F.R. § 800.4. In other words, the Government was required to determine the impact of the project on tribes besides the Catawba.

To fulfill these obligations, Interior reached out to North Carolina's State Historic Preservation Office in early 2019. See ECF No. 1-4 (DOI Letter of Jan. 30, 2020) at ECF p. 3. It did so to inquire whether historic resources of any kind might be present at the project site. Id. A few weeks later, the SHPO responded that it was "not aware" of any such resources there. Id. So the agency forged ahead with its evaluation. At the end of the year, on December 22, 2019, it published a draft Environmental Assessment, concluding that the Nation's project would have no

significant environmental impact.  See Approval Ltr. at 31–36; ECF No. 13-2 (Declaration of Chester McGhee), ¶ 3.  Such finding, if ultimately finalized, would obviate the need for a more involved Environmental Impact Statement.

The next day, Interior notified Plaintiff of the publication of the Draft EA.  Id., ¶¶ 7–8.  That is because the NHPA requires agencies to "consult" with Indian tribes "that attach[] religious and cultural significance to" a historic property potentially affected by a federal undertaking.  See 54 U.S.C. §§ 302706, 306102.  And here, the EBCI alleges that the Kings Mountain site falls squarely within "Cherokee historical and treaty territory."  See ECF No. 1 (Complaint), ¶ 19 (emphasis added).

On January 22, 2020, Plaintiff's counsel submitted a letter to the agency, objecting to the Draft EA on several grounds.  See ECF No. 1-3 (EBCI Letter).  Of note, it asserted that Interior did not consult with the EBCI about whether historical properties important to the Tribe were located on the proposed site.  Id. at 1–2.  Eight days later, the agency wrote to Plaintiff's Tribal Historic Preservation Officer Russell Townsend, noting the North Carolina SHPO's views and asking him to "verify . . . that the proposed project will not impact any specific sites having potential religious or cultural significance to Eastern Band of Cherokee Indians."  DOI Jan. 30 Letter at ECF p. 1.

Over the next few weeks, further correspondence was exchanged between the agency and Plaintiff, culminating with a meeting between the two in February here in Washington.  See ECF No. 14-7 (Briefing Emails); ECF No. 14-2 (Declaration of Richard Sneed), ¶¶ 7–9, 13; ECF No. 14-5 (EBCI Briefing Paper).  At that meeting, EBCI Chairman Richard Sneed reiterated his Tribe's concern that the "project could impact Cherokee cultural sites."  Sneed Decl., ¶ 15.  The Catawba believe that the Eastern Band's concern has more to do with preventing competition to

4

its own casino than any sentimental regard for its ancestors. See ECF No. 12 (Catawba Opp.) at 1. Plaintiff's true motivation, however, is not something the Court finds relevant to its decision here.

In any event, Interior greenlighted the Nation's land-into-trust application on March 12, believing that its decision was on all fours with federal law. See Approval Ltr. at 37. Within days, on March 17, the EBCI filed this suit against Interior, the BIA, and several agency officials. It challenges Defendants' action on three fronts. For starters, it maintains that Interior's decision to take the land into trust runs smack up against a statute codifying a 1993 settlement agreement between South Carolina and the Catawba. See Compl., ¶¶ 88–114 (Counts I–III); The Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub. L. No.103–116, 107 Stat. 1118 (1993). At this stage, understanding the details of that Act is unnecessary. Suffice it to say that, according to the EBCI, the settlement agreement bars Interior from taking the Kings Mountain site into trust for the Nation and deeming it eligible for gaming. See Compl., ¶¶ 88–114. Plaintiff believes that the agency's decision to do so consequently violated the Administrative Procedure Act, as it was arbitrary and capricious and contrary to law. Id.

The EBCI also asserts that the agency flouted the procedural protections afforded under the NHPA. See Compl., ¶¶ 115–143 (Count IV). In broad strokes, Plaintiff maintains that Interior "did not make reasonable efforts to consult with the EBCI in good faith during the environmental review process encompassing the historic preservation analysis." Id., ¶ 134. It also alleges that the agency violated NEPA by failing to adequately consider the environmental impact of the proposed site and to promptly publish its findings. Id., ¶¶ 144–64; see ECF No. 17 (Pl. Reply) at 15–23.

On the same day it filed its Complaint, the EBCI moved for a temporary restraining order and a preliminary injunction against the Kings Mountain site's being taken into trust. See ECF No. 2 (Pl. Motion & Brief). Shortly after, the Catawba moved to intervene in support of federal Defendants, which the Court permitted. See Minute Order of Mar. 23, 2020.

