## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EASTERN BAND OF CHEROKEE INDIANS,<br><br>       Plaintiff,<br><br>  and<br><br>THE CHEROKEE NATION,<br><br>       Plaintiff-Intervenor,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,<br><br>       Defendants,<br><br>  and<br><br>THE CATAWBA INDIAN NATION,<br><br>       Defendant-Intervenor. | Civil Action No. 20-cv-00757-JEB |

## THE CATAWBA INDIAN NATION'S MOTION TO DISMISS
## AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ........................................................................... 1

STATEMENT ................................................................................. 3

    A.    The Catawba Indian Nation ................................................ 3

    B.    The Catawba's Litigation And Settlement With South Carolina .............. 6

    C.    The Catawba's Land-Into-Trust Application ............................... 8

    D.    This Lawsuit .................................................................. 11

APPLICABLE STANDARDS ............................................................. 12

ARGUMENT ................................................................................. 13

I.    EBCI'S APA/SETTLEMENT ACT CLAIMS SHOULD BE DISMISSED ......................... 13

    A.    Count I Should Be Dismissed Because Interior Was Authorized To Take The Land Into Trust Under Section 5 Of The IRA ....................... 13

        1.    Section 9(a) of the Settlement Act authorizes IRA land-into-trust acquisitions ................................................ 13

        2.    Section 4(b) of the Act authorizes IRA land-into-trust acquisitions ........................................................... 19

        3.    The settlement agreement does not foreclose the application of section 5 of the IRA to the Catawba ........................ 21

    B.    Count II Should Be Dismissed Because Interior's Conclusion Regarding Gaming Eligibility On The Kings Mountain Site Is Consistent With The APA ..................................................... 22

        1.    Interior did not violate the APA by applying IGRA to the Catawba land-into-trust request, because the Settlement Act does not preclude such an application .............................. 22

        2.    Interior did not violate the APA in concluding that the Catawba's application satisfied IGRA ............................ 24

    C.    *Chevron* Deference And The Indian Canon Confirm The Validity Of Interior's Construction Of The Settlement Act ........................ 27

D.    Count III Should Be Dismissed For The Same Reasons As Counts I-II.................................................................................................29

II.    THE TRIBES' NHPA CLAIMS SHOULD BE DISMISSED ............................................30

A.    EBCI Has Not Plausibly Alleged A NHPA Violation .............................31

1.    Interior was not required to consult with EBCI, but in any event it did so ......................................................................31

2.    EBCI's contrary arguments lack merit ..........................................36

B.    The Cherokee Has Not Plausibly Alleged A NHPA Violation..............................39

C.    If There Was Any NHPA Violation, It Was Harmless As A Matter Of Law..............................................................................................41

III.    THE TRIBES' NEPA CLAIMS SHOULD BE DISMISSED ............................................43

A.    Neither Tribe States A Viable Claim Based On The Supposed Failure To Publish The EA Or FONSI.................................................44

B.    There Is No Plausible Claim That Interior Was Required To Prepare An EIS ........................................................................47

C    The Tribes' Remaining NEPA Allegations Fail As A Matter Of Law..............................................................................................49

CONCLUSION.................................................................................................50

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................12

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ............................12, 32, 44

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................12

*Birckhead v. FERC*, 925 F.3d 510 (D.C. Cir. 2019).....................................................43

*Board of Education v. Mergens*, 496 U.S. 226 (1990) ...................................................19

*Caddo Nation of Oklahoma v. Wichita & Affiliated Tribes*, 2016 WL 3080971
 (W.D. Okla. May 31, 2016) .................................................................... 42-43

*California v. Cabazon Band of Indians*, 480 U.S. 202 (1987) ......................................22

*Canonsburg General Hospital v. Burwell*, 807 F.3d 295 (D.C. Cir. 2015)...................20

*Catawba Indian Tribe of South Carolina v. State of South Carolina*, 978 F.2d
 1334 (4th Cir. 1992) (en banc)............................................................................6

*Catawba Indian Tribe of South Carolina v. United States*, 982 F.2d 1564 (Fed.
 Cir. 1993) ..........................................................................................................6

*Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837
 (1984)..................................................................................................................27

*Chiquita Brands International Inc. v. SEC*, 805 F.3d 289 (D.C. Cir. 2015) ................20

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................25, 26

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ......................................................28

*Coit Independence Joint Venture v. Federal Savings & Loan Insurance Corp.*,
 489 U.S. 561 (1989).............................................................................................24

*Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d
 552 (D.C. Cir. 2016) ...........................................................................................28

*Connecticut ex rel. Blumenthal v. U.S. Department of the Interior*, 228 F.3d 82
 (2d Cir. 2000)...............................................................................16, 17, 18, 28

*Connecticut v. U.S. Department of the Interior*, 344 F. Supp. 3d 279 (D.D.C.
 2018) ...................................................................................................................29

*Covad Communications Co. v. Bell Atlantic Corp.*, 407 F.3d 1220 (D.C. Cir. 2005) ....................................................................................................................12

*Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332 (6th Cir. 1991) ...............................................................................................24

*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975) ......................................49

*Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280 (2010) ...........................................................................23

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002) .......................................43

*Gresham v. Azar*, 950 F.3d 93 (D.C. Cir. 2020) ..........................................................25

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) .............................................................23

*He Depu v. Yahoo! Inc.*, 950 F.3d 897 (D.C. Cir. 2020) ..........................................3, 12

*Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989) .......................................................23

*Hermes Consolidated, LLC v. EPA*, 787 F.3d 568 (D.C. Cir. 2015) ...........................41

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) .........................................................9

*Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348 (Fed. Cir. 2013) ...........................................................................................................24

*Liberty Maritime Corp. v. United States*, 928 F.2d 413 (D.C. Cir. 1991) ...................19

*Lomax v. Ortiz-Marquez*, ___ S. Ct. ___, 2020 WL 3038282 (U.S. June 8, 2020) ................20, 21

*McCreary v. Offner*, 172 F.3d 76 (D.C. Cir. 1999) ......................................................37

*McMillan Park Committee v. National Capital Planning Commission*, 968 F.2d 1283 (D.C. Cir. 1992) ...........................................................................30

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985) ......................................28

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) .....................................................25, 29

*Narragansett Indian Tribal Historic Preservation Office v. FERC*, 949 F.3d 8 (D.C. Cir. 2020) ...................................................................................30

*Narragansett Indian Tribe v. Warwick Sewer Authority*, 334 F.3d 161 (1st Cir. 2003) ...........................................................................................................42

*National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ................................................................................................50

*National Parks Conservation Association v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019) .........................................................................................................49

*National Trust for Historic Preservation v. Blanck*, 938 F. Supp. 908 (D.D.C. 1996) .........................................................................................................31

*NTCH, Inc. v. FCC*, 950 F.3d 871 (D.C. Cir. 2020) ....................................31

*Russello v. United States*, 464 U.S. 16 (1983) ............................................15

*Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, ___ F. Supp. 3d ___, 2020 WL 1065406 (D.D.C. Mar. 5, 2020)....................................28, 29

*Save Our Heritage, Inc. v. FAA*, 269 F.3d 49 (1st Cir. 2001) ......................41

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) ...............................................20

*Shea v. Director, Office of Workers' Compensation Programs*, 929 F.2d 736 (D.C. Cir. 1991) .......................................................................................20

*Sierra Club v. FERC*, 827 F.3d 36 (D.C. Cir. 2016) ...................................20

*South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498 (1986)....................3, 5, 6

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4 (D.D.C. 2016) ...................................................................................35, 37, 39

*Stanford v. United States*, 2014 WL 2574492 (E.D. Ky. June 9, 2014) .......24

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ........................................12

*United States v. Harris*, 13 F.3d 555 (2d Cir. 1994).....................................39

*United States v. Maria*, 186 F.3d 65 (2d Cir. 1999) ....................................39

*Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council, Inc.*, 435 U.S. 519 (1978)....................................................................................50

*Whitman v. American Trucking Associations*, 531 U.S. 457 (2001) ...........15

*Wilson v. Block*, 708 F.2d 735 (D.C. Cir. 1983) ........................................37

## STATUTES

5 U.S.C. §706..................................................................................................22

25 U.S.C.
 §1 ................................................................................................................17
 §2703 ..........................................................................................................19

42 U.S.C. §4332 ....................................................................................................43

54 U.S.C. §306108 ................................................................................................30

Administrative Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified
 as amended at 5 U.S.C. §551 *et seq.*) ..............................................................1

Catawba Indian Claims Settlement Act, 1993 S.C. Act No. 142 ...............................8

*Catawba Indian Tribe of South Carolina Land Claims Settlement Act, Pub. L.
 No. 103-116, 107 Stat. 1118 (1993) ....................................................... *passim*

Catawba Tribe of South Carolina Division of Assets Act, Pub. L. No. 86-322, 73
 Stat. 592 (1959) ................................................................................................6

Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988)
 (codified as amended at 25 U.S.C. §2701 *et seq.*) ........................................10

*Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified as
 amended at 25 U.S.C. §461 *et seq.*) ................................................................6

Maine Indian Claims Settlement Act, Pub. L. No. 96-420, 94 Stat. 1785 (1980) .......17

Mohegan Nation of Connecticut Land Claims Settlement Act, Pub. L. No. 103-
 377, 108 Stat. 3501 (1994) ..............................................................................16

National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 852 (1970)
 (codified as amended at 42 U.S.C. §4321 *et seq.*) ..........................................2

National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966)
 (codified as amended at 16 U.S.C. §470 *et seq.*) ........................................ 1-2

S.C. Code Ann.
 §27-16-40 ...............................................................................................8, 14
 §27-16-90 ....................................................................................................8
 §27-16-100 ..................................................................................................8
 §27-16-110 ..................................................................................................8

## RULES AND REGULATIONS

Federal Rule of Civil Procedure 12 .....................................................................12

24 C.F.R.
 §58.1 .........................................................................................................46
 §58.43 .......................................................................................................46

25 C.F.R.
    Part 151 .................................................................................................................9
    §292.2 ...............................................................................................19, 25, 26
    §292.7 ...............................................................................................................10

*36 C.F.R.
    §800.2 ...............................................................................................30, 35, 39, 40
    §800.3 ........................................................................................30, 31, 32, 33, 39
    §800.4 ......................................................................................................33, 37
    §800.16 ..............................................................................................................32

40 C.F.R.
    §§1501.3-1501.6 ..................................................................................................44
    §1501.4 ................................................................................................43, 44, 46, 47
    §1502.16 ..............................................................................................................50
    §1506.6 ...............................................................................................44, 45, 46
    §1508.9 ..............................................................................................................50
    §1508.27 ............................................................................................47, 48, 49

43 C.F.R. §10010.60 ................................................................................................47

*Land Acquisitions; Catawba Indian Nation, Kings Mountain Parcel, North
    Carolina*, 85 Fed. Reg. 17,093 (Mar. 26, 2020) ................................................11

## OTHER AUTHORITIES

Catawba Indian Nation:  Trust Acquisition and Mixed-Use Entertainment
    Complex, www.catawbanationclevelandcountyea.com (visited June 15,
    2020) ...............................................................................................................45

Indian Affairs (@USIndianAffairs), Twitter (Mar. 13, 2020, 7:50 PM),
    twitter.com/USIndianAffairs/status/1238613491893899264 ...........................46

Press Release, U.S. Department of Interior:  Indian Affairs Announces Two
    Historic Decisions Taking Into Trust Tribal Lands Under New Guidance
    (Mar. 13, 2020), www.bia.gov/as-ia/opa/online-press-release/indian-
    affairs-announces-two-historic-decisions-taking-trust-tribal.................................... 45-46

U.S. Department of Interior, Bureau of Indian Affairs, Acquisition of Title to
    Land Held in Fee or Restricted Fee Status (Fee-To-Trust Handbook) (June
    28, 2016), www.bia.gov/sites/bia.gov/files/assets/public/raca/handbook/
    pdf/Acquisition_of_Title_to_Land_Held_in_Fee_or_Restricted_Fee_Statu
    s_50_OIMT.pdf ...............................................................................................47

## INTRODUCTION

For over two decades, the Eastern Band of Cherokee Indians (hereafter EBCI) has enjoyed a monopoly on casino gaming in western North Carolina, reaping billions of dollars in revenue from its two casinos—money that has improved life tremendously for EBCI and its members.  Yet for ten years now, EBCI has taken myriad steps to deny the Catawba Indian Nation (hereafter Catawba) the same opportunity to use gaming to alleviate the widespread poverty and other crippling hardships afflicting *its* members.  This lawsuit is another such step.

All of EBCI's claims here, however—as well as the largely copycat claims advanced by the Cherokee Nation (hereafter Cherokee)—fail as a matter of law.  The two tribes ask this Court to overturn a decision by the Interior Department and its officials to take a parcel of land in North Carolina into trust for the Catawba, and to deem that land eligible for gaming once in trust. But in a thorough decision, the federal defendants (hereafter Interior) explained that the Catawba had met the requirements for both a discretionary taking of land into trust and for gaming on that trust land.  Among other things, Interior explained that the Catawba is, as noted, severely distressed economically (a fact largely attributable to South Carolina unlawfully dispossessing the Catawba of almost 150,000 acres of its aboriginal lands in the 1840s).  Interior also explained that permitting the Catawba to develop a casino complex on the land will provide much-needed revenue, employment opportunities, and cultural expression for the Catawba's several thousand members.  And Interior explained, that in turn will facilitate the Catawba's economic self-sufficiency and self-determination, which is the overarching goal of federal Indian law today.

