PRERAK SHAH
Deputy Assistant Attorney General
Environment and Natural Resources Division

PETER KRYN DYKEMA
SALLY J. SULLIVAN
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Email: peter.dykema@usdoj.gov
Ph:  (202) 305-0436
Fx: (202) 305-0506

*Attorneys for Federal Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EASTERN BAND OF CHEROKEE INDIANS<br>88 Council House Loop, Cherokee, NC 28719<br><br>Plaintiff,<br><br>    vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR<br>1849 C Street, N.W., Washington, D.C. 20240, et al.<br><br>Defendants. | )<br>)<br>)<br>) Civil Action No. 1:20-cv-757-JEB<br>)<br>)<br>)<br>)<br>)<br>) |

## FEDERAL DEFENDANTS' MOTION TO DISMISS AND
## MEMORANDUM IN SUPPORT

Federal Defendants respectfully request that the Complaint in this case be dismissed for

lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim under Fed. R.

Civ. P. 12(b)(6).

# MOTION TO DISMISS

United States Department of The Interior, United States Bureau of Indian Affairs, David Bernhardt, in his official capacity as Secretary of the United States Department of the Interior, Tara Katuk MacLean Sweeney, in her official capacity as Assistant Secretary for Indian Affairs, and R. Glen Melville, in his official capacity as Acting Regional Director for the Bureau of Indian Affairs Eastern Regional Office, hereby respectfully move the Court to dismiss the Complaint for lack of jurisdiction and for failure to state a claim on which relief may be granted. The Complaint must be dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) because Plaintiff Eastern Band of Cherokee Indians lacks standing under Article III to the United States Constitution; the Complaint should also be dismissed for failure to state a claim under Fed. R. Civ. P. 12(b)(6) because the interests Plaintiff asserts is, in most if not all of the Counts of the Complaint, outside the zone of interests implicated by the statutes there invoked.

This motion is supported by the supporting Memorandum that follows.

Respectfully submitted,

PRERAK SHAH
Deputy Assistant Attorney General
Environment and Natural Resources Division

PETER KRYN DYKEMA
SALLY J. SULLIVAN
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044-7611
Email: peter.dykema@usdoj.gov
Ph:  (202) 305-0436
Fx: (202) 305-0506

*Attorneys for Federal Defendants*

June 15, 2020.

**MEMORANDUM IN SUPPORT OF**
**FEDERAL DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

I.      ARGUMENT: PLAINTIFF DOES NOT HAVE STANDING TO PURSUE
        ANY OF ITS CLAIMS ......................................................................................... 2

        A.      Legal Standard ......................................................................................... 2

                1.      Article III standing and Rule 12(b)(1) ......................................... 2

                2.      "Prudential" standing and Rule 12(b)(6 ...................................... 5

        B.      Plaintiff Has Not Established Concrete, Particularized, or Imminent
                Injury (Counts 1-5) ................................................................................. 7

        C.      Plaintiff Has Not Identified Any Injury Stemming From Federal
                Defendants' Alleged Violations of the Catawba Settlement Act of
                1993 (Counts 1-3) ................................................................................. 12

        D.      The Band is Outside the Zone of Interests Encompassed by the
                Catawba Settlement Act (Counts 1-3) .................................................. 13

        E.      Procedural Harm by Itself Does Not Establish Article III Standing
                for Plaintiff's NHPA and NEPA Claims (Counts 4-5) ......................... 16

II.     CONCLUSION ................................................................................................... 18

# TABLE OF AUTHORITIES

## Cases

*Akiachak Native Community v. U.S. Dept. of Interior,*
   584 F.Supp.2d 1 (D.D.C. 2008) ........................................................................ 14, 15

*Allen v. Wright,*
   468 U.S. 737 (1984) ......................................................................................... 5, 12

*Al–Owhali v. Ashcroft,*
   279 F.Supp.2d 13 (D.D.C. 2003) ....................................................................... 3, 4

*Animal Legal Def. Fund, Inc. v. Espy,*
   23 F.3d 496 (D.C. Cir. 1994) .................................................................................. 5

*Animals v. Salazar,*
   713 F. Supp. 2d 20 (D.D.C. 2010) ....................................................................... 16

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) .................................................................................. 3

*Assoc. of Data Processing Serv. Orgs., Inc. v. Camp,*
   397 U.S. 150 (1970) ............................................................................................. 15

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................ 5, 6

*Browning v. Clinton,*
   292 F.3d 235 (D.C. Cir. 2002) ............................................................................. 6, 7

*Capital Legal Found. v. Commodity Credit Corp.,*
   711 F.2d 253 (D.C. Cir. 1983) ............................................................................... 12

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ............................................................................................ 3, 7

*Clarke v. Securities Industry Ass'n,*
   479 U.S. 388 (1987) ............................................................................................... 5

*Conley v. Gibson,*
   355 U.S. 41 (1957) ................................................................................................. 6

*Ctr. for Biological Diversity v. Bernhardt,*
   No. CV 18-2576 (RC), 2020 WL 709635 (D.D.C. Feb. 12, 2020) .......................... 3

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
   563 F.3d 466 (D.C. Cir. 2009) .............................................................................. 16

