## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

EASTERN BAND OF CHEROKEE INDIANS,  )
FELICIA DOVER, JASON C. MCLEYMORE,  )
WILLIAM DEWEY MCLEYMORE, DONNA M. )
LANDERS, WILLIAM SHANE MCLEYMORE,  )
SONYA A. BEATY, JAMES EDWARD  )
MCLEYMORE, STEPHEN DEWEY  )
MCLEYMORE, BRIAN G. ARROWOOD,  )
SHIRLEY M. ARROWOOD, JOHN CHARLES )
MCLEYMORE, and WANDA CLARK,  )
  )
      Plaintiffs,  )
  )
      v.  )      Civil Action No. 1:20-cv-00757-JEB
  )
UNITED STATES DEPARTMENT OF THE  )
INTERIOR, *et al.*,  )
  )
      Defendants.  )

### FIRST AMENDED COMPLAINT OF
### PLAINTIFFS THE EASTERN BAND OF CHEROKEE INDIANS AND
### TWELVE MEMBERS OF THE EASTERN BAND OF CHEROKEE INDIANS

1.    Plaintiffs the Eastern Band of Cherokee Indians (the "EBCI") and twelve enrolled members of the EBCI (the "Individual Plaintiffs") bring this action to reverse an unlawful March 12, 2020 decision of Defendant Assistant Secretary of the Interior Tara Sweeney (the "March 12 Decision") directing the trust acquisition of land within the EBCI's historical territory in North Carolina. The driving force behind this acquisition is an unsavory but well-connected casino developer, Wallace Cheves, who has prevailed upon the Catawba Indian Nation of South Carolina to lend its name to the scheme and has deployed his influence to reverse the Department of the

Interior's[1] long-held position that such trust acquisitions are unlawful.  But while back-room dealing can sway an agency, the law is stubborn.  The reality remains that—as the Department previously concluded—the land acquisition directed by the March 12 Decision violates the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub. L. No. 103–116, 107 Stat. 1118 (the "1993 Settlement Act"), as well as the Indian Reorganization Act of 1934 (the "IRA"), the Indian Gaming Regulatory Act ("IGRA"), the National Historical Preservation Act (the "NHPA"), and the National Environmental Policy Act ("NEPA").  Cheves has tried, without avail, to persuade Congress to lift the statutory bars to his scheme.  Until Congress does, these statutes will continue to foreclose the action the March 12 Decision directs.

2.     The EBCI—the only federally recognized Indian tribe in North Carolina—has succeeded against heavy odds by doing things by the book.  The EBCI is composed of descendants of the Cherokees who found refuge in the Great Smoky Mountains and avoided forced removal in the 1830s to Indian Territory in present-day Oklahoma, as well as Cherokees who survived the Trail of Tears and returned to the Cherokee homeland.  The EBCI's reservation, the Qualla Boundary, is located in a remote area of western North Carolina and is home to the EBCI's government and most of its citizens.  Through hard work, the EBCI has rebuilt its institutions of government.  It has relied heavily on revenues from on-reservation gaming under IGRA—just as Congress envisioned when it enacted IGRA "to promote tribal economic development [and] self-sufficiency" via gaming on a tribe's own "Indian lands."  25 U.S.C. § 2701(4), (5).  The EBCI today deploys these revenues to provide high-quality health care, education, and law enforcement grounded in Cherokee sovereignty, culture, and values.  The EBCI also works with the other two

---

[1] The defendants in this action include the Department of the Interior and several of its officials. For convenience, this Complaint refers to them collectively as the "Department of the Interior" or the "Department" or the "Federal Defendants."

federally recognized Cherokee governments now based in Oklahoma—the Cherokee Nation and the United Keetoowah Band of Cherokee Indians ("UKB")—to exercise cultural sovereignty over former Cherokee lands outside the Qualla Boundary.

3.      The revenues that can accrue from tribal gaming, however, can attract the wrong people.  For example, in 2007, two Catawba-connected businessmen pled guilty to a scheme to unlawfully funnel Catawba funds to political candidates in order to reverse South Carolina's ban on gaming by the Catawba.  On the heels of those convictions, Cheves—a casino operative with a history of criminal and civil enforcement actions against him and his companies for illegal gambling—prevailed on the Catawba to try its luck in North Carolina.  The Catawba agreed to lend its name to a casino project in Kings Mountain, North Carolina, in Cleveland County, just outside Charlotte and within the EBCI's historical territory.  This practice of "reservation shopping" has been roundly condemned.  *See* United South and Eastern Tribes, Resolution No. 2005:022 (resolution by intertribal organization, including the Catawba, condemning "'reservation shopping' [that] is often promoted and financed by wealthy developers" seeking to build casinos in "states where [tribes] have no reservation or trust land").  But given the lure of gaming revenues, some tribes remain willing to sign onto such schemes.

4.      This suit, however, does not ask this Court to pass upon the wisdom of permitting reservation shopping.  Plaintiffs recognize that the Catawba have suffered hardships, and understand why Cheves's proposal found a receptive audience.  Instead, Plaintiffs have brought this suit because Congress has considered whether the Catawba could acquire trust land and game outside its South Carolina reservation—and determined that it could not.  The Department's disregard of Congress's commands threatens imminent, irreparable harm to Plaintiffs.

5.      The controlling statutes are the IRA and the 1993 Settlement Act.  Although Section 5 of the IRA generally authorizes the Department to acquire trust land "for the purpose of providing land for Indians," 25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465), Congress has determined that only some tribes may use Section 5.  In the 1993 Settlement Act, Congress addressed Section 5's applicability to the Catawba.  The 1993 statute embedded in federal law a Settlement Agreement that resolved, nationwide, claims arising out of the allegedly unlawful sale of the Catawba's land centuries ago.  On the one hand, the 1993 Settlement Act reversed the termination of the Catawba's federal recognition and created a federal reservation for the Catawba in South Carolina.  On the other hand, the Act strictly limited the Catawba's sovereignty:

- *First*, the Act created a specific process for acquiring trust land for the Catawba in South Carolina and, simultaneously, excluded the Catawba from availing themselves of the general land-into-trust process under IRA Section 5.

- *Second*, the Act permitted the Catawba to acquire trust land only in South Carolina.

- *Third*, the Act specified that IGRA "shall not apply to the Tribe," 1993 Settlement Act § 14(a), thereby "affirmatively" prohibiting the Catawba "from gaming activity" except as permitted under South Carolina law.  *TOMAC v. Norton*, 193 F. Supp. 2d 182, 194 n.8 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006).

6.      Cheves and the Catawba are welcome to persuade Congress that it has made unwise policy choices that should be amended.  But until then, Congress's statutes govern.  Indeed, when Cheves started down this path, he had no illusions about the barriers the Act created—and neither did the Department of the Interior.  In 1993, the Department raised concerns about the bill that became the 1993 Settlement Act precisely because it "relinquish[ed] much of the Secretary's

authority … with regard to trust land transactions."[2]  Recognizing the same point, Cheves in 2019 persuaded pliant U.S. Senators to introduce a bill that would have reversed these statutory barriers and specifically authorized a casino at Kings Mountain.  The Department testified that the bill's passage was necessary for the project to proceed.  Under current law, the Department told the Senate, the Act's "exclusion [of IGRA] specifically applies to the Tribe," and "the Settlement Act … exempts the Tribe" from the Department's regulations for taking land into trust.[3]

7.     Those words remain just as true today.  But after Congress chose to leave the 1993 Settlement Act and the IRA unchanged, Cheves leveraged his political connections to pressure the Department to proceed without the legislation it had previously recognized was necessary. Succumbing to the pressure, the March 12 Decision directs the Department to take land into trust for the Catawba under Section 5 of the IRA, saying not *one word* about the provisions of the 1993 Settlement Act excluding the Catawba from Section 5.   The decision then exercises that (nonexistent) Section 5 authority to take land into trust *in North Carolina*—while acknowledging that "a literal reading" of the Act would preclude this step.  Finally, the decision determines that the Kings Mountain site will be gaming-eligible under IGRA, *ignoring* the 1993 Settlement Act's express bar on Catawba gaming.

8.     That is not all.  In the Department's haste to reach its predetermined result, the Department violated the provisions of the NHPA and NEPA requiring careful deliberation and consultation.  Under the NHPA, the EBCI was entitled to a "reasonable opportunity" to consult "early" in the process, so that the EBCI and its members could identify and protect Cherokee

---

[2] *Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993: Hearing on S. 1156 Before the S. Comm. on Indian Affairs*, 103 Cong. 269 (1993).
[3] *Hearing on S. 279, S. 790, and S. 832 Before the Senate Comm. on Indian Affairs*, 116th Cong. 8–10 (2019) (statement of Principal Deputy Assistant Secretary of the Interior John Tahsuda, III).

cultural resources located at the Kings Mountain site.  But instead, the Department skipped its normal consultation process, substituting a single, eleventh-hour letter, 16 months after the Catawba submitted its application.  When the EBCI in a follow-up meeting demanded the consultation process that the NHPA requires, the Department duped the EBCI out of its NHPA rights by failing to disclose that the EBCI would have no *other* avenue for consultation before the Department took the Kings Mountain site into trust.  As a result, Plaintiffs face imminent harm to the Cherokee cultural resources that are likely to exist at the Kings Mountain site.

9.     The Department likewise skipped over the "hard look" at environmental and human consequences demanded by NEPA.  *First*, the Department arbitrarily and capriciously found that no Environmental Impact Statement ("EIS") was necessary, contravening both the regulations dictating the opposite result and bedrock requirements of reasoned decisionmaking.  For example, the Final Environmental Assessment ("Final EA") states that "[n]o verified historic properties or property boundaries have been found to be located on or adjacent to the project site."  Final EA at 25, Ex. H.  But in fact, North Carolina records show that "an archaeological site recorded within the project location" contains "an historical pottery kiln and prehistoric lythic scatter—human made stone tools," July 6, 2020 Declaration of Russell Townsend, Eastern Band of Cherokee Indians Tribal Historic Preservation Officer ¶ 21 ("Townsend July Decl.")—which the Department would have known, had it bothered to consult with the EBCI under the NHPA.  *Second*, the Department did not publish the Final EA and Finding of No Significant Impact ("FONSI") until March 23, 2020, nearly two weeks after the March 12 Decision.  For unprecedented actions like this one, the regulations require an agency to publish its final EA 30 days before acting.  *Third*, the Department violated NEPA's requirement that agencies consider genuine alternatives.  The Department short-circuited that process by considering only trivial tweaks to the Kings Mountain

6

project, rather than the obvious alternative of directing Cheves and the Catawba to seek trust land in South Carolina, in the Catawba's, rather than the EBCI's, historical territory.

10.     Plaintiffs bring this suit to redress the imminent harms that will flow from the Department's failure to abide by the 1993 Settlement Act, the IRA, IGRA, the NHPA, and NEPA. As soon as the Catawba and the casino developers commence construction, the EBCI and its members will lose—irreparably—their ability to protect the Cherokee cultural resources and patrimony that likely exist at the Kings Mountain site.  Meanwhile, Cheves's scheme will undermine the success that the EBCI has spent decades building, diverting largely into the hands of a non-Indian developer the gaming revenues that the EBCI earns today—and on which the EBCI and its members depend to fund hospitals, schools, Cherokee language initiatives, domestic-violence prevention, family income supplements, and firefighting in the Great Smoky Mountains, among many other governmental programs.  To avoid these harms, Plaintiffs seek an order permanently enjoining the Department from holding the Kings Mountain site in trust for the Catawba and permanently enjoining the Catawba from operating any gaming on that site, among other relief detailed below.

## PARTIES

11.     Plaintiff the Eastern Band of Cherokee Indians is a federally recognized tribal nation headquartered on the Qualla Boundary, the Eastern Band's reservation, at 88 Council House Loop, Cherokee, North Carolina 28719.

12.     Plaintiff Felicia Dover is an enrolled adult member of the EBCI who owns property and resides at 118 Trotter Lane, Kings Mountain, North Carolina 28086, less than four miles from the Kings Mountain site.

13.     Plaintiff Jason C. McLeymore is an enrolled adult member of the EBCI who owns property and resides at 121 Moore Road, Kings Mountain, North Carolina 28086, less than eight miles from the Kings Mountain site.

14.     Plaintiff William Dewey McLeymore is an enrolled adult member of the EBCI who owns property and resides at 135 Moore Road, Kings Mountain, North Carolina 28086, less than eight miles from the Kings Mountain site.

15.     Plaintiff Donna M. Landers is an enrolled adult member of the EBCI who owns property and resides at 316 Mooreview Lane, Kings Mountain, North Carolina 28086, less than eight miles from the Kings Mountain site.

16.     Plaintiff William Shane McLeymore is an enrolled adult member of the EBCI who owns property and resides at 322 Mooreview Lane, Kings Mountain, North Carolina 28086, less than eight miles from the Kings Mountain site.

17.     Plaintiff Sonya A. Beaty is an enrolled adult member of the EBCI who owns property and resides at 503 North 14th Street, Bessemer City, North Carolina 28016, about nine miles from the Kings Mountain site.

18.     Plaintiff James Edward McLeymore is an enrolled adult member of the EBCI who owns property and resides at 615 Athenia Place, Bessemer City, North Carolina 28016, less than ten miles from the Kings Mountain site.

19.     Plaintiff Stephen Dewey McLeymore is an enrolled adult member of the EBCI who owns property and resides at 101 Linville Court, Bessemer City, North Carolina 28016, about ten miles from the Kings Mountain site.

20.     Plaintiff Brian G. Arrowood is an enrolled adult member of the EBCI who owns property and resides at 2918 Tryon Courthouse Road, Bessemer City, North Carolina 28086, less than 13 miles from the Kings Mountain site.

21.     Plaintiff Shirley M. Arrowood is an enrolled adult member of the EBCI who owns property and resides at 2912 Tryon Courthouse Road, Bessemer City, North Carolina 28086, less than 13 miles from the Kings Mountain site.

22.     Plaintiff John Charles McLeymore is an enrolled adult member of the EBCI who owns property and resides at 127 West 4th Avenue, Gastonia, North Carolina 28052, less than 15 miles from the Kings Mountain site.

23.     Plaintiff Wanda Clark is an enrolled adult member of the EBCI who owns property and resides at 1548 Anderson Street, Gastonia, North Carolina 28052, less than 15 miles from the Kings Mountain site.  The twelve EBCI members described above are referred to collectively in this First Amended Complaint as the "Individual Plaintiffs."