The EBCI subsequently agreed to withdraw its TRO Motion and proceed only on the preliminary injunction, while the Catawba consented to delay the transfer of the land into trust for 45 days. Id. Having heard oral argument via teleconference on April 15, 2020, the Court is now prepared to rule on the Motion.

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. NRDC, 555 U.S. 7, 24 (2008). A party seeking preliminary relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Id. at 20.

Before the Supreme Court's decision in Winter, courts weighed these factors on a sliding scale, allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. Davis v. PGBC, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009); see Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360–61 (D.C. Cir. 1999). Our Circuit has hinted, though not held, that Winter should be read to abandon the sliding-scale analysis, in favor of a "more demanding burden" requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm. Sherley v. Sebelius, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (quoting Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1292 (D.C. Cir. 2009)). At any rate, courts in this Circuit have held that "if a party makes no showing of

irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." Henke v. Dep't of the Interior, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) (quoting CityFed Fin. Corp. v. OTS, 58 F.3d 738, 747 (D.C. Cir. 1995)).

### III.  Analysis

Given that the EBCI must show irreparable harm to prevail here, the Court starts and ends with that analysis. In our Circuit, a litigant faces a "high standard for irreparable injury." Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). To clear this hurdle, a movant must demonstrate that such "injury is likely in the absence of an injunction," not just that it is a "possibility." Winter, 555 U.S. at 22. The injury, moreover, must be "great" and "of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." Chaplaincy, 454 F.3d at 297 (quoting Wis. Gas. Co. v FERC, 758 F.2d 669, 674 (D.C. Cir. 1985)). Further, the harm "must be beyond remediation" — that is, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date in the ordinary course of litigation weighs heavily against a claim of irreparable harm." Id. at 297–98 (quoting Wis. Gas. Co., 758 F.2d at 674). With these principles in mind, the Court now turns to Plaintiff's alleged injuries.

    A.  Procedural Harm

In its opening brief, the EBCI principally maintains that, without injunctive relief, it will suffer irreparable harm in the form of lost consultation rights outlined in the NHPA and NEPA. See Pl. Br. at 14–16; ECF No. 1-1 (Mar. 16, 2020, Declaration of Russell Townsend), ¶ 21 ("If the Kings Mountain site is taken into trust . . . [,] [Plaintiff] will lose the right to consultation on and protection of Cherokee religious and cultural sites."). At its core, Plaintiff's alleged injury is thus a procedural one. See Pl. Br. at 15 (characterizing harm as loss of "procedural right").

A chorus of federal courts, however, has found that procedural injury, standing alone, cannot constitute irreparable harm. See, e.g., Friends of Animals v. U.S. Bureau of Land Mgmt., 232 F. Supp. 3d 53, 67 (D.D.C. 2017) ("[A] procedural harm arising from a NEPA violation is insufficient, standing alone, to constitute irreparable harm justifying issuance of a preliminary injunction.") (quoting Fund for Animals v. Norton, 281 F. Supp. 2d 209, 222 (D.D.C. 2003)); NPCA v. U.S. Forest Serv., 2016 WL 420470, at *11 (D.D.C. Jan. 22, 2016) (same); see also Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't of Interior, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010) (finding irreparable harm under NHPA after noting likely risk of "[d]amage to or destruction of" "hundreds of known historical sites" in addition to loss-of-consultation right). Rather, to shoulder its burden to obtain a preliminary injunction, a litigant must show that the procedural harm is accompanied by a "concrete injury." Fisheries Survival Fund v. Jewell, 236 F. Supp. 3d 332, 336 (D.D.C. 2017) (citing Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998)); see also Wis. Gas Co., 758 F.2d at 674 (noting that injunctive relief requires "actual" injury).

The parties vigorously disagree about whether the EBCI has also alleged such a concrete harm. See Catawba Opp. at 16; ECF No. 13 (DOI Opp.) at 28; Pl. Reply at 14–15. Notably, Defendants posit that the EBCI's opening papers are silent about non-procedural injury. See Catawba Opp. at 16; DOI Opp. at 28. They are partially correct. Plaintiff's brief in support of its Motion says nothing about this. See Pl. Br. at 14–16. As chronicled above, its focus instead is on the procedural injuries sustained from NEPA and NHPA violations.