Seeking to block these benefits, EBCI brings claims under three federal laws:  the Administrative Procedure Act, or APA, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. §551 *et seq.*); the National Historic Preservation Act, or NHPA, Pub. L. No.

89-665, 80 Stat. 915 (1966) (codified as amended at 16 U.S.C. §470 *et seq.*); and the National Environmental Policy Act, or NEPA, Pub. L. No. 91-190, 83 Stat. 852 (1970) (codified as amended at 42 U.S.C. §4321 *et seq.*).  The Cherokee brings similar NHPA and NEPA claims, but with some different factual allegations.  None of these claims, from either tribe, is plausible.

For example, EBCI's APA claim rests primarily on the notion that a 1993 statute, which approved the settlement of litigation brought by the Catawba, bars the Interior Department from taking land into trust for the Catawba outside South Carolina.  But while the statute contains provisions *governing* the Catawba's land acquisitions in South Carolina, it contains no language *limiting* the Catawba to land acquisitions in that state.  In fact, the statute states—without any geographic restriction—that, "[n]otwithstanding any other provision of law," the Catawba "shall be eligible for all benefits and services furnished to federally recognized Indian tribes."  Catawba Indian Tribe of South Carolina Land Claims Settlement Act (hereafter Settlement Act), Pub. L. No. 103-116, §4(b), 107 Stat. 1118, 1121 (1993).  One such benefit and service is having land taken into trust for the purpose of a tribe's economic development.  And even if the act were ambiguous, principles of agency deference and the Indian canon of construction would each require that that ambiguity be resolved in Interior's and the Catawba's favor.

EBCI's NEPA claim, meanwhile, rests largely on the assertion that Interior failed to prepare either a final environmental assessment (hereafter EA) or a finding of no significant impact, or FONSI.  But documents cognizable in this posture—namely the EA and FONSI themselves—show that that is simply wrong.  Likewise demonstrably false is the tribes' claim that Interior failed to consider alternatives to the Catawba's proposal.

Finally, the tribes' NHPA claim is that Interior violated NHPA regulations by not consulting them about historic properties on the land at issue.  But Interior did consult EBCI—

asking it directly to advise on whether there was any reason to believe there were historic

properties on the land—and Interior moved forward with its decision only after EBCI offered no

such reason.  EBCI unquestionably had a "reasonable opportunity" to express its views, which is

what NHPA regulations require.  As for the Cherokee, nothing entitled it to any consultation.

Both EBCI's and the Cherokee's complaints should be dismissed.

## STATEMENT[1]

### A.   The Catawba Indian Nation

The Catawba Indian Nation is a federally recognized tribe, and currently "the only

federally recognized tribe in South Carolina."  Dkt. 1-2 (hereafter Approval Letter) at 14.  It has

several thousand members, over 250 of whom live in North Carolina.  *Id.* at 11.[2]

The Catawba's connection to the southeastern United States dates back centuries:  Its

"aboriginal territory [was] in what is now North and South Carolina," *South Carolina v.

Catawba Indian Tribe, Inc.*, 476 U.S. 498, 500 (1986), and its members have resided on that land

since before English settlement, *see* Approval Letter 14.

Today, the Catawba—like many tribes, bands, and nations—faces significant economic

challenges.  Two economic figures, in particular, underscore its dire circumstances.  First, the

Catawba's (pre-coronavirus) unemployment rate is 13.8%, more than triple the pre-coronavirus

rates in North Carolina and South Carolina (4.2% and 4.3%, respectively).  Approval Letter 12.

Second, the Catawba has a median household income of $33,029, which is 40% below the

equivalent figures for the Carolinas.  *Id.*

---

[1] This statement relies to a significant extent on Interior's approval letter, i.e., the decision being
challenged.  This Court can consider the letter in resolving this motion because the letter is an
exhibit to EBCI's complaint.  *See He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020).

[2] Interior stated in its decision (page 11) that there are 2,800 Catawba members.  Although it is
not relevant for purposes of this motion, the correct figure is around 3,400, *see* Dkt. 12-7.

The Catawba's economic woes have engendered significant hardship.  Lacking much tax revenue, the Catawba relies largely on the U.S. government for funding.  Approval Letter 12.  Because that funding varies year-over-year, however, *id.*, the Catawba has been forced to take several steps deleterious to its members.  For instance, the Catawba has had to reduce after-school programs for its youth, lay off staff who offered critical trauma and support services for crime victims, and transfer portions of its fee land to a local school district to compensate the district for educating tribal children.  *Id.*  The Catawba also lacks funds to develop a tribal-justice system, including tribal courts and law enforcement.  *Id.*  Nor can the Catawba maintain its own roads, because federal funding provides a small fraction of the money needed.  *Id.* at 12-13.

Seeking to overcome these economic challenges, the Catawba has undertaken numerous efforts "to establish business ventures to produce revenue."  Approval Letter 12.  "[B]ut none have produced substantial or stable sources of revenue."  *Id.*  One reason for this is a lack of land on which the Catawba may pursue such opportunities.  *Id.* at 27.  In particular, "[t]he Nation's current land trust base of 1,012 acres is subject to development restrictions" stemming from a settlement between the Catawba and South Carolina over several of the Catawba's land claims, and legislation implementing the settlement.  *Id.*

That settlement—which is central to this litigation, and detailed in the next subsection—arises out of disputes tracing back centuries.  "Significant encroachment by settlers on the Nation's lands began around the 1730s."  Approval Letter 14.  In 1760, the Carolina colonies and the Catawba signed the Treaty of Pine Tree Hill, under which (as Congress explained in 1993) the Catawba "ceded vast portions of its aboriginal territory in the present States of North and South Carolina in return for guarantees of being quietly settled on a 144,000-acre reservation," Settlement Act §2(a)(4)(A), 107 Stat. at 1118.  Soon thereafter, the Catawba entered into the

1763 Treaty of Augusta with Great Britain, essentially ratifying the terms of the Treaty of Pine Tree Hill.  Approval Letter 14.

Although the Catawba then fought alongside the colonists during the Revolutionary War (earning the recognition of George Washington), Approval Letter 15, those efforts did not lead to a harmonious relationship between the Catawba and the new country it had helped in the struggle for independence.  In the ensuing decades, after settlers had leased much of the Catawba's treaty land, they "began petitioning South Carolina to arrange a [new] treaty by which the Nation would cede its claims to the leased land."  *Id.*  In 1840, the Catawba and South Carolina signed the Treaty of Nation Ford, *id.*, under which the Catawba conveyed to South Carolina its 144,000 acres in exchange for South Carolina's promise to spend $5,000 to buy a new reservation (in addition to cash payments), *South Carolina*, 476 U.S. at 501.

Although South Carolina immediately seized the Catawba's land, it did not fulfill its end of the bargain.  The state spent "only $2,000 instead of $5,000 to purchase" land for the promised new reservation.  *South Carolina*, 476 U.S. at 501.  That land, moreover, consisted of only 630 acres, *see* Approval Letter 15, and "it was not actually 'new' land because it was located within the original 144,000-acre tract," *South Carolina*, 476 U.S. at 501.

"Toward the end of the nineteenth century, the Nation began seeking federal assistance in bringing claims against South Carolina for the unlawful conveyance of its reservation lands." Approval Letter 16.  The Interior Department, after being unhelpful for many decades, eventually agreed to assist.  *See id.* at 16-18.  In 1942, it approved an agreement between itself, South Carolina, and the Catawba, under which the state acquired 3,434 acres of land near the Catawba's existing reservation and conveyed it in trust to the United States for the Catawba.  *Id.* at 17.  The United States further "agreed to make annual contributions of available sums for the

welfare of the Tribe and to assist the Tribe with education, medical benefits, and economic

development." *South Carolina*, 476 U.S. at 502.  Shortly thereafter, the Catawba organized

under the Indian Reorganization Act, or IRA, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified

as amended at 25 U.S.C. §461 *et seq.*).  *See South Carolina*, 476 U.S. at 502-503.

These positive developments for the Catawba were short-lived.  In 1959, Congress

enacted the Catawba Tribe of South Carolina Division of Assets Act, Pub. L. No. 86-322, 73

Stat. 592 (repealed 1993) (hereafter Termination Act).  This law terminated the trust relationship

between the United States and the Catawba, lifted federal restrictions on alienation of the

Catawba's federal reservation, and distributed tribal assets.  Approval Letter 18.  That left the

Catawba with only the 630-acre reservation in South Carolina.  *Id.* at 18 n.122.

**B.      The Catawba's Litigation And Settlement With South Carolina**

In 1980, after trying but failing to obtain a legislative settlement of its claims to its

historical lands in South Carolina, the Catawba sued South Carolina in federal court, setting off

over a decade of litigation that ultimately made its way to the Supreme Court.  *See South

Carolina*, 476 U.S. 498; *see also, e.g.*, *Catawba Indian Tribe of South Carolina v. State of South

Carolina*, 978 F.2d 1334 (4th Cir. 1992) (en banc); *Catawba Indian Tribe of South Carolina v.

United States*, 982 F.2d 1564 (Fed. Cir. 1993).  In 1992, however, the Catawba, South Carolina,

and the United States agreed to a comprehensive settlement of the Catawba's claims, a resolution

that encompassed federal recognition of the Catawba and the restoration of its trust status.

As relevant here, this settlement is reflected in three documents.

First, the Catawba and South Carolina executed a fifty-page "agreement in principle,"

intended to "settle[] the claims and suits pending in" court concerning the Catawba's land claims

against the state.  *See* Dkt. 1-6 (hereafter Settlement Agreement) at §3.1.  This agreement

provided that, upon its ratification and the passage of local, state, and federal implementing

legislation, the Catawba would dismiss with prejudice its relevant pending lawsuits. *See id.* §6.4.

In return, South Carolina would transfer title to the Catawba's existing reservation to Interior, *id.*

§14.1, as well as pay (along with the United States) into a trust fund established in part to permit

the Catawba to acquire additional land, *id.* §5.

The settlement agreement also set out procedures by which such land purchases in South

Carolina could take place.  Settlement Agreement §§14-15.  With respect to reservation land, it

provided that the Catawba would generally be required to obtain the consent of existing

landholders, the state, and any local authorities before asking Interior to take land into trust.  *Id.*

§14.  It also provided that the Catawba could acquire non-reservation land without such

approval, but any such land would be "subject to the laws, ordinances, taxes, and regulations of"

South Carolina.  *Id.* §15.2.  Finally, the agreement provided that any gaming operation conducted

by the Catawba "on and off the reservation" would be governed by South Carolina law (as

modified by the agreement and state implementing legislation) rather than federal law.  *Id.* §16.1.

Second, Congress enacted a statute, the Settlement Act, to implement the aspects of the

settlement that required congressional approval.  This statute formally "restored" the "trust

relationship between the [Catawba] and the United States," Settlement Act §4(a)(1), 107 Stat. at

1121, and it made the Catawba and its members "eligible for all benefits and services furnished

to federally recognized Indian tribes and their members," *id.* §4(b), 107 Stat. at 1121.  The law

also allowed the Catawba to organize under the IRA (a law that allows Interior to take land into

trust on behalf of tribes), explicitly providing that the Catawba would be "subject to [the] Act."

*Id.* §9(a), 107 Stat. at 112.  And the Settlement Act adopted the land-acquisition and gaming

provisions of the settlement agreement described above.  *Id.* §§12-14, 107 Stat. at 1133-1136.

Third, South Carolina enacted the Catawba Indian Claims Settlement Act, 1993 S.C. Act No. 142.  This statute provided that the Catawba would be "subject to the civil, criminal, and regulatory jurisdiction of the State … to the same extent as any other person, citizen, or land in the State, except as otherwise expressly provided."  S.C. Code Ann. §27-16-40.  It also implemented the procedures set out in the settlement agreement for the Catawba's acquisition of new land as well as the rules that would govern the Catawba's conduct of gaming activities within South Carolina.  *See id.* §§27-16-90, -100, -110.