*Ctr. for Law & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005) ............................................................................ 17

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006) ............................................................................................... 9

*Davis v. FEC*,
  554 U.S. 724 (2008) ................................................................................................... 2

*Dorsey v. Am. Express Co.*,
  499 F. Supp. 2d 1 (D.D.C. 2007) ......................................................................... 5, 13

*Elec. Privacy Info. Ctr. v. Dep't of Commerce*,
  No. 19-777, 2020 WL 1978949 (U.S. Apr. 27, 2020) ............................................. 9

*Erby v. United States*,
  424 F. Supp. 2d 180 (D.D.C. 2006) ......................................................................... 4

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ..................................................................................................... 6

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .................................................................................. 3

*Friends of Capital Crescent Trail v. Fed. Transit Admin.*,
  No. CV 17-1811 (RJL), 2019 WL 1046889 (D.D.C. Mar. 5, 2019) ........................ 5

*Gunpowder Riverkeeper v. FERC*,
  807 F.3d 267 (D.C. Cir. 2015) .................................................................................. 5

*Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*,
  724 F.3d 206 (D.C. Cir. 2013) ................................................................................ 17

*Kowal v. MCI Communications Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) .............................................................................. 6, 7

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ................................................................................................... 5

*Lujan v. Defs. Of Wildlife*,
  504 U.S. 555 (1992) .......................................................................................... 2, 3, 9

*Macharia v. United States*,
  334 F.3d 61 (D.C. Cir. 2003) .................................................................................... 3

*Maiden Creek Assocs. v. U.S. Dep't of Transp.*,
  823 F.3d 184 (3d Cir. 2016) ................................................................................. 5, 16

*Mortensen v. First Fed. Sav. & Loan Ass'n*,
  549 F.2d 884 (3d Cir. 1976) ...................................................................................... 4

*Nat'l Parks Conservation Ass'n v. Manson*,
  414 F.3d 1 (D.C. Cir. 2005) .................................................................................... 17

*Papasan v. Allain*,
  478 U.S. 265 (1986) ................................................................................................... 6

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) .............................................................................. 12

iii

*Phoenix Consulting, Inc. v. Republic of Angola*,
  216 F.3d 36 (D.C.Cir. 2000) ........................................................................ 4

*Privacy Info. Ctr. v. United States Dep't of Commerce*,
  928 F.3d 95 (D.C. Cir. 2019) .................................................................. 9, 17

*Role Models Am., Inc. v. Harvey*,
  459 F. Supp. 2d 28 (D.D.C. 2006) .............................................................. 16

*Sparrow v. United Air Lines, Inc*.,
  216 F.3d 1111 (D.C. Cir. 2000) ................................................................... 6

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................... 17

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  205 F. Supp. 3d 4 (D.D.C. 2016) ............................................................... 10

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................. 16, 17

*Summit Health, Ltd. v. Pinhas*,
  500 U.S. 322 (1991) ..................................................................................... 6

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ................................................................................. 2

*West v. Lynch*,
  845 F.3d 1228 (D.C. Cir. 2017) ........................................................... 2, 3, 6

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013) ............................................................... 8, 16

*Wilderness Soc. v. Griles*,
  824 F.2d 4 (D.C. Cir. 1987) ................................................................. 14, 15

**Statutes**

25 U.S.C. § 3001 ............................................................................................ 7

25 U.S.C. § 941(2)(b) .................................................................................. 14

25 U.S.C. § 941(2)(b)(4) .............................................................................. 16

25 U.S.C. §§ 2701-2721 ................................................................................ 1

25 U.S.C. §§ 5101-5144 ................................................................................ 1

Pub. L. No. 100-497, 102 Stat. 2467 (1988) ................................................. 1

Pub. L. No. 103-116, 107 Stat. 1118 (1993) ................................................. 1

Pub. L. No. 73-383, 48 Stat. 984 (1934) ....................................................... 1

Pub. L. No. 79-404, 60 Stat. 237 (1946) ....................................................... 2

iv

Pub. L. No. 89-665, 80 Stat. 915 (1966) ........................................................ 1

Pub. L. No. 91-190, 83 Stat. 852 (1970) ........................................................ 2

SC ST § 27–16–20 .......................................................................................... 14

SC ST § 27–16–20(2) ...................................................................................... 16

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................... 5

**Regulations**

25 C.F.R. § 292.12(b) ...................................................................................... 8

25 C.F.R. Part 151 ........................................................................................... 1

25 C.F.R. Part 292 ........................................................................................... 1

36 C.F.R. § 800.13(b)(3) .................................................................................. 11

36 C.F.R. § 800.4(b)(1) .................................................................................... 10

## I.     INTRODUCTION

On September 17, 2018, the Catawba Indian Nation (Catawba) filed an application with the Department of the Interior (Interior) requesting that it take the Kings Mountain site in North Carolina into trust for the Nation's benefit.  *See* ECF No. 1-2 (DOI Approval Letter) at 1–2[1]; *see generally* Indian Reorganization Act, 25 U.S.C. §§ 5101 et seq.; 25 C.F.R. Part 151.  Catawba also asked for a determination of whether the land, once in trust, would be eligible for gaming pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701 et seq.  *See* Approval Letter at 1; *see also* 25 C.F.R. Part 292 (applicable regulations).  Following an 18-month administrative process, Interior approved the application on March 12, 2020.  *See* Approval Letter.  Immediately thereafter the Eastern Band of Cherokee Indians (the Band) filed suit seeking to invalidate the approval.  The Band named as defendants Interior, the Bureau of Indian Affairs (BIA), and three officials at Interior and the BIA (collectively, Federal Defendants).  Catawba has intervened as a defendant, and the Cherokee Nation has intervened as a plaintiff.[2]