24.     Intervenor-Plaintiff the Cherokee Nation is a federally recognized tribal nation headquartered in Tahlequah, Oklahoma.  The Cherokee Nation's reservation boundaries encompass all or part of 14 counties in what is now northeastern Oklahoma, the Nation's home since being forcibly removed from Cherokee historical territory.  The Cherokee Nation's historical territory encompassed parts of North Carolina, including what is now Cleveland County, where the Kings Mountain site is located, as well as portions of six other States in the Southeast.  The Cherokee Nation and the United States entered into numerous treaties and other agreements throughout the years and continue to do so.

25.     Defendant the Department of the Interior is a federal executive department, which was established by Congress and charged with responsibility for managing and administering certain federal authorities and obligations related to Indian tribes.

26.     Defendant the Bureau of Indian Affairs (the "BIA") is an agency within the Department with delegated responsibilities for managing and administering certain federal authorities and obligations related to Indian tribes.

27.     Defendant David Bernhardt is the Secretary of the Interior, whose office is located at 1849 C Street, N.W., Washington, D.C. 20240.  Congress has authorized the Secretary to carry out federal administration of tribal-lands acquisition and programs.  The Secretary has delegated his authority to take lands into trust to the Assistant Secretary for Indian Affairs by Part 209, Chapter 8, of the Departmental Manual.  Secretary Bernhardt is sued in his official capacity only.

28.     Defendant Tara Katuk MacLean Sweeney is the Assistant Secretary of the Interior – Indian Affairs, whose office is also located at 1849 C Street, N.W., Washington, D.C. 20240. The Assistant Secretary has direct line authority over the BIA Regional Offices, including the Eastern Region.  Assistant Secretary Sweeney is sued in her official capacity only.

29.     Defendant R. Glen Melville is the Acting Regional Director for the BIA's Eastern Regional Office, located at 545 Marriott Drive, Suite 700, Nashville, Tennessee 37214.  Director Melville oversees the transfer of title from fee simple to tribal trust and has been directed to "immediately" take the Kings Mountain, North Carolina parcel into trust upon completion of ministerial tasks.  Acting Director Melville is sued in his official capacity only.

30.     Intervenor-Defendant the Catawba Indian Nation ("Catawba") is a federally recognized tribal nation headquartered at 996 Avenue of the Nations, Rock Hill, South Carolina 29730.

## JURISDICTION AND VENUE

31.     This Court has subject-matter and personal jurisdiction over Plaintiffs' claims as they present civil actions arising under the laws of the United States (28 U.S.C. § 1331), are brought by a federally recognized Indian tribe wherein the matter in controversy arises under federal law (28 U.S.C. § 1362), and are premised upon legal wrongs committed by a federal agency under the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 702, 706.  This case challenges the legality of Department decisions and actions based on the 1993 Settlement Act, the IRA, IGRA, the NHPA, NEPA, and federal regulations implementing those statutes.

32.     Venue is proper in the U.S. District Court for the District of Columbia under 28 U.S.C. § 1391(b) and (e)(2) because the United States and federal officers acting in their official capacities and under color of legal authority are defendants, and substantial parts of the events giving rise to these claims occurred in the District.

33.     The United States has waived its sovereign immunity from suit in 5 U.S.C. § 702.

34.     The March 12 Decision declares that it is a final agency action subject to judicial review under the APA, 5 U.S.C. § 704, *see* Ex. F at 37, and in accordance with 40 C.F.R. § 1500.3, the NEPA claims involve actions that will result in irreparable injury to Plaintiffs.

## STATEMENT OF FACTS

### A.     The Eastern Band of Cherokee Indians

35.     The EBCI is a federally recognized tribal nation based in Cherokee, North Carolina.

36.     With about 15,000 tribal citizens, the EBCI is composed of the descendants of Cherokees who resisted forced federal removal from the Cherokee territory by finding refuge in the Great Smoky Mountains, as well as Cherokees who made the walk on the Trail of Tears to Indian Territory (now Oklahoma) and then returned to their homeland in North Carolina.

37.     Before contact with non-Indians, the Cherokee lived in and governed the southeastern part of what is now the United States, in the current-day States of North Carolina, South Carolina, Alabama, Georgia, Kentucky, Tennessee, and Virginia.

38.     Through the Cherokee Treaty of July 20, 1777, the Cherokees agreed to cede certain lands in present-day North Carolina to the Commissioners from the State of North Carolina.

39.     Today, the Qualla Boundary is the home of the EBCI.  Comprising about 57,000 acres of land that is primarily rugged, mountainous terrain, the Qualla Boundary is held in trust by the United States for the benefit of the EBCI and is located next to Great Smoky Mountains National Park in western North Carolina.

40.     The EBCI has fought tenaciously to preserve its separate history, culture, language, and sovereignty.  Because of this commitment, the EBCI continues to have fluent speakers of the Cherokee language, continues to traditionally gather plants in its territory—both on- and off-reservation—for food and medicine, and continues cultural practices that have endured since time immemorial.

41.     Over the course of decades, the EBCI has rebuilt its institutions of government.  It has replaced federally constructed and operated hospitals and boarding schools for Indians with its own hospital and K-through-12 schools that are infused with Cherokee culture, language, and values.  The EBCI has exercised its sovereign authorities and established its own professional court system, police force, and detention facilities.  The EBCI also exercises criminal jurisdiction over non-Indians who commit domestic and dating violence crimes within the EBCI's jurisdiction.  And the EBCI—in coordination with federal, state, and local governments—is active outside of its reservation boundaries, including fighting fires in the Great Smoky Mountains, gathering foods

and medicines in the Great Smoky Mountains National Park, operating the Sequoyah Birthplace Museum in Tennessee, and protecting off-reservation sacred sites like the Kituwah Mound.

42.    The EBCI also regularly provides direct payments to its members on a per-capita basis.  Peer-reviewed academic studies have demonstrated that children in families that receive these EBCI income supplements are significantly less likely as young adults to abuse alcohol or cannabis, suffer psychiatric problems, or get arrested, and they are almost 15 percent more likely to finish high school.[4]

43.    The EBCI and its members also fight to protect Cherokee remains and items of cultural patrimony within the Cherokee treaty and historical territory.

44.    In particular, the EBCI's Tribal Historic Preservation Officer ("THPO") ensures that the NHPA and NEPA are applied to protect Cherokee patrimony within the Cherokee historical territory.  The EBCI's THPO consults with federal agencies, private organizations and companies, and individuals to ensure NHPA and NEPA compliance, reviewing between 2,500 and 5,000 cultural-resource consultation requests per year.  Townsend July Decl. ¶ 6.

45.    To fund its government, the EBCI relies on revenues from two on-reservation gaming facilities, one in Cherokee, North Carolina, and one in Murphy, North Carolina.  These facilities are the largest employers on the EBCI's reservation—as well as the largest employers in western North Carolina, which has few urban centers—and account for a significant proportion of the EBCI's overall revenues.

46.    The EBCI operates these facilities under a Class III gaming compact with the State of North Carolina pursuant to IGRA, under which the EBCI shares a portion of the facilities'

---

[4] *See* National Academies of Sciences, Engineering, and Medicine, *A Roadmap to Reducing Child Poverty* 80–81 (2019) (citing four studies), https://doi.org/10.17226/25246.

revenues with the State.  *See* Approved Tribal—State Class III Gaming Compact; Indian Gaming, 77 Fed. Reg. 48,167 (Aug. 13, 2012); Indian Gaming, 59 Fed. Reg. 50,422 (Oct. 3, 1994).

47.     By lawfully and responsibly operating these gaming facilities for decades, the EBCI has earned a strong reputation and substantial goodwill throughout the surrounding communities and the State as a whole.

48.     The aboriginal, historical, and treaty territory of the EBCI and the Cherokee Nation includes present-day Cleveland County, North Carolina, where the Kings Mountain site lies.  The 1777 Treaty cession area includes Cleveland County.

49.     The 1884 Royce Map of Cherokee Land Cessions (Ex. L) also demonstrates that present-day Cleveland County is located within the Cherokee historical and treaty territory.

50.     Because Cleveland County is within Cherokee aboriginal, historical, and treaty territory, federal agencies as a matter of course contact the EBCI, the UKB, and the Cherokee Nation to protect Cherokee cultural resources within Cleveland County.

51.     The EBCI continues to exercise cultural sovereignty over the Cleveland County area, via cultural resource–protection programs led by the EBCI's THPO.  Townsend July Decl. ¶ 4.

### B.     The Catawba and the 1993 Settlement Act

#### i.     *The Catawba Indian Nation of South Carolina*

52.     The Catawba is an Indian tribe headquartered in South Carolina.

53.     The northwestern limit of the Catawba's aboriginal, historical, and treaty territory was the Catawba River and its tributaries, which lie to the east of present-day Kings Mountain, North Carolina.

54.     In 1760 and 1763, the Catawba "surrendered to Great Britain its aboriginal territory" in exchange for a 225-square-mile tract of land, located in what is now South Carolina.

*South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 500 (1986).  Although the 1760 treaty

has been lost, there is no evidence that the Catawba ceded in that treaty (or the 1763 treaty) any

land in present-day North Carolina.

55.     In 1840, the Catawba conveyed the 225-square-mile tract to the State of South

Carolina in return for a 630-acre reservation established by South Carolina.

56.     In 1852, South Carolina purchased a 630-acre tract as a new reservation for the

Tribe.

57.     Beginning in the late 1800s, the Catawba sought federal assistance in bringing

claims for the unlawful conveyance of its reservation lands.

58.     In 1959, Congress enacted the Catawba Indian Tribe Division of Assets Act, Pub.

L. No. 86-322, 73 Stat. 592 (1959), which terminated the federal government's relationship with

the Catawba.

59.     Even after termination, the Catawba continued to pursue their land claims.

### ii.     The 1993 Settlement Act and Its Limits on the Catawba's Sovereignty

60.     In 1993, Congress passed the Catawba Indian Tribe of South Carolina Land Claims

Settlement Act of 1993.

61.     The 1993 Settlement Act effected a "comprehensive" settlement of the Catawba's

claims.  1993 Settlement Act § 2(a)(8).

62.     The 1993 Settlement Act incorporates expressly and by reference an Agreement in

Principle (the "Settlement Agreement") (Ex. J), entered into between the Catawba and the State of

South Carolina, as well as South Carolina's Catawba Indian Claims Settlement Act (the "State

Act"), S.C. Code Ann. §§ 27-16-10 *et seq.*

63.     In particular, under the 1993 Settlement Act, "the Settlement Agreement … [is]

approved, ratified, and confirmed by the United States to effectuate the purposes of this Act, and

15

shall be complied with in the same manner and to the same extent as if [it] had been enacted into Federal law."  1993 Settlement Act § 4(a)(2); *see* 139 Cong. Rec. 22,583–95 (1993) (reprinting full Settlement Agreement in the *Congressional Record*).

64.     The 1993 Settlement Act specifies that "[t]o the extent possible, this Act shall be construed in a manner consistent with the Settlement Agreement and the State Act"—though "[i]n the event of a conflict," the 1993 Settlement Act controls.  1993 Settlement Act § 15(b).

65.     As part of this comprehensive settlement, the 1993 Settlement Act ratified land transfers "located anywhere within the United States from, by, or on behalf of the Tribe," including "pursuant to any treaty, compact, or statute of any State."  1993 Settlement Act § 6(a).  The Act then extinguished "all claims against the United States [or] any State" concerning land transfers. *Id.* § 6(c).  And the Act extinguished Catawba land claims "located anywhere in the United States." *Id.* § 6(d).  For these purposes, the Settlement Act defined "State" to include any State in the United States.  *Id.* § 3(11); *see id*. § 3(2) (defining the land claims subject to extinguishment to include "any … [land] claim which could have been asserted by the Tribe or any Catawba Indian").

66.     In return, Congress restored the Catawba's status as a federally recognized Indian tribe.  1993 Settlement Act § 4(a), (c).

67.     The 1993 Settlement Act, however, strictly limits the Catawba's sovereignty and the federal government's power with respect to the Catawba.

68.     Those strict limits made the 1993 Settlement Act controversial.  For example, the Area Director for the BIA's Eastern Office, Bill Ott—accompanied by the Associate Solicitor for Indian Affairs, David Moran, and the BIA's Eastern Area Acting Trust Officer Ralph Gonzales—testified that the Act

> diminishes the Department's authority and its ability to discharge its
> duty as trustee.  The bill would relinquish much of the Secretary's

16

authority to the State with regard to trust land transactions. It mandates the Secretary to seek the approval of State and local governments in administering its trust responsibilities to the tribe[]…. The bill would also restore the federal relationship to the tribe, but would only partially reinstate the tribal status. It would subordinate the tribe to State, County, and city authority, while limiting tribal authority and jurisdiction.[5]

69. The Catawba understood the restrictive nature of the 1993 Settlement Act and accepted the restrictions. For example, the attorney who represented the Catawba in settlement negotiations, Don Miller of the Native American Rights Fund, explained that the "particular circumstances" of the Catawba warranted congressional approval:

[T]he manner in which the parties' agreement divides and allocates the respective jurisdictional powers of the Tribe and State and Federal governments reflects the particular circumstances of the Catawba Tribe and its non-Indian neighbors. These allocations are a function of … the wishes of the Catawba Tribe as expressed by an overwhelming vote of support for the settlement agreement.[6]

70. Likewise, at the same hearing, Senator Inouye (the Chairman of the Senate Committee on Indian Affairs) asked the Catawba Chief, Gilbert Blue, why the tribe had "agree[d] to relinquish those attributes of sovereignty that are usually retained by federally recognized tribes" and instead accept a status that was "in many respects … similar to a local government in the State of South Carolina." The Catawba Chief replied: "Basically, it was because of the size of our people and the relationship that we've had with the community over the years…. [W]e will have control of our people on the reservation and those who come on the reservation …. There will be less disruption among my people and the people in the community by relinquishing some of these things than we would gain by having them."[7]

---

[5] *Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993: Hearing on S. 1156 Before the S. Comm. on Indian Affairs*, 103d Cong. 269 (1993).

[6] *Id.* at 230; *see also id.* at 251 (Catawba Chief's testimony).

[7] *Id.* at 95.

71.     Congress accepted the Catawba's wishes.   During the House floor debate, Representative Richardson (the Chairman of the House Subcommittee on Indian Affairs) noted that "[s]ome have been critical of the concessions made by the [Catawba]," but that the Catawba was "well aware of the consequences of these concessions," and that "[p]art of self-governance is making hard choices."  139 Cong. Rec. 22,583 (1993) (statement of Rep. Richardson).  Congress determined that it would "respect the choices the tribe has made."  *Id.*

72.     The tribe's choices were endorsed not only by the Department of the Interior and the Office of Management and Budget, but also by the Native American Rights Fund and the National Congress of American Indians.  139 Cong. Rec. 22596 (1993) (statement of Rep. Spratt).