The EBCI's short Motion, on the other hand, is a different story. Read generously, it appears to make out an allegation of concrete injury — namely, that absent injunctive relief, "cultural patrimony and/or human remains found on these 16.57 acres will be completely lost."

Pl. Mot. at 3. As further evidence that it claims an actual injury, Plaintiff maintains that it incorporated the declaration of its THPO, id. at 4; Hrg. Tr. (Apr. 15, 2020) at 46:22–48:3, who also avers that the gaming complex may harm "human made stone tools" or "human remains" that could be on the proposed site. See Townsend Mar. Decl., ¶¶ 17–18. In rejoinder, the Catawba contend that Plaintiff did not actually incorporate Townsend's declaration in its Motion. See Catawba Opp. at 16; Hrg. Tr. at 22:6–15. As such, the argument goes, the EBCI waived this alleged injury for purposes of its preliminary-injunction request. See Catawba Opp. at 16; Hrg. Tr. at 21:20–21. The Nation is certainly correct that, at the least, the EBCI could have been considerably clearer in its papers about the source of its injury. As even a liberal reading of Plaintiff's pleadings nonetheless manifests that the injuries fall short of irreparable, the Court need not spend any time on the intricacies of forfeiture doctrine.

    B.  <u>Concrete Harm</u>

First and foremost, Plaintiff has not shown that it is likely that Cherokee historical artifacts even exist at the Kings Mountain site. Plaintiff's THPO stated that, in the past, the Tribe has consulted with other federal agencies several times about Cherokee historic-preservation matters in Cleveland County. See ECF No. 14-4 (Apr. 10, 2020, Declaration of Russell Townsend), ¶ 4. During one of those consultations, he identified "pre-historic Cherokee ceramics" roughly "ten miles away from Kings Mountain." Id., ¶ 5. That, however, does not make it <u>likely</u> that Cherokee resources also exist on that mountain — let alone, on the proposed gaming site, which occupies only 16 acres of Kings Mountain.

Perhaps seeking to fill in the gap, Townsend also declared that "there is evidence of an archeological investigation" on Kings Mountain. See Townsend Mar. Decl., ¶ 17. Yet, he offered no additional supporting details, leaving several key questions unanswered. For

9

example, who conducted that investigation and when? Did the investigation yield any evidence of Cherokee resources there? Given this thin record, the Court cannot conclude that it is likely that any EBCI resources exist on the parcel of land at issue.

To be sure, Townsend also stated that a "historical pottery kiln and prehistoric lythic scatter" — *i.e.*, "human made stone tools" — have been found at Kings Mountain. Id. According to him, the North Carolina Department of Transportation made this "incidental discovery" when it was working on a project in the area over a decade ago. Id. Nothing in his declaration, however, places the cultural relics on the proposed gaming site itself. See Final EA at ECF p. 712; id. at ECF p. 723 (demonstrating that 16.57-acre parcel was only portion of NCDOT's project area). More significantly, Townsend did not aver that any of those items belonged to the Cherokee. See Townsend Mar. Decl., ¶ 17. Nor has he identified — with any degree of certainty — that there are any human remains at the site, much less that they are Cherokee. Id., ¶ 18 ("If there are any human remains at the site, then they are potentially intact below the zone of impact from [NCDOT's earlier] work.") (emphases added). In brief, the record is devoid of any concrete information supporting the EBCI's position.

Plaintiff also maintains that Interior's consultation process should have included a cultural or archeological survey of the project site with the EBCI's input in case the Tribe could locate relevant material. See Townsend Mar. Decl., ¶¶ 12, 17; Pl. Reply at 8; Hrg. Tr. 8:5–9:3. In effect, Plaintiff requests that its THPO be provided an opportunity to check out a project site for possible cultural items any time that site is located within the EBCI's aboriginal lands. To state the argument is nearly to refute it, for EBCI aboriginal lands appear to be vast indeed. Such areas potentially encompass most of Kentucky and substantial portions of Tennessee, the two Virginias, Alabama, Georgia, and the Carolinas. See ECF No. 1-8 (Royce Map); ECF No. 18-1

(Demonstrative Exhibits) at 12; see also Hrg. Tr. at 45:9–46:5 (Plaintiff stating that aboriginal lands are identified by a 1777 treaty). The statutes at issue do not compel the Government to conduct extensive surveys, and certainly not archeological digs, within these broad geographical bounds each time it proposes to take a major action — without any proof that items of cultural significance will likely be found there. See Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers, 205 F. Supp. 3d 4, 35 (D.D.C. 2016) (recognizing that claim under NHPA must be grounded in determination of where tribe's "culturally significant lands lie" rather than general allegation that such lands extend to "wherever the buffalo roamed").