### C.    The Catawba's Land-Into-Trust Application

Roughly a decade ago, the Catawba—seeking to generate much-needed revenue and economic development for its people—decided to develop a casino and mixed-use entertainment complex on a 16.57-acre parcel of land in Cleveland County, North Carolina.  Approval Letter 2.  That land, known as the Kings Mountain site, is 34 miles from the Catawba's headquarters in South Carolina, *id.*, and within the Catawba's aboriginal lands, *id.* at 9.  The complex is expected to generate $72 million in income in its first year of operations, growing to $150 million in the fifth year.  *Id.* at 36.  The development will also create 2,600 direct employment opportunities. *Id.* at 27.  And it will provide an important cultural benefit to the Catawba, by including a gift shop where native artwork and handcraft is sold.  *Id.* at 36.  "The on-site gift shop will enable the [Catawba] to provide its members with a commercial outlet to help preserve and share [its] unique artistic and cultural heritage."  *Id.*  That is particularly valuable to the Catawba, because although the Catawba's "pottery tradition" is of "vital importance … to the expression of Catawba identity," tribal artisans "struggle to support themselves on their craft alone."  *Id.*

The Catawba first submitted a land-into-trust application for the Kings Mountain site to the Secretary of Interior in 2013.  Approval Letter 2.  That application was withdrawn five years

later, shortly before a replacement application was submitted in September 2018.  *See id.*  This
second application asked the secretary to take the land into trust for the Catawba's benefit
"pursuant to the Department's land acquisition regulations at 25 C.F.R. Part 151."  *Id.*  It also
asked for a determination of whether the land, once in trust, would be eligible for gaming.[3]

In considering the Catawba's second application, Interior engaged in an investigation and
consultation process with respect to potential environmental impact to the Kings Mountain site
from the Catawba's proposed project and the possibility of historic properties on the site.  Of
particular relevance here, Interior conducted its own historical research of the site, *see* Dkt. 12-2
(hereafter Draft EA) at 22-23, and then contacted North Carolina's State Historic Preservation
Office (SHPO), *see* Dkt. 1-4 (hereafter Melville Letter) at 1-2.  The research gave no reason to
believe there were historic properties on the site, *see* Draft EA 23, and the SHPO (which has
jurisdiction over the site) responded that it was not aware of any such properties, *see* Melville
Letter 2.  Interior then prepared a draft EA, concluding that the Catawba's project would not
affect historic properties or have any significant environmental impact; the draft was posted
online and published in three local newspapers.  Approval Letter 31-36.  An Interior Department
official also e-mailed EBCI directly to solicit comments on the draft EA.  EBCI Compl. ¶50.

In its comments on the draft EA, EBCI objected to Interior's failure to consult with it
about whether historic properties important to EBCI were located on the Kings Mountain site.
*See* Dkt. 1-3 (hereafter EBCI Comments) at 1-2.  Eight days later, Interior wrote a letter to
EBCI's Tribal Historic Preservation Officer (THPO), noting the North Carolina SHPO's views

---

[3] Although EBCI alleges (Compl. ¶45) that the Catawba's first application was denied, Interior's
approval letter—which as noted is an exhibit to EBCI's complaint—correctly states (page 2) that
the application was withdrawn.  While the difference is not relevant to this motion, this Court
need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to
the complaint," *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).

and asking EBCI to "verify … that the proposed project will not impact any specific sites having

potential religious or cultural significance to the Eastern Band."  Melville Letter 1.

EBCI does not allege that it ever directly responded to Interior's letter.  Six weeks after

the letter was sent—which was also 18 months after the Catawba had filed its second land-into-

trust application—Interior acted, granting the application in March 2020.  Approval Letter 37.[4]

In its approval letter, Interior concluded (at 23-27) both that it had authority under section

5 of the IRA to grant the Catawba's application—deeming that authority undisturbed by the

Settlement Act—and that the application satisfied the requirements in Interior's IRA regulations

for taking land into trust.  These requirements include "that acquisition of the Site in trust will

facilitate tribal self-determination and economic development," *id.* at 13; that the Catawba

"needs additional land … because its existing land base and tribal ventures are unable to meet

[its] needs," *id.* at 11; and "that the construction, maintenance, and operation of the gaming and

entertainment facility will provide a major economic benefit to the" Catawba, *id.* at 37.

Interior further concluded that the Kings Mountain site would be eligible for gaming once

in trust, because the Catawba satisfied the "restored-lands exception" to the general prohibition

on Indian gaming established by the Indian Gaming Regulatory Act, or IGRA, Pub. L. No. 100-

497, 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §2701 *et seq.*).  *See* Approval

Letter 3; *see also* 25 C.F.R. §292.7 (restored-lands exception).  The Catawba met the exception,

---

[4] In its reply in support of its motion for a preliminary injunction, EBCI discussed events from this period that it had omitted from both its complaint and its preliminary-injunction motion and supporting memorandum.  For example, EBCI recited that after it received the letter that Interior sent to the EBCI THPO, it requested and was granted an in-person meeting between EBCI leadership and senior Interior officials.  PI Reply 6-7.  EBCI also disclosed that before this meeting, it submitted a five-page single-spaced brief to Interior, outlining EBCI's concerns with the Catawba's project.  *Id.* at 6.  Because EBCI excluded these events from its complaint (for reasons difficult to understand), the Catawba does not believe they can be considered in resolving this motion.

Interior explained, for two reasons.  First, the Catawba is a "restored tribe," meaning that it "was federally recognized at one time," then "lost its government-to-government relationship" (with the Termination Act), and later was "restored to federal recognition" (with the Settlement Act). Approval Letter 3-5, 18.  Second, the Kings Mountain site constitutes "restored lands," because the Catawba has both modern and historical connections to it, and because the Catawba timely submitted its discretionary land-into-trust application.  *Id.* at 5-11.

Lastly, Interior concluded that taking the Kings Mountain site into trust was consistent with both NEPA and NHPA.  In its final EA—completed in March 2020, along with the required FONSI—Interior concluded that because the Catawba agreed to use certain best practices and undertake enumerated mitigation measures, its proposed entertainment complex would have a "less than significant" impact across several environmental dimensions.  Approval Letter 31. The EA also concluded that the complex's impact on cultural resources would be "less than significant," in light of Interior's research and the SHPO's report that it had no knowledge of any historic properties potentially affected by the gaming development.  *Id.* at 33.

Notice of Interior's decision approving the Catawba's application was published in the Federal Register.  *See Land Acquisitions; Catawba Indian Nation, Kings Mountain Parcel, North Carolina*, 85 Fed. Reg. 17,093 (Mar. 26, 2020).

## D.     This Lawsuit

Five days after Interior approved the Catawba's application, EBCI filed this action for declaratory and injunctive relief, challenging that decision as violating NEPA, NHPA, and the APA.  *See* Dkt. 1 at ¶¶88-164.  EBCI also moved for a preliminary injunction against the Kings Mountain site being taken into trust, Dkt. 2, which this Court denied, *see* Dkts. 21-22.  By that time, the Catawba had intervened to defend Interior's decision, *see* Dkt. 7.  After the denial of

the preliminary-injunction motion, the Cherokee intervened to challenge Interior's decision, *see*

Dkt. 26.  As noted, the Cherokee's complaint (Dkt. 33) raises NEPA and NHPA claims similar to

EBCI's, but with some variation in the factual allegations.

## APPLICABLE STANDARDS

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to

state a claim upon which relief can be granted."  Although "detailed factual allegations" are not

necessary to survive a Rule 12(b)(6) motion, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 552

(2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks

omitted).  A plaintiff must therefore put forth "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged," *id.*, meaning that

the facts alleged in the complaint "must be enough to raise a right to relief above the speculative

level," *Twombly*, 550 U.S. at 555.  A court considering a Rule 12(b)(6) motion "must treat the

complaint's factual allegations as true," but it is "not bound to accept as true a legal conclusion

couched as a factual allegation, or to accept inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint."  *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C.

Cir. 2006) (citations and quotation marks omitted).

"In deciding a motion to dismiss, a court may … consider documents attached to or

incorporated in the complaint."  *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020).  "A

district court may [also] consider a document that a complaint specifically references[.]"

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015).  And a court may

take "judicial notice of facts on the public record."  *Covad Communications Co. v. Bell Atlantic

Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

**ARGUMENT**

**I.      EBCI'S APA/SETTLEMENT ACT CLAIMS SHOULD BE DISMISSED**

Counts I-III of EBCI's complaint allege that Interior violated the Settlement Act—and

hence the APA—in approving the Catawba's land-into-trust application.  Specifically, EBCI

alleges that Interior violated the Settlement Act and APA both by applying section 5 of the IRA

and its implementing regulations to take the land into trust (count I) and by concluding that the

land, once in trust, will be eligible for gaming under IGRA and its implementing regulations

(count II).  Each claim fails as a matter of law.  *See infra* Part I.A-B.  In fact, each does so even

without applying two interpretive rules that support Interior's statutory interpretations: *Chevron*

deference and the Indian canon of construction.  Once those rules are applied, there is no doubt

that EBCI's APA claims fail to state a viable claim.  *See infra* Part I.C.  Finally, count III, which

largely just repackages the allegations made in counts I and II, should be dismissed for the same

reasons as the first two counts.  *See infra* Part I.D.

**A.      Count I Should Be Dismissed Because Interior Was Authorized To Take The
              Land Into Trust Under Section 5 Of The IRA**

EBCI's claim that Interior violated the APA by taking the land into trust under section 5

of the IRA rests entirely on the premise that the Settlement Act removes Interior's "authority

to … take lands into trust for Catawba … pursuant to Section 5."  EBCI Compl. ¶90; *see also id.*

¶¶89-93.  That premise is incorrect, and thus ECBI's conclusion is as well.

1.      *Section 9(a) of the Settlement Act authorizes IRA land-into-trust
                acquisitions*

Interior correctly concluded that it had authority under section 9(a) of the Settlement Act

to take land into trust for the Catawba.  That section states that the Catawba "shall be subject to

[the IRA] except to the extent [the IRA's] sections are inconsistent with this Act."  107 Stat. at

1125.  This language "parallels [language] found in … statutes" that the Supreme Court and

Interior have determined "extended the IRA to particular tribes."  Approval Letter 22.  And the language means that the application of IRA section 5 to the Catawba is authorized unless such an application is inconsistent with the Settlement Act.

EBCI's claim of such an inconsistency rests principally on sections 12, 13, and 15(e) of the Settlement Act.  *See* EBCI Compl. ¶¶30-35, 90.  Sections 12 and 13 establish procedures by which the Catawba can acquire reservation and non-reservation land, respectively, in South Carolina.  Specifically, section 12(c) provides that the Catawba can generally expand its reservation to land within certain "Zones"—all of which are in South Carolina.  107 Stat. at 1134; *see also* Settlement Agreement §§14.3-14.5.  And section 13(b) permits the Catawba to acquire "non-Reservation lands," but provides that South Carolina law will govern on such land.  107 Stat. at 1136; *see also* Settlement Agreement §15.2.  Lastly, section 15(e) "approv[es]" and "ratifi[es]" (*id.* at 1137) section 19.1 of the settlement agreement and South Carolina Code Annotated §27-16-40, each of which provides that any "land … held in trust by the United States … for the" Catawba "shall be subject to the laws of [South Carolina] and the civil and criminal jurisdiction of the courts of the State."  Because these provisions are limited to land in South Carolina, EBCI alleges (Compl. ¶35) that "all lands held in trust by the United States for Catawba" must therefore be within South Carolina as well, and that Interior "is not authorized to operate beyond the terms provided in Sections 12 and 13."  In other words, EBCI alleges that the Act must prohibit the Catawba from acquiring land in any other state.

Nothing in the Settlement Act justifies that enormous leap.  Again, sections 12 and 13 *authorize* land acquisitions in South Carolina (under the enumerated conditions).  That does nothing to show that the Act *prohibits* acquisitions by the Catawba outside the state.  The complaint points to no express statutory language imposing such a prohibition, because there is

none.  And that alone is fatal to EBCI's claims, given that a nationwide prohibition on land acquisitions—including within the Catawba's aboriginal territory, which encompasses North as well as South Carolina, *see supra* p.3—would be a far reaching (and draconian) step.  Such an extreme departure from the established IRA land-into-trust regime requires clear congressional language, because "Congress … does not … hide elephants in mouseholes," *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).  That is particularly true when, as here, there is no clear rationale for the "elephant":  EBCI offers no explanation for why Congress would have deemed it appropriate to bar the Catawba from having land taken into trust anywhere outside South Carolina.

Nor is there simply a lack of clear statutory language to support EBCI's argument; there is in fact significant contrary textual and contextual evidence.

As to text, in several other provisions of the Settlement Act, Congress explicitly adopted a geographic scope beyond South Carolina.  For example, section 3(9) of the statute defines the Catawba's "service area" to be not just South Carolina but also six North Carolina counties (including Cleveland County, where the Kings Mountain site is located).  107 Stat. at 1120.  Likewise, sections 6(a) and 6(d)(1)—which ratify the Catawba's land transfers and extinguish its aboriginal title, respectively—each apply to "lands located anywhere within the United States." *Id.* at 1122-1123.  The absence of any similar language in sections 12, 13, and 15(e) indicates that Congress intended for those provisions to apply only in South Carolina, because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion," *Russello v. United States*, 464 U.S. 16, 23 (1983).

As to context, the Settlement Act's primary purpose was—as its title indicates—to settle a decade of litigation between the Catawba and South Carolina over land within that state.  *See supra* pp.6-7.  Congress made multiple findings in the statute regarding that litigation (*see* §2(a)(5), (7), 107 Stat. at 1119), and also made clear that one of the law's central purposes was to approve the settlement of that litigation (*see* §2(b)(1), 107 Stat. at 1119).  Given that, it makes sense that the law would address only the Catawba's entitlement to (and procedures regarding) land in South Carolina.  That is especially true given that "North Carolina … was not a party to the settlement agreement," Approval Letter 26.  The parties (and Congress) thus had no reason to address the Catawba's ability to acquire land there.