The Band brings claims under four federal laws.  Counts 1-3 allege that Federal Defendants violated various provisions of the Catawba Indian Tribe of South Carolina Land Claims Settlement Act, Pub. L. No. 103-116, § 2(a)(4)(A), 107 Stat. 1118, 1118 (1993) (Catawba Settlement Act).[3]  Count 4 alleges violations of the National Historic Preservation Act, Pub. L. No. 89-665, 80 Stat. 915 (1966) (codified as amended at 16 U.S.C. §470 et seq.) (NHPA).  Count

---

[1] Page references to pleadings and other documents filed in this case refer to the pdf page, rather than the documents' internal pagination.

[2] Federal Defendants' response to the Cherokee Nation's Complaint is due July 6.

[3] Counts 1-3 also invoke provisions of the Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 (1988) (codified as amended at 25 U.S.C. §2701 *et seq.*) (IGRA) and the Indian Reorganization Act, Pub. L. No. 73-383, 48 Stat. 984 (1934) (codified as amended at 25 U.S.C. §5101 *et seq.*) (IRA).

5 alleges violations of the National Environmental Policy Act, Pub. L. No. 91-190, 83 Stat. 852

(1970) (codified as amended at 42 U.S.C. §4321 et seq.) (NEPA).  Because none of these statutes

creates a private right of action, the Band invokes, in all five of its counts, the Administrative

Procedure Act, Pub. L. No. 79-404, 60 Stat. 237 (1946) (codified as amended at 5 U.S.C. § 551

et seq.) (APA).

## II.     ARGUMENT: PLAINTIFF DOES NOT HAVE STANDING TO PURSUE ANY OF ITS CLAIMS

Each of the Band's claims should be dismissed because it has not alleged an injury in fact

sufficient to meet the "irreducible constitutional minimum" required for Article III standing.

Counts 1-3 should be dismissed for the additional reason that the claims there asserted do not fall

within the zone of interests of the statutes invoked.  For these reasons, the Court should dismiss

the Complaint in its entirety.

### A.  Legal Standard

#### 1.  Article III standing and Rule 12(b)(1).

Plaintiff bears the burden of proof to establish federal jurisdiction.  *Lujan v. Defs. Of

Wildlife*, 504 U.S. 555, 561 (1992).  "The Constitution limits [federal] 'judicial Power' to

'Cases' and 'Controversies," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (citing U.S.

CONST. art. III, § 2, cl. 1), and "there is no justiciable case or controversy unless the plaintiff

has standing." *Id*.  Standing is "not dispensed in gross," and a plaintiff must demonstrate

standing for each claim it seeks to press. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct.

1645, 1650 (2017) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)).

To meet Article III's "irreducible constitutional minimum of standing," a plaintiff must

establish three elements. *Lujan*, 504 U.S. at 560.  First, a plaintiff must show that it has suffered

an "injury in fact" that is "concrete and particularized", not "conjectural" or "hypothetical." *Id*.

(citations omitted).  The Band's injury must also be actual or imminent; it must be "certainly impending" and cannot rely "on a highly attenuated chain of possibilities." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 410 (2013).  "'[A]llegations of *possible* future injury' are not sufficient." *Id*.  Second, a plaintiff must demonstrate "a causal connection between the injury and the conduct complained of" such that Plaintiff's injury is "'fairly . . . trace[able]'" to the conduct of the Defendant. *Lujan*, 504 U.S. at 560-61 (citations omitted).  Third, a plaintiff must show it is likely, as opposed to merely speculative, that its injury will be redressed by a favorable decision of the Court. *Id*. at 561.  "When conjecture is necessary, redressability is lacking." *West*, 845 F.3d at 1237.

"Because subject matter jurisdiction focuses on the court's power to hear the claim, the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion as compared to a Rule 12(b)(6) motion for failure to state a claim." *Ctr. for Biological Diversity v. Bernhardt*, No. CV 18-2576 (RC), 2020 WL 709635, at *4 (D.D.C. Feb. 12, 2020). In assessing a challenge to a plaintiff's standing, courts therefore test a complaint's legal conclusions. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (in context of standing analysis under Rule 12(b)(1) "we do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint" (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)); *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003).

As to factual allegations in the complaint, the level of scrutiny depends on whether the challenge is facial or factual.  Facial challenges "attack[ ] the factual allegations of the complaint that are contained on the face of the complaint." *Al–Owhali v. Ashcroft*, 279 F.Supp.2d 13, 20 (D.D.C. 2003) (internal quotation marks and citation omitted).  "If a defendant mounts a 'facial'

3

challenge to the legal sufficiency of the plaintiff's jurisdictional allegations, the court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party." *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).