73.     Three aspects of the 1993 Settlement Act are especially relevant here.

> *1.  The 1993 Settlement Act Prohibits Applying Section 5 of the Indian Reorganization Act to Catawba Trust-Land Acquisitions.*

74.     First, the Catawba are excluded from the general land-into-trust process of Section 5 of the IRA in favor of a Catawba-specific regime created by the 1993 Settlement Act itself.

75.     IRA Section 5 authorizes the Department to acquire trust land "for the purpose of providing land for Indians."  25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465).  But given the significant effects that such acquisitions can have on surrounding communities, state and local governments, and other tribes, Congress has determined that only certain tribes may invoke Section 5.  Some of the limits on Section 5 come from the IRA itself; other limits come from other statutes specifying whether and to what extent Section 5 applies.  *Cf. Carcieri v. Salazar*, 555 U.S. 379, 382 (2009) (limiting Section 5 to tribes "under federal jurisdiction" at the IRA's enactment).

76.     The 1993 Settlement Act is one such act limiting Section 5's application.

77.     The 1993 Settlement Act's regime for land acquisitions has two parts—one for "Reservation" and another for "Non-Reservation" properties.  1993 Settlement Act §§ 12–13.

78.     As to "Reservation" properties, Section 12 of the 1993 Settlement Act transformed the Catawba's state reservation (the "Existing Reservation") into a federal reservation and provided that the United States would take that land into trust for the Catawba.

79.     The 1993 Settlement Act also provides specific procedures for acquiring lands in an adjacent "Expanded Reservation" that "may be held in trust together with the Existing Reservation." 1993 Settlement Act § 12(b)(6).

80.     The 1993 Settlement Act specifies that the "general land acquisition regulations of the Bureau of Indian Affairs, contained in part 151 of title 25, Code of Federal Regulations, shall not apply to the acquisition of lands authorized by this section." 1993 Settlement Act § 12(m). The Part 151 regulations are the Department's regulations implementing IRA Section 5.

81.     As to "Non-Reservation Properties," Section 13 of the 1993 Settlement Act allows acquisitions by the Catawba but provides that "[j]urisdiction and status of all non-Reservation lands shall be governed by section 15 of the Settlement Agreement," which is discussed below. 1993 Settlement Act § 13(a).

82.     The 1993 Settlement Act provides that the Catawba may not make use of the general land-into-trust process under Section 5 of the IRA. The Act specifies that "[i]f the Tribe so elects, it may organize [a tribal government] under the" IRA, and that the "Tribe shall be subject to such Act *except to the extent such sections are inconsistent with this Act*." 1993 Settlement Act § 9(a) (emphasis added).

83.     The Settlement Act, as explained above, incorporates the Settlement Agreement as federal law—and in turn, the Settlement Agreement provides that the Catawba may "organize under the [IRA] and may adopt and apply to the Tribe any of the following provisions to the extent they are consistent with this Agreement: Sections 461, 466, 469, 470, 470a, 471, 472, 472a, 473,

475a, 476, 477, 478, 478a, and 478b." Settlement Agreement § 9.1, Ex. J. This authorization expressly omits the land-into-trust provision in Section 5 of the IRA, 25 U.S.C. § 5108, which in 1993 was codified at 25 U.S.C. § 465. *Compare* Act of Oct. 6, 1972, Pub. L. No. 92-470, 86 Stat. 783 (1972) (providing that a newly recognized Apache Indian tribe in Arizona "shall be subject to *all of the provisions*" of the IRA, and expressly citing "25 U.S.C. 461–479" without omitting particular sections (emphasis added)).

84.     When Congress passed the 1993 Settlement Act, it was aware that the Act incorporated these limitations on the IRA. The House Natural Resources Committee noted that the Act "incorporates by reference … limitations on the applicability of … the Indian Reorganization Act contained in the Settlement Agreement and State Act." H.R. Rep. No. 103-257, pt. 1, at 20 (1993).

85.     The Settlement Act's structure confirms that Congress understood that Section 5 of the IRA would not be available to the Catawba. When the federal government takes land into trust for an Indian tribe under Section 5, the land acquires a special status. It becomes inalienable, it acquires immunity from taxation, and (as a matter of federal common law) many state laws cease to apply on the Indian trust land—replacing, to that extent, state jurisdiction with tribal and federal jurisdiction. *E.g.*, *Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1148–49 (9th Cir. 2020).

86.     By contrast, the 1993 Settlement Act provides that non-reservation lands cannot have that special status.

A.     As noted earlier, under Section 13, "[j]urisdiction and status of all non-Reservation lands shall be governed by section 15 of the Settlement Agreement," 1993 Settlement Act § 13(a). Section 15, in turn, provides that lands may be held in trust only under the Catawba-specific regime created by the Settlement Act and the

Settlement Agreement, which provides that Catawba laws "shall be subject to [state] laws, ordinances, taxes, and regulations."  Settlement Agreement § 15.2, Ex. J.

B.       Section 13 also provides that "[n]otwithstanding any other provision of law, the Tribe may lease, sell, mortgage, restrict, encumber, or otherwise dispose of such non-Reservation lands in the same manner as other persons and entities under State law, and the Tribe as land owner shall be subject to the same obligations and responsibilities as other persons and entities under State, Federal, and local law." 1993 Settlement Act § 13(b).

C.       As well, Section 13 specifies that "[o]wnership and transfer of non-Reservation parcels shall not be subject to Federal law restrictions on alienation."  *Id.* § 13(c).

D.       Section 4 provides that the "Act shall not be construed to empower the Tribe with special jurisdiction," and that the "jurisdiction and governmental powers of the Tribe shall be solely those set forth in this Act and the State Act."  *Id.* § 4(e).

E.       Section 10 provides that "[a]ll matters involving tribal powers, immunities, and jurisdiction, whether criminal, civil, or regulatory, shall be governed by the terms and provisions of the Settlement Agreement and the State Act, unless otherwise provided in this Act."  *Id.* § 10(1).[8]

None of these provisions can be squared with allowing the Catawba to invoke Section 5, which would render trust lands immune from most state laws, would make those lands inalienable as a

---

[8] *Accord* Settlement Agreement § 19.1, Ex. J ("Except as expressly otherwise provided in the implementing legislation, the Tribe and its members, any lands or natural resources owned by the Tribe, and any land or natural resources held in trust by the United States or by any other person or entity for the Tribe, shall be subject to the laws of the State and the civil and criminal jurisdiction of the courts of the State, to the same extent as any other person or land in the State.").

matter of federal law, and would authorize the Catawba to exercise "tribal powers, immunities, and jurisdiction" beyond those provided by the 1993 Settlement Act.

87.    Congress, again, understood that the 1993 Settlement Act precluded the Catawba from acquiring non-reservation lands that would have the special status that IRA Section 5 confers. Senator Fritz Hollings of South Carolina explained that the "bill permits only two types of lands. First, the land held in trust by the United States as the expanded reservation.  Any other land not qualifying for reservation status will be held in fee simple and have all the jurisdictional attributes of any other land."  139 Cong. Rec. 19,919 (1993).

> 2.    *The 1993 Settlement Act Prohibits Trust Acquisitions Outside South Carolina.*

88.    Second, while the 1993 Settlement Act provides for trust acquisitions under its Catawba-specific regime ***within*** South Carolina, it prohibits trust acquisitions ***elsewhere***.

89.    When Congress passed the 1993 Settlement Act, it was aware that the Catawba claimed connections to North Carolina.  For example, the Act identifies certain locations in North Carolina as within the Catawba's "service area," which means that Catawba members living in that area are deemed to reside "near" the Catawba's South Carolina reservation for certain federal programs and services, such as federal Indian Health Service funding.  1993 Settlement Act §§ 3(9), 4(b).

90.    Congress, however, declined to permit the Catawba to seek federal trust acquisitions in North Carolina.  Not only does the 1993 Settlement Act provide no authority for such acquisitions, but any such acquisitions would violate the 1993 Settlement Act's express terms.

91.    For example, the 1993 Settlement Act's Section 13(a) provides—as just noted— that "[j]urisdiction and status of all non-Reservation lands shall be governed by section 15 of the Settlement Agreement."  The phrase "all non-Reservation lands" means—of course—"all non-

Reservation lands," wherever located.  And in turn, Section 15 of the Settlement Agreement specifies that "[a]ll non-reservation properties, and all activities conducted on such properties, shall be subject to the laws, ordinances, taxes, and regulations of the State"—defined (in Section 2.3 of the Settlement Agreement) as the State of **South Carolina**.  Because South Carolina law does not govern activities conducted in North Carolina, the Catawba cannot seek to acquire lands in trust in North Carolina consistent with the limit that such "lands shall be governed by section 15 of the Settlement Agreement."  1993 Settlement Act § 13(a).

92.     The 1993 Settlement Act also provides that "the Tribe may lease, sell, mortgage, restrict, encumber, or otherwise dispose of such non-Reservation lands in the same manner as other persons and entities under State law," 1993 Settlement Act § 13(b), which is again defined (in Section 3(11) of the Act) as the state law of South Carolina.  The 1993 Act does not permit the Catawba to acquire lands in trust in North Carolina, where South Carolina law does not apply.  *Accord* Settlement Agreement § 19.1, Ex. J, *quoted supra* note 8.

> ### 3.  The 1993 Settlement Act Renders the Indian Gaming Regulatory Act Inapplicable to the Catawba.

93.     Third, the 1993 Settlement Act renders IGRA inapplicable to the Catawba.

94.     Section 14(a) of the 1993 Settlement Act provides: "INAPPLICABILITY OF INDIAN GAMING REGULATORY ACT.—The Indian Gaming Regulatory Act (25 U.S.C. 2701 *et seq.*) shall not apply to the [Catawba] Tribe."

95.     Instead, the 1993 Settlement Act provides that, unlike under IGRA, South Carolina law governs the Catawba's gaming.  Under Section 14(b) of the 1993 Settlement Act,

> [t]he Tribe shall have the rights and responsibilities set forth in the Settlement Agreement and the State Act with respect to the conduct of games of chance.  Except as specifically set forth in the Settlement Agreement and the State Act, all laws, ordinances, and regulations of the State, and its political subdivisions, shall govern

the regulation of gambling devices and the conduct of gambling or wagering by the Tribe on and off the Reservation.

96.     When Congress passed the 1993 Settlement Act, it was aware of how the Act would affect IGRA:  "The Indian Gaming Regulatory Act shall not apply.  The Tribe is authorized to establish two high stakes bingo games under the terms of [the] state bill.  One must be within the claim area, the other facility must have the approval of the county and any municipality in which located."  H.R. Rep. No. 103-257, pt. 1, at 21 (1993); *accord* 139 Cong. Rec. 22,597 (1993) (these state-law gaming rights were available to the Catawba "[i]n lieu of having the Indian Gaming Regulatory Act apply").[9]

97.     Decisions of this Court and the D.C. Circuit have recognized that the 1993 Settlement Act broadly prohibits the Catawba from gaming, except as authorized by South Carolina law.  This Court has explained that "[w]hen Congress intends to prohibit a tribe from gaming activity, it says so affirmatively"—citing, as an example, the 1993 Settlement Act. *TOMAC*, 193 F. Supp. 2d at 194 n.8.  Likewise, the D.C. Circuit has stated that the "Catawba Indians … regained lands through legislative settlement[] in which they accepted general state jurisdiction over tribal lands.  *See* 25 U.S.C. §§ 941b(e), m(c) ….  The Catawba Indians' … settlement act[] specifically provide[s] for exclusive state control over gambling.  *See id*. § 941*l*(a)."  *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998).

---

[9] The Catawba may have been so willing to give up rights under IGRA because, in 1993, "there [was] little sentiment … on the [Catawba's] Mormon-influenced reservation" to proceed with even the limited gaming under South Carolina law permitted by the 1993 Settlement Act.  *See* Christina Connor, *It'll Get Better, Catawba River Indians Say: Carolinas: The tribe lost federal recognition and many left the reservation.  But now, with a $50-million settlement of their land claim in the offing, a new era is dawning*, L.A. Times (Dec. 5, 1993), https://www.latimes.com/archives/la-xpm-1993-12-05-mn-64095-story.html#:~:text=The%20tribe%20visited%20George%20Washington,promise%20that%20was%20never%20fulfilled.

C.      **Cheves's Scheme and the Department of the Interior's Initial Rejection**

i.      *The Scheme*

98.      Despite the 1993 Settlement Act's restrictions, Wallace Cheves and his associates believed they could use the Catawba to create a new casino at Kings Mountain, North Carolina.

99.      Kings Mountain is outside the Catawba's aboriginal, historical, and treaty territory. It sits to the west of the Catawba River and its tributaries, which marked the northwestern boundary of the Catawba's historical territory.

100.      Sky Boat, LLC—which names Cheves as Managing Partner—serves as developer and operator for Catawba gaming operations.[10]

101.      Cheves is not a man to be deterred by what the law forbids, no matter how clearly.

102.      One reason is Cheves's willingness to violate the law.

103.      In 2001, the South Carolina Attorney General determined that Cheves operated illegal sweepstakes games.[11]

104.      In 2003, Cheves and others were indicted in the U.S. District Court for the Northern District of Ohio for illegal gambling, conspiracy to defraud the United States, and money laundering.[12]

---

[10] *Catawba Indian Nation Financial Statements and Independent Auditor's Reports as of and for the year ended December 31, 2014*, http://catawbaindian.net/assets/docs/2014-Catawba-Indian-Nation-FS-final-2014.pdf.

[11] *See* Letter from Charlie Condon, Attorney General of South Carolina, to Hon. Robert M. Stewart, Chief, S.C. Law Enforcement Division Chief (Jan. 8, 2001) (naming First Link, a company in which Cheves did or does hold an executive position, as operating "illegal gambling inside and out").

[12] *See United States v. Simons*, No. 5:02-cr-00504-PCE-14 (N.D. Ohio filed Dec. 17, 2002), ECF No. 1.