In any event, such a survey would not likely bear the EBCI any fruit here. The site is a "highly disturbed" area that has been used for multiple purposes. See Final EA at ECF p. 10. More specifically, it has been previously "prospected for tin," id., and, in 2005, NCDOT used it as "a soil b[o]rrow pit during the construction" of a nearby road. Id. at ECF p. 712. When road construction concluded the following year, state authorities "graded" — *i.e.*, leveled — the land. Id. As such, even if Plaintiff's THPO went onto the land, a visual review would likely not yield much information. And, given that this land is privately owned at the moment, see Catawba Apr. 17 Notice at 1, there is no evidence that the THPO would have been permitted to excavate or undertake a more extensive survey.

Finally, it bears noting that, as part of its review of the Catawba's application, Interior searched "historical and archeological literature," as well as the National Register of Historic Properties, to determine the "locations and chronologies of known cultural resources within the project area." Final EA at ECF p. 26. It did not find any "eligible or potentially eligible historic properties" or "paleontological resources" there. Id. at ECF pp. 27. In addition, the agency found it "unlikely that the area [would] yield[] important paleontological specimens." Id. It was

not alone in its thinking; North Carolina's SHPO, too, maintained that it was not "aware of [any] historic resources which would be affected by the project." DOI Jan. 30 Ltr. at ECF p. 3.

Even if Cherokee historical artifacts exist at the proposed site, the EBCI has not shown that any damage to such resources is imminent. In its Final Environmental Assessment, Interior pointed out that the Catawba had agreed to use certain best practices and undertake enumerated mitigation measures so that the proposed complex would have a "less than significant" impact across several environmental measures. See Final EA at ECF pp. 68–70; Approval Ltr. at 31–36; id. at 35 (pointing to § 5.0 of Final EA). Notably, it identified certain procedures to help reduce the adverse effects of the proposed gaming complex on protected resources, including historic properties and cultural patrimony. See Final EA at ECF p. 68 (referencing Table 2-2 in EA).

Here are the details. If any such resource is discovered during the construction process, "work within 50 feet of the find shall be halted until a professional archeologist . . . , or paleontologist if the find is paleontological in nature, can assess the significance of the find in consultation with the BIA, other appropriate agencies and the Nation." Id. at ECF p. 18. Under the applicable regulations, the agency expert shall also notify EBCI's THPO of the find. See 36 C.F.R. § 800.13(b)(3); see also Final EA at ECF p. 19 (listing EBCI THPO Townsend as contact). If the find is significant, the THPO shall meet with the archeologist (or paleontologist) to "determine the appropriate course of action." Id. at ECF pp. 18–19.

Separately, the EBCI THPO will also be contacted if human remains are uncovered. Id. Assuming that such remains are Native American, the construction process will halt until "the THPO and [an agency] representative have made the necessary findings as to the origins and disposition." Id. at ECF p. 19. The reference to EBCI's THPO was added to the mitigation provision of the EA after the EBCI made its objections known to Interior following its review of

the initial EA.  Compare ECF No. 12-2 (Draft EA) at ECF pp. 17–18, with Final EA at ECF p. 19.  The agency's Final Approval letter specifically references mitigation steps to be implemented by the Catawba.  See Approval Ltr. at 35–36.  The Catawba and federal Defendants, in fact, relied heavily on the enforceability of the mitigation measures in arguing here against the imminence of any injury.  Should the Catawba fail to adhere to these mitigation measures, consequently, the EBCI would have grounds to return to court.

These steps assure the EBCI that any significant resources will be preserved if they are discovered during the construction process.  The Court is not holding that any mitigation plan would always suffice to vitiate irreparable harm, but in the context of this case, where there is no evidence of Cherokee artifacts and the land has already been substantially disturbed by state construction activities, the plan suffices to greatly reduce the imminence of injury.

For these reasons, the EBCI has not cleared the "high standard" for irreparable harm.  See Chaplaincy, 454 F.3d at 297.  As a result, the Court need not consider the other prongs of the injunction test.

### IV. Conclusion

The Court, accordingly, will deny Plaintiff's Motion for a Preliminary Injunction.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  April 30, 2020