Interior's reading of the Settlement Act as not limiting the Catawba's land acquisitions outside South Carolina is also—as Interior explained (Approval Letter 25-26)—supported by a Second Circuit decision interpreting similar statutes.  The Mohegan Nation of Connecticut Land Claims Settlement Act (hereafter Mohegan Settlement Act), Pub. L. No. 103-377, 108 Stat. 3501 (1994) "provide[d] a mechanism" by which the Mohegan Nation could "add property to its reservation" with the use of settlement funds, but was silent on whether Interior could exercise its ordinary IRA land-into-trust authority with respect to property not acquired with settlement funds, *Connecticut ex rel. Blumenthal v. U.S. Department of the Interior*, 228 F.3d 82, 87 (2d Cir. 2000).  When Interior tried to exercise that authority to take such property into trust for the Mohegan, Connecticut sued, arguing (as EBCI does here) that the statute provided the exclusive mechanism for the tribe to acquire property.  *Id.*  The Second Circuit disagreed.  It explained that the Mohegan Settlement Act was not "intended to settle once-and-for-all the extent of the [tribe]'s sovereignty"; rather, the law "emerged from the specific land dispute arising out of … lawsuits filed by the Tribe."  *Id.* at 90.  And the law's findings, the court stated, reflected this

"more parochial" purpose:  Congress found that the pendency of the lawsuit had "placed a cloud on the titles to much of the land in the" affected area, and desired to "remove all clouds on titles resulting from" the suit.  *Id.*  "Nothing in the Act," the court continued, "indicates that Congress intended to establish the outermost boundaries of the Tribe's sovereign territory."  *Id.*  The Catawba Settlement Act reflects the same "parochial" intent—to settle a pending lawsuit—and it makes almost identical findings, *see* Settlement Act §2(b)(4), 107 Stat. 1120 (Act was intended "to remove the cloud on titles *in the State of South Carolina*" (emphasis added)).  It, too, should not be read to set an "outermost boundar[y]" on the Catawba's land, *Blumenthal*, 228 F.3d at 90.

That conclusion is strengthened, as the Second Circuit observed, by the fact that Congress clearly knows how to "prohibit the [Interior] Secretary from taking into trust *any* lands outside of specifically designated" territory, *Blumenthal*, 228 F.3d at 90 (emphasis added).  The Maine Indian Claims Settlement Act, Pub. L. No. 96-420, 94 Stat. 1785 (1980), broadly prohibited the secretary from taking land into trust anywhere in Maine on behalf of the relevant tribes, other than in delineated plots.  And it did so with express language, stating that "[e]xcept for the provisions of [the Act], the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians … in the State of Maine."  25 U.S.C. §1724(e).  "The absence of an analogous provision in the [Connecticut] Settlement Act," the Second Circuit explained, confirmed that that statute "was not meant to eliminate the Secretary's power under the IRA" to take land into trust in contexts not governed by the law.  *Blumenthal*, 228 F.3d at 90.  So too here, the fact that no provision in the Catawba Settlement Act expressly bars the Catawba from seeking to acquire trust land outside South Carolina, or bars the secretary from taking possession of such land on the Catawba's behalf, "confirms that the Settlement Act was not meant to" limit the Catawba's rights in the extreme way EBCI suggests.  *Id.*

In seeking a preliminary injunction, EBCI attempted to distinguish *Blumenthal* on its facts, arguing that the Mohegan "was not attempting to use [the act in question] to acquire lands beyond the borders of the State." Dkt. 17 (hereafter PI Reply) at 35 (emphasis omitted). That is immaterial. Again, the question in *Blumenthal* was whether a settlement act's mechanism for a tribe to acquire *certain* land should be read to bar Interior from taking *other* land into trust pursuant to the IRA. *See* 228 F.3d at 90. That is virtually the identical question raised here. EBCI also argued more generally that the other land-claims settlement acts cited by the Second Circuit in *Blumenthal*—and by Interior here, *see* Decision Letter 22-23 & nn.157-158—have no precedential force in light of statements made around the time the Catawba Settlement Act was pending that that law should not "set precedent for the larger body of Federal Indian law," PI Reply 36. But the fact that the Settlement Act is in some ways *sui generis* (as these statements at most reflect) does not mean that it was enacted in a vacuum, or in any way diminish the probative value of comparing the Act's terms to those of prior settlement acts, whether to identify similarities or differences.

Finally, Interior's reading of the Settlement Act as not barring land acquisitions outside South Carolina is reinforced by the settlement agreement and South Carolina's implementing legislation, each of which provided that the Catawba would be "subject to the … jurisdiction of the State … to the same extent as any *other* person … in the State," EBCI Compl. ¶35 (emphasis added) (quoting each document). The use of the word "other" in each document makes clear that the documents apply only to the extent the Catawba is "in the State." To say the Catawba is subject to jurisdiction to the same extent as "any other person … in the State" necessarily means the Catawba is also "in the state." Had the parties intended to bind the Catawba even outside South Carolina, the agreement and enabling legislation would have omitted the word "other,"

providing that the Catawba was subject to South Carolina's jurisdiction "to the same extent as any person in the State."[5]

In short, application of section 5 of the IRA to acquire land outside South Carolina for the Catawba is not inconsistent with anything in the Settlement Act. Section 9(a) of the statute thus authorizes Interior to use its section 5 authority to take such land into trust for the Catawba.

> 2.     *Section 4(b) of the Act authorizes IRA land-into-trust acquisitions*

Section 4(b) of the Settlement Act independently authorized Interior to take land into trust for the Catawba. That provision states that "the Tribe and [its] Members shall be eligible for all benefits and services furnished to federally recognized Indian tribes and their members because of their status as Indians." 107 Stat. at 1121. One such benefit and service is having land taken into trust under the IRA. *See, e.g.*, 25 U.S.C. §2703(4)(B) (referring to lands "held in trust by the United States for the benefit of any Indian tribe"); 25 C.F.R. §292.2 (similar). Section 4(b), moreover, states that it applies "[n]otwithstanding any other provision of law." 107 Stat. at 1121. So even if there were other language in the Settlement Act supporting EBCI's argument, the argument would still fail because that language would be trumped by section 4(b). *See Liberty Maritime Corp. v. United States*, 928 F.2d 413, 416 (D.C. Cir. 1991).

In seeking a preliminary injunction, EBCI argued (PI Reply 38-40) that taking land into trust pursuant to the IRA is not one of the "benefits and services" contemplated by the Act. The "plain language" of section 4(b), EBCI argued, "makes … clear" that the "benefits and services"

---

[5] EBCI's complaint also invokes (e.g., ¶72 & n.6) the Settlement Act's legislative history, citing materials that show (according to EBCI) that the Catawba understood it would be limited to acquiring land through the mechanisms in sections 12 and 13. But even putting aside that "reliance on legislative history is hazardous at best," *Board of Education v. Mergens*, 496 U.S. 226, 242 (1990), the materials EBCI cites show only that the Catawba understood that the procedures in sections 12 and 13 differ from those in the IRA. They in no way suggest that the Catawba believed the Settlement Act would govern the Catawba's acquisition of land outside South Carolina.

contemplated by the Act were limited to those specifically identified in section 4(b).  *Id.* at 38-39.  But section 4(b) contains no such limitation, and courts "may not narrow a provision's reach by inserting words Congress chose to omit."  *Lomax v. Ortiz-Marquez*, ___ S. Ct. ___, 2020 WL 3038282, *3 (U.S. June 8, 2020).  Indeed, section 4(b) states that the Catawba and its members "shall be eligible for *all* benefits and services furnished to federally recognized Indian tribes and their members because of their status as Indians."  107 Stat. at 1121 (emphasis added).  EBCI assumes that the next sentence—listing some "benefits and services," *id.*—exhaustively defines that term.  But nothing in that sentence justifies that reading; in fact, the sentence states that the Catawba "shall be eligible to [receive] the special services performed by the United States for tribes because of their status as Indian tribes."  *Id.*  EBCI never explained why taking land into trust is not such a "service."  Instead, it pointed (PI Reply 39) to snippets of legislative history that it said show that the term "meant access to programs and grants."  Those snippets do no such thing:  They simply restate the Act's terms—which, as explained, favor the Catawba.

EBCI also argued (PI Reply 38) that under *SEC v. Chenery Corp.*, 332 U.S. 194 (1947), this Court cannot consider section 4(b) because Interior did not rely on it in granting the Catawba's application.  But Interior explicitly cited section 4(b).  Approval Letter 22.  *Chenery* "does not bar … counsel from … elaborating on the … agency['s]" decision.  *Chiquita Brands International Inc. v. SEC*, 805 F.3d 289, 299 (D.C. Cir. 2015).  In any event, *Chenery*'s mandate that courts "judge the propriety of [agency] action solely by the grounds invoked by the agency," 332 U.S. at 196, applies only "to agency actions that involve policymaking or other acts of agency discretion," *Canonsburg General Hospital v. Burwell*, 807 F.3d 295, 305 (D.C. Cir. 2015), not to issues of law.  *Accord Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir. 2016); *Shea v. Director, Office of Workers' Compensation Programs*, 929 F.2d 736, 739 n.4 (D.C. Cir. 1991).

And whether section 4(b) of the Settlement Act authorized Interior to take land into trust on the Catawba's behalf is a purely legal question.  Hence, the *Chenery* doctrine does not apply.

> 3.   *The settlement agreement does not foreclose the application of section 5 of the IRA to the Catawba*

Lastly, EBCI alleges (Compl. ¶¶33-35) that the settlement *agreement* makes clear that Interior cannot apply section 5 of the IRA to take land into trust for the Catawba.  Section 9.1 of the agreement states that the Catawba may "organize under the Indian Reorganization Act … and may adopt and apply to the [Catawba] any of the following [IRA] provisions to the extent they are consistent with this Agreement," followed by a list of those provisions, a list that does not include section 5.  That provision does not help EBCI, for three reasons.

First, for the same reasons just given regarding the Act, the settlement agreement applies only to South Carolina except where a different scope is expressly specified (which it is not in section 9.1).  Any limits in section 9.1 thus do not apply to land acquisitions in North Carolina.

Second, contrary to EBCI's assumption, the list of IRA provisions in section 9.1 is not exclusive; section 9.1 says that the Catawba may "adopt and apply" certain IRA provisions.  The EBCI thus ask this Court to add the word "only" before the listed provisions.  Again, that is impermissible.  *See supra* p.20 (citing *Lomax*, 2020 WL 3038282, *3).

Third, if section 9.1's list were exclusive and applied outside South Carolina, then it would conflict with section 9(a) of the Settlement Act, which provides (as explained) that the *entire* IRA applies to the Catawba except where application of that law conflicts with the Settlement Act (an exception not implicated by the application of section 5 here).  And section 15(b) of the Act states that "[i]n the event of a conflict between the provisions of this Act and the Settlement Agreement …, the terms of this Act shall govern."  107 Stat. at 1136.

*       *       *

Sections 9(a) and 4(b) of the Settlement Act each separately authorize Interior to take land outside South Carolina into trust for the Catawba, and nothing in the settlement agreement requires a contrary result.  Count I therefore fails as a matter of law and should be dismissed.

**B.      Count II Should Be Dismissed Because Interior's Conclusion Regarding Gaming Eligibility On The Kings Mountain Site Is Consistent With The APA**

In Count II, EBCI alleges that Interior acted arbitrarily or capriciously in two ways:  first, by applying IGRA to the Catawba's land-into-trust application when the Settlement Act supposedly bars any application of IGRA to the Catawba, *see* EBCI Compl. ¶¶95-98, and second, by deciding that the Kings Mountain site satisfies IGRA's requirements for gaming, *id.* ¶¶99-109.  Neither allegation states a viable claim for relief.

1.      *Interior did not violate the APA by applying IGRA to the Catawba land-into-trust request, because the Settlement Act does not preclude such an application*

EBCI first alleges (Compl. ¶¶95-98) that Interior acted "contrary to law," 5 U.S.C. §706 in interpreting the Settlement Act not to preclude the application of IGRA to the Catawba for gaming outside South Carolina.  As an initial matter, even if this argument were correct, there would be no basis to disturb Interior's decision to take the land into trust, which is separate from the decision regarding gaming eligibility.  And if IGRA is inapplicable to the land once placed into trust, then the Catawba would be entitled to conduct gaming activity on the land under the Supreme Court's decision in *California v. Cabazon Band of Indians*, 480 U.S. 202 (1987).