Factual challenges, by contrast, are "addressed to the underlying facts contained in the complaint." *Al–Owhali*, 279 F. Supp. 2d at 20. Where a defendant disputes the factual allegations in the complaint that form the basis for a court's subject-matter jurisdiction, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir. 2000). Instead, a court deciding a Rule 12(b)(1) motion asserting a factual challenge "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* In such situations, "the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Erby*, 424 F. Supp. 2d at 183 (internal quotations omitted); *see also Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1976) (holding that a court ruling on a factual challenge to its jurisdiction is not required to accept the plaintiff's factual allegations as true but, rather, "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case ... and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims").

The instant motion presents both a facial, and a factual, challenge to Plaintiff's standing.

### 2.  *"Prudential" standing and Rule 12(b)(6).*

"In addition to constitutional standing, a plaintiff must have a valid cause of action for the court to proceed to the merits of its claim."  *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 273 (D.C. Cir. 2015).  In what used to be referred to as "prudential standing," a plaintiff cannot bring suit for violations of statutes that were never intended to promote the interests plaintiff's suit would advance, based on the presumption "that a statutory cause of action extends only to plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Accordingly, "[t]o secure judicial review under the APA, [Plaintiff] must show that the injuries [it] assert[s] fall within the 'zone of interests' of the relevant statute."  *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 499 (D.C. Cir. 1994) (citing *Clarke v. Securities Industry Ass'n*, 479 U.S. 388 (1987)).

A zone of interests dismissal is made under Rule 12(b)(6) [4], which allows dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see generally Dorsey v. Am. Express Co*., 499 F. Supp. 2d 1, 2–3 (D.D.C. 2007).  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the standard of

---

[4] *See Friends of Capital Crescent Trail v. Fed. Transit Admin*., No. CV 17-1811 (RJL), 2019 WL 1046889, at *3 fn.3 (D.D.C. Mar. 5, 2019):

> The zone of interests inquiry has, in past cases, been referred to as a question of prudential standing. But since the Supreme Court clarified that "prudential standing is a misnomer as applied to the zone-of-interests analysis," *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 127 (2014) (quotation marked omitted), motions to dismiss claims for failing the zone of interests test have been evaluated under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1), *see Maiden Creek Assocs. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 n.1 (3d Cir. 2016) ("[W]e must analyze ... dismissal under Rule 12(b)(6) because the issue is whether appellants alleged harm that falls within NEPA's zone of interests, a question of statutory standing.").

pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Id*. at 555.(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the 'grounds' of 'entitle[ment] to relief,' a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Papasan v. Allain*, 478 U.S. 265, 286 (1986). The Court stated that there was no "probability requirement at the pleading stage," *Twombly*, 550 U.S. at 556, but "something beyond ... mere possibility ... must be alleged[.]" *Id*. at 1557-58. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id*. at 555, or must be sufficient "to state a claim for relief that is plausible on its face." *Id*. at 570. The Court referred to this newly-clarified standard as "the plausibility standard." *Id*. at 560-61 (abandoning the "no set of facts" language from *Conley v. Gibson*).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept as true all of the factual allegations contained in the complaint. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 325 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp*., 16 F.3d 1271, 1276 (D.C. Cir. 1994); s*ee also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113 (D.C. Cir. 2000). While the complaint is to be construed liberally in plaintiff's favor, the Court need not accept inferences drawn by the plaintiff if those inferences

are unsupported by facts alleged in the complaint; nor must the Court accept plaintiff's legal

conclusions. *Kowal*, 16 F.3d at 1276; *Browning*, 292 F.3d at 242.

### B.  Plaintiff Has Not Established Concrete, Particularized, or Imminent Injury (Counts 1-5)

The challenged actions here are the government's: taking the King's Mountain tract into

trust for the benefit of Catawba; making a determination that that tract is eligible for gaming; and

(allegedly) engaging in inadequate consultation with the Band regarding the possibility that the

tract contains historical or cultural artifacts of interest to the Band.  Nowhere in its Complaint or

supporting papers does the Band identify any concrete, particularized, or imminent harm

resulting from these actions.

Nowhere does Plaintiff explain how Federal Defendants' alleged violations of the

Catawba Settlement Act, NHPA, and NEPA have caused any "concrete" or "particularized"

harm to Plaintiff's interests.  *See generally* Compl.  Nor does Plaintiff allege that it will suffer

imminent or "certainly impending" future injury (*Clapper*, 568 U.S. at 409), as a result of these

alleged violations.  *Id*.  Plaintiff does not allege that it has any present legal right or interest in

the land.  *Id*.  And while Plaintiff asserts that it "continues to exercise cultural sovereignty" over

the area,.  *id*. ¶ 21,[5]  its "cultural sovereignty" is premised on its (disputed)[6] assertion that the

---

[5] The term, which gained currency following the publication of an article by Coffey and Tsosie, is defined by those authors as "the effort of Indian nations and Indian people to exercise their own norms and values in structuring their collective futures." Wallace Coffey & Rebecca Tsosie, *Rethinking the Tribal Sovereignty Doctrine: Cultural Sovereignty and the Collective Future of Indian Nations*, 12 Stan. L. & Policy Rev. 191, 196 (2001).  The undersigned is aware of no federal or state judicial decision recognizing that "cultural sovereignty" is or might entail a legally enforceable right independent of federally recognized rights such as those conferred by NHPA and the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq*.