105.    In 2013, then-Alabama Attorney General Luther Strange successfully brought a forfeiture action against Cheves and others after Alabama law enforcement authorities seized 691 illegal slot machines and $288,657 in cash as contraband.[13]

106.    Another reason that legal barriers did not deter Cheves is that, given his deep political connections, he hoped he could either persuade Congress to change the 1993 Settlement Act or induce the Executive Branch to ignore it.  Cheves served on Senator Lindsay Graham's national finance committee when Senator Graham ran for President in 2016.  Federal Election Commission records reflect that, since 2016, Cheves has donated more than $700,000 to various candidates and committees, including more than $330,000 to the Trump Victory committee and more than $250,000 to the Republican National Committee.

107.    The lure of gaming revenues has proved too powerful for the Catawba to resist. The Catawba has been unable to game under the terms that the 1993 Settlement Act actually permits: in South Carolina, where the Catawba Reservation is located, and subject to South Carolina law.  In 2007, two Catawba-connected businessmen pled guilty to election fraud after they funneled campaign contributions from the Catawba through "straw contributors" to federal political candidates whom the Catawba hoped would champion the "cause of expanded Indian gambling rights [which] was controversial in South Carolina."  Government's Sentencing Mem. at 2, *United States v. Collier*, Case No. 1:07-cr-00182-RCL (D.D.C. Jan. 28, 2008), ECF No. 25. Shortly after those guilty pleas, the Catawba signed on to Cheves's scheme.

---

[13] *See Houston Cty. Econ. Dev. Auth. v. State*, 168 So. 3d 4, 7 (Ala. 2014) (per curiam) (upholding the forfeiture decision in *State v. $283,657.68 U.S. Currency*, No. CV-2012-900266 (Ala. Cir. Ct. July 26, 2012), that names Segway Gaming Systems of Alabama, a company in which Cheves is or was a partner, as having ownership interest in illegal gambling devices).

108.     The Kings Mountain project remains, at bottom, Cheves's project.  And it has little

to do with the Catawba, beyond their willingness to lend their tribal status to the project.  The

project's estimated cost of $273 million is equivalent to nearly $100,000 for each of the 2,800

Catawba members.  March 12 Decision at 11, 28, Ex. F.  Meanwhile, there is no evidence that a

single Catawba citizen lives in Cleveland County,[14] and the employment opportunities generated

by the facility's construction and operation are projected to "primarily be filled by the available

labor force *in Cleveland County*," not by Catawba members.  *Id.* at 28 (emphasis added).

109.     Congress chose to regulate Indian gaming through IGRA precisely to prevent

projects like this one—where a tribe's non-Indian casino developer and operator's "prior activities,

criminal record[,] if any, or reputation, habits, and associations pose a threat to the public interest

or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable,

unfair, or illegal practices, methods, and activities in the conduct of gaming."  25 U.S.C. § 2711(e).

### ii.     The Department's Initial Rejection

110.     On August 30, 2013, the Catawba submitted to the BIA a mandatory trust

application pursuant to the 1993 Settlement Act, demanding that the Department transfer 16.57

acres of Cherokee aboriginal land at the Kings Mountain site in North Carolina into trust for the

purpose of constructing an off-reservation casino and mixed-use entertainment complex, to be

operated by Sky Boat Gaming, LLC.  *See* March 12 Decision at 2 & n.8, 37, Ex. F.

111.     On March 23, 2018, the Deputy Secretary of the Interior issued a memorandum

concluding that the mandatory trust authority under the 1993 Settlement Act did not extend to

lands outside South Carolina.  *Id.* at 2.

112.     On April 4, 2018, the Catawba withdrew its mandatory application.  *Id.*

---

[14] *Cf.* March 12 Decision at 7, Ex. F (asserting that 253 Catawba members live somewhere in North Carolina but not that any Catawba member lives in Cleveland County).

### iii. *The Second Application and the Unsuccessful Drive to Amend the 1993 Settlement Act*

113.    On September 17, 2018, the Catawba submitted a discretionary application pursuant to Section 5 of the IRA, 25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465), and its implementing regulations at 25 C.F.R. Part 151.

114.    The September 2018 application requested an off-reservation acquisition of trust land at the Kings Mountain site.  The application also requested a determination that the Kings Mountain site is gaming-eligible under IGRA.

115.    But on the heels of the Department's 2018 interpretation, Cheves and the Catawba recognized that their scheme needed federal legislation to proceed.  Cheves therefore paired the second application with a drive for a statutory fix.

116.    On March 13, 2019, Senator Graham introduced S. 790, a bill co-sponsored by Senators Richard Burr and Thom Tillis that endeavored to methodically eliminate the three barriers created by the 1993 Settlement Act.  Section 1(a) of S. 790 "authorized [the Catawba] to own and operate a gaming facility … [in] North Carolina."  S. 709, 116th Cong. § 1(a) (2019).  Section 1(b) required the facility to "operate in accordance" with IGRA, but made Section 20 of IGRA, 25 U.S.C. § 2719, which generally prohibits gaming on land taken into trust after 1998, inapplicable to the Kings Mountain site.  *Id.* § 1(b).  And Section 1(c) authorized the Secretary of the Interior "to take the land [at the Kings Mountain site] … into trust."  *Id.* § 1(c).

117.    At a May 1, 2019 hearing on S. 790, Catawba Chief William Harris acknowledged that this statutory amendment was necessary for the Kings Mountain project to proceed due to the 1993 Settlement Act's broad prohibition on IGRA gaming: "The [1993] Catawba Federal

Settlement Act set forth the Tribe's gaming rights in South Carolina, but it also broadly provides that **IGRA does not apply to the Tribe**."[15]

118.    At this May 1, 2019 hearing, John Tahsuda III, current Counselor to the Secretary of the Interior—then Principal Deputy Assistant Secretary for Indian Affairs—left no doubt as to the Department's view that, absent legislation, the Kings Mountain project could not proceed.  As to IGRA, Mr. Tahsuda cited Section 14 of the 1993 Settlement Act—which states that IGRA "shall not apply to the [Catawba] Tribe"—and explained:

> We have several technical concerns with the [Senate bill's] language.  First, the language in Section 1(b) focuses on the IGRA's application to the gaming facility, but does not address application of the IGRA's provisions to the Tribe.  As indicated previously, the exclusion provision at section 14 of the underlying Settlement Act specifically applies to the Tribe….[16]

119.    Mr. Tahsuda's testimony also acknowledged that, as of May 2019, the Department understood that the 1993 Settlement Act prohibited it from taking land into trust for the Catawba under 25 C.F.R. Part 151:

> In addition, the Settlement Act, at section 12(m), exempts the Tribe from the provisions of 25 C.F.R. Part 151, the Department's Fee-to-Trust regulations, which the Department relies on for making discretionary trust acquisitions.[17]

120.    Congress never enacted S. 790 or any other statute repealing the 1993 Settlement Act's express limits.

---

[15] *See* Testimony of William Harris, Chief of the Catawba Indian Nation, on S. 790 Before the Senate Committee on Indian Affairs 10 (May 1, 2019) (emphasis added), https://www.indian. senate.gov/sites/default/files/Written%20Testimony%20of%20Catawba%20Chief%20William% 20Harris%20on%20S%20790.pdf.

[16] Statement of John Tahsuda III, U.S. Dep't of the Interior, Before the S. Comm. on Indian Affairs 3 (May 1, 2019), https://www.indian.senate.gov/sites/default/files/Tahsuda%20SCIA%205.1%20 Statement%20Final.pdf.

[17] *Id.*

**D.      The Department's About-Face in the March 12 Decision**

121.    Despite Cheves's efforts, his bill did not make it out of the Senate Committee on Indian Affairs.

122.    Cheves proved more successful in using his Executive Branch connections to bludgeon the Department to reverse its decades-old interpretation and disregard the 1993 Settlement Act's prohibitions.

123.    On multiple occasions, Cheves and others associated with the project met or communicated with high-level administration officials on the Kings Mountain project— sometimes individually, sometimes accompanied by members of the Catawba.

124.    On March 12, 2020, Defendant Sweeney issued a decision directing the transfer of the Kings Mountain site into trust for the Catawba and determining that the Catawba could lawfully game at the Kings Mountain site under IGRA.

125.    In three ways, the March 12 Decision runs roughshod over the 1993 Settlement Act, the IRA, and IGRA.

126.    ***First***, the March 12 Decision finds that the 1993 Settlement Act provides statutory authority for the Catawba to invoke IRA Section 5—when in fact, the 1993 Settlement Act specifically eliminates such authority.  In particular, the March 12 Decision relies on Section 9(a) of the Settlement Act, which provides that the Catawba "shall be subject to" the IRA.  But the March 12 Decision ignores that section's caveat, which renders the IRA inapplicable "to the extent such sections are inconsistent with" the 1993 Settlement Act.  March 12 Decision at 22, Ex. F. And the March 12 Decision disregards the myriad ways, detailed above, that the 1993 Settlement Act—including via its incorporation of the Settlement Agreement—is inconsistent with permitting the Catawba to invoke IRA Section 5 and its implementing regulations.

127.    ***Second***, the March 12 Decision allows the Catawba to invoke IRA Section 5 to acquire trust land in North Carolina, ignoring that the 1993 Settlement Act prohibits the Catawba from acquiring trust lands outside South Carolina.  Indeed, the March 12 Decision is internally inconsistent.  At one point, the March 12 Decision acknowledges that "Congress made clear its intention that '[a]ll properties acquired by the Nation shall be acquired subject to the terms and conditions set forth in the Settlement Agreement.'"  March 12 Decision at 24, Ex. F.  But as explained above, the Settlement Agreement's "terms and conditions" specify that South Carolina law shall apply to any property acquired by the Catawba, and they prohibit trust acquisitions outside South Carolina.

128.    In a masterwork of understatement, the March 12 Decision concedes that "[o]ne could argue that the [1993 Settlement Act] represents a comprehensive framework for all lands the Nation seeks to convey into trust, including lands located outside South Carolina."  *Id*. at 25.  But the Decision asserts that this reading would be "contrary to the statutory language and the broad extension of the Secretary's general authority to take lands into trust for the Nation under Section 5 of the IRA," *id*.—while ignoring that the 1993 Settlement Act forecloses that authority.

129.    Likewise, the March 12 Decision acknowledges that a "literal reading" of Section 13 of the 1993 Settlement Act—which extends South Carolina "civil, criminal, and regulatory jurisdiction" to "all non-Reservation lands"—is inconsistent with permitting trust acquisitions outside South Carolina.  *Id*. at 26.  But rather than follow Section 13's clear command that the Act ***does not permit*** trust acquisitions for the Catawba outside South Carolina, the March 12 Decision opines that following Section 13's clear text would produce an "absurd result."  *Id.*  Instead, the March 12 Decision states that the "provisions of Section 13 should be interpreted as applying to non-Reservation lands outside the Expanded Reservation but within the State."  *Id*.  This

maneuver, however, is not an "interpretation" of the Settlement Act, but rather a rewriting of it. There is nothing absurd about limiting the South Carolina–based Catawba to land in South Carolina, as Congress directed in the Act's text.

130.   The March 12 Decision relies heavily on the Second Circuit's decision in *Connecticut ex rel. Blumenthal v. United States Department of the Interior*, 228 F.3d 82 (2d Cir. 2000). That reliance, too, is arbitrary. There, the Connecticut Indian Land Claims Settlement Act created a settlement fund, allowed property acquisitions with this fund, and provided that certain lands "acquired under this subsection"—meaning, the subsection creating the fund and allowing property acquisitions with its proceeds—could only be acquired in fee, not trust. *Id*. at 88 (quotation marks omitted). Challengers nonetheless claimed that this provision prohibited ***any*** trust acquisition on behalf of the Tribe, even with funds not derived from the settlement fund. *Id*. at 87. *Blumenthal* held that, instead, this prohibition was limited to properties acquired with settlement funds "under this subsection." *Id*. (quotation marks omitted). This case is nearly the opposite: The 1993 Settlement Act's express text prohibits the Catawba from invoking IRA Section 5 and acquiring trust lands outside South Carolina, and it is the Department that must rewrite the 1993 Settlement Act to say something it does not.[18]

131.   ***Third***, the March 12 Decision finds that IGRA applies to the Catawba, and relies on that finding to support taking the Kings Mountain site into trust, when the 1993 Settlement Act provides exactly the opposite: that IGRA "shall not apply to the Tribe" and that instead the

---

[18] The March 12 Decision also relies on the Maine Indian Claims Settlement Act, which states that "[e]xcept for the provisions of this Act, the United States shall have no other authority to acquire lands or natural resources in trust for the benefit of Indians." March 12 Decision at 25, Ex. F. The Decision deems it significant that the 1993 Settlement Act "omit[s] similar language." *Id.* (quoting MICSA § 5(e)). But there is more than one way to skin a cat. And in the 1993 Settlement Act— including via its incorporation of the Settlement Agreement—Congress was no less clear in prohibiting the Catawba from resorting to the IRA Section 5 and doing so outside South Carolina.

Catawba would have only the gaming rights that South Carolina law allows.  Remarkably, the March 12 Decision says not *one word* about this express prohibition, even though the March 12 Decision concludes that the Kings Mountain site will be gaming-eligible, relies on that conclusion to find that the Catawba's trust application should be granted under Part 151, and applies the Department's Part 292 regulations implementing IGRA to the application.  March 12 Decision at 3–11, 27–29, Ex. F.  For example, 25 C.F.R. § 151.10(c) requires the Secretary to consider the purposes for which land will be used when evaluating a trust application—and the March 12 Decision presumes that the Kings Mountain site will be used for gaming, notwithstanding the Act's express prohibition.

132.    In deeming IGRA applicable to the Catawba, and in concluding that the Catawba could invoke IRA Section 5 and its implementing regulations to support the Catawba's application at the Kings Mountain site, the March 12 Decision also departed from the Department's settled positions—expressed in both the hearings on the 1993 Settlement Act and the 2019 hearing on S. 790.  Yet the March 12 Decision fails to acknowledge or justify that departure.[19]

133.    ***Fourth***, and in the alternative, even if IGRA applied to the Catawba (and it does not), the March 12 Decision is contrary to law and arbitrary and capricious.  Section 20 of IGRA prohibits gaming on land taken into trust after 1988, unless an exception applies.  25 U.S.C. § 2719(a).  Here, the March 12 Decision relied on the exception for lands "taken into trust as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition," *id.*

---

[19] The March 12 Decision also improperly uses the March 10, 2020 *Carcieri* m-opinion to analyze the Catawba's right to have land in trust for gaming purposes, effectively expanding the authority and rights of the Catawba in contradiction to Congress's clear language in the 1993 Settlement Act.

§ 2719(b)(1)(B)(iii), which the Department has implemented via regulations codified at 25 C.F.R. Part 292.