In any event, this claim fails for the same reason as EBCI's IRA claim:  The Settlement Act (like the settlement agreement) does not restrict the Catawba's activities outside of South Carolina.  *See supra* Part I.A.  In arguing the contrary, EBCI points primarily to section 14(a) of the Settlement Act, which states that IGRA "shall not apply to the" Catawba.  107 Stat. at 1136. EBCI alleges (Compl. ¶36) that this language "plain[ly]" bars the application of IGRA to *any*

- 22 -

land taken into trust on behalf of the Catawba anywhere in the United States.  EBCI likewise alleges that because the Act and the agreement provide that South Carolina law will apply to Catawba's gaming activities, *see id.* ¶¶37-40, the Catawba "voluntarily relinquished any right to gaming under the IGRA" anywhere, *id.* ¶36.  But again, these allegations proceed from the premise that the Settlement Act and the settlement agreement impose nationwide restrictions on the Catawba's operations, rather than merely establishing procedures by which the Catawba could operate *within* South Carolina.  As discussed, that premise is infirm.  *See supra* Part I.A.

Indeed, section 14(b) of the Settlement Act—the provision right after the one EBCI relies on—leaves no doubt that the statute made IGRA inapplicable only in South Carolina.  Section 14(b) states that the "laws, ordinances, and regulations of the State" (South Carolina) "shall govern the regulation of gambling devices and the conduct of gambling or wagering by the [Catawba] on and off the Reservation."  107 Stat. at 1136; *see also* Settlement Agreement §16.1.  That provision must be limited to gaming *in* South Carolina, or else South Carolina law would govern a casino the Catawba chose to open in Las Vegas, Atlantic City, or anywhere else.  As Interior concluded, that would be an absurd result.  Approval Letter 26.  In fact, it would be unconstitutional, because the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders."  *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989).

Nor can EBCI retreat to the claim that sections 14(a) and 14(b) have different scopes, with the latter applying only in South Carolina (for the reason just given) but the former applying nationwide.  "Courts have a 'duty to construe statutes, not isolated provisions.'" *Graham County Soil & Water Conservation District v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)).  Hence, "unless the text

clearly indicates otherwise, adjacent subsections on similar topics presumably have the same

scope." *Stanford v. United States*, 2014 WL 2574492, *3 (E.D. Ky. June 9, 2014) (Thapar, J.)

(citing *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1366 (Fed. Cir.

2013)); *accord Franklin Federal Savings Bank v. Director, Office of Thrift Supervision*, 927 F.2d

1332, 1339 (6th Cir. 1991) (citing *Coit Independence Joint Venture v. Federal Savings & Loan

Insurance Corp.*, 489 U.S. 561, 573-574 (1989), in interpreting a statutory provision in part

through "an analysis of nearby provisions"). As explained, section 14(b) of the Settlement Act

can apply only to gaming in South Carolina. There is no basis, textual or otherwise, for giving

the immediately preceding provision a monumentally broader scope.

Finally, EBCI cites (Compl. ¶41) statements by courts that the Settlement Act *was*

intended to prohibit the Catawba from engaging in gaming activity under IGRA. But even

setting aside that these statements are plainly dicta, the Catawba does not dispute that section 14

provides that the Catawba's gaming activity *in* South Carolina would be governed only by the

settlement agreement and South Carolina law. The question is whether section 14 prohibits the

Catawba from engaging in gaming under IGRA in any *other* state. None of the cases that EBCI

cites addresses that question, and hence none supports EBCI's challenge to Interior's reading of

the Settlement Act as not imposing a nationwide bar on applying IGRA to the Catawba.

2. *Interior did not violate the APA in concluding that the Catawba's application satisfied IGRA*

EBCI also claims (Compl. ¶¶99-108) that Interior violated the APA in concluding that

the Catawba could conduct gaming activities on the Kings Mountain site once it is in trust,

because IGRA's "restored-lands exception" is satisfied. That claim is implausible.

A court assessing whether agency action is arbitrary or capricious must ask "whether the

decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

The court also asks whether the agency has "examine[d] the relevant data and articulate[d] a

satisfactory explanation for its action including a rational connection between the facts found and

the choice made." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile

Insurance Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted).  This "standard of review is a

narrow one," *Overton Park*, 401 U.S. at 416; vacatur is permissible only if the agency "entirely

failed to consider an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise." *State Farm*, 463 U.S.at 43, *quoted in

Gresham v. Azar*, 950 F.3d 93, 99 (D.C. Cir. 2020).

      EBCI has not plausibly alleged that Interior failed to clear this low bar.  Although there

were several components to Interior's conclusion that the Catawba had satisfied IGRA's

"restored-lands exception," *see* Approval Letter 3-11, EBCI attacks only one:  Interior's finding

(*see id.* at 9-10) that the Catawba showed a "significant historical connection to the land," 25

C.F.R. §292.12(b).  That showing is made if either (a) the land in question "is located within the

boundaries of the tribe's last reservation under a ratified or unratified treaty" *or* (b) the tribe

"demonstrate[s] by historical documentation the existence of the tribe's villages, burial grounds,

occupancy or subsistence use in the vicinity of the land."  25 C.F.R. §292.2.  Interior cited that

standard and determined that the Catawba met the second prong (and likely the first, though only

one is necessary).  Approval Letter 9-10.  Specifically, after reviewing historical evidence that

Catawba submitted, Interior concluded that there was "evidence of Catawba villages, occupancy,

and subsistence use in the vicinity of the Site," including evidence from 13 archeological sites

located "within the [Catawba's] ancestral lands."  *Id.* at 10.  In a footnote, Interior *alternatively*

- 25 -

found a significant historical connection from the fact that the Kings Mountain site is "likely within the [Catawba's] last reservation in North Carolina," *id.* at 9 n.46, again based on historical evidence that Catawba submitted.  Interior therefore "consider[ed] the relevant factors," and it made no "clear error in judgment" in applying them, *Overton Park*, 401 U.S. at 416.

Disputing this, EBCI alleges (Compl. ¶¶103-104) that the agency acted arbitrarily or capriciously in relying on the 1760 Treaty of Tree Pine Hill, which has been "lost to history," to find that the site is "likely within the [Catawba's] last reservation in North Carolina," Approval Letter 9 n.46.  That allegation is meritless—Interior is entitled to draw a reasoned conclusion about a historical fact despite not having what would be the best evidence regarding that fact— but it would not matter even if the allegation were valid.  As just explained, Interior's finding that the Kings Mountain site is "likely within the [Catawba's] last reservation in North Carolina," Approval Letter 9 n.46, was an explicitly alternative ground for Interior's conclusion that the Catawba had shown the required "significant historical connection," 25 C.F.R. §292.2, to the Kings Mountain site.  Interior's leading ground for that conclusion (as also just explained) was that the Catawba had "demonstrate[d] by historical documentation the existence of … villages, burial grounds, occupancy or subsistence use in the vicinity of the land," *id.*  More specifically, Interior found that "[t]he [Catawba's] ancestors continuously used and occupied the lands within the vicinity of the Site," including by "occup[ying] the land, engag[ing] in subsistence activities, such as hunting and fishing, and gather[ing] clay, among other daily life activities."  Approval Letter 9.  EBCI advances *no* allegation that this primary reasoning is either flawed or alone insufficient to support Interior's underlying decision.  As a matter of law, that failure to attack a completely independent ground for Interior's finding precludes the conclusion that Interior acted arbitrarily or capriciously.

EBCI briefly suggests two other bases for its APA claim, but neither is plausible.  First, EBCI alleges (Compl. ¶103) that the Catawba has "relinquished any and all claims to aboriginal title, rights, and claims" in section 6 of the Settlement Act, and that this somehow prohibits the Catawba from invoking (or Interior from relying on) the restored-lands exception.  That allegation fails as a matter of law because the Catawba is not asserting a claim of title to the Kings Mountain site, i.e., a claim that the site already belongs to the Catawba.  The Catawba is instead attempting to have the United States *acquire* title to the site, to hold in trust for the Catawba.  The two are categorically different.  Second, EBCI implies (Compl. ¶107) that Interior acted arbitrarily or capriciously in concluding that the Catawba have a "significant historical connection" to the site because EBCI and other tribes *also* have such a connection.  But even accepting for purposes of this motion that other tribes have a connection to the site, that is no impediment:  As Interior explained, "IGRA's restored lands exception does not require the [tribe] to demonstrate that it [is] the only tribe with historical connections to the area."  Approval Letter 10.  EBCI identifies no reason to read IGRA any differently, that is, no basis to set aside— under the narrow APA standard of review—this aspect of Interior's decision.

## C. *Chevron* Deference And The Indian Canon Confirm The Validity Of Interior's Construction Of The Settlement Act

For the reasons given in Parts I.A. and I.B.1, EBCI's statutory-interpretation allegations lack merit.  But dismissal would be required even if those allegations showed that the Settlement Act is ambiguous regarding Interior's authority to take the Kings Mountain site into trust for the Catawba and to permit gaming on it.  That is because both agency-deference principles and the Indian canon of construction require that any such ambiguity be resolved in the Catawba's favor.

Under *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984), an agency decision is entitled to deference if it rests on a "permissible" interpretation of a

federal statute that Congress "has authorized [the agency] to implement," *Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016).  That is the situation here regarding the Settlement Act:  Congress expressly authorized the Interior Secretary "to implement the terms of [the] Settlement Agreement," Settlement Act §2(b)(2), 107 Stat. at 1119, a directive that encompasses implementation of the Settlement Act, *see Blumenthal*, 228 F.3d at 93 (deferring to Interior's interpretation of an ambiguous land-claim settlement act).

Separately, under the Indian canon of construction, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see also Confederated Tribes*, 830 F.3d at 558.  And the Settlement Act was enacted to "promote [the Catawba's] self-determination and economic self-sufficiency" and "in recognition of the United States['] obligation to the" Catawba.  Settlement Act §2(a)(1), (8), 107 Stat. at 1118-1119.  The "'principles of equitable obligations …' applicable to the trust relationship between the United States and the Native American people" that animate the Indian canon, *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001), thus militate strongly in favor of a reading of the statute that favors the Catawba.

That conclusion is not affected by the fact that the opposing parties are also Indian tribes. The Settlement Act was enacted for the benefit of the Catawba, not EBCI or the Cherokee, and as another judge in this district has explained, "[i]t would be strange to construe a statute against the only Tribe it seeks to benefit simply because another Indian tribe objects," *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, ___ F. Supp. 3d ___, 2020 WL 1065406, at *21 (D.D.C. Mar. 5, 2020), *appeals docketed*, Nos. 20-5123, 20-5125, 20-5127, 20-5128 (D.D.C. May 8, 2020).  That decision also explains that other case law declining to apply the Indian canon where there were tribes on both sides involved disputes over how to interpret generally

- 28 -

applicable Indian statutes like IRA or IGRA, not (as here) a statute enacted for the specific benefit of one tribe.  *See id.* (citing *Connecticut v. U.S. Department of the Interior*, 344 F. Supp. 3d 279, 314 (D.D.C. 2018)).

Applying the Indian canon and *Chevron* deference—in fact, either one suffices—makes clear that as a matter of law, Interior did not act unlawfully in approving the Catawba's land-into-trust application or concluding that IGRA can apply to the Catawba.  To take just one example, in light of section 14(b) of the Settlement Act (and case law holding that adjacent provisions are construed harmoniously), there is no serious argument that section 14(a) of the statute *unambiguously* makes IGRA inapplicable to the Catawba throughout the country, rather than just in South Carolina.  Hence, the application of *Chevron* deference or the Indian canon requires the Court to uphold Interior's interpretation in the Catawba's favor.  The same is true for EBCI's other statutory arguments; EBCI cannot plausibly allege that the statute unambiguously has any of the meaning EBCI ascribes to it.

### D.    Count III Should Be Dismissed For The Same Reasons As Counts I-II

Count III of EBCI's complaint (¶¶111-114) alleges that Interior acted arbitrarily or capriciously in concluding that the Settlement Act authorized the agency to take land into trust on behalf of the Catawba and did not bar it from applying IGRA.  But count III alleges no flaw in Interior's decision beyond those asserted in earlier parts of its complaint.  EBCI does not claim, for instance, that Interior has failed to "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43; its argument is, again, merely that Interior's actions violate the Settlement Act.  Count III thus does not state a claim for relief independent of counts I and II, and so it should be dismissed for the same reasons given above regarding those counts.

II.   **THE TRIBES' NHPA CLAIMS SHOULD BE DISMISSED**

Each tribe alleges (EBCI Compl. ¶¶115-143; Cherokee Compl. ¶¶60-95) that Interior

violated section 106 of NHPA, 54 U.S.C. §306108, by failing to (in the statute's words) "take

into account the effect of [granting the Catawba's application] on any historic property" in the

King's Mountain site, *id.*  Neither tribe states a plausible claim for relief under that provision.

Section 106 "requires federal agencies to consider the effect of their actions on certain

historical or culturally significant sites and properties … and to seek ways to mitigate those

effects." *Narragansett Indian Tribal Historic Preservation Office v. FERC*, 949 F.3d 8, 10 (D.C.

Cir. 2020).  The Advisory Council on Historic Preservation has promulgated "regulations

implementing the NHPA," regulations that "command substantial judicial deference." *McMillan*

*Park Committee v. National Capital Planning Commission*, 968 F.2d 1283, 1287-1288 (D.C. Cir.