[6] Both Federal Defendants and Catawba question Plaintiff's assertion that the Kings Mountain Site encompasses historic Cherokee treaty territory.  *See* ECF No.12 at 28; ECF No.13 at 22, 25, 29.  *See also* BIA Decision Document (ECF No. 1-2) at 10-11 (& fn. 46) ("the Site is located

land at issue was once Cherokee treaty territory (Compl. 2).  But even if accepted as true, that fact alone does not confer constitutional standing on the Band to bring suit in the absence of any actual or imminent on-the-ground injury.  *See WildEarth Guardians v. Jewell*, 738 F.3d at 305-06.

Most significantly, the Band has not alleged or shown that the site contains any Cherokee cultural or religious artifacts, or Cherokee human remains.  *See generally* Compl.; *see also Memorandum Opinion* 7-10, ECF No. 22.  Nor has the Band even alleged that it is *likely* that the site contains such Cherokee artifacts or remains.  Compl.  While the Band alleges that North Carolina files "show that there is evidence of an archeological investigation on the Kings Mountain Site" (Compl. ¶¶ 59, 65), the Band offers no supporting details regarding this investigation, and, critically, does not allege that this investigation pertains to, or has uncovered, any Cherokee cultural or religious artifacts.  *See* Compl.  Likewise, the fact that NCDOT made an "incidental discovery" of a "historical pottery kiln and prehistoric lythic scatter" at the Kings Mountain Site when it was working on a project in the area over a decade ago (ECF No. 1-1, Townshend Decl. ¶ 17) falls short of alleging imminent harm to the Band's interests.  The Band does not allege that the cultural relics were discovered on the proposed gaming site itself. Compl.; *see also* Final EA (ECF No. 13-1) at 712; *id*. at 723 (aerial photograph showing that 16.57-acre parcel was only a portion of NCDOT's project area).  And, more significantly, the Band does not allege that any of those items belonged to the Cherokee.  *See* Townsend Decl., ¶

---

within Catawba ancestral lands and is likely within the Nation's last reservation in North Carolina"); 25 C.F.R. § 292.12(b) (defining "significant historical connection" in part as land located "within the boundaries of the tribe's last reservation under a ratified or unratified treaty"); ECF No. 18-1 at 3-7, 11-12 (April 15, 2020 demonstrative exhibits).  Deciding the instant motion does not require resolution of this disagreement.

17.  In short, the Band does not provide any basis for alleging or concluding that any Cherokee cultural artifacts, or human remains, have been, or are likely to be, found at the site.

To the contrary, the Band expressly concedes, by its THPO, Mr. Townshend, that the Band "is unable to determine whether this final agency action will destroy or harm Cherokee religious or cultural sites," (Compl. ¶ 68), and "cannot determine whether Cherokee religious or cultural sites exist at the site" (Compl. ¶ 85).  These admissions belie the Band's claim to actual or imminent injury in fact.  And with respect to human remains, the Band has not alleged that any human remains have been, or are likely to be found, at the site, much less that such remains are Cherokee.  *See* Compl.  Instead, the Band offers only the speculative allegation from Mr. Townshend that "[i]f there are any human remains at the site, then they are *potentially* intact below the zone of impact from" NCDOT's using the site as a borrow pit.  (Townshend Decl. ¶ 18) (emphasis added).  Allegations of a "conjectural" or "hypothetical" injury do not suffice. *Lujan*, 504 U.S. at 560.  As the D.C. Circuit recently put it, "[s]peculation … 'is ordinarily fatal to standing.'"  *Elec. Privacy Info. Ctr. v. United States Dep't of Commerce*, 928 F.3d 95, 102 (D.C. Cir. 2019), *cert. denied sub nom. Elec. Privacy Info. Ctr. v. Dep't of Commerce*, No. 19-777, 2020 WL 1978949 (U.S. Apr. 27, 2020) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006)).  Here, the Band offers nothing more than bare speculation that Cherokee artifacts or remains could exist at the site coupled with a (disputed) assertion that the site was once Cherokee territory.

Were this Court to accept such bare speculation—untethered to even the likelihood of adverse effects—as constitutionally sufficient, it would expand standing to an untenable degree. Indeed, the Band could raise the specter that Cherokee artifacts or remains could potentially be found throughout all of its historic treaty territory, covering large swathes of the southeastern

9

United States.  Compl. ¶ 19; Ex. G to Compl. (Royce Map); ECF No. 18-1 at 11-12 (same).  But

that possibility alone surely cannot confer standing upon this Plaintiff to bring suit and seek to

block any federal activity occurring in that entire geographic area.  As this Court stated in its

prior ruling denying the Band's motion for a preliminary injunction:  "The statutes at issue do

not compel the Government to conduct extensive surveys, and certainly not archeological digs,

within these broad geographical bounds each time it proposes to take a major action — without

any proof that items of cultural significance will likely be found there."  ECF No. 22 at 11 (citing

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4, 35 (D.D.C.