134.    By its terms, however, the statutory "Restored Lands" exception does not apply. The 1993 Settlement Act both "restored" the Catawba and provided a Catawba-specific process for trust acquisitions.  1993 Settlement Act §§ 4(a), 12–13.  Lands taken into trust outside of that Catawba-specific process are not acquired "as part of … the restoration of lands" to the Catawba. The March 12 Decision is contrary to law, and arbitrary and capricious, in relying on the Restored Lands exception to evade the limits Congress erected in the statute authorizing the Catawba's restoration.  To the extent the Department concluded that its Part 292 regulations—which were not drafted with the Catawba's unique restoration act in mind—yielded a different result, those regulations cannot lawfully change the result the statute dictates.

135.    *Fifth*, and in the further alternative, even if the Part 292 regulations could lawfully be applied to the Catawba, the March 12 Decision is contrary to law and arbitrary and capricious in determining that the Catawba's application satisfied the requirements of Part 292.

136.    For one thing, the March 12 Decision erred in concluding that the application satisfied the requirement that "newly acquired lands must be located within the State and States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population."  25 C.F.R. § 292.12(a).  The Catawba is not "located" in North Carolina; it is located in South Carolina, which is the only state in which the Catawba has a "governmental presence." In concluding the opposite, the March 12 Decision relied entirely on the assertion that the Catawba provides services to people who are located in North Carolina.[20]  Such services do not establish

---

[20] March 12 Decision at 7–8, Ex. F (enumerating "First time home buyer's assistance," "Childcare assistance," "Crime Victims Assistance services," "Substance abuse services," "Indian Child Welfare Act (ICWA) notifications," "ICWA case assistance … including appearing in North

that the Catawba are "located" in North Carolina and have a "governmental presence" there.  If they did, every tribe could be "located" anywhere in the country.  For example, the March 12 Decision asserted that the Catawba appear in North Carolina state courts under the Indian Child Welfare Act—which can occur anywhere that an "Indian child" happens to be located.  *See* 25 U.S.C. § 1911(c).  The March 12 Decision cites not one piece of evidence that the Catawba has any permanent governmental presence in North Carolina.

137.    It is no surprise that the Catawba has no governmental presence in North Carolina. The 1993 Settlement Act nowhere authorizes the Catawba to establish a governmental presence in North Carolina—and provides that the "jurisdiction and governmental powers of the Tribe shall be solely those set forth in this Act and the State Act."  1993 Settlement Act § 4(e).  Likewise, Section 10(1) of the Act specifies that "[a]ll matters involving tribal powers, immunities, and jurisdiction, whether criminal, civil, or regulatory, shall be governed by the terms and provisions of the Settlement Agreement and the State Act"—which authorize a governmental presence only in South Carolina.  The March 12 Decision is thus contrary to law and arbitrary and capricious in determining that the Catawba is "now located" in North Carolina.

138.    The March 12 Decision also erred in concluding that the Catawba had demonstrated a "significant historical connection to the land."  25 C.F.R. § 292.12(b).  The Part 292 regulations require an applicant to show that the land it seeks to acquire "is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty," or to "demonstrate by historical

---

Carolina state court," "Other Family Services," "Transit services to access Family Services or the Indian Health Service clinic," "College scholarship programs," "Job placement services," "Processing Tribal Historic Preservation requests," and "Working with North Carolina state and local governments on this and other projects").

documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."  25 C.F.R. §§ 292.2, 292.12(b).

139.   Here, the March 12 Decision primarily relied on the second prong.  It stated that the Catawba's "network of ancestral villages … is within the boundaries of the [Kings Mountain] Site" and that the Catawba had "occupied the land" and "engaged in subsistence activities."  March 12 Decision at 9, Ex. F.  But the Decision cited only a *memorandum* from the Catawba's legal counsel.  *Id*. at 9 nn.44–45.  This shows only that the Catawba *assert* that they have satisfied the second prong, not that they have "demonstrated [that fact] by historical documentation."  25 C.F.R. § 292.2.  The March 12 Decision never analyzes whether any "historical documentation" "demonstrate[s]" these connections to the Kings Mountain site.

140.   In a footnote, the March 12 Decision invokes the first prong, stating that the Kings Mountain site "*may* be located within the boundaries of the Nation's last reservation in North Carolina under the 1760 Treaty of Pine Hill."  March 12 Decision at 9 n.46, Ex. F (emphasis added).  But under Part 292, it is not enough that land "may be" within a treaty-recognized reservation; the tribe must show that the land "is" located within such treaty-recognized territory.  25 C.F.R. § 292.12(b).  The agency itself says that the 1760 Treaty is "lost to history," and it does not provide any other documentation to support the Catawba's assertion of historical ties to what is in fact *Cherokee* ancestral homeland.  March 12 Decision at 9 n.46, Ex. F.[21]

141.   Moreover, as noted in comments that the EBCI submitted on the Draft Environmental Assessment (the "Draft EA") on January 22, 2020, the Catawba cannot demonstrate "significant historical connection" under the regulations to lands that are located in

---

[21] The Catawba also cannot assert any historic or aboriginal territory in North Carolina because, in the 1993 Settlement Act, they relinquished any and all claims to aboriginal title, rights, and claims throughout the United States.  1993 Settlement Act § 6(b)–(e).

the historical territory of the EBCI, the UKB, and the Cherokee Nation.  Ex. A.  The EBCI, the

UKB, and the Cherokee Nation assert more than simple "aboriginal ties" to the Kings Mountain

site.  The three tribes have well-documented ties to the area, based upon a treaty and a long history

of dealings with federal agencies related to these lands.

142.    It is arbitrary and capricious for the Department to find that the Catawba

demonstrated "*significant* historical connection" under 25 C.F.R. § 292.12(b) (emphasis added),

based on the Catawba's counsel's bare assertions and statements of what "may be" contained in a

treaty lost to history that no one can read, review, or substantiate, and that likely did not address

lands in North Carolina.

> **E.    In Its Haste, the Department Evaded the Consultation Required by the National Historic Preservation Act.**

143.    In its haste to cover its about-face, the Department failed to satisfy the NHPA's

consultation requirements.

> ### *i.    The National Historic Preservation Act's Consultation Requirements*

144.    The NHPA "foster[s] conditions under which our modern society and our historic

property can exist in productive harmony" and "contribute[s] to the preservation of nonfederally

owned historic property and give[s] maximum encouragement to organizations and individuals

undertaking preservation by private means."   54 U.S.C. § 300101(1), (4).  To further those

purposes, Section 106 of the NHPA requires federal agencies to "take into account the effect of"

their "undertaking[s] on any historic property."  *Id*. § 306108.

145.    The NHPA established an independent agency, the Advisory Council on Historic

Preservation ("ACHP"), 54 U.S.C. § 304101, and empowered it to issue binding regulations to

govern Section 106's implementation.

146.    Indian tribes have special rights under the NHPA and Section 106.  The NHPA defines "historic property" to include "[p]roperty of traditional religious and cultural importance to an Indian tribe."  *Id.* §§ 300308, 302706(a).  For such property, Section 106 requires federal agencies to "consult with any Indian tribe … that attaches religious and cultural significance to" a historic property potentially affected by a federal undertaking.  *Id.* §§ 302706(b), 306102.

147.    This consultation requirement is not limited to historic properties on tribal lands. For federal undertakings outside of "tribal lands," the regulations require the federal agency to "make a reasonable and good faith effort to identify Indian tribes … that shall be consulted in the section 106 process."  36 C.F.R. § 800.2(c)(2)(ii)(A).  The agency must identify "***any*** Indian tribes . . . that ***might*** attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties.  Such Indian tribe … that requests in writing to be a consulting party shall be one."  *Id.* § 800.3(f)(2).  Nor is this consultation requirement limited to ***known*** historic properties; it extends to any "historic properties that ***may exist***."[22]

148.    Then, the agency must "ensure that consultation in the section 106 process provides the Indian tribe … a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."[23]

---

[22] Advisory Council on Historic Preservation, *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook* 17 (Dec. 2012) ("*Handbook*") (emphasis added).

[23] 36 C.F.R. § 800.2(c)(2)(ii)(A); *accord id.* § 800.4(a)(3) (the NHPA's general requirement for agencies to "[s]eek information" from "consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area and identify issues relating to the undertaking's potential effects on historic properties"); *id.* § 800.4(a)(4) (the NHPA's requirement to "[g]ather information from any Indian tribe … identified pursuant to § 800.3(f) to assist in identifying properties, including those located off tribal lands, which may be of religious and cultural significance to them …, recognizing that an Indian tribe … may be

149.    The regulations underscore that this consultation process cannot be a "check the box" exercise, and must recognize the distinctive rights of Indian tribes under Section 106.  Hence, "consultation should commence early in the planning process, in order to identify and discuss relevant preservation issues and resolve concerns about the confidentiality of information on historic properties."  *Id.* § 800.2(c)(2)(ii)(A).  Moreover, when an agency's undertaking also triggers NEPA, the agency "should consider [its] section 106 responsibilities as early as possible in the NEPA process" and should consult with Indian tribes "early in the NEPA process, when the purpose of and need for the proposed action as well as the widest possible range of alternatives are under consideration."  *Id.* § 800.8(a)(1)–(2).

150.    Moreover, consultation under Section 106 "must recognize the government-to-government relationship between the Federal Government and Indian tribes" and must "be conducted in a sensitive manner respectful of tribal sovereignty" and "sensitive to the concerns and needs of the Indian tribe."  *Id.* § 800.2(c)(2)(ii)(B)–(C).

151.    The Section 106 process does not allow federal agencies, States, or other entities to speak on behalf of a tribe.  Federal agencies "shall acknowledge that Indian tribes … possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them."  *Id.* § 800.4(c)(1).  The ACHP's *Handbook* underscores that "agency or contract archaeologists" cannot identify what properties may be of significance to an Indian tribe; rather, "unless an archeologist has been specifically authorized by a tribe to speak on its behalf on the subject, it should not be assumed that the archaeologist possess[es] the appropriate expertise to determine what properties are or are not of significance to an Indian tribe.  The

---

reluctant to divulge specific information regarding the location, nature, and activities associated with such sites").

appropriate individual to carry out such a determination is the representative designated by the tribe for this purpose."[24]

152.    Consultation with Indian tribes under Section 106 typically proceeds via a "tribal historic preservation officer," or "THPO."  By regulation, THPOs have special responsibilities on "tribal lands," akin to state historic preservation officers, *id.* § 800.2(c)(2)(i)(A)—and THPOs also often serve as tribes' liaisons for consulting on federal undertakings outside tribal lands.

153.    In the EBCI's experience, the federal government's normal process for Section 106 consultation has generally been consistent with the NHPA and its implementing regulations.  The EBCI's THPO reviews between 2,500 and 5,000 consultation requests per year, including requests concerning actions in Cleveland County, North Carolina.  Townsend July Decl. ¶ 6.  Federal agencies generally consult with the EBCI's THPO early in the planning process, as the regulations require.  For example, when the BIA proceeds with an undertaking within the EBCI's aboriginal, historical, and treaty territory requiring an EA under NEPA, the BIA will typically consult with the EBCI's THPO before issuing a draft EA.  *Id.* ¶ 9.  That allows the EBCI's THPO to participate in developing research designs and scopes of work, which is essential for ensuring that the EBCI has a meaningful opportunity to consult.  *Id.* ¶ 10.  And when the EBCI's THPO informs the BIA that the EBCI has concerns about an undertaking, the BIA will generally work with the EBCI's THPO to conduct a cultural survey of the land at issue so that the EBCI may determine whether religious or cultural items are present.  *Id.* ¶ 16.

> ### ii.    *The Department's Failure to Satisfy the National Historic Preservation Act's Consultation Requirements*

154.    Here, however, the Department was in too much of a hurry to complete the trust acquisition championed by Cheves to follow the NHPA's mandate that agencies must "stop, look,

---

[24] *Handbook*, at 20.

and listen" before proceeding.  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F.

Supp. 3d 4, 8 (D.D.C. 2016) (quotation marks omitted).  Instead, the Department tried to swap

pretext for the government-to-government consultation that the NHPA demands.

155.    Contrary to its normal process, the Department did not consult with the EBCI under

Section 106 *at all* before issuing a Draft EA in December 2019.

156.    On January 22, 2020, the EBCI submitted comments on the Draft EA highlighting

that the Department had "failed to fulfill its dut[ies]" under Section 106.  EBCI Comments 2, Ex.

B.

157.    Only thereafter, on January 31, 2020, did the BIA (via Chet McGhee, the Regional

Environmental Scientist for the BIA) send the EBCI (via Russell Townsend, the EBCI's THPO)

an email attaching a terse letter, dated January 30, 2020.  The letter purported to express the BIA's

desire "to verify with your office that the proposed project will not impact any specific sites having

potential religious or cultural significance to the Eastern Band of Cherokee Indians."  Ex. C, at 1.

The letter stated that the "North Carolina Department of Natural and Cultural Resources – State

Historic Preservation Office reviewed the project and was not aware of any historic resources in

the area" and attached a letter dated February 22, 2019—nearly a year before—memorializing that

conclusion.  *Id.*

158.    The January 30, 2020 letter did not ask the EBCI to respond by any specific date.

Nor did the letter respond to, or even acknowledge, the issues raised in the EBCI's January 22

Comments on the Draft EA.

159.    Nonetheless, on January 31, 2020, the EBCI's Principal Chief, Richard Sneed,

requested a meeting with Assistant Secretary Sweeney to discuss concerns about the proposed trust

acquisition.  *See* July 6, 2020 Declaration of the Eastern Band of Cherokee Indians Principal Chief Richard Sneed ("Chief Sneed July Decl.") ¶ 11; *see also* Ex. D.

160.     On February 10, 2020, Principal Chief Sneed and a majority of the EBCI's Tribal Council members met with Deputy Solicitor for Indian Affairs Kyle Scherer, Counselor to the Assistant Secretary – Indian Affairs Matthew Kelly, and Policy Advisor Phil Bristol (though not Assistant Secretary Sweeney) about the proposed trust acquisition.  Chief Sneed July Decl. ¶ 16.

161.     At the February 10, 2020 meeting, Principal Chief Sneed reiterated the EBCI's concern that "real consultation must take place to protect Cherokee cultural resources in the project area"—consultation that the Department had failed to provide.  *Id.* ¶ 18.

162.     The EBCI also provided, in advance of the February 10 meeting, a briefing paper objecting to the Department's failure to conduct "any reasonable or good faith effort to comply with the [NHPA's] implementing regulations."  February 7, 2020 Briefing Paper at 3, Ex. E; Chief Sneed July Decl. ¶¶ 13-14.