1992).  Those regulations explain that the statute—in furtherance of the underlying obligation to

consider the potential effects of proposed actions on historic properties—"requires the

[responsible] agency official to consult with any Indian tribe … that attaches religious and

cultural significance to historic properties that may be affected by an undertaking."  36 C.F.R.

§800.2(c)(2)(ii).  When such consultation is required, it consists of "provid[ing] the Indian tribe

… a reasonable opportunity to identify its concerns about historic properties, advise on the

identification and evaluation of historic properties, including those of traditional religious and

cultural importance, articulate its views on the undertaking's effects on such properties, and

participate in the resolution of adverse effects."  *Id.* §800.2(c)(2)(ii)(A).  And to ensure that the

agency can afford interested tribes that "reasonable opportunity," *id.*, the agency must "make a

reasonable and good faith effort to identify … tribes … that might attach religious and cultural

significance to historic properties in the area of potential effects and invite them to be consulting

parties," *id.* §800.3(f)(2).

In evaluating whether Interior complied with those obligations here, this Court—as both tribes appear to acknowledge, *see* EBCI Compl. ¶117; Cherokee Compl. ¶61—reviews "under the arbitrary and capricious standard of the Administrative Procedure Act," *National Trust for Historic Preservation v. Blanck*, 938 F. Supp. 908, 915-916 (D.D.C. 1996), *aff'd*, 203 F.3d 53 (D.C. Cir. 1999) (table).  As explained in more detail above, *see* pp.24-25, that standard is "highly deferential," *NTCH, Inc. v. FCC*, 950 F.3d 871, 885 (D.C. Cir. 2020) (per curiam). Under that deferential standard, neither complaint states a viable claim for relief under NHPA.

### A.    EBCI Has Not Plausibly Alleged A NHPA Violation

EBCI's NHPA claim rests on the assertion (Compl. ¶134) that Interior "did not make reasonable efforts to consult with the EBCI in good faith during the environmental review process encompassing the historic preservation analysis."  The complaint itself, however, and other documents cognizable on a motion to dismiss show that that assertion is not plausible.

#### 1.    Interior was not required to consult with EBCI, but in any event it did so

As elaborated below, in evaluating the Catawba's application, Interior's investigation led it to reasonably conclude that there are no historic properties on the Kings Mountain site.  As a result, it had no obligation to consult with the EBCI (or any other tribe); if there are no historic properties on a site, there cannot be "tribes … that might attach religious or cultural significance to [such] properties," 36 C.F.R. §800.3(f)(2).  In any event, Interior *did* consult with EBCI, reaching out to it on multiple occasions and giving it months to offer any reason to doubt Interior's conclusion that the Kings Mountain site lacked any historic properties.  Yet Interior received no information from EBCI warranting reconsideration of that conclusion.  And while EBCI insists that it was entitled to vastly more expansive forms of consultation, nothing in NHPA (or any other authority) creates such an entitlement.  These circumstances—consultation where none was required—do not remotely constitute a plausible NHPA violation.

a.      As recounted in the draft EA—which this Court can consider because it is

"specifically reference[d]" in EBCI's complaint, *Banneker*, 798 F.3d at 1133—Interior began its

section 106 efforts by conducting extensive research to identify historic properties, including

review of "historical and archaeological literature[,] and background information search[es]."

Draft EA 22.  Interior also searched for items on the National Register of Historic Places within

one mile of the Kings Mountain site (as catalogued by an online tool created by the North

Carolina SHPO) in order "to identify the types, locations and chronologies of known cultural

resources within the project area."  *Id.*  These searches did not reveal any "verified historic

properties or property boundaries" at the site, nor any "eligible or potentially eligible historic

properties."  *Id.* at 23.  Furthermore, Interior's research established that the site was "highly

disturbed" in 2005, when the North Carolina Department of Transportation used the location as a

"soil borrow pit," after which the site was "graded."  Melville Letter 1; *see also* Draft EA 19.

Having completed this research, Interior then contacted the North Carolina SHPO.  *See*

Melville Letter 2.  This was a "reasonable and good faith" step, 36 C.F.R. §800.3(f)(2), given

that the SHPO and not EBCI's THPO is the relevant entity for NHPA purposes, *see id.*

§800.16(w) (THPO is "the tribal official … who has assumed the responsibilities of the SHPO

for purposes of Section 106 compliance *on tribal lands*" (emphasis added)); *id.* §800.16(x)

(defining "[t]ribal lands" as "all lands within the exterior boundaries of any Indian reservation

and all dependent Indian communities").  And as discussed, the SHPO confirmed Interior's

research, responding that it "ha[d] conducted a review of the [Kings Mountain] project and [was]

aware of no historic resources which would be affected by the project."  Melville Letter 2.

EBCI's complaint contains no allegation that Interior had any reason to doubt the

accuracy of the SHPO's assertion, i.e., any reason to think the SHPO had conducted an

inadequate review, was not being forthcoming, or was in any other way not fully qualified to opine correctly on the presence or absence of historic properties on the Kings Mountain site that would be affected by the Catawba's proposed development.  Nor does the complaint (or any other document, much less one cognizable at this juncture) suggest that Interior had any such reason.  Hence, once it had both completed its research and received the SHPO's response, Interior had satisfied its obligation to "make a reasonable and good faith effort to identify any Indian tribes … that might attach religious and cultural significance *to historic properties in the area of potential effects*," 36 C.F.R. §800.3(f)(2) (emphasis added).  If—as Interior's research indicated, and the SHPO confirmed—there are no "historic properties in the area of potential effects," *id.*, then there obviously cannot be any tribes "that might attach religious and cultural significance" to such properties, *id.*

EBCI alleges, however (Compl. ¶128), that NHPA regulations "required Defendants to '[g]ather information from any Indian tribe … to assist in identifying properties'" (alteration and omission in original) (quoting 36 C.F.R. §800.4(a)(4)).  That is wrong as a matter of law.  The ellipsis in this quote omits the phrase "identified pursuant to § 800.3(f)."  And as explained, here Interior reasonably did not identify EBCI under §800.3(f).  Section 800.4(a)(4) therefore did not impose any obligation on Interior to "[g]ather information" from EBCI.

b.      In any event, Interior did seek information from EBCI about historic properties—and received none.  Specifically, almost twelve weeks before issuing its final decision, Interior published the draft EA, announcing its conclusion (and the North Carolina SHPO's concurrence with that conclusion) that the Kings Mountain site contains no historic properties.  EBCI Compl. ¶49; *see* Draft EA 22-23, 36.  Interior then took several steps to seek comment on the draft EA: It made the draft "available for state and local governments, resource agencies, and public review

on December 22, 2019, for a comment period ending on January 22, 2020"; published notices of availability in three North Carolina newspapers; and posted the draft online.  Approval Letter 31. It also reached out to EBCI directly seeking comment on the draft EA.  *See* EBCI Compl. ¶50.

Interior's consultation with EBCI did not stop there.  On the last day of the period for comments on the draft EA, EBCI submitted a letter providing comments.  EBCI did not claim in these comments that any EBCI historic properties *were* located on the Kings Mountain site.  It instead criticized Interior's consultation *process*, stating—without mentioning Interior's direct outreach to EBCI seeking comments on the draft EA, *see* EBCI Compl. ¶50—that "no effort has been made, and no invitation has been sent, inviting the EBIC [sic] to consult over this proposed federal action."  EBCI Comments 2.  Interior responded just eight days later, sending EBCI's THPO a letter further soliciting EBCI's input.  *See* Melville Letter 1.  "BIA is currently working to identify, analyze and document any potentially significant impacts associated with" the Catawba's application and associated plan to develop a gaming complex, the letter explained, and was specifically seeking "to verify with your office that the proposed project will not impact any specific sites having potential religious or cultural significance to" EBCI.  *Id.*  Reinforcing the point, the letter also stated that although North Carolina's SHPO had "reviewed the project and was not aware of any historic resources in the area of the project," "BIA [was] very interested in hearing from your office regarding this project."  *Id.*  EBCI does not allege it sent Interior a response to this letter any time before Interior approved the Catawba's application.

By writing directly to EBCI to solicit comments on the draft EA, and then sending a follow-up letter to EBCI in response to EBCI's comments, Interior provided EBCI with exactly what NPHA requires, namely "a *reasonable opportunity* to identify its concerns about historic properties, [and] advise on the identification and evaluation of historic properties," 36 C.F.R.

§800.2(c)(2)(ii)(A) (emphasis added), *quoted in* EBCI Compl. ¶122.  The reasonableness of this opportunity is buttressed by the fact that Interior first contacted EBCI almost twelve weeks before it approved the Catawba's application, and waited six weeks after sending the follow-up letter to issue its final decision, giving EBCI ample time to offer a substantive critique of the conclusion that the Kings Mountain site lacked any historic properties.

"Section 106 … is often described as a 'stop, look, and listen' provision."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4, 8 (D.D.C. 2016) (Boasberg, J.). Here, Interior looked to, and listened to, the relevant historical research and the relevant agency (the North Carolina SHPO) regarding whether there were historic properties on the Kings Mountain site that might be affected by the project.  Then, when it made its initial determination that there were none, it stopped, looked, and listened to the public, publishing that finding in the draft EA and seeking comment, including directly from EBCI.  And when EBCI then (wrongly) complained about not being consulted directly, Interior consulted again, i.e., "stopped," "looked" to EBCI, and "listened" for any information about historic properties.  After many weeks of "listening," however, Interior had heard no basis from EBCI to change its finding, so it moved forward, approving the Catawba's application.  All this is not a plausible NHPA violation.[6]

---

[6] As noted in the Statement, *see supra* n.4, EBCI's reply in support of its preliminary-injunction motion disclosed that shortly after receiving Interior's follow-up letter, EBCI requested a meeting with the Interior Department to discuss its concerns about the Catawba's application. Dkt. 17-1 ¶8.  Department officials granted the request, meeting with EBCI Principal Chief Sneed and others over a month before the Catawba's application was approved, *id.* ¶13, and also receiving EBCI's five-page, single-spaced brief about the project, *see* ¶11 (excerpting the briefing paper); *see also* PI Reply 6.  Although EBCI's reply suggested that EBCI views this information as bolstering its NHPA claim, the opposite is true, because the information shows that Interior's NHPA-related consultation with EBCI was even more extensive—i.e., that EBCI had even more of a "reasonable opportunity" to be heard, 36 C.F.R. §800.2(c)(2)(ii)(A)—than EBCI revealed in its complaint and its preliminary-injunction motion and memorandum.  The information also reveals that even during this additional consultation, EBCI provided no sound reason to doubt Interior's finding that the Kings Mountain site lacked historic properties.

2.    *EBCI's contrary arguments lack merit*

Brushing aside all the consultation just described, EBCI's complaint alleges various

shortcomings in Interior's outreach efforts.  Many of these are contradicted by the complaint's

allegations and exhibits themselves.  Those that are not still fail as a matter of law.

EBCI's broadest allegation (Compl. ¶142) is that EBCI "never had a chance to exercise

its sovereign right to protect Cherokee cultural patrimony and cultural resources."  *Accord id.*

¶140.  To the extent EBCI is referring simply to the rights that NHPA confers, EBCI's complaint

and other cognizable documents show that is wrong; as explained, EBCI had no right to be

consulted, because Interior reasonably concluded that there were no historic properties, but in

any event, Interior *did* consult with EBCI—and heard nothing from EBCI suggesting that any

historic properties would be affected by the Catawba's project.  *See supra* Part II.A.1.  To the

extent the right EBCI invokes goes beyond the procedural protections that NHPA provides, no

authority provides such a right.

EBCI also asserts (Compl. ¶138) that "[t]he mailing of one single letter does not, alone,

satisfy" NHPA.  That would fail even if true, because as explained Interior's outreach here went

beyond one letter.  And even as to that letter, EBCI's allegation that it gave no "indicat[ion] that

[Interior] had read, considered, or in any way reviewed the concerns the EBCI raised in its

official comments to the Draft EA" (*id.* ¶136) is refuted by the letter itself (which the Court can

consider here).  EBCI's comments on the draft EA complained in relevant part about a lack of

consultation regarding historic properties.  *See* EBCI Comments 1-2.  The letter directly

responded to those concerns, by soliciting EBCI's input on whether the Catawba's application

might "impact any specific sites having potential religious or cultural significance to" EBCI,

Melville Letter 2.  Meanwhile, Interior's alleged failure to "follow up with a good faith attempt

to consult" with EBCI after the letter, EBCI Compl. ¶137, does not support a viable NHPA claim because EBCI alleges no facts plausibly suggesting that any "follow up" was legally required.[7]

In addition to alleging inadequate consultation, EBCI alleges (e.g., Compl. ¶¶61, 65, 67, 84) that Interior violated NHPA by not conducting a cultural survey.  That allegation likewise fails as a matter of law, because "neither the NHPA nor the Advisory Council regulations require that any cultural surveys be conducted for a federal undertaking," *Standing Rock Sioux*, 205 F. Supp. 3d at 33.  As discussed, NHPA regulations simply required Interior to "make a reasonable and good faith effort to carry out appropriate identification efforts."  36 C.F.R. §800.4(b)(1). And those efforts, the regulations specify, "*may* include background research, consultation, oral history interviews, sample field investigation, and field survey."  *Id.* (emphasis added).  "It goes without saying" that "'may' means may," i.e., that the listed items are not mandatory.  *Standing Rock Sioux*, 205 F. Supp. 3d at 33 (quoting *McCreary v. Offner*, 172 F.3d 76, 83 (D.C. Cir. 1999)).  That is why the D.C. Circuit has held that "[t]he regulations do not expressly require agencies in all cases completely to survey impact areas, and in fact recognize that the need for surveys will vary from case to case," *Wilson v. Block*, 708 F.2d 735, 754 (D.C. Cir. 1983).