2016)).  Here, the Band has failed even to allege that items of Cherokee cultural significance are

*likely* to be found at the site.  *See* Compl.

   To the extent the Band attempts to allege an injury stemming from BIA's failure to

conduct a cultural or archeological survey of the site, which could potentially have uncovered

such artifacts, it fares no better.  First, the Band does not allege that Federal Defendants have a

regulatory or statutory duty to conduct such a survey.  *See* Compl. ¶¶ 84, 129.  To the contrary,

both the regulations and case law make clear that the federal government has no such obligation.

36 C.F.R. § 800.4(b)(1) ("The agency official shall make a reasonable and good faith effort to

carry out appropriate identification efforts, which *may* include … field survey") (emphasis

added); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 205 F. Supp. 3d 4, 35

(D.D.C. 2016) ("neither the NHPA nor the Advisory Council regulations require that *any* cultural

surveys be conducted for a federal undertaking").  Second, the site is a "highly disturbed" area

that has been "prospected for tin," and was used as a "soil borrow pit" by NCDOT during the

construction of a nearby road beginning in 2005.  Final EA at 23, 38-39, 496, 735.  Thus, it is

most likely that any cultural artifacts at the site, if they ever existed, were previously harmed or

damaged by the actions of third parties years ago.  Third, the site is privately-owned property[7]; as such, the federal government did not have the authority to excavate the site or authorize the Band's THPO to enter the site and conduct its own excavation or archeological dig.  The Band cannot complain that it was injured by the failure of the federal government to undertake actions it had no legal duty, or legal authority, to undertake.

Finally, to the extent the Band alleges that transfer of the land into trust for the Catawba will terminate its right to future consultation or impede its ability to protect Cherokee religious or cultural material that may exist at the site (Compl. 3), this allegation is belied by the evidence already before the Court.  The Final EA makes clear that if any historic properties or cultural patrimony are discovered during the construction process, "work within 50 feet of the find shall be halted until a professional archeologist . . . , or paleontologist if the find is paleontological in nature, can assess the significance of the find in consultation with the BIA, other appropriate agencies and [the Band]."  Final EA at ECF p. 18.  Under the applicable regulations, the agency expert shall also notify the Band's THPO of the find.  *See* 36 C.F.R. § 800.13(b)(3); *see also* Final EA at ECF p. 19 (listing the Band's THPO Townsend as contact).  If the find is significant, the THPO shall meet with the archeologist (or paleontologist) to "determine the appropriate course of action."  *Id*. at  pp. 18–19.  Separately, the Band's THPO will also be contacted if human remains are uncovered.  *Id*.  Assuming that such remains are Native American, the construction process will halt until "the THPO and [an agency] representative have made the necessary findings as to the origins and disposition."  *Id*. at p. 19.  These measures preserve the Band's consultation role as well as the Band's opportunity to protect any Cherokee cultural

---

[7] ECF No. 19 (Catawba Apr. 17, 2020, Notice) at 1 ("[T]he land is currently owned by Roadside Truck Plaza, Inc., a private company owned by a citizen of North Carolina").

artifacts or human remains discovered during construction.  Thus, the Band has failed to allege

any injury which is imminent or "certainly impending" as a result of the transfer of land into

trust.

In sum, it is clear that the Tribe has not identified a sufficiently concrete or imminent

injury to be able to demonstrate standing for its claims.  For that reason, the Court should dismiss

the Complaint in its entirety.

### C.  Plaintiff Has Not Identified Any Injury Stemming From Federal Defendants' Alleged Violations of the Catawba Settlement Act of 1993 (Counts 1-3)

The Band's first three Counts allege that Federal Defendants violated the Catawba

Settlement Act, the IRA, and IGRA.  Compl. ¶¶ 88-114.  But the Band does not identify any

harm that it has suffered, or will suffer imminently, as a result of the alleged violations.  *Id*.  A

party must have suffered a cognizable injury to have standing and a violation of the "right to

have the Government act in accordance with law" is not a cognizable injury.  *Allen v. Wright*,

468 U.S. 737, 754 (1984).  That a federal statute may have been violated does not confer

standing to bring suit in federal court unless a plaintiff can show that he was "adversely affected"

by the agency's violation of law.  *Capital Legal Found. v. Commodity Credit Corp.*, 711 F.2d

253, 258 (D.C. Cir. 1983) ("A sincere, vigorous interest in the action challenged, or in the

provisions of law allegedly violated, will not do to establish standing if the party's interest is

purely ideological, uncoupled from any injury in fact, or tied only to an undifferentiated injury

common to all members of the public"); *see also People for the Ethical Treatment of Animals v.

U.S. Dep't of Agric.*, 797 F.3d 1087, 1102 (D.C. Cir. 2015) ("Thus, 'absent the ability to

demonstrate a 'discrete injury' flowing from the alleged violation, [plaintiff] …cannot establish

standing merely by asserting that the [agency] failed to process its complaint in accordance with

law.").  The Band fails to make any such showing here, and, for that reason alone, the Court

must dismiss Counts 1-3.