163.     The Department and its officials did not disclose, at the February 10 meeting or any time thereafter, that the Department intended to proceed with taking the Kings Mountain site into trust without providing the EBCI with any further opportunity to consult on the trust acquisition.

164.     The Department nonetheless decided, on March 12, 2020, to take the Kings Mountain site into trust for the Catawba.

165.     This maneuver was a stark departure from the Department's past practice. Normally, concerns like those raised in the EBCI's January 22, 2020 comments and at the February 10, 2020 meeting would trigger a full consultation "process where the BIA would work with … the EBCI THPO … to conduct a cultural survey on the land at issue so we could determine whether religious or cultural items were present at the site."  Townsend July Decl. ¶ 16.

166.    Indeed, to this day, the Department has not even **contacted** the Cherokee Nation or the UKB about the Kings Mountain site.

167.    The Department's evasion of its NHPA obligations has had real consequences.  On March 16, 2020, the EBCI's THPO sent a letter to the BIA reiterating the EBCI's concerns that the Department had not provided the consultation that Section 106 demands.  March 16, 2020 Email at 1, Ex. G.  That letter noted that, despite the Department's claim that North Carolina records indicated that no historic resources existed in the area, "there actually is an archaeological site recorded within the project location listed in the NC State Archaeological Site Inventory," which should have triggered an archaeological survey "to determine the nature and extent of the recorded archaeological site."  *Id.*  In particular, the North Carolina Department of Transportation had "made an incidental discovery of **an historical pottery kiln and prehistoric lithic scatter—human made stone tools**."  Townsend July Decl. ¶ 21 (emphasis added).

168.    The EBCI also explained why NEPA's **public** consultation process was no substitute for the government-to-government consultation that the NHPA demands.  For example, sensitive information about issues like "bur[ials] … might not appear in public facing reports," and statutes and agreements might bar the disclosure of sensitive and confidential information in public processes—such as the "agreement with the North Carolina Division of Archaeology" that prohibited the EBCI from making further disclosures about the contents of the State's archaeological files, which aimed to avoid "'treasure mapping' and leading looters to the site." March 16, 2020 Email at 1-2, Ex. G; Townsend July Decl. ¶ 21.

169.    Such concerns are why the NHPA requires a private consultation process, not merely an opportunity to comment that lumps Indian tribes with members of the public.  March 16, 2020 Email at 2–3, Ex. G; *see Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Dep't*

*of Interior*, 755 F. Supp. 2d 1104, 1118–19 (S.D. Cal. 2010) ("BLM's invitation to 'consult,' then, amounted to little more than a general request for the Tribe to gather its own information about all sites within the area and disclose it at public meetings.").

170.     The "mitigation measures" proposed in the Final EA, Ex. H, published on March 23, 2020, 11 days after the March 12 Decision, do not mitigate the harm the EBCI and its members have suffered and will suffer from the Department's failure to adhere to the NHPA.  If a potential archaeological site or human remains are found, the Final EA provides that an archaeologist— presumably hired by the Catawba (or Wallace Cheves), and not required to have expertise in Indian (much less Cherokee) archaeology or human remains—may determine whether the finding is "significant."  *Id.* at 16.  If this hand-picked archaeologist determines that the finding is not "significant," nothing else need be done and the EBCI will not be contacted. *Id.*[25]  The EBCI was not consulted in the creation of this mitigation measure, and this measure offers no protection at all for the EBCI's historical and cultural interests in the Kings Mountain site.

**F.     In Its Haste, the Department Failed to Conduct the Analysis Required by the National Environmental Policy Act.**

171.     In its rush to judgment, the Department also failed to satisfy NEPA's requirements.

---

[25] Even if the finding is "significant," the Final EA is ambiguous as to whether the EBCI's THPO will be consulted in determining "the appropriate course of action."  Final EA, Ex. H, at 16.  In this Court's preliminary-injunction decision, the Court interpreted this provision as requiring that the EBCI's THPO (as well as the Catawba's THPO) be contacted, and emphasized that this requirement was "enforceab[le]" and that "the EBCI would have grounds to return to court" if the Department or the Catawba failed to adhere to this requirement.  ECF No. 22 at 12–13.  But even if that interpretation is correct, it leaves many questions unresolved.  What happens, for example, if the Catawba's THPO and the EBCI's THPO ***disagree*** about the "appropriate course of action"? *See* Final EA at 16–17, Ex. H (similar issues, in the event "human remains are discovered").  The ambiguity of these mitigation measures, and the uncertainty over whether the Department and the Catawba will adhere to them, underscore the inadequacy of the mitigation measures.

### i.    The Requirements of the National Environmental Policy Act

172.    For "every … major Federal action[] significantly affecting the quality of the human environment," NEPA requires a detailed statement—known as an "environmental impact statement," or "EIS"—addressing "the environmental impact of the proposed action," any "adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action."  42 U.S.C. § 4332(C)(i)–(iii).  NEPA requires agencies to "'consider every significant aspect of the environmental impact of a proposed action,'" so as to "inform the public that it has indeed considered environmental concerns."[26]

173.    The Council of Environmental Quality ("CEQ") has promulgated regulations implementing NEPA.

174.    Under CEQ's regulations, an EIS must be prepared for any major federal action, unless the action is subject to a "categorical exclusion" or the agency issues an "environmental assessment" (or "EA") that reasonably makes a "finding of no significant impact" ("FONSI").  40 C.F.R. § 1501.4(a)(2), (e).  "If *any* significant environmental impacts might result from the proposed agency action[,] then an EIS must be prepared *before* agency action is taken."[27]

175.    CEQ's regulations define what it means for a major federal action to "significantly" (or not significantly) affect the human environment.

176.    On the one side, significance turns on an action's "context"; hence, "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality"—and "in the case of a site-

---

[26] *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (quoting *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978)).
[27] *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002) (quoting *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (internal quotation marks omitted)); *see also* 42 U.S.C. § 4332(2)(C).

specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." 40 C.F.R. § 1508.27(a).

177.    On the other side, significance turns on an action's "intensity." *Id.* § 1508.27(b). A "significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial." *Id.* § 1508.27(b)(1).  Agencies must consider the "degree to which the proposed action affects public health or safety"; any "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources"; the "degree to which the effects on the quality of the human environment are likely to be highly controversial"; the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; the "degree to which the action may establish a precedent for future actions with significant effects"; the "degree to which the action … may cause loss or destruction of significant scientific, cultural, or historical resources"; and whether "the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.*

178.    A court reviewing an agency's decision not to prepare an EIS must "ensure 'that no arguably significant consequences have been ignored.'"  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F. Supp. 3d 101, 122 (D.D.C. 2017) (quoting *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 860 (D.C. Cir. 2006)).  "When examining the adequacy of the FONSI and the EA upon which it was based, courts must determine whether the agency: '(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment], (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently

reduce the impact to a minimum.'"  *Id.* (quoting *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011)).

179.     NEPA also provides a timing rule.  Agencies must "make the finding of no significant impact available for public review … for 30 days before the agency makes its final determination whether to prepare an [EIS] and before the action may begin" either if the "proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency" or if the "nature of the proposed action is one without precedent."  40 C.F.R. § 1501.4(e)(2).

180.     Finally, NEPA requires consideration of "alternatives to the proposed action."  42 U.S.C. § 4332(C)(iii).  Reviewing courts "must determine whether the agency adequately discuss[ed] reasonable alternatives to the proposed action and compare[d] the respective environmental impacts of each."  *Food & Water Watch v. U.S. Dep't of Agric.*, No. CV 17-1714 (BAH), __ F. Supp. 3d __, 2020 WL 1479462, at *10 (D.D.C. Mar. 26, 2020) (internal quotation marks omitted) (alterations in original).  "An alternative is reasonable if it is objectively feasible as well as reasonable in light of [the agency's] objectives."  *Id.* (quotation marks omitted) (alteration in original).

### ii.     The Department's Issuance of an Environmental Assessment and Finding of No Significant Impact

181.     On December 19, 2019, the Department issued a Draft EA for the Kings Mountain trust acquisition.

182.     The EBCI was not consulted prior to the publication of the Draft EA, contrary to the NHPA's requirements, and the BIA's normal practices.  *Supra* ¶¶ 149, 153, 155.

183.     On December 23, 2019, EBCI Principal Chief Sneed received an email from David Lambert, at the BIA's Eastern Regional Office Natural Resources Department, "requesting [his]

review and comments on this draft Environmental Assessment for the King's Mountain site" and directing the EBCI to a nongovernmental website (http://catawbanationclevelandcountyea.com) that hosted the Draft EA.

184.    On January 22, 2020, the EBCI submitted comments to the BIA Eastern Regional Office identifying significant deficiencies in the Draft EA and requesting that the deficiencies be addressed by preparing an EIS.  EBCI Comments at 1, 6, Ex. B.

185.    At the February 10, 2020 meeting described above, the EBCI reiterated those concerns and again underscored the need for a full EIS.

186.    On March 12, 2020, the Department issued its decision to take land into trust for the Kings Mountain project, without having published either a final EA or a FONSI.

187.    On March 13, 2020, an EBCI Historic Preservation Specialist, Stephen Yerka, emailed the BIA's Mr. McGhee.

188.    The same day, Mr. McGhee responded that the Final EA and FONSI were not finished yet.

189.    On March 16, 2020, Mr. Townsend sent the email described above, *supra* ¶¶ 167-68, which raised concerns not just about the Department's failure to consult under the NHPA, but about the "NEPA … review and documentation."  March 16, 2020 Email at 1, Ex. G.

190.    Mr. Townsend's March 16, 2020 email identified a significant error in the Draft EA, which found that the project's effect "on cultural resources would not be significant" based on the statement of the North Carolina State Historic Preservation Office that it was "aware of no historic resources which would be affected by the project."  Draft EA at 36, Ex. A.  Mr. Townsend explained, as noted above, that "there actually is an archaeological site recorded within the project

location listed in the NC State Archaeological Site Inventory."  March 16, 2020 Email at 1, Ex. G; *accord* Townsend July Decl. ¶ 21.

191.    On March 23, 2020, the Department published the Final EA and FONSI.  The FONSI was dated March 12, 2020.

### iii.    The Department's Failure to Comply with the Requirements of the National Environmental Policy Act

192.    In three respects, the Department's actions were unlawful under NEPA.

193.    *First*, the Department violated NEPA's timing rule, which requires public notice of a FONSI 30 days before the agency makes its final decision when either (i) the type of action "normally" requires an EIS under the agency's procedures or (ii) the action is "without precedent." 40 C.F.R. § 1501.4(e)(2).

194.    Here, the Department's action is unprecedented because there is no precedent for taking land into trust for a tribe in a separate State from where that tribe's headquarters and reservation are located, and within the treaty territory of another tribe.

195.    Likewise, this type of action would "normally" require an EIS under the Department's own policies.  In particular, the Department's policies normally require an EIS for "[p]roposed water development projects."  Dep't of the Interior, *Departmental Manual*, 516 DM 10, at 10.4(A)(2)–(3).  Here, the Kings Mountain project includes proposed water developments. *See* Final EA at 10–11, Ex. H ("Taps will be made to the existing 16" water main along Dixon School Road to bring water into the site for domestic, fire suppression and irrigation needs," and "a new pump station and associated pipe system will be built to serve the proposed facility.  This would likely consist of a 12" gravity sewer outfall to a new pump station and 12" force main to direct flow back to the City's wastewater treatment facility.").

196.    **Second**, the Department's consideration of alternatives was arbitrary and capricious.

197.    The Final EA identifies three alternatives to the Kings Mountain project: (1) a "Reduced Intensity Alternative" (*i.e.*, a smaller gaming facility); (2) a "Non-Gaming Alternative" (building a truck stop on land taken into trust for the Catawba); and (3) a "No Action Alternative." Final EA at 19–21, Ex. H.  The Final EA then determines that proceeding with the full Kings Mountain project would "best meet[] the purpose and need for Proposed Action" because large-scale gaming "would provide the greatest socioeconomic benefit to the Nation." *Id.* at 22.

198.    This identification of alternatives was arbitrary and capricious, first, because it ignored the cardinal rule that the "agency should … 'always consider the views of Congress' to the extent they are discernible." *Food & Water Watch*, 2020 WL 1479462, at *24 (quotation marks omitted).  Here, whatever the Department's views on whether the Catawba would benefit from gaming under IGRA, Congress has decreed in the 1993 Settlement Act that the Catawba may not do so.

199.    Moreover, aside from doing nothing at all, the Department failed to consider any genuine alternatives to taking the Kings Mountain site into trust, and instead considered only modest adjustments to the size and scope of the planned construction project at the Kings Mountain site.  Final EA 8–22, Ex. H.  The Department did not consider taking land into trust for the South Carolina–based Catawba **somewhere else**—either in South Carolina or, at minimum, outside the EBCI's aboriginal, historical, and treaty territory.

200.    The Final EA avers that "[e]valuating any other parcels would be speculative and beyond the scope and control of the BIA action."  Final EA, App. M at 8, Ex. H.  But this excuse arbitrarily and capriciously ignores that the Department was undertaking the **discretionary**

acquisition of trust land to support Catawba economic development.  The Department could direct the Catawba to explore alternatives to pursuing economic development in Cherokee territory.[28]

201.   **Third**, the Department acted arbitrarily and capriciously in finding that the Kings Mountain project would have no "significant" impact on the environment and that a full EIS was unnecessary.  The Department failed to show that no "arguably significant" consequences were ignored, and failed to "make a convincing case" for its FONSI.

202.   In assessing significance, the Final EA gets the "context" wrong.  NEPA's regulations require significance to be "analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a).  But here, the Final EA considers only the local impacts of the Kings Mountain project, to the exclusion of other relevant impacts.

A.   The Final EA ignores that the Kings Mountain site sits within the EBCI's aboriginal, historical, and treaty territory and that—as detailed below—the project will undermine the EBCI's ability to protect its cultural patrimony on the site.