EBCI does not plausibly allege that it was arbitrary or capricious for Interior to use the first two methods on the list (background research and consultation) but not a survey.  Most importantly, EBCI has not alleged that it ever asked for a survey.  It is utterly *im*plausible that Interior acted arbitrarily or capriciously by forgoing a cumbersome activity it was never asked to undertake.  Moreover, the history of the Kings Mountain site cuts against the need for a survey. As noted, over a decade ago, the site was "heavily disturbed when North Carolina Department of

---

[7] The Catawba also notes that, while not cognizable at this juncture, Interior *did* "follow-up," with senior Department officials meeting in person with EBCI leadership and receiving a five-page single-space brief from EBCI laying out its concerns with the project.  *See supra* n.6.

Transportation … used the entire site as a soil borrow pit during [a road] construction" project—after which "[t]he site was … graded."  Melville Letter 2.  Given these disturbances, and the North Carolina SHPO's confirmation of Interior's initial research that the Kings Mountain site contained no historic properties, there is no basis to plausibly infer that Interior acted arbitrarily or capriciously in concluding that a survey was not necessary to further confirm that finding.

Nor is plausibility achieved by the EBCI THPO's assertion that "North Carolina site files show that there is evidence of an archaeological investigation on the Kings Mountain site," Dkt. 1-1 (hereafter Townsend Declaration) at ¶17, *quoted in* EBCI Compl. ¶59; *see also* EBCI Compl. ¶65.  To begin with, this Court has rightly noted that the THPO "offered no additional supporting details, leaving several key questions unanswered."  Dkt. 22 at 9.  But that aside, even if such an investigation occurred, and if the existence of the investigation somehow obligated Interior to conduct a survey, EBCI alleges (Compl. ¶¶82, 84) that it first informed Interior of the supposed investigation four days *after* the Catawba's application was approved, *see* Dkt. 1-5 at 2.  That does not allow for a plausible inference that Interior violated NPHA—a law that, again, does not require a survey—by not conducting an unrequested survey *before* approving the application.

Next, EBCI alleges (Compl. ¶67) that it was never informed Interior was "moving forward with *final agency action*."  That too is refuted by EBCI's own submission:  Interior's follow-up letter (attached to the complaint) says that the agency "is … reviewing an application from the Catawba … to place approximately 16.57 acres into federal trust in Kings Mountain."  Melville Letter 2.  The draft EA (page 3) contained similar information.  As such, EBCI cannot plausibly claim ignorance that Interior was progressing towards final action.

Lastly, EBCI alleges two technical deficiencies with Interior's NHPA process.  Neither plausibly constitutes a violation of the statute.

First, EBCI alleges (Compl. ¶53) that NHPA required Interior to consult with it "before the preparation of the Draft EA."  This argument rests on the admonition in 36 C.F.R. §800.2(c)(2)(ii)(A) that "[c]onsultation should commence early in the planning process."  But "should" is not "shall."  *See United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999); *United States v. Harris*, 13 F.3d 555, 559 (2d Cir. 1994).  The provision imposes no legally enforceable obligation on Interior and thus provides no plausible basis to vacate Interior's decision.  That is especially the case given that another NHPA regulation explicitly contemplates that consulting parties will be identified not only at the outset but also "as the section 106 process moves forward," 36 C.F.R. §800.3(f).[8]

Second, EBCI alleges (Compl. ¶79(a)-(d)) that Interior's decision is unlawful because nowhere in the decision did Interior "mention" or "consider" various features of EBCI's historical ties to the Kings Mountain site.  But nothing in NHPA (or any law) requires the agency's final order to explicate all the steps the agency took to satisfy NHPA.  What Interior was required to do under NHPA was provide EBCI "a reasonable and good-faith opportunity to identify sites of importance to it."  *Standing Rock Sioux*, 205 F. Supp. 3d at 33.  As explained, Interior did so.

### B.      The Cherokee Has Not Plausibly Alleged A NHPA Violation

The Cherokee's NHPA claim likewise fails as a matter of law.  According to its complaint (¶85), the Cherokee was entitled to be consulted by Interior because NHPA "requires

---

[8] The assertions by EBCI's THPO that "BIA would *typically* consult with [him] and other Cherokee THPOs prior to the release of a draft EA," Townsend Declaration ¶9 (emphasis added), *quoted in* EBCI Compl. ¶57, and that "BIA *typically* reaches out early to us in the process," *id.* ¶10 (emphasis added), *quoted in* EBCI Compl. ¶58, are likewise of no moment even if true (as they are assumed to be at this juncture).  Nothing in NHPA or its regulations provides that an agency's typical consultation practice creates a legally enforceable entitlement to that same degree and form of consultation every time an agency engages in an undertaking.

… good faith consultation with Tribal Nations if and when the agency considers undertaking a final agency action on lands that a Tribal Nation ceded by treaty." That capacious claim is not the law. *See* Dkt. 22 at 10. Rather, Interior was required to "consult with any Indian tribe … that attaches religious and cultural significance to historic properties that may be affected by an undertaking." 36 C.F.R. §800.2(c)(2)(ii). And there is no plausible contention that Interior acted arbitrarily or capriciously in not consulting with the Cherokee, largely for the same reasons given above regarding EBCI, namely that Interior's consultation with the SHPO and its own research led it to reasonably conclude that there are no historic properties on the Kings Mountain site.[9]

The Cherokee's claim is also implausible, however, given Interior's extensive consultation with EBCI. To be sure, consultation with one tribe does not automatically absolve an agency from its obligation to consult with other potentially impacted tribes. But EBCI's THPO "protect[s] *Cherokee* cultural patrimony within the Cherokee historical territory." EBCI Compl. ¶17 (emphasis added). This is not surprising; EBCI comprises "descendants of Cherokees who resisted forced removal from the Cherokee territory by finding refuge in the Great Smoky Mountains, as well as Cherokees who made the walk … to … Oklahoma" and "returned to … North Carolina," *id.* ¶12, and its "historic territory … at this location" is "co-extensive" with the Cherokee's, Cherokee Compl. ¶52. In other words, any Cherokee historic properties are EBCI historic properties as well. As such—and contrary to the Cherokee's implication that Interior's consultation with EBCI should have triggered consultation with the Cherokee, *id.* ¶40—Interior's consultation with EBCI ensured that a lack of consultation with the Cherokee did not risk leaving any of its historic properties unaccounted for.

---

[9] Enormous swaths of the Cherokee's complaint are copied verbatim or nearly verbatim from EBCI's, confirming that many of the arguments made above regarding EBCI apply equally to the Cherokee.

**C.      If There Was Any NHPA Violation, It Was Harmless As A Matter Of Law**

Even if Interior should have consulted with the Cherokee, or consulted even more extensively with EBCI, neither tribe plausibly alleges that Interior's failure in that regard was prejudicial, and hence any violation would provide no basis to vacate Interior's approval of the Catawba's application.

Under the harmless-error doctrine—which applies to NHPA violations, *see Save Our Heritage, Inc. v. FAA*, 269 F.3d 49, 63 (1st Cir. 2001)—courts "affirm an agency's decision despite errors when it is clear that … the agency would have reached the same ultimate result had the errors not been made."  *Hermes Consolidated, LLC v. EPA*, 787 F.3d 568, 579 (D.C. Cir. 2015) (omission in original) (quotation marks omitted).  Neither complaint alleges facts supporting a plausible conclusion that Interior would have rejected the Catawba's application if the Cherokee had been consulted or EBCI had been consulted even more extensively.

To the contrary, each tribe's submission confirms that any error was harmless, by showing that neither tribe has any significant evidence of historic properties at the Kings Mountain site, i.e., any evidence that plausibly would have led Interior to a different decision.  For example, EBCI alleges (Compl. ¶68) that given the information it currently has, it "'cannot determine whether Cherokee religious or cultural sites exist at the site'" (quoting Townsend Declaration ¶17).  It therefore wanted Interior to conduct "an archeological survey to determine the nature and extent of the archeological material on the site."  *Id.*  The same is true of the Cherokee:  In a declaration attached to its complaint, its THPO, Elizabeth Toombs, makes clear that had Interior contacted her, she would not have responded by providing information showing that there are (or even might be) historic properties at the site that hold cultural significance to the Cherokee.  Rather, she would have "request[ed] … a cultural survey on the land at issue."  Dkt. 33-1 at ¶10.  If either tribe possessed information that could plausibly have led Interior to a

different outcome—namely, actual information of historical significance about the Kings
Mountain site—it would have provided that information, instead of simply asking for a survey
that (theoretically) could have revealed historic properties.

Under these circumstances, the tribes could show harm from the alleged NHPA violation
only if it is plausible both that Interior would have agreed to a survey if one had been requested
and that the survey would have uncovered properties of historical significance to the Cherokee
that would have led Interior to make a different decision on the Catawba's application.  But the
tribes had no entitlement to a survey, especially without any specific information about historic
properties at the Kings Mountain site—and given the specific indications, including from the
North Carolina SHPO, that there are no such properties.  *See supra* pp.32-33.  As another circuit
has explained, "[w]here no historic property has been identified, the Tribe has no basis under the
NHPA to demand particular actions by the" government.  *Narragansett Indian Tribe v. Warwick
Sewer Authority*, 334 F.3d 161, 168 (1st Cir. 2003).  It is simply implausible that Interior would
have conducted a cultural survey based on the information presented by the tribes.

And even if a survey was conducted, there are no plausible allegations that it would have
uncovered any actual (or even potential) historic properties on the site.  For example, the
Cherokee's allegation (Compl. ¶86) that "pre-historic Cherokee ceramics" were found "*ten miles
from Kings Mountain*" (emphasis added) does not allow for a plausible inference that there are
Cherokee historic properties at the Kings Mountain site itself—again, particularly given the
SHPO's directly contrary conclusion, and the documented history of the site having been
thoroughly dug up a decade earlier, *see* Melville Letter 1; Dkt. 13-1 (hereafter Final EA) at 10,
712.  In light of these shortcomings, the tribes have not plausibly alleged any prejudice from the
alleged NHPA violations.  *See Caddo Nation of Oklahoma v. Wichita & Affiliated Tribes*, 2016

WL 3080971, at *9 (W.D. Okla. May 31, 2016) (an agency does not necessarily violate NHPA just because it "may not have executed its Section 106 duties perfectly").

## III.   THE TRIBES' NEPA CLAIMS SHOULD BE DISMISSED

Under NEPA and its implementing regulations, an agency considering undertaking a "major Federal action[]," 42 U.S.C. §4332(C), must prepare an environmental impact statement (EIS) unless the agency determines—after completing an EA—that no "'significant' environmental impacts might result from the proposed … action," *Grand Canyon Trust v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002).  In that event, the agency must instead "[p]repare a finding of no significant impact." 40 C.F.R. §1501.4(e).

Here, Interior prepared an extensive draft EA that assessed the effects of the Catawba's proposed project across twelve different environmental categories, including land and water resources, air quality, noise, and cultural resources.  *See* Draft EA 28-65.  In each category, the draft EA concluded the proposed action would have no significant impact.  *Id.*  The draft EA also compared the impact of the proposed action and three alternatives, including a "no action alternative."  *Id.* at 19-22.  Interior made the draft EA available online, publicized its availability, and sought comment.  *See infra* p.45.  Once the comment period ended, Interior considered and responded to all submitted comments, finalized the EA, and issued a FONSI.  Final EA App'x O; Dkt. 13-3 (hereafter FONSI).  Both the final EA and the FONSI were also made available online.

The tribes allege that Interior violated NEPA in three respects.  First, they allege that the EA and FONSI were not made adequately available.  Second, they allege defects in the EA, including inadequate consultation and inadequate consideration of alternatives.  Finally, they allege that an EIS was required.  Particularly given the narrow, arbitrary-and-capricious standard of review that applies to the tribes' NEPA claims, *see Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019), none of these allegations states a plausible claim for relief.

### A.     Neither Tribe States A Viable Claim Based On The Supposed Failure To Publish The EA Or FONSI

Both EBCI (Compl. ¶150) and the Cherokee (Compl. ¶117) allege that the EA and

FONSI were published either too late or not at all.  These allegations fail to state a plausible

claim for relief because NEPA and its implementing regulations do not require publication of

either document.