### D.  The Band is not within the Zone of Interests Encompassed by the Catawba Settlement Act (Counts 1-3)

The Band's Counts 1-3 do not come within the zone of interests advanced by the

Catawba Settlement Act and must therefore be dismissed under Fed. R. Civ. P. 12(b)(6) for

failure to state a claim on which relief may be granted.

Three instruments embody the agreement between Catawba, the State of South Carolina,

and the United States: the fifty-page "agreement in principle" between Catawba and South

Carolina intended to "settle[] the claims and suits pending in" court concerning Catawba's land

claims against the state (excerpted as ECF No. 1-6); the Catawba Indian Claims Settlement Act

enacted by South Carolina (1993 S.C. Act No. 142); and the federal Catawba Settlement Act by

which, among other things, the United States formally "restored" the "trust relationship between

[Catawba] and the United States," Catawba Settlement Act §4(a)(1), and made Catawba and its

members "eligible for all benefits and services furnished to federally recognized Indian tribes

and their members."  *Id*. §4(b). Nothing in any of these materials indicates or suggests that the

interests the Band might advance by its lawsuit are within the interests promoted by the cited

laws.

The parties to the agreement are Catawba and the State of South Carolina.  ECF No. 1-6

at 2.  The land at issue was Catawba land.  *Id*. at 2-3 ("'Catawba Claim Area' shall mean that

area of approximately 144,000 acres in York, Lancaster, and Chester Counties, South Carolina

claimed by the Catawba Tribe under the Treaty of Pine Tree Hill in 1760 and the Treaty of

Augusta in 1763, and surveyed by Samuel Wylie in 1764, and ceded by the Catawba Indian

Tribe to the State of south Carolina by the Treaty of Nation Ford in 1840.").  The South Carolina

Settlement Act was designed to resolve claims asserted by Catawba against the State and the United States.  SC ST § 27–16–20.  The purposes of the federal Catawba Settlement Act are stated as follows:

> (b) PURPOSE.—It is the purpose of this Act—
> (1) to approve, ratify, and confirm the Settlement Agreement entered into by the non-Indian settlement parties and [Catawba], except as otherwise provided by this Act;
> (2) to authorize and direct the Secretary to implement the terms of such Settlement Agreement;
> (3) to authorize the actions and appropriations necessary to implement the provisions of the Settlement Agreement and this Act;
> (4) to remove the cloud on titles in the State of South Carolina resulting from [Catawba's] land claim; and
> (5) to restore the trust relationship between [Catawba] and the United States.

25 U.S.C. § 941(2)(b). The interests promoted here are those of Catawba, South Carolina, and the United States.  The Band's interests are in no way implicated.  Indeed, it is hard to see how anyone residing outside of South Carolina could assert claims within the zone of interests promoted by the Catawba Settlement.

Two cases involving the Alaska Native Claims Settlement Act (ANCSA), *Wilderness Soc. v. Griles*, 824 F.2d 4 (D.C. Cir. 1987) and *Akiachak Native Community v. U.S. Dept. of Interior*, 584 F.Supp.2d 1 (D.D.C. 2008), illustrate the fact that the Band's claims here are not within the zone of interests promoted by the Catawba settlement and its implementing legislation.  In *Akiachak* plaintiffs, Native Tribes located in Alaska, sought to invalidate regulations regarding Interior's taking Alaskan land into trust for the benefit of Native Tribes.  The State of Alaska sought intervention, which plaintiffs opposed on the grounds that the State lacked prudential standing.  The court held that, because Alaska was a party to ANSCA, and because plaintiffs' claims implicated ANSCA provisions of central interest to the State, the State had prudential

standing.  584 F. Supp. 2d at 8 ("Alaska, as a party to ANCSA and obligated under its terms . . . could sustain injury that is clearly within the zone of interests protected and regulated under this statute") (citing *Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 155 (1970)).

In contrast, in *Griles*, plaintiffs were environmental protection organizations (the Wilderness Society and the Sierra Club) who challenged a Bureau of Land Management policy affecting the implementation of ANCSA.  The challenged policy had the effect of removing submerged lands from federal control and vesting control in Tribal grantees. 824 F.2d at 7.  The court held that, because plaintiffs could not allege that they (or their members) used the lands in question, they lacked standing.  Absent such actual usage, the court noted, "the threat of injury would be too amorphous or uncertain; it would be no greater for the plaintiff than for any person simply opposed to the governmental action in question."  *Id*. at 12; *see also id*. ("In short, the issue in each case is whether the plaintiff has put forward enough facts to show that his intended behavior will be injured as a direct or indirect result of the challenged governmental action.").

The Band does not allege that its members use the lands whose ownership was resolved by the Catawba settlement and its implementing legislation (the "Catawba Claim Area," ECF No. 1-6 at 2-3).  Nor does it claim any ownership interests in the

Catawba Claim Area.[8]  Counts 1-3 therefore fall outside the zone of interests promoted

by the Catawba Settlement Act and must be dismissed for failure to state a claim.[9]

### E.  Procedural Harm by Itself Does Not Establish Article III Standing for Plaintiff's NHPA and NEPA Claims (Counts 4-5)

A plaintiff claiming procedural injury "must 'show not only that the defendant's acts

omitted some procedural requirement, but also that it is substantially probable that the procedural

breach will cause the essential injury to the plaintiff's own interest.'" *In Def. of Animals v.*

*Salazar*, 713 F. Supp. 2d 20, 26 (D.D.C. 2010) (quoting *Ctr. for Biological Diversity v. U.S.*

*Dep't of the Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009)).  While courts "relax the redressability

and imminence requirements for a plaintiff claiming a procedural injury, 'the requirement of

injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute.'"

*WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (quoting *Summers v. Earth*

*Island Inst.*, 555 U.S. 488, 497 (2009)).  For that reason, "[a] procedural injury claim [ ] must be

tethered to some concrete interest adversely affected by the procedural deprivation."  *Id.*  As the

---

[8] The South Carolina implementing legislation noted that the Catawba Claim Area potentially impacted "large numbers of landowners, citizens, and communities" in South Carolina. SC ST § 27–16–20(2).  Similarly, one of the (federal) Catawba Settlement Act's purposes was "to remove the cloud on titles in the State of South Carolina resulting from [Catawba's] land claim.".  25 U.S.C. § 941(2)(b)(4).  These landowners, as intended beneficiaries of the settlement, might be able to establish prudential standing to enforce provisions in the settlement and its implementing legislation, but the Band is not among them.

[9] To whatever extent the interests the Band is actually trying to promote relate to its ownership and operation of two casinos with which the Catawba facility would compete (*see* Final EA at 44 (analyzing likely impact of Catawba casino on existing Cherokee casinos)), Claims 4 and 5 (NHPA and NEPA) would also fail under the zone of interests test.  Purely economic interests are not protected by NEPA, and do not establish standing. *Maiden Creek Assocs., L.P. v. U.S. Dep't of Transp.*, 823 F.3d 184, 194 (3d Cir. 2016) ("The vast majority of NEPA authority makes clear that economic injury alone does not satisfy the statute's zone of interests test" (collecting cases)).  The same is true of NHPA.  *Role Models Am., Inc. v. Harvey*, 459 F. Supp. 2d 28, 38 (D.D.C. 2006), *aff'd on other grounds sub nom. Role Models Am., Inc. v. Geren*, 514 F.3d 1308 (D.C. Cir. 2008) (citing cases).

Supreme Court has made clear: "a procedural right *in vacuo* - is insufficient to create Article III standing." *Summers*, 555 U.S. at 496.

The Band's fourth and fifth Counts allege "archetypal procedural injuries": failure adequately[10] to consult under Section 106 of the NHPA (Compl. 3; ¶¶ 87, 117, 142), and failure to comply with regulatory obligations under NEPA[11] (Compl. ¶¶ 154, 162, 163). *See, e.g., Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005) (agency's failure to prepare environmental impact statement before taking action with adverse environmental consequences constitutes "archetypal procedural injury."). But these alleged procedural harms—without more—are insufficient to establish Article III standing. *Summers,* 555 U.S. at 496; *see also Elec. Privacy Info. Ctr. v. United States Dep't of Commerce*, 928 F.3d 95, 102 (D.C. Cir. 2019) ("'a bare procedural violation, divorced from any concrete harm, [does not] satisfy the injury-in-fact requirement of Article III.'") (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016), *as revised* (May 24, 2016))); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("the plaintiffs have standing only if, *inter alia*, (1) the government violated their procedural rights designed to protect their threatened concrete interest, *and (2) the violation resulted in injury to their concrete, particularized interest*.") (emphasis added). The Band,

---

[10] Plaintiff admits, as it must, that BIA in fact consulted with the Eastern Cherokee. Compl. ¶ 136.

[11] Plaintiff's NEPA claim appears to be premised on Federal Defendants' alleged failure to publish the Final EA and FONSI. Compl. ¶¶ 154, 162-63. BIA published both documents on March 23, 2020, ten days after the issuance of the decision document. *see* http://catawbanationclevelandcountyea.com Any procedural injury Plaintiff suffered as a result of the slight delay in their publication is *de minimis*, and, in any event, does not satisfy the injury in fact prong of the Article III standing test. *See Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp*., 724 F.3d 206, 217 (D.C. Cir. 2013) (publication of final EA after final decision was made was a "technical error" that "was . . . harmless and not grounds for vacating or remanding.")

therefore, must establish an injury to its "concrete, particularized interests" in order to establish Article III standing—which, as shown above, it fails to do.

**III.      CONCLUSION**

For the foregoing reasons, Federal Defendants respectfully request that the Complaint be dismissed in its entirety with prejudice.

Dated this 15th day of June, 2020.

Respectfully submitted,

PRERAK SHAH
Deputy Assistant Attorney General

*/s/Peter Kryn Dykema*
Peter Kryn Dykema
Sally J. Sullivan
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington DC 20044-7611
peter.dykema@usdoj.gov
Phone: (202) 305 0436
Fax: (202) 305 0274

*Attorney of Record for Defendants*

18

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served electronically by the Court CM/ECF system on June 15, 2020, upon all counsel of record.


*/s/ Peter Kryn Dykema*

Peter Kryn Dykema