B.   The Final EA arbitrarily discounts the harm that the Kings Mountain project will inflict on the EBCI and its members by redirecting to Cheves and the Catawba the fruits of Indian gaming in North Carolina that the EBCI has spent decades developing.  Indeed, the Final EA **acknowledges** that the Kings Mountain project will result in "market cannibalization" that will harm EBCI's gaming facilities.  Final EA at 42, Ex. H.  Yet the Final EA brushes off this harm

---

[28] To be clear, Plaintiffs' view—which follows the plain statutory text—is that the 1993 Settlement Act prohibits the Catawba from acquiring trust lands anywhere outside South Carolina, and entirely prohibits the Catawba from gaming under IGRA.  But to the extent the Department now disagrees, it has an obligation to consider alternatives outside the historical Cherokee treaty territory.  *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991) (agency must "evaluate alternative ways of achieving its goals").

with the *ipse dixit* that the Kings Mountain project "would not cause a significant impact, as it would not affect the ability of the [EBCI] to provide essential services and facilities to its membership or result in the closure of any of the competing gaming facilities." *Id.* The Final EA does not say, however, what it means by "essential services and facilities," or why only those "essential" services are relevant to assessing "significance." Neither does the Final EA analyze the actual impact of a new gaming facility next door to Charlotte, the region's largest city, on the programs the EBCI provides to serve its members and to protect the Qualla Boundary. Nor does the Final EA explain why it would take "closure" of the EBCI's gaming facilities, as opposed to simply significant economic harm, to count as a "significant impact."

        C.      The Final EA ignores the project's impact on western North Carolina, and on other tribes that may be affected by the reservation-shopping precedent established by the March 12 Decision.

        D.      The Final EA ignores that a majority of the Kings Mountain City Council opposes the project, as does the majority of the North Carolina General Assembly. *See* Final EA, App. M, Ex. H; Ex. T.

    203.    The Final EA also fails to adequately assess the project's intensity in the manner that NEPA's regulations demand—a determination that must be made based on an agency's consideration of ten factors, any one of which "may be sufficient to require development of an EIS." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, No. CV 16-1534, __ F. Supp. 3d __, 2020 WL 1441923, at *2 (D.D.C. Mar. 25, 2020) (quoting *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019)).

        A.      First and foremost, in assessing the project's impact on "cultural resources," 40 C.F.R. § 1508.27(b)(3), (8), the Final EA repeats the Draft EA's basic factual error detailed

above.  The Final EA asserts that no "known archaeological sites or cultural materials are currently located within" the Kings Mountain site, based on information provided by the North Carolina State Historic Preservation Office.  Final EA at 38, Ex. H.  That information is the Final EA's *only* basis for concluding that the project's effect "on cultural resources would not be significant."  *Id.* But as explained above, the EBCI's THPO had—before the Department published the Final EA— provided evidence that the information received from the North Carolina State Historic Preservation Office was *incorrect*.  Underscoring the significance of that error, the Department's six-page FONSI devoted an entire *paragraph*, and the entirety of its discussion of "cultural resources," to recounting the incorrect information received from the State.  FONSI at 3, Ex. I.

B.      The Final EA was also arbitrary and capricious in concluding that mitigation measures could sufficiently address the harm that would result from an "inadvertent discovery of archaeological resources" at the site.  Final EA at 16, Ex. H; *see supra* ¶ 170.

C.      The Final EA fails to assess the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.  40 C.F.R. § 1508.27(b)(5).  The Final EA relies on municipal services that are to be provided by the City of Kings Mountain.  But no agreement between the Catawba and the City of Kings Mountain is in place.  And as the Final EA itself recounts, the majority of the Kings Mountain City Council opposes the project, *see* Final EA, App. M—as do many members of the community, the North Carolina General Assembly, Ex. T, and many North Carolina counties, Exs. M–S.  The Final EA does not analyze the potential impacts on the environment (human or otherwise) in the event an agreement cannot be reached.

D.      The Final EA fails to adequately address whether the action will threaten violations of Federal, state, or local law or requirements imposed for the protection of the

environment.  40 C.F.R. § 1508.27(b)(10).  The Final EA asserts that if the property is taken into

trust for the Catawba, "it would no longer be subject to City or County land use regulations but

would be under the civil regulatory jurisdiction of the [Catawba] Nation and the federal

government."  Final EA at 48, Ex. H.  But as explained above, the 1993 Settlement Act provides

that when the Catawba acquire non-Reservation lands, "[j]urisdiction and status of all non-

Reservation lands shall be governed by section 15 of the Settlement Agreement," and these lands

"shall be subject to the same obligations and responsibilities as other persons and entities under

State, Federal, and local law."  1993 Settlement Act § 13(a)–(b); *see also id.* §§ 4(e), 10(2).  The

Final EA does not address the effects of these jurisdictional restrictions, which also exacerbate the

uncertainty of the project's impacts.

      E.      In ignoring the Catawba's jurisdictional limits under the 1993 Settlement

Act, the Final EA fails to adequately analyze the degree to which the proposed action affects public

health and safety.  40 C.F.R. § 1508.27(b)(2).

      F.      The Final EA ignores effects on the quality of the human environment that

are likely to be highly controversial, including those stated above.  *Id.* § 1508.27(b)(4).  Agency

actions are likely to be "highly controversial" where there is "consistent and strenuous opposition,

often in the form of concrete objections to the [agency's] analytical process and findings, from

agencies entrusted with preserving historic resources and organizations with subject-matter

expertise."  *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1086 (D.C. Cir.),

*amended in part on reh'g*, 925 F.3d 500 (D.C. Cir. 2019).  The EBCI has raised and identified

flaws related to the analysis of cultural protection, selection of alternatives sites, impacts on

biological resources, economic analysis and impact, impact to public utilities, and Catawba

jurisdiction under the 1993 Settlement Act, among other objections.  Yet the Final EA, published

less than two months after the EBCI submitted its comments, did not adequately resolve these concerns about the proposed highly controversial actions, nor did the Department ever respond to the EBCI's detailed concerns.  The Department did not succeed in resolving this controversy, as evidenced by the EBCI's complaints after the Final EA was issued.[29]

204.    These flaws render the Final EA and FONSI arbitrary and capricious.

**G.    The Threats the Kings Mountain Scheme and the March 12 Decision Pose to the Eastern Band of Cherokee Indians and the Individual Plaintiffs**

205.    The decision to take land in Kings Mountain, North Carolina, into trust so that Cheves and the Catawba may game threatens irreparable harm to the EBCI and the Individual Plaintiffs.

206.    The Kings Mountain site is likely to contain Cherokee cultural artifacts.  Townsend July Decl. ¶ 23.  As explained above, North Carolina state records show that an "archaeological site recorded within the project location" included artifacts consisting of pottery and stone tools. *Id.* ¶ 21.  Moreover, the EBCI has identified archaeological records confirming that "pre-historic Cherokee ceramics" have been found "in Cleveland County," within "ten miles from Kings Mountain," which is "a short distance in the world of pre-historic Cherokee archaeology." *Id.* ¶ 13.  The artifacts found at the Kings Mountain site are thus likely to be Cherokee artifacts. *Id.* ¶ 24.  Indeed, given that Cherokees have always greatly outnumbered Catawbas in this area, any cultural artifacts and any human remains are more likely to be Cherokee than Catawba. *Id.*  And

---

[29] The Final EA also does not attempt to consider or address controversy over the greater Indian country policy implications of the Catawba's Kings Mountain project.  For years, Cheves and the Catawba have tried—unsuccessfully—to achieve a legislative fix in Congress to the prohibitions in the 1993 Settlement Act that bar the Catawba from acquiring out-of-state trust lands for gaming under IGRA.  The Department is aware of the EBCI's opposition to the Catawba's reservation-shopping in North Carolina, and is aware that tribes throughout the United States oppose reservation-shopping for an off-reservation casino in another tribe's ancestral homelands—as reflected in, among other things, the 2005 resolution from the United South and Eastern Tribes, the region's leading intertribal organization. *See supra* ¶ 3.

the proposed development at the Kings Mountain site is likely to destroy Cherokee artifacts (though the precise nature of the artifacts cannot be determined with certainty given the Department's failure to conduct an archaeological survey or consult with the EBCI).  *Id*.[30]

207.    Building a casino on trust land for another tribe at the Kings Mountain site thus imminently imperils the EBCI's ability to protect its cultural resources.  Moreover, as also explained above, the mitigation measures proposed in the Final EA wholly fail to avoid this harm.

208.    Cheves's proposed casino will also divert revenues that the EBCI's gaming facilities in Cherokee and Murphy, North Carolina, earn today.  These facilities draw a significant share of their patrons from the Charlotte metropolitan area and from areas that are closer to Charlotte than to either Cherokee or Murphy.  The Kings Mountain site sits between Cherokee and Murphy, on the one hand, and Charlotte, on the other.  If a gaming facility opens at the Kings Mountain site, it will reduce the revenues of the facilities in Cherokee and Murphy.

209.    Economic studies confirm that new casinos generally cannibalize the revenues of existing casinos in the wider region, including across state lines.[31]

---

[30] While construction by the North Carolina Department of Transportation in 2005 disturbed the Kings Mountain site, it remains likely to contain Cherokee artifacts.  Townsend July Decl. ¶ 22–23.  The Kings Mountain site's "soils are deep with deep residuum," and any "Cherokee artifacts," including "any human remains at the site," could "be intact below the zone of impact from the 2005 work."  *Id*. ¶ 24.

[31] *See, e.g.*, William R. Eadington et al., *Estimating the Impact of California Tribal Gaming on Demand for Casino Gaming in Nevada*, 14 UNLV Gaming Research & Rev. J. 33, 42 (2010); Ryan M. Gallagher, *An Examination of Cannibalization Effects within the Riverboat Gaming Industry: The Case of Illinois-Area Casinos*, 45 Growth & Change 41, 53 (2014); Richard McGowan, *The Competition for Gambling Revenue: Pennsylvania v. New Jersey*, 13 Gaming Law Review & Econ. 145, 153 (2009); J.S. Shonkwiler, *Assessing the Impact of Atlantic City Casinos on Nevada Gaming Revenues*, 21 Atlantic Econ. J. 50, 58 (1993); Richard Thalheimer & Mukhtar M. Ali, *The Demand for Casino Gaming*, 35 Applied Econ. 907, 914 (2003); Douglas M. Walker & Todd M. Nesbit, *Casino Revenue Sensitivity to Competing Casinos: A Spatial Analysis of Missouri*, 45 Growth & Change 21, 31 (2013).

210.    The Final EA acknowledges that gaming at the Kings Mountain site will result in "market cannibalization" and reduce the revenues of the EBCI's gaming facilities (though the Final EA underestimates the degree of cannibalization).  Final EA at 42, Ex. H.

211.    The resulting loss in revenue would undermine the EBCI's ability to provide for the safety, health, welfare, and cultural survival of the EBCI's citizens.  This loss will also harm many non-tribal communities in rural western North Carolina that have come to rely on the jobs and economic activity generated by the EBCI's Cherokee and Murphy gaming facilities.

212.    Cheves's proposed casino will also undermine the reputation and goodwill that the EBCI and its members have earned in North Carolina for the EBCI's lawful and responsible gaming, by associating Indian gaming with developers with criminal histories, like Cheves.

213.    As citizens and enrolled members of the EBCI, the Individual Plaintiffs likewise will suffer irreparable harm from the Federal Defendants' actions.  Each of the Individual Plaintiffs owns property and resides within 4 to 15 miles of the Kings Mountain site.  Ms. Dover and the other Kings Mountain residents live west of the site; Ms. Beaty and the other Bessemer City residents live north of the site; and Ms. Clark and the other Gastonia resident live east of the site. All twelve Individual Plaintiffs oppose the construction and eventual operation of Cheves's proposed casino because it would severely and detrimentally impact their community and its character, as well as the Individual Plaintiffs personally.

214.    Specifically, the Individual Plaintiffs are concerned that (1) the construction site will generate noise, disruption, and pollution; (2) the construction could destroy Cherokee gravesites, human remains, ceramics, tools, and other cultural artifacts; (3) operating the casino at Kings Mountain will increase traffic and congestion, which in turn will harm air quality in the community; (4) Cheves has a history of corruption and unlawful gaming and will attract criminals

to the area, causing crime to increase and public safety to decrease; (5) Cheves's casino and the kinds of people it will attract will increase the rates of drug abuse and homelessness in the area; (6) Kings Mountain, Bessemer City, Gastonia, and other municipalities near the site, as well as Cleveland County and nearby Gaston County, will become saddled with extra expenses for law enforcement and other public services, which could cause the Individual Plaintiffs' taxes to increase; (7) Cheves's casino will drive down property values in the surrounding community; (8) Cheves's casino will undermine the Cherokees' hard-earned reputation throughout North Carolina for conducting Indian gaming fairly and honestly; and (9) a non-Cherokee casino in North Carolina will reduce the EBCI casinos' revenues and thus reduce the EBCI's services and payments to the Individual Plaintiffs and other Cherokee families.

215.    Because the Kings Mountain site and the surrounding area were historically Cherokee and not Catawba, the Individual Plaintiffs believe it should not be the site for a Catawba casino.  They believe that, if the Catawbas want to game, they should do so on their own reservation, in South Carolina—not in North Carolina.

## CLAIMS FOR RELIEF

### COUNT I:

**Violation of the Administrative Procedure Act, the 1993 Settlement Act, and Section 5 of the Indian Reorganization Act**

216.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

217.    Although Section 5 of the IRA authorizes the Department to acquire trust land "for the purpose of providing land for Indians," 25 U.S.C. § 5108 (formerly codified at 25 U.S.C. § 465), Section 5 does not apply to the Catawba.

218.    The 1993 Settlement Act and the Settlement Agreement that the 1993 Settlement Act incorporates into federal law prohibit the Catawba from using Section 5 of the IRA and its

implementing regulations at 25 C.F.R. Part 151, and prohibit the Department from relying on Section 5 of the IRA and its implementing regulations at 25 C.F.R. Part 151 to take land into trust for the Catawba.

219.    Moreover, under Section 5 and the 1993 Settlement Act, the Catawba may not use Section 5 to obtain trust land outside South Carolina.

220.    The March 12 Decision nonetheless relies on Section 5 of the IRA and its implementing regulations at 25 C.F.R. Part 151 to take land into trust for the Catawba in North Carolina.

221.    The Department violated both Section 5 of the IRA and the 1993 Settlement Act, and acted arbitrarily and capriciously, in relying on Section 5 and the Part 151 regulations to take land into trust for the Catawba in North Carolina.

222.    The Department departed without acknowledgement from its previous position that the Department has no authority to take land into trust for the Catawba under Section 5 of the IRA and the Part 151 regulations, as reflected in the 1993 testimony of the BIA Eastern Region Director and the 2019 testimony of Mr. Tahsuda on S. 790.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016) ("It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" (citation omitted)).