As an initial matter, the Cherokee's claim (Compl. ¶117) that Interior "failed to complete

and issue either a Final EA or a FONSI until March 23, 2020—eleven days after taking final

agency action on March 12, 2020," contradicts the face of the two documents (which the Court

can consider because the Cherokee's complaint "specifically references" them, *Banneker*, 798

F.3d at 1133).  The FONSI is dated March 12, 2020, and it cites to the final EA.  *See* FONSI

1, 6.  Given that the Cherokee provides no basis to conclude that either document was misdated,

its allegation regarding the completion and issuance of the final EA and FONSI is wholly

implausible.

In any event, neither tribe identifies any legal obligation on Interior's part to publish the

final EA or the FONSI.  NEPA's regulations do not generally require publication of either

document.  *See* 40 C.F.R. §§1501.3-1501.6.  Indeed, the regulations do not even mandate the

publication of "environmental impact statements, the comments received, [or] any underlying

documents."  *Id.* §1506.6(f).  Those materials need only be made "available to the public

pursuant to the provisions of the Freedom of Information Act."  *Id.*  Since EAs and FONSI are

less significant documents under NEPA than an EIS, it makes sense that they also generally are

not subject to any publication requirement.

Undaunted, both tribes cite 40 C.F.R. §§1501.4(e)(1) and 1506.6.  *See* EBCI Compl.

¶160; Cherokee Compl. ¶132.  But neither regulation creates a publication requirement.  In fact,

- 44 -

although each tribe alleges that NEPA regulations impose a broad mandate for FONSIs to "be made 'available to the affected public,'" EBCI Compl. ¶160; Cherokee Compl. ¶132, the regulation they quote—36 C.F.R. 1501.4(e)(1)— states that "[t]he agency shall make the finding of no significant impact available to the affected public *as specified in § 1506.6*" (emphasis added).  The regulation thus imposes no obligation beyond what appears in section 1506.6.  And that section requires "publication" only if the proposed federal action has "effects of national concern."  *Id.* §1506.6(b)(2).  Neither tribe has alleged that Interior's decision here has national effects, nor would any such assertion be plausible as to a decision to take into trust 16.57 acres of undeveloped land within the boundaries of a single state (indeed, a single county).

Both tribes also quote 40 C.F.R. §1500.1(b), which provides that "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken."  EBCI Compl. ¶161; Cherokee Compl. ¶133.  But making "environmental information … available" is not equivalent to publishing a final EA or a FONSI—and any argument for equating them is foreclosed by the fact that the regulations, as just noted, specify when "publication" is required, 40 C.F.R. §1506.6(b)(2).  Here, Interior took several steps to make "environmental information … available."  It published notices of the draft EA's availability in a number of local newspapers, and it made the draft EA available online (at Catawba Indian Nation:  Trust Acquisition and Mixed-Use Entertainment Complex (2020), www.catawbanationclevelandcountyea.com).  Approval Letter 31.  It also made the final EA and FONSI available online, at the same website.  And it announced its land-into-trust decision on the Department's website and Twitter account.  Press Release, U.S. Department of Interior:  *Indian Affairs Announces Two Historic Decisions Taking Into Trust Tribal Lands Under New Guidance* (Mar. 13, 2020), www.bia.gov/as-ia/opa/online-press-release/indian-

affairs-announces-two-historic-decisions-taking-trust-tribal; Indian Affairs (@USIndianAffairs),

Twitter (Mar. 13, 2020, 7:50 PM), twitter.com/USIndianAffairs/status/1238613491893899264.

This regulation therefore likewise does not support a plausible claim of a NEPA violation.

Similarly flawed is both tribes' reliance on 40 C.F.R. §1506.6(b)(1), which provides that

"[i]n all cases the agency shall mail notice to those who have requested it on an individual

action."  EBCI Compl. ¶161; Cherokee Compl. ¶133.  The "notice" referred to in that regulation

is "notice of NEPA-related hearings, public meetings, and the availability of environmental

documents."  40 C.F.R. §1506.6(b).  Neither tribe alleges that it requested such notice, so there is

no plausible basis to infer a violation of the regulation.[10]

Even further afield is the tribes' related allegation (ECBI Compl. ¶163; Cherokee Compl.

¶135) that "NEPA's regulations require Defendants to 'send the FONSI notice … *to the*

*appropriate tribal* …. agencies.'"  The regulation they quote, 24 C.F.R. §58.43(a), was issued by

the Department of Housing and Urban Development, and is intended to "provide[] instructions

and guidance to recipients of HUD assistance," 24 C.F.R. §58.1.  It has no relevance here.

Lastly, NEPA regulations provide that "[i]n certain limited circumstances, … the agency

shall make the finding of no significant impact available for public review … for 30 days before

the agency makes its final determination whether to prepare an environmental impact statement

and before the action may begin."  40 C.F.R. §1501.4(e)(2).  Those two circumstances are

(1) where "[t]he proposed action is … one which normally requires the preparation of an [EIS]

under the procedures adopted by the agency pursuant to § 1507.3," and (2) where "[t]he nature of

---

[10] Section 1506.6(b)(3) also provides that "[i]n the case of an action with effects primarily of local concern," this notice "may" include "[n]otice to Indian tribes when effects may occur on reservations."  40 C.F.R. §1506.6(3).  But even putting aside that the regulation's use of "may" makes clear that such notice is not mandatory, neither tribe alleges that any effects from the Catawba's project may occur on its reservation.

the proposed action is one without precedent," *id.* §1501.4(e)(2)(i), (ii).  Even assuming that

"make … available for public review" means "publication," this regulation does not help the

tribes.  Neither tribe alleges the first circumstance, and rightly so, as taking land into trust is not

on the Interior Department's list of proposed actions that "will normally require the preparation

of an EIS," 43 C.F.R. §10010.60(a).  The Cherokee does allege (¶107) that the action here is

without precedent, because it is "the first time Defendants have decided to take land into trust, in

the treaty territory of other Tribal Nations, for a Tribe located in a different State.  *See also id.*

¶124.  But the regulation makes clear that the "without-precedent" test is not applied at that level

of granularity; rather, the regulation applies when "[t]he *nature* of the proposed action is one

without precedent," 40 C.F.R. §1501.4(e)(2)(ii) (emphasis added).  Here, the nature of the

proposed action is taking land into trust, which is obviously not without precedent.  *See*

*generally* U.S. Department of Interior, Bureau of Indian Affairs, Acquisition of Title to Land

Held in Fee or Restricted Fee Status (Fee-To-Trust Handbook) (June 28, 2016), www.bia.gov/

sites/bia.gov/files/assets/public/raca/handbook/pdf/Acquisition_of_Title_to_Land_Held_in_Fee_

or_Restricted_Fee_Status_50_OIMT.pdf.

     In short, the tribes' argument fails because there was no legal obligation to publish the

final EA or FONSI here.

     **B.**     **There Is No Plausible Claim That Interior Was Required To Prepare An EIS**

     The tribes next allege (ECBI Compl. ¶56(t); Cherokee Compl. ¶110) that Interior should

have prepared an EIS rather than issuing a FONSI.  But an EIS is required only if the proposed

action will have a "significant impact."  40 C.F.R. §1501.4(e).  Here, EBCI alleges no reason

why that standard is met, while the Cherokee alleges (Compl. ¶105) only that Interior failed to

adequately consider the ten factors that NEPA regulations make relevant, *see* 40 C.F.R.

§1508.27.  That allegation is not plausible.

Specifically, the Cherokee alleges (Compl. ¶¶106, 108) that Interior did not consider either the Kings Mountain site's "proximity to historic or cultural resources," 40 C.F.R. §1508.27(b)(3), or the "degree to which the action … may cause loss or destruction of significant scientific, cultural, or historical resources," *id.* §1508.27(b)(8).  That allegation is refuted by the EA's plain text.  It shows that—as detailed above in Part II—Interior conducted research and consulted the North Carolina SHPO, which reported that it was aware of "no historic resources which would be affected by the project."  Final EA 38.  Interior thus concluded that because "no historic properties, known archaeological sites or cultural materials are currently located within the Area of Potential Effects for the site[,] … [n]o known historic, cultural, religious or archaeological resources or paleontological resources would be affected."  *Id.*  Of course, Interior recognized "the possibility … that previously unknown archaeological or paleontological resources could be encountered during construction," but it noted that federal law would provide protection for any such resources.  *Id.*  Interior therefore determined that the effect of the project "would not be significant."  *Id.*  That determination was not plausibly arbitrary or capricious.

The Cherokee alleges, however (Compl. ¶106), that the foregoing analysis "disregard[s] the important status of the 1777 Cherokee Treaty Territory and Cherokee Nation's treaty rights to protect its cultural patrimony."  That is so, the Cherokee alleges (*id.* ¶108), because "other Cherokee cultural artifacts and resources are known to exist" in Cleveland County.  But the Cherokee's basis for that allegation is the declarations submitted earlier in this case by EBCI's THPO—and those declarations (again as explained in detail in the NHPA section) directly contradict the Cherokee's allegation, acknowledging that with the information it currently has, EBCI "cannot determine whether Cherokee religious or cultural sites exist at the site," Townsend

Declaration ¶15.  As noted, this Court need not credit factual allegations that are contradicted by other documents cognizable on a motion to dismiss.

The Cherokee next alleges (Compl. ¶107) that Interior failed to consider two other factors that bear on whether to prepare an EIS:  "[t]he degree to which the action may establish a precedent for future actions with significant effects," 40 C.F.R. §1508.27(b)(6), and whether "the effects on the quality of the human environment are likely to be highly controversial," *id.* §1508.27(b)(4).  But the "controvers[y]" and "precedent" the Cherokee points to are not environmental in nature.  It alleges (Compl. ¶107) that Interior's land-into-trust decision "constitutes the first time Defendants have decided to take land into trust, in the treaty territory of other Tribal Nations, for a Tribe located in a different state."  This alleged controversy— which would not, in any event, rise to a level requiring an EIS, *see Fund for Animals v. Frizzell*, 530 F.2d 982, 988 n.15 (D.C. Cir. 1975) (per curiam)—does not relate to the "effects on the quality of the human environment," 40 C.F.R. §1508.27(b)(4).  The Cherokee has failed to allege any *environmental* effect.  That omission is fatal.  *See National Parks Conservation Association v. Semonite*, 916 F.3d 1075, 1084 (D.C. Cir. 2019), *amended*, 925 F.3d 500 (D.C. Cir. 2019).

## C.    The Tribes' Remaining NEPA Allegations Fail As A Matter Of Law

The tribes offer three other allegations regarding NEPA.  First, they claim that the EA failed to consider alternatives.  Second, they allege that Interior had to consult with them under NEPA.  Third, EBCI alleges "fundamental flaws" in the draft EA's analysis.  Each claim fails.

1.    The tribes' claim that the EA "contain[s] *no* alternative courses of action," ECBI Compl. ¶¶156-159; Cherokee Compl. ¶¶125-131, is refuted by the document's plain text.  As noted earlier, the EA lays out three alternatives to taking the land into trust, *see* Final EA 19-22, and it analyzes those alternatives' impact across twelve different environmental categories, *see id.* at 28-65.  Perhaps recognizing this, the Cherokee retreats to the allegation (Compl. ¶129) that

Interior was obligated to offer an alternative involving a different location.  But the Cherokee provides no rationale for imposing such a requirement.  It does not allege, for example, that an alternate site would lessen the "environmental effect[]" of the project, 40 C.F.R. §1502.16(d).  Indeed, it does not even allege that any other site was feasible.  As the Supreme Court has explained, "[t]ime and resources are simply too limited to hold that an [EIS] fails because the agency failed to ferret out every possible alternative," i.e., "every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. Natural Resource Defense Council, Inc.*, 435 U.S. 519, 551 (1978).  The Court has similarly condemned "obstructionism" based on "obscure reference to matters that 'ought to be' considered." *Id.* at 553-554.  That is all the Cherokee offers.  Its allegation is implausible and therefore fails as a matter of law.

2.     The tribes next allege (ECBI Comp. ¶152; Cherokee Compl. ¶118) that the draft EA "does not satisfy … NEPA because" it does not list any tribes "with whom Defendants consulted, in violation of 40 C.F.R. §1508.9(b)."  But the tribes have not alleged that they were consulted for NEPA purposes.  They thus have not plausibly alleged a violation of the regulation.

3.     Finally, EBCI cites (Compl. ¶151) the slew of comments it submitted on the draft EA, asserting that they show "the Draft EA is fundamentally flawed."  But it is the final EA and not the draft EA that matters, *see National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659 (2007), and the complaint fails to allege *any* defect in the final EA (which addressed EBCI's comments in detail, *see* Final EA at App'x O, pp.8-15).  Even if there were any defect in the draft EA, therefore, that would provide no basis for relief.

## CONCLUSION

The complaint and complaint-in-intervention should each be dismissed with prejudice.

Dated:  June 15, 2020

Respectfully submitted,

/s/ Daniel S. Volchok
Daniel S. Volchok (#497341)
Arpit K. Garg (#1033861)
Alex Hemmer (#198279)
Samuel M. Strongin (#240970)
Amy C. Lishinski (#1620295; D.D.C.
    admission pending)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363
E-mail:  daniel.volchok@wilmerhale.com