223.    The March 12 Decision is a "final agency action" within the meaning of the APA.

224.    The Department's failure to comply with the 1993 Settlement Act and Section 5, and its unexplained departure from its prior position, renders the March 12 Decision arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

## COUNT II:

### Violation of the Administrative Procedure Act, the 1993 Settlement Act, and the Indian Gaming Regulatory Act

225.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

226.     Although IGRA in certain circumstances authorizes Indian tribes to game on their "Indian lands," 25 U.S.C. § 2710(b)(1), (d)(1), Congress has excluded the Catawba from IGRA.

227.     The 1993 Settlement Act specifies that IGRA "shall not apply to the Tribe" and prohibits the Catawba from gaming entirely except in accordance with South Carolina law.

228.     Nonetheless, the March 12 Decision concluded that the Catawba could game under IGRA and applied to the Catawba the Part 292 regulations that implement IGRA.  Then, in determining that the Catawba met the criteria for taking the Kings Mountain site into trust and in deciding to accept that site into trust, the March 12 Decision took as its premise that the Catawba would be able to game at the Kings Mountain site in North Carolina—even though the 1993 Settlement Act prohibits the Catawba from doing so.

229.     The Department violated both IGRA and the 1993 Settlement Act, and acted arbitrarily and capriciously, in applying IGRA to the Catawba.

230.     Moreover, because the stated purpose of the Part 292 regulations that the Department used to qualify the Kings Mountain site as "Restored Lands" is to allow the Department to determine applicable exceptions to IGRA's requirements, and because the 1993 Settlement Act provides that IGRA does not apply to the Catawba, it was arbitrary and capricious for the March 12 Decision to consider the Catawba's claim to "Restored Lands" under 25 C.F.R. Part 292.

231.    The March 12 Decision also departed without acknowledgement from the Department's previous position that the 1993 Settlement Act rendered IGRA inapplicable to the Catawba.

232.    The March 12 Decision is a "final agency action" within the meaning of the APA.

233.    The Department's failure to comply with IGRA and the 1993 Settlement Act, and its unexplained departure from its prior position, renders the March 12 Decision arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

**COUNT III:**

**Violation of the Administrative Procedure Act and the
"Restored Lands" Exception in IGRA and the Part 292 Regulations**

234.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

235.    In the alternative, even if the Department could lawfully apply IGRA to the Catawba, the March 12 Decision is contrary to law and arbitrary and capricious in determining that the application satisfied the requirements of IGRA and the regulations in Part 292.

236.    Section 20 of IGRA prohibits gaming on land taken into trust after 1988, unless an exception applies.  25 U.S.C. § 2719(a).

237.    In concluding that the Kings Mountain site would be gaming-eligible when taken into trust, the March 12 Decision relied on the "Restored Lands" exception, which exempts from IGRA's prohibition "lands … taken into trust … as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition."  *Id.* § 2719(b)(1)(B)(iii).

238.    The Restored Lands exception, however, does not apply.  The 1993 Settlement Act restored the Catawba's federal recognition and created a Catawba-specific process for taking land into trust for the Catawba.  Lands taken into trust outside that process are not acquired "as part of … the restoration of lands" to the Catawba.  The March 12 Decision is contrary to law and arbitrary

and capricious in nonetheless concluding that the Restored Lands exception applied to the Catawba's trust application under Section 5 of the IRA.

239.    Moreover, the Part 292 regulations specify that "newly acquired lands must be located within the State and States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population."   25 C.F.R. § 292.12(a).   The Catawba is not "located" in North Carolina; it is located in South Carolina, which is the only state in which the Catawba has a "governmental presence."  The March 12 Decision is contrary to law and arbitrary and capricious in concluding that the Catawba is "located" in North Carolina, and has a "governmental presence" in North Carolina, based on the evidence the March 12 Decision cited, such as the assertion that the Catawba provides services to people located in North Carolina.

240.    Finally, under Part 292, a tribe must establish a "significant historical connection" to the land sought to be acquired, either by showing that the "land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or by "demonstrat[ing] by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."  25 C.F.R. §§ 292.2, 292.12(b).  The Catawba's application did not satisfy either prong of this definition, and the March 12 Decision is arbitrary and capricious in nonetheless finding that the Catawba had established a "significant historical connection" with the Kings Mountain site.

241.    The March 12 Decision is a "final agency action" within the meaning of the APA.

242.    In determining that the Catawba's application satisfied the requirements for the Restored Lands exception under IGRA and the Part 292 regulations, the March 12 Decision is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

## COUNT IV:

## Violation of the Administrative Procedure Act
## and the Indian Gaming Regulatory Act

243.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

244.    The March 12 Decision applies IGRA to the Catawba's application without acknowledging that the Catawba's casino developer and operator, Wallace Cheves, is a known bad actor who has repeatedly circumvented gaming laws and regulations, and is thus inconsistent with IGRA's stated purpose of "provid[ing] a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players."  25 U.S.C. § 2702(2).

245.    The March 12 Decision also undermines IGRA's purpose of establishing "Federal standards for gaming on Indian lands … necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue."  *Id.* § 2702(3).

246.    The March 12 Decision sanctions exactly what Congress enacted IGRA to prevent: a project where the Catawba's casino developer and operator's "prior activities, criminal record[,] if any, or reputation, habits, and associations pose a threat to the public interest or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming."  *Id.* § 2711(e).

247.    The March 12 Decision violates IGRA and harms the reputation of Indian tribes otherwise complying with IGRA, including the EBCI.  In particular, the March 12 Decision harms the goodwill that the EBCI and its members have amassed over the years with the government leaders and the citizens of North Carolina by conducting the EBCI's gaming operations fairly, honestly, and with painstaking attention to compliance with the law.  The March 12 Decision, by

63

authorizing a project whose developer and operator's "prior activities … create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming," *id.* § 2711(e), also increases the risk that the EBCI's casinos will lose revenue due to Cheves's willingness to engage in illegal gambling practices.

248.    The March 12 Decision is a "final agency action" within the meaning of the APA.

249.    In granting the Catawba's application while ignoring that the application is spearheaded by a known bad actor, the March 12 Decision is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

## COUNT V:

### Violation of the Administrative Procedure Act
### and the National Historic Preservation Act

250.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

251.    Whenever a federal undertaking may affect historic property, the NHPA and its implementing regulations require federal agencies to "identify Indian tribes" that may be affected and then "ensure that consultation in the section 106 process provides the Indian tribe … a reasonable opportunity to identify its concerns about historic properties, advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance, articulate its views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."   54 U.S.C. § 306108; 36 C.F.R. § 800.2(c)(2)(ii)(A).

252.    The March 12 Decision's directive to take land into trust for the Catawba is an "undertaking" within the meaning of the NHPA.

253.    The March 12 Decision is a "final agency action" within the meaning of the APA.

254.     The Department violated the NHPA and its implementing regulations in at least the following ways.

255.     The Department failed to consult with the EBCI "early in the planning process," as the NHPA's regulations command, including by failing to consult with the EBCI before issuing the Draft EA.  36 C.F.R. § 800.2(c)(2)(ii)(A).  That failure deprived the EBCI and its members of the opportunity to address gaps and errors in the information provided by the North Carolina State Historic Preservation Office.

256.     The Department failed to "ensure" that the Section 106 process "provide[d] [the EBCI] a reasonable opportunity" to identify its concerns and articulate its views.  Even though the EBCI repeatedly emphasized its concerns about the Department's failure to consult under Section 106—including at the February 10, 2020 meeting—the Department withheld its intention to proceed to a final decision without providing the EBCI any further opportunity to consult or resolve the concerns in the EBCI's comments on the Draft EA.  After the Department's unexpected March 12 Decision, the EBCI again reiterated its concerns about the Department's failure to consult and underscored that this failure had caused the Department to ignore gaps and errors in the information provided by the North Carolina State Historic Preservation Office.  The Department never conducted the type of cultural survey that is customarily used to protect Cherokee cultural resources, particularly where (as here) the EBCI had expressed concerns about a project's impact on those resources.  The Department never provided the EBCI or its members with a reasonable opportunity to identify Cherokee cultural resources, patrimony, or burials located at the Kings Mountain site.  Once the land is transferred into trust for the Catawba, the mitigation measures provided in the Final EA will not protect Plaintiffs' rights, under federal law, to repatriate Cherokee remains and cultural patrimony located in or at the Kings Mountain site.

257.    The Department's approach failed to "recognize the government-to-government relationship between the Federal Government and [the EBCI]" and was not "conducted in a sensitive manner respectful of tribal sovereignty" and "sensitive to the concerns and needs of the [EBCI and its members]." *Id.* § 800.2(c)(2)(ii)(B)–(C).

258.    The "mitigation measures" set forth in the Final EA are wholly inadequate and do not mitigate the harm that the EBCI and its members have suffered and will suffer from the Department's failure to adhere to the NHPA.

259.    The Department's failure to comply with the NHPA and its implementing regulations is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

## COUNT VI:

### Violation of the Administrative Procedure Act and the National Environmental Policy Act

260.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

261.    The March 12 Decision is a "major Federal action" within the meaning of NEPA.

262.    The Department violated NEPA by not making its "finding of no significant impact available for public review … for 30 days before the agency ma[de] its final determination whether to prepare an [EIS]."  40 C.F.R. § 1501.4(e)(2).  The decision to take land into trust for gaming "normally" requires the preparation of an EIS, and the March 12 Decision is one "without precedent." *Id.*

263.    The Department failed to adequately consider "alternatives to the proposed action." 42 U.S.C. § 4332(C)(iii).  In identifying alternatives, the Final EA ignored Congress's directive that the Catawba is not permitted to game under IGRA and failed to consider alternatives (aside

from doing nothing at all) that did not involve taking land into trust for the Catawba within the EBCI's aboriginal, historical, and treaty territory.

264.    The Department was arbitrary and capricious in determining that a full EIS was not required because the Kings Mountain project would not significantly affect the quality of the human environment; the Department failed to make a "convincing case" for its finding of "no significant impact"; and the Department failed to show that no "arguably significant" potential consequences had been ignored.  In particular, as detailed above, the Final EA failed to assess the Kings Mountain project in appropriate "context" and failed to adequately address the severity of its impact, including failing to adequately address the "degree to which the proposed action affects public health or safety"; "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources"; the "degree to which the effects on the quality of the human environment are likely to be highly controversial"; the "degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks"; the "degree to which the action may establish a precedent for future actions with significant effects"; the "degree to which the action … may cause loss or destruction of significant scientific, cultural, or historical resources"; and whether "the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

265.    For the same reasons, the Department's FONSI is arbitrary and capricious.

266.    The Department's failure to comply with the requirements of NEPA and its implementing regulations is arbitrary, capricious, an abuse of discretion, and contrary to law in violation of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      Declare that the March 12 Decision violated the IRA, the 1993 Settlement Act, and the APA, and departed without explanation from the Department's previous positions, by applying Section 5 of the IRA and its implementing regulations to approve the Catawba's application to take the Kings Mountain site into trust, and that this action was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

2.      Declare that the March 12 Decision violated IGRA, the 1993 Settlement Act, and the APA, and departed without explanation from the Department's previous positions, by concluding that the Kings Mountain site would be gaming-eligible when taken into trust and by relying on this conclusion to approve the Catawba's application, and that this action was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

3.      Declare that the March 12 Decision violated IGRA, the 1993 Settlement Act, and the APA by concluding that the Catawba's application satisfied IGRA's Restored Lands exception and its implementing regulations in 25 C.F.R. Part 292, and that this action was arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

4.      Declare that the Federal Defendants violated the APA and the NHPA Section 106 consultation process by failing to engage in good-faith consultation with the EBCI, and by failing to provide Plaintiffs with the required reasonable opportunity to identify cultural and historical properties at the Kings Mountain site, and that these actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

5.      Declare that the Federal Defendants violated the APA and NEPA and its implementing regulations by failing to engage in good-faith consultation with the EBCI, failing to

consider reasonable alternatives, failing to provide a 30-day public review period between issuing the FONSI and concluding an EIS was not required, and failing to require an EIS, and that these actions were arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A);

6.      Preliminarily and permanently enjoin the Federal Defendants from taking land into trust, or holding land in trust, at the Kings Mountain site, in Cleveland County, North Carolina, for the benefit of the Catawba Indian Nation;

7.      Preliminarily and permanently enjoin Intervenor-Defendant the Catawba Indian Nation from commencing or continuing construction on the Kings Mountain site, in Cleveland County, North Carolina;

8.      Preliminarily and permanently enjoin Intervenor-Defendant the Catawba Indian Nation from commencing or continuing gaming operations or any other operations that require the Catawba to exercise jurisdiction over the Kings Mountain site, in Cleveland County, North Carolina;

9.      Order the Federal Defendants, their agents, and their employees to initiate and conduct good-faith consultation with the EBCI consistent with the NHPA, NEPA, and their implementing regulations;

10.     Order the Federal Defendants to cure the defects in the Final EA;

11.     Order the Federal Defendants to complete an Environmental Impact Statement;

12.     Assess against the Federal Defendants the costs of this action;

13.     Order the Federal Defendants to pay Plaintiffs their attorneys' fees and costs as authorized under 54 U.S.C. § 307105 for claims brought under the NHPA through the APA; and

14.     Order such other and further relief as it deems just.

Respectfully submitted this 6th day of July, 2020.


By: /s/ Mary Kathryn Nagle

    Mary Kathryn Nagle (DC Bar No. 1033507)
    Wilson Pipestem (OBA No. 16877)
    Abi Fain (OBA No. 31370)
    Pipestem Law, P.C.
    320 S. Boston Ave., Suite 1705
    Tulsa, OK 74103
    918-936-4705
    wkpipestem@pipestemlaw.com
    mknagle@pipestemlaw.com
    afain@pipestemlaw.com
    *Attorneys for Plaintiffs*
    *The Eastern Band of Cherokee Indians*
    *and the Individual Plaintiffs*

    Sam Hirsch (DC Bar No. 455688)
    Zachary C. Schauf (DC Bar No. 1021638)
    Allison M. Tjemsland (DC Bar No. 1720122)
    Jenner & Block LLP
    1099 New York Avenue, NW
    202-639-6000
    shirsch@jenner.com
    zschauf@jenner.com
    atjemsland@jenner.com
    *Attorneys for Plaintiff*
    *The Eastern Band of Cherokee Indians*

## <u>CERTIFICATE OF SERVICE</u>

I, Mary Kathryn Nagle, hereby certify that a copy of the foregoing was served electronically by the Court CM/ECF system on July 6, 2020, upon all counsel of record.


By: <u>/s/ Mary Kathryn Nagle</u>
      Mary Kathryn Nagle