## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EASTERN BAND OF CHEROKEE INDIANS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| and | ) ) | |
| THE CHEROKEE NATION, | ) ) ) | |
| Intervenor-Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:20-cv-00757-JEB |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| THE CATAWBA INDIAN NATION, | ) ) ) | |
| Intervenor-Defendant. | ) | |

## PLAINTIFFS' AND INTERVENOR-PLAINTIFF'S CONSOLIDATED MOTION FOR SUMMARY JUDGMENT

Plaintiffs and Intervenor-Plaintiff hereby respectfully move for summary judgment on their claims that Defendants' March 12, 2020 Decision and the findings and conclusions on which it was based are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; in excess of statutory jurisdiction, authority, or limitations; and without observance of procedure required by law. For the reasons laid out in the accompanying memorandum, Plaintiffs and Intervenor-Plaintiff respectfully ask this Court to grant their motion for summary judgment and hold unlawful, set aside, and vacate Defendants' March 12, 2020 Decision and the findings and conclusions on which it was based. This motion is accompanied by a proposed Order.

Respectfully submitted this 8th day of October, 2020.


/s/ Mary Kathryn Nagle

| | |
|---|---|
| Sara Elizabeth Hill (*pro hac vice*) | Mary Kathryn Nagle (DC Bar No. 1033507) |
|   Attorney General | Wilson Pipestem (OBA No. 16877) |
| Chad Harsha (*pro hac vice*) | Abi Fain (OBA No. 31370) |
|   Secretary of Natural Resources | PIPESTEM LAW, P.C. |
| Paiten Taylor-Qualls (OBA No. 33285) | 320 S. Boston Ave., Suite 1705 |
|   Assistant Attorney General | Tulsa, OK 74103 |
| CHEROKEE NATION | (918) 936-4705 |
| P.O. Box 948 | wkpipestem@pipestemlaw.com |
| Tahlequah, OK 74465-0948 | mknagle@pipestemlaw.com |
| (918) 456-0671 | *Attorneys for The Eastern Band of Cherokee* |
| (918) 458-5580 | *Indians and Individual Plaintiffs* |
| sara-hill@cherokee.org | |
| chad-harsha@cherokee.org | Sam Hirsch (DC Bar No. 455688) |
| paiten-qualls@cherokee.org | Zachary C. Schauf (DC Bar No. 1021638) |
| *Attorneys for The Cherokee Nation* | Allison M. Tjemsland (DC Bar No. 1720122) |
| | Noah B. Bokat-Lindell (DC Bar No. 156032) |
| | JENNER & BLOCK LLP |
| | 1099 New York Avenue, NW |
| | (202) 639-6000 |
| | shirsch@jenner.com |
| | *Attorneys for The Eastern Band of Cherokee* |
| | *Indians* |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

EASTERN BAND OF CHEROKEE INDIANS, )
*et al.*, )
)
              Plaintiffs, )
)
    and )
)
THE CHEROKEE NATION, )
)
          Intervenor-Plaintiff, )
)
    v. )        Civil Action No. 1:20-cv-00757-JEB
)
UNITED STATES DEPARTMENT OF THE )
INTERIOR, *et al.*, )
)
          Defendants, )
)
    and )
)
THE CATAWBA INDIAN NATION, )
)
          Intervenor-Defendant. )

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' AND INTERVENOR-PLAINTIFF'S
## CONSOLIDATED MOTION FOR SUMMARY JUDGMENT

Sara Elizabeth Hill (*pro hac vice*)
  Attorney General
Chad Harsha (*pro hac vice*)
  Secretary of Natural Resources
Paiten Taylor-Qualls (OBA No. 33285)
  Assistant Attorney General
CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74465-0948
(918) 456-0671
(918) 458-5580
sara-hill@cherokee.org
chad-harsha@cherokee.org
paiten-qualls@cherokee.org
*Attorneys for The Cherokee Nation*

Mary Kathryn Nagle (DC Bar No. 1033507)
Wilson Pipestem (OBA No. 16877)
Abi Fain (OBA No. 31370)
PIPESTEM LAW, P.C.
320 S. Boston Ave., Suite 1705
Tulsa, OK 74103
(918) 936-4705
wkpipestem@pipestemlaw.com
mknagle@pipestemlaw.com
*Attorneys for The Eastern Band of Cherokee Indians and Individual Plaintiffs*

Sam Hirsch (DC Bar No. 455688)
Zachary C. Schauf (DC Bar No. 1021638)
Allison M. Tjemsland (DC Bar No. 1720122)
Noah B. Bokat-Lindell (DC Bar No. 156032)
JENNER & BLOCK LLP
1099 New York Avenue, NW
(202) 639-6000
shirsch@jenner.com
*Attorneys for The Eastern Band of Cherokee Indians*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ I

TABLE OF AUTHORITIES ........................................................................ III

INTRODUCTION ........................................................................................ 1

STATEMENT OF FACTS ............................................................................ 5

       A.     The 1993 Act and Its Strict Limits on Catawba Rights and
             Powers ................................................................................ 5

       B.     Cheves's Scheme to Use the Catawba to Game in North
             Carolina, Interior's Initial Rejection of the Scheme, and
             Congress's Refusal to Act ................................................ 8

       C.     Interior's Decision to Reverse Its Prior Positions and
             Accept Land in Trust ...................................................... 11

       D.     Interior's Short-Circuiting of the NHPA and NEPA .................... 13

       E.     The Harm to Plaintiffs ................................................. 15

       F.     This Suit ........................................................................ 15

LEGAL STANDARDS ............................................................................... 17

ARGUMENT .............................................................................................. 17

    I.     Interior Erred By Determining that the Catawba Could Game on
          the Kings Mountain Site Under IGRA and by Taking Land into
          Trust on that Basis (EBCI Count II). ............................................ 17

       A.     Under the 1993 Act, the Catawba Cannot Game Under
             IGRA. ............................................................................. 17

       B.     Because the Catawba Cannot Game Under IGRA, Vacatur
             Is Required. ................................................................... 20

    II.     Interior Erred by Allowing the Catawba to Invoke IRA Section 5
          to Obtain Trust Land Outside South Carolina (EBCI Count I). ............... 22

       A.     Trust Acquisitions Under IRA Section 5 Cannot Be
             Squared with the 1993 Act. ............................................. 22

       B.     Interior's Contrary Arguments Lack Merit. ..................... 25

       C.     Interior's Decision Is Especially Unlawful Because the
             Catawba Used the Catawba Land Acquisition Trust Fund. .......... 28

    III.    Interior Erred by Relying on IGRA's "Restored Lands" Exception
          to Take the Land into Trust (EBCI Count III). ............................ 28

I

A.    Interior Cannot Rely on the "Restored Lands" Exception as to Lands Outside the 1993 Act's Land-Acquisition Framework. ....................................................................29

B.    Section 292.12 Does Not Apply. ....................................................30

C.    The Catawba's Application Did Not Satisfy Section 292.12................................................................................31

IV.    Interior Violated the APA by Authorizing a Known Bad Actor to Develop a Casino in Violation of IGRA (EBCI Count IV). ......................33

V.    Interior Violated the NHPA (EBCI Count V, Cherokee Count I). ............34

A.    Interior Violated the NHPA by Not Consulting with the Cherokee Nation. ......................................................................35

B.    Interior Violated the NHPA by Not Consulting with the EBCI. ...............................................................................39

VI.    Interior Violated NEPA (EBCI Count VI, Cherokee Count II)................41

A.    Interior Violated NEPA by Failing to Prepare an Environmental Impact Statement...................................................41

B.    Interior Violated NEPA by Failing to Properly Consider Alternatives. ..................................................................45

VII.    Plaintiffs Have Standing. .........................................................45

A.    Plaintiffs Have Standing to Raise EBCI Counts I to IV. ..............46

B.    Plaintiffs Have Standing to Bring Their NHPA and NEPA Claims. .........................................................................47

CONCLUSION................................................................................50

II

# TABLE OF AUTHORITIES

### CASES

*Akiachak Native Community v. United States Department of Interior*, 584 F. Supp. 2d 1 (D.D.C. 2008) ............................................................................................7

*Amador County v. Salazar*, 640 F.3d 373 (D.C. Cir. 2011).....................................46, 47

*American Business Ass'n v. Slater*, 231 F.3d 1 (D.C. Cir. 2000) ..................................30

*Butte County v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)..................................................20

*California Communities Against Toxics v. EPA*, 928 F.3d 1041 (D.C. Cir. 2019) .......49

*California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987)..............6, 20, 21

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)....................................................................................................................26

*Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 (D.C. Cir. 1991) .................45

*City of Roseville v. Norton*, 219 F. Supp. 2d 130 (D.D.C. 2002), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003) ..........................................................................................30

*City of Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003) .......................................30

*Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142 (9th Cir. 2020) .......................7, 23

*Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425 (C.D. Cal. 1985) ............43

*Confederated Tribes & Bands of the Yakama Nation v. United States Fish & Wildlife Service*, No. 1:14-CV-3052, 2015 WL 1276811 (E.D. Wash. Mar. 20, 2015) ..................................................................................................................37

*Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334 (9th Cir. 1996)........................................................................................................27

*Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*, 75 F. Supp. 3d 387 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016) ..................................27

*Connecticut ex rel. Blumenthal v. United States Department of Interior*, 228 F.3d 82 (2d Cir. 2000)................................................................................................25, 26

*Connecticut v. United States Department of Interior*, 344 F. Supp. 3d 279 (D.D.C. 2018) ..................................................................................................................27

*Conservation Law Foundation v. Pritzker*, 37 F. Supp. 3d 254 (D.D.C. 2014) ...........17

*Delaware Department of Natural Resources & Environmental Control v. EPA*, 785 F.3d 1 (D.C. Cir. 2015)...........................................................................................46

*District of Columbia Federation of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1971) ..................................................................................................................16

*Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020) .................................................................................................34

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ...................................25, 26

*Food & Water Watch v. USDA*, 451 F. Supp. 3d 11 (D.D.C. 2020) ...........................45

*Forest County Potawatomi Community v. United States*, 330 F. Supp. 3d 269 (D.D.C. 2018) ...........................................................................................................27

*Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996) ...........20

*GEICO v. Fetisoff*, 958 F.2d 1137 (D.C. Cir. 1992)....................................................22

*Grand Canyon Trust v. FAA*, 290 F.3d 339 (D.C. Cir. 2002)..................................41, 44

*Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718 (2017).............................19

*Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44 (D.C. Cir. 2013).................................35

*Ho-Chunk, Inc. v. Sessions*, 894 F.3d 365 (D.C. Cir. 2018)........................................27

*Indigenous Environmental Network v. United States Department of State*, 347 F. Supp. 3d 561 (D. Mont.), *amended and supplemented*, 369 F. Supp. 3d 1045 (D. Mont. 2018) ......................................................................................................43

*Intel Corp. Investment Policy Committee v. Sulyma*, 140 S. Ct. 768 (2020)................19

*Klamath-Siskiyou Wildlands Center v. United States Forest Service*, 373 F. Supp. 2d 1069 (E.D. Cal. 2004)......................................................................................45

*Lemon v. Geren*, 514 F.3d 1312 (D.C. Cir. 2008) ...................................................48, 49

*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)....................................................................................................................46

*Louisiana Energy & Power Authority v. FERC*, 141 F.3d 364 (D.C. Cir. 1998).........46

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................48

*Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759 (1985)......................................27

*Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) ...........................................................................................18, 20

*National Biodiesel Board v. EPA*, 843 F.3d 1010 (D.C. Cir. 2016).............................46

*Norfolk & Western Railway Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117 (1991)...........................................................................................................22

*Patchak v. Salazar*, 632 F.3d 702 (D.C. Cir. 2011), *aff'd sub nom. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012) ...................47

*Peter v. Nantkwest, Inc.*, 140 S. Ct. 365 (2019).........................................................22

*Pit River Tribe v. United States Forest Service*, 469 F.3d 768 (9th Cir. 2006) ...................36, 37

*Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995) ....................................39, 40, 41

*Pye v. United States*, 269 F.3d 459 (4th Cir. 2001) ...............................................................48

*Quechan Tribe of Fort Yuma Reservation v. United States Department of Interior*,
    755 F. Supp. 2d 1104 (S.D. Cal. 2010) ..........................................................................37, 40, 41

*Rancheria v. Jewell*, 776 F.3d 706 (9th Cir. 2015) ...................................................................27

*Role Models America, Inc. v. Harvey*, 459 F. Supp. 2d 28 (D.D.C. 2006), *aff'd sub
    nom. Role Models America, Inc. v. Geren*, 514 F.3d 1308 (D.C. Cir. 2008).........................48

*SEC v. Chenery*, 332 U.S. 194 (1947) ......................................................................................21

*Simmons v. United States Army Corps of Engineers*, 120 F.3d 664 (7th Cir. 1997) ................45

*Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. United States Corps
    of Engineers*, No. 3:11-cv-03026, 2016 WL 5478428 (D.S.D. Sept. 29, 2016),
    *aff'd*, 888 F.3d 906 (8th Cir. 2018)........................................................................................37

*Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168 (3d Cir. 2000) ...............................48

*South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498 (1986)..............................................5

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 440 F. Supp.
    3d 1 (D.D.C. 2020), *appeal docketed*, No. 20-5197 (D.C. Cir. July 9, 2020) .......17, 21, 41–42

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 205 F. Supp.
    3d 4 (D.D.C. 2016) ..................................................................................................35, 38, 46

*Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 301 F. Supp.
    3d 50 (D.D.C. 2018) ..........................................................................................................49

*Stovic v. Railroad Retirement Board*, 826 F.3d 500 (D.C. Cir. 2016)..........................................26

*TOMAC v. Norton*, 193 F. Supp. 2d 182 (D.D.C. 2002), *aff'd sub nom. TOMAC,
    Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir.
    2006) ....................................................................................................................................2, 18

*TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852 (D.C.
    Cir. 2006) ..........................................................................................................................24, 44

*United Keetoowah Band of Cherokee Indians in Oklahoma v. FCC*, 933 F.3d 728
    (D.C. Cir. 2019) ..................................................................................................................40

*United Steel v. Mine Safety & Health Administration*, 925 F.3d 1279 (D.C. Cir.
    2019) ....................................................................................................................................36

**STATUTES**

5 U.S.C. § 706..............................................................................................................................1, 17

25 U.S.C. § 1911 ................................................................................................32

25 U.S.C. § 2702 ..............................................................................6, 20, 21, 33

25 U.S.C. § 2710 ....................................................................................6, 21, 33

25 U.S.C. § 2711 ...........................................................................................3, 33

25 U.S.C. § 2719 .................................................................................... *passim*

25 U.S.C. § 5108 ..................................................................................................7

42 U.S.C. § 4332 ...............................................................................13, 41, 45

54 U.S.C. § 300101 ...........................................................................................34

54 U.S.C. § 300308 ....................................................................................34, 36

54 U.S.C. § 300309 ...........................................................................................38

54 U.S.C. § 302706 ....................................................................................34, 35

54 U.S.C. § 304101 ...........................................................................................34

54 U.S.C. § 306102 ...........................................................................................35

54 U.S.C. § 306108 ...........................................................................................34

Catawba Indian Tribe Division of Assets Act, Pub. L. No. 86-322, 73 Stat. 592
   (1959) ................................................................................................................5

Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub.
   L. No. 103-116, 107 Stat 1118........................................................... *passim*

Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017,
   Pub. L. No. 115-121, 132 Stat. 40 (2018)....................................................20

Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas
   Restoration Act, Pub. L. No. 100-89, 101 Stat. 666 (1987)........................20

LEGISLATIVE MATERIALS

*Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993:
   Hearing on S. 1156 Before the Senate Committee on Indian Affairs*, 103d Cong.
   269 (1993)................................................................................................7–8

Catawba Indian Nation Lands Act, H.R. 8255, 116th Cong. (2020),
   https://bit.ly/2HTmCBQ ...............................................................................11

139 Cong. Rec. 19,919 (1993) (statement of Sen. Hollings).................................23

139 Cong. Rec. 22,596 (1993) (statement of Rep. Spratt)......................................8

H.R. Rep. No. 103-257, pt. 1 (1993)....................................................................24

S. 790, 116th Cong. (2019) ................................................................................10

Testimony of William Harris, Chief of the Catawba Indian Nation, on S. 790 Before the Senate Committee on Indian Affairs (May 1, 2019), https://bit.ly/3jzrmdS ....................10

Statement of John Tahsuda III, United States Department of the Interior, Before the Senate Committee on Indian Affairs (May 1, 2019), https://bit.ly/2F60tiT ...........................10

## OTHER AUTHORITIES

25 C.F.R. § 151.10 ...........................................................................12, 21, 44

25 C.F.R. § 151.11 ..................................................................................12, 21

25 C.F.R. § 292.11 ..................................................................................30, 31

25 C.F.R. § 292.12 ...........................................................................13, 30, 31

36 C.F.R. § 800.1 ........................................................................................34

36 C.F.R. § 800.2 ...........................................................................13, 35, 36, 38

36 C.F.R. § 800.3 ...........................................................................13, 36, 38

36 C.F.R. § 800.4 ..................................................................................36, 39

36 C.F.R. § 800.5 ........................................................................................36

36 C.F.R. § 800.8 ..................................................................................13, 39

40 C.F.R. § 1501.4 ......................................................................................41

40 C.F.R. § 1508.27 ...........................................................................43, 44, 49

43 C.F.R. § 46.155 ......................................................................................43

Advisory Council on Historic Preservation, *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook* (Dec. 2012) ....................................36, 39

Bureau of Indian Affairs, *National Environmental Policy Act Guidebook* (Aug. 2012), https://on.doi.gov/3jy2Vxs ..............................................................43

*Call with Senator Graham re: Catawba Indian Nation Land into Trust*, James Cason Calendar (Aug. 4, 2017), https://on.doi.gov/3iG0S9g..................................9

Catawba Indian Nation, *Financial Statements and Independent Auditor's Report as of and for the Year Ended December 31, 2014* (July 14, 2017), https://bit.ly/33DXHeg...........................................................................2–3

Catawba Indian Nation, *Financial Statements and Independent Auditor's Reports as of and for the Year Ended December 31, 2018* (Sept. 23, 2019), https://bit.ly/31oHFuu...........................................................................33

*Catawba Indian Nation: Trust Acquisition and Mixed-Use Entertainment Complex*,
https://bit.ly/36GJz5A (last visited Oct. 7, 2020) ..................................................13–14, 14–15

*Catawba – w/Scott Hommel*, Scott Hommel Calendar (Nov. 1, 2017),
https://on.doi.gov/3ljUfv2...................................................................................................9

*Gaming Lobbyists*, SkyBoat Gaming, https://bit.ly/2GE8jAL .............................................9

Collin Huguley, *Ownership of Land Around Kings Mountain Casino Project
Taking Shape*, Charlotte Bus. J. (Sept. 28, 2020), https://bit.ly/3nmd6Ym.......................3, 44

Index-Digest of Exhibits for the Government, Dkt. Nos. 282-A to 282-L, *Eastern
Band of Cherokee Indians v. United States*, 7 Ind. Cl. Com. 140 (1959)................................13

*Indian Entities Recognized by and Eligible to Receive Services from the United
States Bureau of Indian Affairs*, 85 Fed. Reg. 5462 (Jan. 30, 2020) .......................................38

Letter from Eric N. Shepard, Acting General Counsel, National Indian Gaming
Commission to Stephen R. Ward, Conner & Winters, LLP re Trust Land in
Cherokee County, Kansas – Last Recognized Reservation Exemption (Nov. 21,
2014), https://bit.ly/3npghyg...............................................................................................32

*Locate*, Merriam-Webster, https://bit.ly/2SyHJM4 (last visited Oct. 7, 2020) ...........................32

*Meeting with Brian Ballard & Wallace Cheves, Skyboat Management on NC and
SC Land Issues*, David Bernhardt Calendar (Oct. 12, 2017),
https://on.doi.gov/3jDJbIU ..................................................................................................9

*Meeting with Chief Harris, Catawba Indian Nation*, David Bernhardt Calendar
(Apr. 4, 2018), https://on.doi.gov/2F93dMo..........................................................................9

*Meeting with Representatives of the Catawba Tribe*, James Cason Calendar (Aug.
16, 2017), https://on.doi.gov/3iG0S9g...................................................................................9

*Meet w/ Al Simpson, Wallace Cheves, and Greg Smith*, Mick Mulvaney Calendar
(July 12, 2017), https://bit.ly/3jCg5tt....................................................................................9

Theodoric Meyer, *The Most Powerful Lobbyist in Trump's Washington*, Politico
(Apr. 2, 2018), https://politi.co/3iJqe6t..................................................................................9

Jim Morrill, *Catawbas Break Ground on Kings Mountain Casino, Despite Lawsuit
from Cherokees*, News & Observer (July 22, 2020), https://bit.ly/30CYr1i ...........................46

*Part*, Merriam-Webster, https://bit.ly/30UUJjN (last visited Oct. 7, 2020) ...............................29

Rick Rothacker & John Frank, *Catawba Casino Developer Has Long Ties to Video
Poker Industry*, Charlotte Observer (Feb. 9, 2014), https://bit.ly/3iAwMEk .........................34

Charles C. Royce, *The Cherokee Nation of Indians,* in *Fifth Annual Report of the
Bureau of Ethnology to the Secretary of the Smithsonian Institution, 1883–1884*
(1887) ..................................................................................................................5, 13

*Secretary of the Interior's Standards & Guidelines for Federal Agency
Preservation Programs Pursuant to the National Historic Preservation Act*, 63
Fed. Reg. 20,496 (Apr. 24, 1998) ............................................................................................40

*Settle*, Merriam-Webster, https://bit.ly/2HZ3IJT (last visited Oct. 7, 2020) ................................32

United South and Eastern Tribes, Inc., Resolution No. 2005:022 (Feb. 10, 2005),
    https://bit.ly/2Sy12Fk..................................................................................................................27

Plaintiffs the Eastern Band of Cherokee Indians ("EBCI"), twelve enrolled EBCI members ("Individual Plaintiffs"), and Intervenor-Plaintiff the Cherokee Nation (together, "Plaintiffs") move for summary judgment on their claims challenging the March 12, 2020 decision of Defendant Assistant Secretary of the Interior – Indian Affairs Tara Sweeney (the "March 12 Decision," AR3855–92).

## INTRODUCTION

A corrupt casino developer with a long rap sheet.  A small Indian tribe too willing to become a tool in his scheme.  Political appointees who found their way clear to endorse the result the developer—and his hundreds of thousands in campaign contributions—demanded.  These are the facts behind this case (though the government has strained to keep the full facts hidden).  But what decides this case are simple issues of statutory interpretation.  In 1993, Congress expressly prohibited the South Carolina-based Catawba Indian Nation from gaming under the Indian Gaming Regulatory Act ("IGRA") and from acquiring land in "trust" under Section 5 of the Indian Reorganization Act ("IRA") outside of South Carolina.  On March 12, 2020, however, the Department of the Interior—reversing its prior position—took land in North Carolina into trust expressly so the Catawba could build an off-reservation casino and game under IGRA.  This decision is a classic example of action that must be set aside as "arbitrary, capricious, … [or] not in accordance with law" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).

The controlling statute derives from a deal the Catawba struck in 1993, which Congress embedded in the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub. L. No. 103-116, 107 Stat 1118 ("1993 Act").  On the one hand, the 1993 Act reversed the 1959 statute that terminated the Catawba's federal recognition as a tribal government, paid the Catawba $50 million, and authorized the Catawba to acquire reservation and non-reservation lands in South Carolina via a Catawba-specific regime.

1

On the other, the Catawba agreed to significant limits.  First, the 1993 Act provided that IGRA—which authorizes tribes to engage in high-stakes casino gaming with federal regulatory oversight—"shall not apply to the Tribe," 1993 Act § 14(a), thereby "affirmatively" prohibiting the Catawba "from gaming" except as permitted under South Carolina law.  *TOMAC v. Norton*, 193 F. Supp. 2d 182, 194 n.8 (D.D.C. 2002), *aff'd sub nom. TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852 (D.C. Cir. 2006).  Second, the Act excluded the Catawba from all IRA provisions that were "inconsistent with th[e 1993] Act."  1993 Act § 9(a).  That included IRA Section 5, which authorizes Interior to acquire land in "trust" for Indian tribes and—in so doing—renders most state laws inapplicable.  Aside from the South Carolina reservation the 1993 Act created, the Act provided that "[j]urisdiction and status of all non-Reservation lands shall be governed by" state law, and that these lands could not have the special status characteristic of IRA Section 5.  1993 Act § 13(a).  These limits made the deal controversial.  But even so, the Catawba—supported by counsel from the Native American Rights Fund ("NARF")—embraced it.

The events that yielded this suit began when the Catawba started to chafe against the limits of the deal it had struck, and a non-Indian casino developer named Wallace Cheves spied an opening.  In 1993, the Catawba had little appetite to game.  ECF No. 41 ¶ 96 n.9.  But times changed, and Cheves—who is accustomed to using an open wallet to dissolve legal barriers— offered a new deal: The Catawba would provide their name, Cheves would provide funding and political clout, and they would split the proceeds of the casino Cheves planned.  Cheves's terms were exploitative, requiring the Catawba to "pay 6% of gross revenues from gaming activities … for 25 years," and 8% of net revenues thereafter—thus exposing the Catawba to losses if gaming proved unprofitable.  Catawba Indian Nation, *Financial Statements and Independent Auditor's Report as of and for the Year Ended December 31, 2014*, at 24 (July 14, 2017),

https://bit.ly/33DXHeg.  *But see* 25 U.S.C. § 2711(c)(1) (IGRA provision barring management contracts based on a percentage of gross revenues).  Even so, the Catawba went along.

Cheves and the Catawba first asserted that the 1993 Act required Interior to take a site across state lines—in Kings Mountain, North Carolina, within the historical, aboriginal, and treaty territory of the Plaintiff Cherokee Tribes—into trust as reservation land.  Interior, however, explained that the "Act cannot be reasonably interpreted to support a … trust acquisition in North Carolina without further Congressional action."  AR430.  Next, Cheves tried to deploy his influence on Capitol Hill, where both the Catawba and Interior admitted that the plan could proceed only if Congress acted.  But Congress declined to do so.  Finally, Cheves brought the full weight of his influence down on the Administration—and prevailed on Interior to reverse its long-held position and accept the site into trust, so the Catawba could game in North Carolina.

There is surely a story to tell about Interior's reversal.  Plaintiffs trust that counsel for Interior acted in good faith when they submitted the certification affirming that the Administrative Record reflects "the documents … before [Interior] when the … March 12, 2020, decision … was made."  ECF No. 49-1 ¶ 2.  But political clout is wielded through phone calls and meetings, and Interior—along with the Office of Management and Budget ("OMB")—has stonewalled Plaintiffs on requests under the Freedom of Information Act ("FOIA") that seek to obtain a fuller picture.  True, Plaintiffs could have pursued FOIA lawsuits and litigated the Administrative Record.  Time, however, is a luxury Plaintiffs do not have.  The Catawba have already broken ground at Kings Mountain and announced they will begin gaming there by "mid 2021."  Collin Huguley, *Ownership of Land Around Kings Mountain Casino Project Taking Shape*, Charlotte Bus. J. (Sept. 28, 2020), https://bit.ly/3nmd6Ym.  The farther that Cheves and the Catawba take the project, the more they will argue to Congress that the law must be changed to retroactively permit it.

Nor is exploring this story—revealing though it might be—necessary for vacatur. Whatever the reasons for Interior's decision, it is patently unlawful.  First, it entirely ignores the 1993 Act's prohibition on gaming under IGRA.  Second, the decision flouts the 1993 Act's prohibition against the Catawba invoking IRA Section 5 and acquiring trust lands outside South Carolina, lamely averring that following the 1993 Act's text would produce an "absurd result." AR3880.  Third, if IGRA did apply, 25 U.S.C. § 2719 would bar the acquisition.  With narrow exceptions, that section prohibits taking land into trust for gaming purposes after 1988 except if, after extensive consultation, "the Governor of the State in which the gaming activity is to be conducted concurs" that gaming is appropriate.  25 U.S.C. § 2719(b)(1)(A).  Here, Interior invoked the exception for lands taken into trust "as part of … the restoration of lands for an Indian tribe that is restored to Federal recognition."  *Id.* § 2719(b)(1)(B)(iii).  But the lands taken into trust "as part of" the Catawba's restoration are the South Carolina lands acquired long ago under the 1993 Act, not North Carolina lands acquired wholly outside the 1993 Act.  Indeed, the March 12 Decision is the first time, in more than 30 years since IGRA's enactment, that Interior has exercised its Section 5 power to take land into trust for a casino in a State where the tribe had no trust land. The decision is a patent evasion of Section 2719's narrow limits.

In its haste to reach the result Cheves's influence procured, Interior also violated two more statutes that require careful deliberation and consultation.  First, under the National Historic Preservation Act ("NHPA"), the Cherokee Nation and the EBCI were entitled to a "reasonable opportunity" to consult "early" in the process, so that the two Cherokee Tribes and their members could identify and protect Cherokee cultural resources at the Kings Mountain site.  But Interior never contacted the Cherokee Nation.  And Interior swindled the EBCI out of its consultation rights by sending only a single, 11th-hour letter—after Interior had already indicated it intended to take

the land into trust, AR1221, after the Draft Environmental Assessment was published, and without telling the EBCI that Interior intended to proceed a month later without the further consultation the EBCI demanded.  Second, Interior violated the National Environmental Policy Act ("NEPA"), including by arbitrarily and capriciously finding that no Environmental Impact Statement was necessary.  Interior proclaimed that "[n]o verified historic properties or property boundaries have been found," AR2530, without reviewing North Carolina records showing the opposite.

Interior made these errors for the same reason it flouted the 1993 Act:  In its rush to appease Cheves, Interior had no time for either substantive statutes or procedural duties standing as obstacles.  For just those reasons, however, the Court must set aside the March 12 Decision.

## STATEMENT OF FACTS

### A.     The 1993 Act and Its Strict Limits on Catawba Rights and Powers

The Catawba is an Indian tribe headquartered in South Carolina.  AR447.  The northwestern limit of its aboriginal, historical, and treaty territory was the Catawba River and tributaries, which lie to the east of present-day Kings Mountain, in Cleveland County, North Carolina.  Charles C. Royce, *The Cherokee Nation of Indians*, in *Fifth Annual Report of the Bureau of Ethnology to the Secretary of the Smithsonian Institution, 1883–1884*, at 317 (1887).  In 1760 and 1763, the Catawba "surrendered to Great Britain its aboriginal territory" in exchange for a 225-square-mile tract in what is now South Carolina.  *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 500 (1986).  Over time, the Catawba lost many of its lands and sought federal assistance in bringing claims for unlawful conveyances.  AR3870.  But in 1959, Congress in the Catawba Indian Tribe Division of Assets Act, Pub. L. No. 86-322, 73 Stat. 592 (1959), terminated—with the agreement of a majority of the Catawba—the federal government's relationship with the Catawba and allocated the Tribe's lands to individual members.  Even so, the Catawba pursued their land claims and pressed for restoration.  AR455.

In 1993, the Catawba struck a "comprehensive" settlement, which Congress enacted in statute.  1993 Act § 2(a)(8).  The Act incorporates expressly and by reference an Agreement in Principle (the "Settlement Agreement") entered into between the Catawba and the State of South Carolina, AR539–83, as well as South Carolina's Catawba Indian Claims Settlement Act (the "State Act"), S.C. Code Ann. §§ 27-16-10 *et seq.*, AR531–38.  *See* 1993 Act § 4(a)(2).

The Catawba reaped substantial benefits from the bargain.  The 1993 Act restored the Catawba's federal recognition as a tribal government.  *Id.* § 4(a)–(c).  It yielded $50 million in payments from the federal government and South Carolina.  *Id.* § 6(g); *see id.* § 5.  And it created a Catawba-specific framework for acquiring land.  The Act, first, transformed the Catawba's state reservation into a federal reservation and provided that the United States would take that land— plus up to 4,200 acres in two designated "expansion zones"—into trust for the Catawba.  *Id.* § 12; *see* AR564–65 § 14.2.5.  Second, the Act authorized the Catawba to acquire "Non-Reservation Properties," subject to restrictions detailed below.  1993 Act § 13.

In return, the Catawba accepted significant restrictions.  With "little sentiment" favoring gaming, ECF No. 41 ¶ 96 n.9, the Catawba agreed that the "Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.) shall not apply to the Tribe," 1993 Act § 14.  Congress had enacted IGRA in 1988 in the wake of *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which allowed Indian tribes—in most circumstances—to operate casino-style gaming on Indian lands free from state or federal regulation.  *Id.* at 206, 221–22; *see* 25 U.S.C. § 2702(2).  Under IGRA, tribes on Indian lands may conduct "Class II" gaming (*i.e.*, bingo and electronic variants) subject to regulation by the National Indian Gaming Commission ("NIGC") and "Class III" gaming (*i.e.*, casino-style gaming) only under "a Tribal-State compact."  25 U.S.C. § 2710(b)(1), (d)(1)–(2).  The Catawba, however, agreed that instead South Carolina law would "govern the regulation of

gambling devices and the conduct of gambling or wagering by the Tribe on and off the Reservation." 1993 Act § 14(b). The Agreement allowed the Catawba to obtain only two state bingo licenses, required the Catawba to pay state taxes of "ten percent of the gross proceeds," and authorized the Catawba to employ "video poker or similar electronic play devices" only "to the same extent … authorized by state law." AR572–73 §§ 16.4.3, 16.4.5, 16.8.

Meanwhile, the 1993 Act excluded the Catawba from IRA Section 5, which generally authorizes Interior to acquire trust land "for the purpose of providing land for Indians." 25 U.S.C. § 5108. Land acquired under Section 5 becomes inalienable, and the acquisition "divest[s] [the] state of important aspects of its jurisdiction," replacing that jurisdiction with "federal and tribal" jurisdiction. *Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1149 (9th Cir. 2020); *see Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008). The 1993 Act replaced Section 5's system with its Catawba-specific framework. Section 13(a) provided that "[j]urisdiction and status of all non-Reservation lands shall be governed by section 15 of the Settlement Agreement"—which specified that such lands would not be "subject to any … special attributes," would not be limited by any "federal law restrictions on alienation," and would be subject to the "laws, ordinances, taxes, and regulations of the State [of South Carolina]." AR571 § 15.1–.2. Congress did not leave its intent to guesswork, providing that the Catawba could invoke only IRA provisions not "inconsistent with this Act." 1993 Act § 9(a); *see id.* § 4(e). Congress thus barred the Catawba from invoking IRA Section 5 to gain trust land outside South Carolina.

The 1993 Act's limits did not go unnoticed. Interior officials testified that the Act "would relinquish much of the Secretary's authority to [South Carolina] with regard to trust land transactions" and "would subordinate the [T]ribe to State, County, and city authority, while limiting tribal authority and jurisdiction." *Catawba Indian Tribe of South Carolina Land Claims*

*Settlement Act of 1993: Hearing on S. 1156 Before the S. Comm. on Indian Affairs*, 103d Cong. 269 (1993) (statement of Bill Ott, Area Director, Eastern Office, Bureau of Indian Affairs).  The Catawba's lawyer, however, explained that the limits were appropriate given the Catawba's "particular circumstances," and the Catawba Chief reaffirmed that they "agree[d] to relinquish those attributes of sovereignty that are usually retained by federally recognized tribes" because there would be "less disruption … by relinquishing … these things than we would gain by having them."  *Id.* at 95, 230, 251.  The Tribe's choice was endorsed not only by Interior and OMB, but also by NARF and the National Congress of American Indians.  139 Cong. Rec. 22,596 (1993) (statement of Rep. Spratt).

    **B.**    **Cheves's Scheme to Use the Catawba to Game in North Carolina, Interior's Initial Rejection of the Scheme, and Congress's Refusal to Act**

Having obtained the 1993 Act's benefits, some Catawba members eventually began to begrudge its burdens.  Meanwhile, the risk the Catawba were warned of—that the Act left their sovereignty vulnerable to South Carolina's whims—was realized.  Even as the Catawba turned their eyes to gaming, South Carolina "made video poker illegal," AR196, and the Catawba found that bingo under the Act's conditions was uneconomical, AR456.  But rather than returning to Congress and seeking to hold South Carolina to account, the Catawba fell in with Wallace Cheves. In 2003, Cheves had been indicted in Ohio for illegal gambling, conspiracy to defraud the United States, and money laundering; and in 2013, the Alabama Attorney General successfully brought a forfeiture action against Cheves and others after authorities seized 691 illegal slot machines and $288,657 in cash as contraband.  ECF No. 41 ¶¶ 104–105 (citing news sources).

Given Cheves's political connections, he had high hopes of bulldozing his way through the legal barriers to Catawba gaming.  Cheves served on the national finance committee for Senator Lindsay Graham's 2016 presidential run, and since 2016 has donated more than $700,000 to

candidates and committees, including more than $330,000 to the Trump Victory Committee and more than $250,000 to the Republican National Committee. *Id.* ¶ 106. The high-level Administration officials that Cheves and the Catawba—a Tribe with barely 2,000 members, AR460—met with concerning the Kings Mountain project included Mick Mulvaney, the then-Director of OMB; Secretary of the Interior Bernhardt (at least twice); Secretary Bernhardt's Chief of Staff Scott Hommel; and Associate Deputy Secretary James Cason (at least twice).[1] At least once, Cheves and his lobbyists—including Brian Ballard, dubbed "the most powerful lobbyist in Trump's Washington"—met with the Secretary without Catawba representatives.[2]

In 2013, the Catawba submitted an application arguing that the 1993 Act mandated that Interior take land into trust in Kings Mountain, North Carolina, AR182–84, within Cherokee historical and aboriginal territory, and outside the Catawba's territory, AR2501. The Catawba told Interior that it would not seek to engage in "gaming … under the Indian Gaming Regulatory Act" because, under the 1993 Act, "IGRA 'shall not apply to the Tribe'"—though the Catawba said, vaguely, they might game "to the extent permissible under relevant law." AR185. Interior, however, turned aside the request, explaining that the "Act may not be reasonably read to provide authority to take lands in North Carolina into trust." AR434.

---

[1] *Meet w/ Al Simpson, Wallace Cheves, and Greg Smith*, Mick Mulvaney Calendar (July 12, 2017), https://bit.ly/3jCg5tt; *Call with Senator Graham re: Catawba Indian Nation Land into Trust*, James Cason Calendar (Aug. 4, 2017), https://on.doi.gov/3iG0S9g; *Meeting with Representatives of the Catawba Tribe*, James Cason Calendar (Aug. 16, 2017), https://on.doi.gov/3iG0S9g; *Catawba – w/Scott Hommel*, Scott Hommel Calendar (Nov. 1, 2017), https://on.doi.gov/3ljUfv2; *Meeting with Chief Harris, Catawba Indian Nation*, David Bernhardt Calendar (Apr. 4, 2018), https://on.doi.gov/2F93dMo.

[2] *Meeting with Brian Ballard & Wallace Cheves, Skyboat Management on NC and SC Land Issues*, David Bernhardt Calendar (Oct. 12, 2017), https://on.doi.gov/3jDJbIU; *see* Theodoric Meyer, *The Most Powerful Lobbyist in Trump's Washington*, Politico (Apr. 2, 2018), https://politi.co/3iJqe6t; *Gaming Lobbyists*, SkyBoat Gaming, https://bit.ly/2GE8jAL.

After striking out with Interior, Cheves and the Catawba tried Congress.  On March 13, 2019, Senator Graham introduced S. 790, a bill cosponsored by Senators Richard Burr and Thom Tillis that endeavored to eliminate the barriers created by the 1993 Act.  Section 1(a) "authorized [the Catawba] to own and operate a gaming facility … [in] North Carolina."  S. 790, 116th Cong. § 1(a) (2019).  Section 1(b) required the facility to "operate in accordance" with IGRA, but made Section 20 of IGRA, 25 U.S.C. § 2719—which generally prohibits gaming on land taken into trust after 1988—inapplicable.  S. 790 § 1(b).  And Section 1(c) authorized the Secretary of the Interior "to take the land [at the Kings Mountain site] … into trust," effectively overriding the 1993 Act's prohibition against IRA Section 5 trust acquisitions.  *Id.* § 1(c).

At the hearings, Catawba Chief William Harris acknowledged that these amendments were necessary because the 1993 Act "set forth the Tribe's gaming rights in South Carolina, but … also broadly provides that ***IGRA does not apply to the Tribe***."  *See* Testimony of William Harris, Chief of the Catawba Indian Nation, on S. 790 Before the S. Comm. on Indian Affairs 10 (May 1, 2019), https://bit.ly/3jzrmdS (emphasis added).  John Tahsuda III—then Principal Deputy Assistant Secretary – Indian Affairs—emphasized that "the exclusion provision" from IGRA in the "Settlement Act specifically applies to the Tribe."  Statement of John Tahsuda III, U.S. Dep't of the Interior, Before the S. Comm. on Indian Affairs 3 (May 1, 2019), https://bit.ly/2F60tiT.  As to trust authority, Tahsuda explained that Interior could not entertain a discretionary application from the Catawba because "the Settlement Act, at section 12(m), exempts the Tribe from the provisions of 25 C.F.R. Part 151, [Interior's IRA Section 5] Fee-to-Trust regulations, which Interior relies on for making discretionary trust acquisitions."  *Id.*  Congress, however, did not enact Cheves's bill or otherwise eliminate the 1993 Act's barriers.

Recently, Cheves made another attempt with H.R. 8255, which would purport to "clarify

the status of gaming conducted by the Catawba Indian Nation" and ratify Interior's decision.  *See* Catawba Indian Nation Lands Act, H.R. 8255, 116th Cong. (2020), https://bit.ly/2HTmCBQ.  No future committee action is scheduled on this bill.

### C.    Interior's Decision to Reverse Its Prior Positions and Accept Land in Trust

Meanwhile, Cheves judged that he could use his robustly financed Administration connections to strong-arm Interior.  He was right.  On September 17, 2018, the Catawba submitted an application seeking the discretionary acquisition of the Kings Mountain site under IRA Section 5 and Interior's regulations at 25 C.F.R. Part 151.  AR3856.  The Catawba claimed they had "enter[ed] into a bad bargain" in the 1993 Act, which they sought Interior's help in altering. AR586.  Again, the Catawba conceded that they could not game under IGRA—stressing that the 1993 "Act is quite clear" that "IGRA's inapplicability … attaches directly to the Nation"—but averred they could "conduct gaming … to the extent permissible under relevant law."  AR461.

On March 12, 2020, Assistant Secretary – Indian Affairs Tara Sweeney granted the Catawba's application and determined that Interior "will accept … the King[s] Mountain Site into trust"—and that "[o]nce acquired in trust, the Nation may conduct gaming on the site."  AR3855. First, Interior found that the 1993 Act provided statutory authority for the Catawba to invoke IRA Section 5, relying on the provision in Section 9(a) of the 1993 Act providing that the Catawba "shall be subject to" the IRA.  Interior acknowledged that Congress had restricted the IRA's application to the Catawba to the extent "inconsistent with" the 1993 Act.  It acknowledged, too, that "[o]ne could argue that" the Act's Catawba-specific land-acquisition provisions "represent[ed] a comprehensive framework for all lands the Nation seeks to convey in trust" and that, on a "literal reading," the 1993 Act was inconsistent with invoking IRA Section 5 outside South Carolina. AR3879–80.  Interior, however, deemed the Act's text "absurd" and so interpreted its restrictions to apply only to "lands outside the … Reservation but within [South Carolina]."  AR3880.

Second, Interior determined that "the Nation may conduct gaming on the Site."  AR3855.
Remarkably, the decision said ***not one word*** about the 1993 Act's express statement that IGRA
"shall not apply to the Tribe" or the Catawba's repeated concession that the Act meant what it said.
Nor did Interior accept the Catawba's vague suggestion that some other "relevant law" permitted
the type of "casino" gaming contemplated in the application—which "consist[ed] of 75,128
[square feet for gaming] with approximately 1,796 electronic gaming machines and 54 tables."
AR3856.  Instead, Interior rejected the Catawba's concession and concluded that "once transferred
into trust, the Nation may conduct gaming on the King[s] Mountain Site pursuant to … IGRA."
AR3891.  Nor was this conclusion about gaming under IGRA some passing remark.  Interior relied
on it in deciding to take land into trust.  For example, 25 C.F.R. § 151.10(c) requires the Secretary
to consider the purposes for which land will be used.[3]  The use Interior identified was that the
Catawba would game under IGRA by "construct[ing] a casino."  AR3881.  Likewise, weighing
the "anticipated economic benefits" under 25 C.F.R. § 151.11(c), Interior relied on the projected
revenues from the gaming that Interior believed the Tribe could conduct under IGRA.  AR3890.

Third, Interior considered whether 25 U.S.C. § 2719 barred the acquisition.  That IGRA
provision specifies that "gaming regulated by [IGRA] shall not be conducted on lands acquired …
after October 17, 1988," but provides an exception for lands taken into trust "as part of … the
restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(a),
(b)(1)(B)(iii).  Interior concluded that the Catawba could invoke this exception even though the
1993 Act—which restored the Catawba's federal recognition—also created a specific land-
acquisition regime that Interior had already concluded did not authorize the Kings Mountain
acquisition.  AR432–33.  Interior also concluded that the Catawba's application satisfied the

---

[3] All C.F.R. citations refer to the regulations in effect on March 12, 2020.

requirements of Interior's regulations implementing the "restored lands" exception in 25 C.F.R. § 292.12, which specify (as relevant here) that "newly acquired lands must be located within the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population."  AR3860–61; *see* 25 C.F.R. § 292.12(a)–(b).

### D. Interior's Short-Circuiting of the NHPA and NEPA

Meanwhile, Interior skipped the procedural requirements that might have prevented action on Cheves's request.  The NHPA requires that agencies "make a reasonable and good faith effort to identify Indian tribes … that shall be consulted" under NHPA Section 106, 36 C.F.R. § 800.2(c)(2)(ii)(A), and identify and consult with "any Indian tribes … that might attach religious and cultural significance" to historic properties that might exist, *id.* § 800.3(f)(2).[4]  NEPA requires an environmental impact statement for "every … major Federal action[] significantly affecting the quality of the human environment," unless an "environmental assessment" reasonably finds that there will be no significant impact.  42 U.S.C. § 4332(C)(i)–(iii).  When agency action triggers both statutes, the agency "should consider [its] section 106 responsibilities as early as possible in the NEPA process, … when the purpose of and need for the proposed action as well as the widest possible range of alternatives are under consideration."  36 C.F.R. § 800.8(a)(1)–(2).

Here, Interior published a Draft Environmental Assessment, or EA, on December 20, 2019. *Catawba Indian Nation: Trust Acquisition and Mixed-Use Entertainment Complex,*

---

[4] The Kings Mountain site, and Cleveland County more broadly, is within the historical territory of the EBCI and the Cherokee Nation.  The Cherokee ceded this land in the Cherokee Treaty of July 20, 1777, as illustrated by the Map of Cherokee Land Cessions in Charles C. Royce, *The Cherokee Nation of Indians,* in *Fifth Annual Report of the Bureau of Ethnology to the Secretary of the Smithsonian Institution, 1883–1884*, at plate VIII, plate IX (1887), map available at https://www.loc.gov/item/99446145/, which the United States Court of Claims relied on in adjudicating the EBCI's and the Cherokee Nation's claims against the United States.  *See* Index-Digest of Exhibits for the Government, Dkt. Nos. 282-A to 282-L, at 1–2, *Eastern Band of Cherokee Indians v. United States*, 7 Ind. Cl. Com. 140 (1959) (describing Royce's report on the Cherokees as the "most complete study of any of the Indian tribes").

https://bit.ly/36GJz5A (last visited Oct. 7, 2020).  Interior never contacted the Cherokee Nation to

consult, before or after the Draft EA was published—even though Interior routinely consults with

both the Cherokee Nation and the EBCI on other matters in the vicinity of Kings Mountain, and

even though prehistoric cultural artifacts likely to be Cherokee have been found at the site.

For its part, the EBCI in its January 22, 2020 comments on the Draft EA objected to

Interior's failure to consult.  AR2476.  On January 30, Interior belatedly sent the EBCI tribal

historic-preservation officer ("THPO") a letter, AR2481, but the letter neither addressed the

concerns that the EBCI raised in its comments nor led to genuine consultation.  The very next day,

the EBCI wrote to demand a meeting.  The meeting occurred on February 10, 2020, and the EBCI

underscored that "real consultation must take place to protect Cherokee cultural resources."  ECF

No. 41-1 ¶ 18; *see* AR2496–501 (EBCI counsel attaching briefing paper for meeting).  The issues

the EBCI had raised were not resolved during the February 10 meeting, and the EBCI had every

reason to believe there would be follow-up.  Instead, Interior disregarded the EBCI's requests and,

without warning, issued a decision a month later.

On March 16—before Interior published the Final EA—EBCI officials wrote to inform

Interior of a significant omission.  The Draft EA found that the project would not have a significant

impact on "cultural resources" because North Carolina records supposedly showed that no historic

resources existed around the Kings Mountain site.  AR1800.  But in fact, the EBCI explained,

"there actually is an archaeological site recorded within the project location listed in the NC State

Archaeological Site Inventory."  ECF No. 41-9, at 2.  This discovery, the EBCI urged, should

trigger a survey "to determine the nature and extent of the recorded archaeological site."  *Id.*

Undeterred, Interior plowed ahead, publishing on March 23, 2020 a Final EA and "Finding of No

Significant Impact" reiterating the same false claims.  *Catawba Indian Nation: Trust Acquisition*

*and Mixed-Use Entertainment Complex*, https://bit.ly/36GJz5A (last visited Oct. 7, 2020).

### E.      The Harm to Plaintiffs

Interior's decision will inflict great harm on the EBCI, the Cherokee Nation, and their citizens.  The EBCI—the only federally recognized Indian tribe in North Carolina—is composed of descendants of the Cherokees who found refuge in the Great Smoky Mountains and avoided forced removal in the 1830s to Indian Territory in present-day Oklahoma, and Cherokees who survived the Trail of Tears and returned to the Cherokee homeland.  ECF No. 41-1 ¶ 3.  Although its reservation, the Qualla Boundary, is located in a remote area of western North Carolina, the EBCI has successfully developed responsible and lawful gaming operations in partnership with the State pursuant to Class III gaming compacts under IGRA.  *Id.* ¶ 23.  The EBCI relies on the revenues from this gaming to provide high-quality health care, education, and law enforcement grounded in Cherokee sovereignty, culture, and values.  *Id.* ¶ 22.  Cheves's Kings Mountain project, however, is designed to siphon away revenues from the EBCI—located, as the project is, just west of Charlotte, between the EBCI's mountainous reservation and North Carolina's largest metropolitan area.  AR2547; ECF No. 41-1 ¶¶ 21–22.

The EBCI and the Cherokee Nation each stand to suffer from the destruction of their cultural patrimony at the Kings Mountain site, and the loss of their ability to protect this patrimony via the NHPA.  ECF No. 41-1 ¶ 18; ECF No. 42-1 ¶ 10.  Meanwhile, each of the Individual Plaintiffs—who own property and reside between 4 and 14 miles from the Kings Mountain site— fear a variety of imminent harms to their environment and their financial well-being.  *See, e.g.*, Beaty Decl. ¶¶ 6–10, Ex. A; Dover Decl. ¶¶ 6–17, Ex. B; Landers Decl. ¶¶ 9–17, Ex. C.

### F.      This Suit

To prevent these harms, Plaintiffs sued under the APA.  The Amended Complaints collectively assert six claims.  First, the decision is unlawful because it ignores the 1993 Act's

provision barring the Catawba from gaming under IGRA.  Second, the decision violates the 1993

Act's provision rendering IRA Section 5 inapplicable.  Third, if IGRA applied, the decision

unlawfully found that the Catawba's application satisfied the "Restored Lands" exception.  Fourth,

the decision arbitrarily and capriciously ignored Cheves's history of lawlessness.  Fifth, the

decision violated the NHPA.  Sixth, the decision violated NEPA.  The EBCI and the Individual

Plaintiffs pursue the first four claims; all Plaintiffs pursue the last two.

The APA also renders unlawful agency action tainted by undue political influence, *see*

*D.C. Fed. of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971), and the EBCI has

attempted to learn the full story behind Interior's reversal.  On April 16, 2020, the EBCI submitted

expedited FOIA requests to Interior's Office of the Secretary, the Bureau of Indian Affairs

("BIA")—via request numbers OS 2020-00465 and BIA 2020-00663—and OMB seeking

information including documents reflecting: (1) communications to or from Interior personnel

regarding the Catawba's applications; and (2) the names of all individuals with whom political

appointees and career staff met by phone or in person concerning the Catawba's applications, and

the dates of the meetings; and (3) meetings of Interior personnel with persons representing the

Catawba, Skyboat Gaming, or other Cheves-owned companies, regarding the Catawba's

applications.  The BIA has repeatedly promised that documents will be produced imminently.

OMB indicated that it is still processing the April request, and the Office of the Secretary—despite

public calendar entries showing that Secretary Bernhardt met with Cheves to discuss North

Carolina "land issues"—redirected its request to the BIA and marked it as complete.  To date,

however, no documents have been produced.[5]  Such stonewalling is not uncommon when an

---

[5] Interior has fulfilled the EBCI's FOIA request BIA 2020-143206, which sought the production
of materials that Interior produced to a newspaper in 2014.

agency has something to hide.  But rather than delay this suit for the months or years it could take

to learn the full story—even as Cheves breaks ground and commences gaming—Plaintiffs here

rely on the clear law that renders the March 12 Decision invalid, whatever the reasons behind it.

## LEGAL STANDARDS

"'[W]hen a party seeks review … under the APA, ... the district judge sits as an appellate

tribunal.'"  *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F. Supp. 3d 1, 12 (D.D.C.

2020) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)), *appeal docketed*, No.

20-5197 (D.C. Cir. July 9, 2020).  "Summary judgment thus serves as the mechanism for deciding,

as a matter of law, whether an agency action is supported by the administrative record and is

otherwise consistent with the APA."  *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254,

261 (D.D.C. 2014).  The APA requires courts to "hold unlawful and set aside agency action,

findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or

"without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C), (D).

## ARGUMENT

Plaintiffs are entitled to judgment on all six of the claims they collectively assert.

## I.   Interior Erred By Determining that the Catawba Could Game on the Kings Mountain Site Under IGRA and by Taking Land into Trust on that Basis (EBCI Count II).

Interior's March 12 Decision was unlawful and arbitrary because it concluded that the

Catawba can game at Kings Mountain under IGRA when the 1993 Act says the opposite.

### A.   Under the 1993 Act, the Catawba Cannot Game Under IGRA.

As the Catawba explained, "the plain language of the 1993 Settlement Act is quite clear."

AR461.  Section 14(a) provides: "INAPPLICABILITY OF INDIAN GAMING REGULATORY ACT.—The

Indian Gaming Regulatory Act (25 U.S.C. 2701 *et seq.*) shall not apply to the [Catawba] Tribe."

Then, Section 14(b) specifies that "[e]xcept as specifically set forth in the Settlement Agreement and the State Act, all laws, ordinances, and regulations of the State, and its political subdivisions, shall govern … the conduct of gambling or wagering by the Tribe on and off the Reservation." Simply put, the Catawba can game only in South Carolina pursuant to South Carolina law.

Indeed, both this Court and the D.C. Circuit have recognized that Section 14 of the 1993 Act means what it says.  In an opinion affirmed on appeal, this Court explained that "[w]hen Congress intends to prohibit a tribe from gaming activity, it says so affirmatively"—citing the 1993 Act.  *TOMAC v. Norton*, 193 F. Supp. 2d at 194 n.8.  Likewise, the D.C. Circuit has reiterated that the 1993 Act "specifically provide[s] for exclusive state control over gambling" and excludes the Tribe from IGRA.  *Narragansett Indian Tribe v. Nat'l Indian Gaming Comm'n*, 158 F.3d 1335, 1341 (D.C. Cir. 1998).  Given that the Catawba's own application acknowledged the plain meaning of the 1993 Act, AR461, it is especially remarkable that the March 12 Decision says nothing about Section 14.  Ignoring Congress's statutes, however, does not make them go away.

While Plaintiffs do not know what *post hoc* justifications Interior will now offer, Interior will likely embrace the reasoning floated in a footnote to its 2018 decision rejecting the Catawba's mandatory trust application.  Interior will say that, while Section 14 ***says*** that IGRA "shall not apply to the Tribe," Congress did not really ***mean*** to be so categorical; rather, Congress meant only that IGRA does not "apply to the Tribe" ***in South Carolina***.  AR434 n.18.  Just as the March 12 Decision deemed it "absurd" to apply the 1993 Act's limits on IRA Section 5 outside South Carolina, AR3880, Interior will claim that Section 14 is limited to South Carolina and that "IGRA would apply to any 'Indian lands' acquired" elsewhere.  AR434 n.18.

The answer to this argument is the answer to all such nontextual arguments.  Where, as here, "statutory language" is "plain and unambiguous," courts "must enforce" the statute

"according to its terms." *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) (quotation marks omitted). Interior has hypothesized that the "underlying settlement negotiations" yielding the 1993 Act focused on South Carolina, and thus Congress must have intended to reach South Carolina alone. AR3880; *accord* AR434 n.18. But this supposition is neither relevant nor true. It is irrelevant because courts "will not presume … that any result consistent with [a party's] account of [a] statute's overarching goal must be the law"; instead, courts "will presume more modestly instead that [the] legislature says ... what it means and means ... what it says." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017). Here, what Congress said is that IGRA "shall not apply to the Tribe," with no geographic limit. That express text governs.

Nor is it true that North Carolina lands were outside Congress's contemplation. The Act acknowledges that the Catawba "ceded vast portions of its aboriginal territory" in North Carolina through treaties in 1760 and 1763—then extinguishes all the Catawba's land claims arising out of those treaties and ratifies all past transfers of "lands located anywhere in the United States," as part of a "comprehensive" settlement. 1993 Act §§ 1(a)(4)(A), 1(a)(8), 3(2), 4(a)(4)(A), 6(d)(1). Indeed, the Catawba's first trust application conceded that the 1993 Act "settle[d] the Nation's outstanding treaty and land claims in both North and South Carolina." AR448; *accord* AR974, AR980. Hence, while the 1993 Act generally defined "the State" to mean "the State of South Carolina," it eliminated this restriction as to "section 6(a) through (f)," which resolved land issues. 1993 Act § 3(11). The 1993 Act also designates the Catawba's "service area" to include "Cabarrus, Cleveland, Gaston, Mecklenburg, Rutherford, and Union counties in the State of North Carolina." *Id.* § 3(9).[6] The suggestion that Congress's horizons stopped at the South Carolina

---

[6] This means Catawba members living in that area are deemed to reside "near" the Catawba's reservation for purposes of some federal services, like the Indian Health Service. *Id.* §§ 3(9), 4(b).

border thus crumbles when it encounters the 1993 Act's text.  Certainly, there is nothing "absurd" about enforcing Section 14's plain text, given that Congress routinely limits IGRA's applicability. *See, e.g.*, Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. L. No. 100-89, § 107(a), 101 Stat. 666 (1987); Thomasina E. Jordan Indian Tribes of Virginia Federal Recognition Act of 2017, Pub. L. No. 115-121, §§ 106(d), 206(d), 306(d), 406(d), 506(d), 606(d), 132 Stat. 40 (2018); *Narragansett*, 158 F.3d at 1341 (listing statutes).

**B.      Because the Catawba Cannot Game Under IGRA, Vacatur Is Required.**

The Catawba cannot salvage Interior's approval by rehashing their suggestion that they may game under some other "relevant law."  AR461.  While the Catawba's application did not elaborate on what "law" they meant, their motion to dismiss says they intend to "conduct gaming … under … *Cabazon*."  ECF No. 36, at 22.  In the Catawba's view, the 1993 Act gave the Catawba, alone among 500-plus tribes nationwide, the right to game free from IGRA's stringent requirements—so long as they do so outside South Carolina.

That argument fails for two reasons.  First, the Catawba have no right to game under *Cabazon*.  When Congress enacted IGRA "to provide a statutory basis for the operation of [Indian] gaming," 25 U.S.C. § 2702(1), via a statute "'intended to expressly preempt the field in the governance of gaming activities on Indian lands,'" Congress did not permit tribes—at their option—to game under the federal common-law rules that prevailed before.  *Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 544 (8th Cir. 1996) (quoting S. Rep. No. 446, 100th Cong., 2d Sess. 6 (1988)).

The second, and more important, point is the bedrock principle that an "agency's action must be upheld, if at all, on the basis articulated by the agency itself."  *Butte Cnty. v. Hogen*, 613 F.3d 190, 196 (D.C. Cir. 2010) (quotation marks omitted) (citing *SEC v. Chenery*, 332 U.S. 194, 196–97 (1947)).  Here, Interior grounded its decision on the view that IGRA applied to the

Catawba in North Carolina.  Indeed, this case richly illustrates why *Chenery*'s rule is so vital. Interior didn't **miss** the Catawba's repeated claims that they could game outside of IGRA; it heard those claims and **rejected** them.  And for good reason:  *Cabazon* is not just a different doctrine than IGRA; it is a different world.  Where IGRA subjects Class II gaming like bingo to regulation by the NIGC "to shield [tribal gaming] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly," 25 U.S.C. § 2702(2), the Catawba's gaming under *Cabazon* would be regulated by … nobody.  Where IGRA permits casino-type gaming under Class III only pursuant to a "Tribal-State compact" that gives States a say, 25 U.S.C. § 2710(d)(1)(C), *Cabazon* shuts States out.  Indeed, if (counterfactually) Interior had endorsed the Catawba's *Cabazon* theory, the result would be just the sort of "fail[ure] to consider an important aspect of the problem" that routinely yields vacatur.  *Standing Rock*, 440 F. Supp. 3d at 12.

Nor can it be said that the violation of Section 14 is a problem for another day because the March 12 Decision directs only a trust acquisition.  The decision identified "[t]he purposes for which the land will be used," 25 C.F.R. § 151.10(c), as "a casino and mixed-use entertainment complex," and found the trust acquisition warranted because the Catawba claimed that the casino's "anticipated economic benefits," 25 C.F.R. § 151.11(c), amounted to "$72 million in the first year … and $150 million in year five."  AR3881, AR3890.  Interior did not decide whether the "Non-gaming Alternative" considered in the EA—"development of … a truck stop"—would have justified a trust acquisition.  AR3894.  The March 12 Decision then purported to decide the IGRA issue as part of the trust-acquisition process, concluding that "once transferred into trust, the Nation may conduct gaming on the King[s] Mountain Site pursuant to Section 20 of IGRA."  AR3891. With Interior's black-and-white error concerning Section 14 corrected, its decision cannot stand.

II.   **Interior Erred by Allowing the Catawba to Invoke IRA Section 5 to Obtain Trust Land Outside South Carolina (EBCI Count I).**

The 1993 Act is just as fatal to Interior's conclusion that it had authority under IRA Section 5 to take land into trust in North Carolina for the benefit of the South Carolina-based Catawba. Interior's approach—reading into the Act's express restrictions on Section 5 a nontextual disclaimer ("restrictions apply to South Carolina only")—is just as unlawful here as it is above.

A.   **Trust Acquisitions Under IRA Section 5 Cannot Be Squared with the 1993 Act.**

The dispositive text is Section 9(a) of the 1993 Act.  Interior focused on the statement that the Tribe "shall be subject to" the IRA.  AR3876.  But what governs here is the restriction that the IRA shall ***not*** apply "to the extent such sections [of the IRA] are inconsistent with th[e 1993] Act." 1993 Act § 9(a).  The 1993 Act's Catawba-specific land-acquisition system is "inconsistent with" permitting the Catawba to invoke Section 5 in North Carolina—for the same reasons Interior itself invoked in its 2018 decision rejecting the Catawba's mandatory application.

The 1993 Act identifies exactly when and where the Catawba may obtain protected lands and exactly what jurisdictional features those lands will have.  First, the Act provides for a federal "Reservation," with the Catawba's South Carolina reservation now "held by the United States as trustee."  1993 Act § 12(a), (i).  Second, the Act specifies that the "[j]urisdiction and status of all non-Reservation lands shall be governed by section 15 of the Settlement Agreement."  *Id.* § 13(a); *see id.* § 12(f) ("[a]ll properties acquired by the Tribe shall be acquired subject to the terms and conditions set forth in the Settlement Agreement").  The phrase "all non-Reservation lands" means—of course—"all non-Reservation lands," wherever located.  The word "all" "conveys breadth," *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019), and is "one of the least ambiguous in the English language," *GEICO v. Fetisoff*, 958 F.2d 1137, 1142 (D.C. Cir. 1992), "indicat[ing] no limitation," *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991).

The 1993 Act's provisions for "non-Reservation lands" are, in every way, inconsistent with permitting the Catawba to invoke IRA Section 5 to obtain trust lands outside South Carolina.  First, Section 5 acquisitions "divest [the] state of … jurisdiction."  *Club One*, 959 F.3d at 1149.  The 1993 Act and the Settlement Agreement, however, specify that "[a]ll non-reservation properties, and all activities conducted on such properties, shall be subject to the laws, ordinances, taxes, and regulations of the State."  1993 Act § 13(a); AR571 § 15.1–.2.  Second, Section 5 acquisitions render land inalienable as a matter of federal law.  *Club One*, 959 F.3d at 1149.  The 1993 Act, however, provides that "the Tribe may lease, sell, mortgage, restrict, encumber, or otherwise dispose of … non-Reservation lands in the same manner as other persons and entities under State law," with the "Tribe … subject to the same obligations and responsibilities as other persons and entities under State, Federal, and local law."  1993 Act § 13(b).  Third, where Section 5 permits trust acquisitions without geographic limit, the 1993 Act and Settlement Agreement define the "State" law and jurisdiction that apply to non-Reservation lands as "the State of South Carolina."  1993 Act § 3(11); *accord* AR541 § 2.3.  Because South Carolina law and jurisdiction apply only in South Carolina, the Catawba cannot satisfy the Act's restrictions outside South Carolina.

Each of these inconsistencies between IRA Section 5 and the 1993 Act confirms that the Catawba may acquire trust lands only via the bespoke system the 1993 Act creates.  Indeed, in passing the 1993 Act, Congress well understood that the Act created a comprehensive framework for land acquisitions.  Senator Fritz Hollings of South Carolina explained that the "bill permits only two types of lands.  First, the land held in trust by the United States as the expanded reservation.  Any other land not qualifying for reservation status will be held in fee simple and have all the jurisdictional attributes of any other land."  139 Cong. Rec. 19,919 (1993) (statement of Sen. Hollings).  The House report, too, noted that the Act "incorporates by reference …

limitations on the applicability of … the [IRA] contained in the Settlement Agreement and State Act." H.R. Rep. No. 103-257, pt. 1, at 20 (1993); *see TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 864–65 (D.C. Cir. 2006).[7]

When Interior rejected the Catawba's mandatory trust acquisition in 2018, it correctly recognized that similar South Carolina-specific provisions barred the Catawba's attempt to acquire land in North Carolina. Interior observed that the 1993 Act "explicitly limit[ed] … expansion to tracts of land within South Carolina or condition[ed] expansion on" compliance with South Carolina law. AR432. Noting that these provisions could not lawfully apply to lands outside South Carolina, Interior drew the natural conclusion: that the 1993 Act "may not reasonably be read to provide authority to take lands in North Carolina into trust." AR434. Interior rejected the Catawba's argument "that the Department should ignore the [1993 Act's] plain language … by reading these conditions out of any land acquisitions in North Carolina." AR433. Instead, Interior adhered to the principle that the "words of a governing text" control, "and what they convey … is what the text means." *Id.* (quoting Antonin Scalia & Bryan Garner, *Reading the Law: The Interpretation of Legal Texts* 56 (2012)). Indeed, Interior emphasized that the Catawba's argument not only conflicted with the statutory text but would mean that "there would be *fewer* protections for state and local interests in North Carolina, a State that was not party to the Settlement Agreement …, than in South Carolina, which did sign the Settlement Agreement." *Id.*

---

[7] The Settlement Agreement's history confirms that Congress understood this limit to include Section 5. As originally drafted, the Agreement stated that the Catawba "may adopt and apply to the Tribe any of the following provisions to the extent they are consistent with this Agreement: Sections 461, 466, 469, 470, 470a, 471, 472, 472a, 473, 475a, 476, 477, 478, 478a, and 478b"— notably omitting Section 5, then codified at Section 465. Settlement Agreement § 9.1, ECF No. 41-12. The final, conforming amendments replaced this cumbersome list with the general statement that the IRA does not apply to the extent "inconsistent with the" 1993 Act, *see* AR549 § 9.1—recognizing that this streamlined approach accomplished the same result.

In the March 12 Decision, Interior confronted the same argument and reached the opposite (and wrong) result.  It again acknowledged that "a literal reading" of the 1993 Act requires that all lands the Catawba might acquire be "subject to South Carolina … jurisdiction."  AR3880.  Unlike in 2018, however, Interior declared that this "literal reading … produces an absurd result," rewrote the Act's text, and deemed the Act inapplicable to North Carolina.  *Id.*  But the answer to Interior's absurdity—that South Carolina cannot have jurisdiction over a "[s]ite in North Carolina"—is the same one Interior gave in 2018:  The 1993 Act "may not reasonably be read to provide authority to take lands in North Carolina into trust."  AR434.  Interior erred by instead jettisoning the text and sanctioning exactly the result its 2018 decision deemed untenable.  In so doing, Interior both violated the 1993 Act and contravened the bedrock rule that agencies cannot reverse themselves without explanation.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016).

## B.   Interior's Contrary Arguments Lack Merit.

None of Interior's contrary arguments can save its counter-textual reading.  First, with no small understatement, the March 12 Decision concedes that "[o]ne could argue that" the 1993 Act "represents a comprehensive framework for all lands the Nation seeks to convey into trust, including … outside South Carolina."  AR3879.  Interior, however, declined to give the 1993 Act its natural reading on the ground that doing so would be "contrary to … the broad extension of the Secretary's general authority to take lands into trust for the Nation under Section 5."  *Id.*  But the 1993 Act nowhere says one word about any "general [Section 5] authority," even as it expressly states that the 1993 Act is "comprehensive."  1993 Act § 2(a)(8).  Meanwhile, the 1993 Act's provisions concerning the IRA are "broad" only if one ignores the limits the Act creates.

Second, the March 12 Decision relies heavily on *Connecticut ex rel. Blumenthal v. United States Department of Interior*, 228 F.3d 82 (2d Cir. 2000).  This case, however, is the opposite of *Blumenthal*.  There, the Connecticut Indian Land Claims Settlement Act created a settlement fund,

allowed property acquisitions with the fund, and provided that certain lands "'acquired under this subsection'"—meaning, the subsection creating the fund and allowing property acquisitions with its proceeds—could only be acquired in fee, not trust. *Id.* at 88 (citation omitted).  Challengers nonetheless claimed that this provision prohibited any trust acquisition on behalf of the Tribe, even with funds not derived from the settlement fund. *Id.* at 87. *Blumenthal* held that, instead, the text meant what it said and that this prohibition was limited to properties acquired with settlement funds "under this subsection." *Id.* at 88 (quotation marks omitted).  The 1993 Act's limits, however, are not so narrow.  To the contrary, the Act subjects "[a]ll properties acquired by the Tribe"—however acquired—"to the terms and conditions set forth in the Settlement Agreement."  1993 Act § 12(f). Hence, in this case, it is Interior that must rewrite the 1993 Act to say something it does not.[8]

Third, Interior cannot rely on *Chevron*.  The first and dispositive point is that *Chevron* applies only when a "statute is silent or ambiguous." *Chevron, U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).  Here, the 1993 Act could not be clearer, as is evident from the fact that Interior had to fall back on the oft-argued but rarely applied "absurdity" canon. *See Stovic v. R.R. Ret. Bd.*, 826 F.3d 500, 505 (D.C. Cir. 2016) (noting "high bar" to canon's application).  Moreover, Interior in any event is not entitled to deference because it never acknowledged or explained its abrupt departure from its prior, correct reading of the Act.  "An arbitrary and capricious [action] of this sort is itself unlawful and receives no ... deference." *Encino Motorcars*, 136 S. Ct. at 2126.

Fourth, the March 12 Decision gestures at the Indian canon—averring that Interior reached

---

[8] The decision also relies on the Maine Indian Claims Settlement Act, which states that "[e]xcept for the provisions of this Act, the United States shall have no other authority to acquire lands or natural resources in trust."  AR3879.  The decision deems it significant that the 1993 Act "omit[s] similar language." *Id*.  The Maine statute, however, shows only that Congress has multiple ways to accomplish the same result.

its result "without application of the Indian canon," and suggesting that "[s]hould a federal court decide that application of the Indian canon is appropriate," Interior's conclusions "will … [be] strengthened."  AR3878 n.161.  But again, the canon applies only to "ambiguous provisions," which the 1993 Act is not.  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985); *see Ho-Chunk, Inc. v. Sessions*, 894 F.3d 365, 369 n.4 (D.C. Cir. 2018).  And again, this case in any event is not one where the canon can apply.  The canon falls away when "all tribal interests are not aligned"; instead, it "applie[s] only when there is a choice between interpretations that would favor Indians on the one hand and state or private actors on the other."  *Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015); *accord Connecticut v. U.S. Dep't of Interior*, 344 F. Supp. 3d 279, 314 (D.D.C. 2018); *Forest Cnty. Potawatomi Cmty. v. United States*, 330 F. Supp. 3d 269, 280 (D.D.C. 2018); *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 75 F. Supp. 3d 387, 396 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016).  That is because the canon flows from "the unique trust relationship between the United States and the Indians," *Blackfeet Tribe*, 471 U.S. at 766, and "[t]he government owes the same trust duty to all tribes," *Confederated Tribes of Chehalis Indian Reservation v. Washington*, 96 F.3d 334, 340 (9th Cir. 1996).

Here, the Indian canon cannot be applied to permit the Catawba to acquire trust land and game in historical Cherokee territory, destroying Cherokee cultural patrimony in the process.  Indeed, the United South and Eastern Tribes, Inc. ("USET")—an intertribal organization to which the Catawba belongs—has condemned "'reservation shopping' [that] is often promoted and financed by wealthy developers" seeking to build casinos in "states where [tribes] have no reservation or trust land."  USET, Resolution No. 2005:022 (Feb. 10, 2005), https://bit.ly/2Sy12Fk.  The Catawba's position here—which seeks, for the first time, to obtain trust land via Section 5 for a casino in a State where the Tribe has no reservation or trust land—is not the pro-tribal position.

### C.     Interior's Decision Is Especially Unlawful Because the Catawba Used the Catawba Land Acquisition Trust Fund.

Interior's decision is also unlawful because the Catawba used funds from the Catawba Land Acquisition Trust Fund to acquire the Kings Mountain site.  The Catawba's 2013 application represented that the site was "acquired with funds from the Land Acquisition Trust Fund."  AR184; *accord* AR198.  Nothing suggests the source changed.  The 1993 Act specifies that the Catawba may use such funds only in ways that are ***affirmatively authorized*** by the Settlement Agreement, providing that "[t]he Tribe may draw upon the corpus or accumulated income of the Catawba Land Acquisition Trust Fund … to acquire and hold parcels of real estate outside the Reservation for the purposes and in the manner delineated in the Settlement Agreement."  1993 Act § 13(a).  Interior does not and cannot claim that acquiring land for gaming in North Carolina is one of the "purposes" delineated in the Agreement, or that the Catawba have proceeded in the "manner" set forth in that agreement.  Hence, even if the 1993 Act and Agreement did not affirmatively preclude the Catawba from invoking IRA Section 5, Interior's decision independently violated this provision.  At minimum, Interior acted arbitrarily by failing even to consider Section 13.

### III.    Interior Erred by Relying on IGRA's "Restored Lands" Exception to Take the Land into Trust (EBCI Count III).

Even if Interior were right that the Catawba may game under IGRA in North Carolina, its decision violates 25 U.S.C. § 2719.  That section provides that "gaming regulated by [IGRA] shall not be conducted on lands acquired … after October 17, 1988," unless the lands are "within or continuous to the boundaries of the [tribe's] reservation" or unless—after consultation—the Secretary determines that gaming "would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community" and "the Governor of the State … concurs."  25 U.S.C. § 2719(a)(1), (b)(1)(A).  Section 2719 thus restricts tribes to gaming where they are presently located, unless the State agrees or an exception applies.

Here, Interior relied on the "Restored Lands" exception, which—to put "restored" tribes on an equal footing—allows gaming on "lands … taken into trust as part of … the restoration of lands for an Indian tribe … restored to Federal recognition." *Id.* § 2719(b)(1)(B)(iii). The acquisition of North Carolina lands, however, is not "part of" the Catawba's restoration. We ***know*** the acquisitions Congress deemed "part of" that restoration. They are the acquisitions the 1993 Act provides for in South Carolina. By eviscerating Section 2719's careful limits, Interior's decision is contrary to law and arbitrary and capricious.

### A.    Interior Cannot Rely on the "Restored Lands" Exception as to Lands Outside the 1993 Act's Land-Acquisition Framework.

The 1993 Act both restored the Catawba to federal recognition and created a tailored framework for restoring lands to the Catawba. The Act mandated that the United States hold "as trustee" the Catawba's existing state reservation, provided for two specific "expansion zones," and allowed the Catawba to obtain certain "non-contiguous tracts" in reservation status (if the Tribe complied with "section 14 of the Settlement Agreement"). 1993 Act § 12(a), (c), (d). It is this system that, when the Catawba was "restored to Federal recognition," provided for "the restoration of lands for" the Catawba. 25 U.S.C. § 2719(b)(1)(B)(iii). The Kings Mountain property, however, was taken into trust not "as part of" that restoration, but separate from it. *Id.* Indeed, the March 12 Decision's whole premise was that the Kings Mountain acquisition was outside the Act's "framework" for acquiring "additional land in trust." AR3878.

The statutory text again could not be clearer. First, the word "part" means "an essential portion or integral element." *Part*, Merriam-Webster, https://bit.ly/30UUJjN (last visited Oct. 7, 2020). The Kings Mountain acquisition is not an "essential portion" of the 1993 Act's restoration of lands to the Catawba. The Act's Catawba-specific land-acquisition framework is.

Second, Congress deliberately limited the term "restoration of lands" with the definite

article "the," as opposed to the more general "a."  This choice makes clear that the exception does not apply anytime that any lands are provided to a restored tribe, but only to "the restoration" associated with that tribe.  *See Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 4–5 (D.C. Cir. 2000).  Indeed, "[i]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes."  *Id.* (quotation marks omitted).  Here, "the" restoration of lands to the Catawba is what the 1993 Act provides.

Third, the D.C. Circuit has emphasized that the phrase "restoration of lands" fits "comfortably with the concept of restitution."  *City of Roseville v. Norton*, 348 F.3d 1020, 1027 (D.C. Cir. 2003).  And again, the "restitution" Congress decided to provide was the 1993 Act's provisions that restore lands to the Catawba—which went hand in hand with narrow limits on gaming.  *See City of Roseville v. Norton*, 219 F. Supp. 2d 130, 162 (D.D.C. 2002) (looking to restoration act "as a guide in determining what lands Congress intended should be considered as lands sufficient to restore the [tribe] to its previous position"), *aff'd*, 348 F.3d 1020 (D.C. Cir. 2003).  Neither the 1993 Act nor IGRA can be squared with Interior's view that a Section 5 acquisition in North Carolina is "part of" the "restoration of lands" to the Catawba.

## B.    Section 292.12 Does Not Apply.

The regulations yield the same conclusion.  They provide that, if a "tribe was restored by a Congressional enactment …, the tribe must" make one of two mutually exclusive showings.  25 C.F.R. § 292.11(a).  First, if the "legislation requires or authorizes the Secretary to take land into trust for the benefit of the tribe within a specific geographic area," the lands must be "within [that] area."  *Id.* § 292.11(a)(1).  Second, if "the legislation does not provide a specific geographic area …, the tribe must meet the requirements of § 292.12."  *Id.* § 292.11(a)(2).  Interior believed that the second provision, and thus the criteria in § 292.12, applied because the 1993 Act "does not include language that either requires or authorizes the Secretary to take land into trust … within a

specific geographic boundary." AR3860.

This is plainly wrong. The 1993 Act requires the Secretary to take into trust the lands in the Catawba's existing state reservation and authorizes the Secretary to take into trust lands the Catawba might acquire in defined "expansion zones." 1993 Act § 12(a), (c). The Act also authorizes such acquisitions as to qualifying "non-contiguous tracts." *Id.* § 12(d). The first two categories are clearly "specific geographic areas"—and by Interior's lights, the third is too (because Interior's position is that the entire 1993 Act, including the provisions concerning "non-contiguous tracts," concerns only lands in South Carolina). This means that lands must be within these "specific … area[s]" to qualify as "restored lands." 25 C.F.R. § 292.11(a)(1).[9]

### C.    The Catawba's Application Did Not Satisfy Section 292.12.

Even if § 292.12 applied, Interior also erred in concluding that the Catawba satisfied § 292.12. Section 292.12(a) mandates that "newly acquired lands must be located within the State and States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population." 25 C.F.R. § 292.12(a). The Catawba is not located in North Carolina. It is located in South Carolina. In concluding the opposite, Interior averred that the Catawba "provides various services in North Carolina, such as "first time home buyer's assistance," "college scholarship programs," and "Indian Child Welfare Act (ICWA) notifications" and "case assistance." AR3861–62. But providing these sorts of services has nothing to do with whether the Catawba is "located in" North Carolina. The word "located" means "settle[d]," or having

---

[9] It is irrelevant that the 1993 Act identifies Cleveland County as within the Catawba's "service area." The Act specifies that, for "the purpose of eligibility for Federal services made available to members of federally recognized Indian tribes because of their status as Indian tribal members," the "***Members of the Tribe*** in the Tribe's service area shall be deemed to be residing on or near a reservation." 1993 Act § 4(b) (emphasis added). The Act does not say that the ***Tribe itself*** may acquire lands within Cleveland County.

"established [a] residence."  *Locate*, Merriam-Webster, https://bit.ly/2SyHJM4 (last visited Oct. 7, 2020); *Settle*, Merriam-Webster, https://bit.ly/2HZ3IJT (last visited Oct. 7, 2020).  The Catawba cannot be said to be **resident** in North Carolina.  The Catawba perform all governmental functions—Tribal Council meetings, administrative decisions, and other day-to-day operations of government—in South Carolina.  And the Catawba's governmental buildings and tribal businesses are all located in South Carolina, where the Catawba Tribe is "settled."

A recent decision by Interior's NIGC shows what it really means for a tribe to be "located" somewhere.  NIGC considered whether the Quapaw Tribe of Indians of Oklahoma satisfied an analogous requirement in Section 292.4(b)(2)(E), which required the Quapaw to show that it was "presently located" in Kansas, "as evidenced by the tribe's governmental presence and tribal population."  Letter from Eric N. Shepard, Acting General Counsel, NIGC to Stephen R. Ward, Conner & Winters, LLP re Trust Land in Cherokee County, Kansas – Last Recognized Reservation Exemption, at 4 (Nov. 21, 2014), https://bit.ly/3npghyg.  NIGC found this requirement met because the Quapaw had all the things the Catawba in North Carolina lack:  The Quapaw had a government service center in Kansas where "crucial aspects of the [Quapaw] government … [are] overseen, directed, and executed"; Quapaw marshals patrolled Quapaw trust land in Kansas; Quapaw provided emergency services in Kansas; the Quapaw's environmental-services program oversaw environmental permits in Kansas; and a tribal enterprise operated and had offices in Kansas—among many other brick-and-mortar connections with Kansas. *Id.* at 11–14.  By contrast, if the Catawba are "located" in North Carolina, then any tribe is "located" in any state where it provides any service to any of its members.  For example, the March 12 Decision asserts that the Catawba appear in North Carolina state courts under ICWA—which can occur anywhere that an "Indian child" is located.  *See* 25 U.S.C. § 1911(c).  Interior's reading cannot be correct.

**IV.    Interior Violated the APA by Authorizing a Known Bad Actor to Develop a Casino in Violation of IGRA (EBCI Count IV).**

While there is every reason to believe Cheves exerted undue political influence on the March 12 Decision, what is indisputable is that Interior improperly applied IGRA to the Catawba's application without considering the criminal history of the man who would develop and manage the resulting casino.  Through IGRA, Congress created "a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(2).  In doing so, Congress sought to establish "Federal standards for gaming on Indian lands … necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue."  *Id.* § 2702(3).  One of the checks Congress created— and a critical one, given Congress's concern about "corrupting influences"—was to prohibit gaming if a casino developer's "prior activities, criminal record[,] if any, or reputation, habits, and associations" pose "a threat to the public interest or to the effective regulation and control of gaming," or "create or enhance the dangers of unsuitable, unfair, or illegal practices and methods and activities in the conduct of gaming."  *Id.* §§ 2702(2), 2711(e); *see id.* § 2710(d)(2)(B)(ii).

Congress chose to regulate Indian gaming through IGRA precisely to prevent projects like this one.  Cheves, through Sky Boat, LLC, serves as developer and operator for Catawba's proposed gaming operations and has been the prime mover behind the effort to build a Kings Mountain casino.  AR3851; *see* Catawba Indian Nation, *Financial Statements and Independent Auditor's Reports as of and for the Year Ended December 31, 2018*, at 30 (Sept. 23, 2019), https://bit.ly/3loHFuu.  Cheves has an extensive history of illegal and corrupt activity.  In 2003, Cheves was indicted in the U.S. District Court for the Northern District of Ohio for illegal

gambling, conspiracy, and money laundering.  ECF No. 41 ¶ 104 n.12.  In 2001, the South Carolina

Attorney General concluded that Cheves operated illegal sweepstakes.  *Id.* ¶ 103 n.11; *see* Rick

Rothacker & John Frank, *Catawba Casino Developer Has Long Ties to Video Poker Industry*,

Charlotte Observer (Feb. 9, 2014), https://bit.ly/3iAwMEk.  And in 2013, the Alabama Attorney

General successfully brought a forfeiture action against Cheves and others after authorities seized

691 illegal slot machines and $288,657 in cash as contraband.  ECF No. 41 ¶ 105 n.13.  Meanwhile,

the contract Cheves inflicted on the Catawba is downright exploitative: It requires them to pay 6%

of ***gross*** revenues for 25 years and is nearly as bad as the South Carolina gross-receipts tax that

the Catawba found rendered their South Carolina gaming uneconomic.  *Supra* at 2, 7.

Yet even though the EBCI alerted Interior to these concerns, *see* AR950, AR2498–501,

Interior ignored them.  Agencies violate the APA when they "'fail[] to consider ... important

aspect[s] of the problem.'"  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct.

1891, 1910 (2020) (first bracket added) (citation omitted).

## V.     Interior Violated the NHPA (EBCI Count V, Cherokee Count I).

Plaintiffs are also entitled to judgment on their NHPA claim.  NHPA Section 106 "foster[s]

conditions under which our modern society and our historic property can exist in productive

harmony."  54 U.S.C. § 300101(1).  It does so by requiring agencies to "take into account the effect

of" their "undertaking[s] on any historic property," *id.* § 306108, and by establishing an

independent agency—the Advisory Council on Historic Preservation ("ACHP"), *id.* § 304101—

empowered to issue regulations.  The NHPA defines "historic property" to include "[p]roperty of

traditional religious and cultural importance to an Indian tribe."  *Id.* §§ 300308, 302706(a).  Section

106 is a "stop, look, and listen" provision that requires federal agencies to consult with Indian

tribes that might attach religious or cultural significance to properties affected by agency action,

with the goal of "identify[ing any] historic properties potentially affected."  36 C.F.R. § 800.1; *see*

54 U.S.C. §§ 302706(b), 306102; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 8 (D.D.C. 2016).

Here, with pressure mounting for a swift decision, Interior did not endeavor to "look" or "listen"—and certainly, Interior did not feel it could stop.  Interior did not contact the Cherokee Nation at all, even though the Kings Mountain site is within Cherokee historical territory and Interior routinely consults with the Nation on projects in the area.  And after sending a single, 11th-hour letter to the EBCI, Interior refused to engage in the consultation the EBCI demanded.  As a result, Interior made a black-and-white error that threatens significant damage to Cherokee cultural resources.  It asserted that "[n]o verified historic properties or property boundaries have been found to be located on or adjacent to the project site," AR2530, when in fact—as the EBCI explained in a March 15 letter—there "is an archaeological site recorded within the project location listed in the NC State Archaeological Site Inventory," which included a "historical pottery kiln and prehistoric lythic scatter—human made stone tools."  ECF No. 41-2 ¶ 21.[10]

## A.    Interior Violated the NHPA by Not Consulting with the Cherokee Nation.

At the Kings Mountain site, Interior was in such a hurry to finalize the March 12 Decision that it skipped the consultation process entirely.  Interior never—not once—so much as contacted the Cherokee Nation to consult about potential Cherokee cultural resources at the site.  Interior thereby violated the NHPA's core mandates to "make a reasonable and good faith effort to identify Indian tribes … that shall be consulted," 36 C.F.R. § 800.2(c)(2)(ii)(A), and to identify "any Indian

---

[10] While Interior omitted the March 15 letter from the Administrative Record, Plaintiffs here rely on the letter—and the Declarations from Toombs, Townsend, and Chief Sneed—merely to show that Interior's clear failure of consultation has resulted in harm.  Indeed, if Interior had properly consulted with the Cherokee and the EBCI, this information would be in the record.  In any event, extra-record evidence may always be considered when the record otherwise would "preclude effective review."  *Hill Dermaceuticals, Inc. v. FDA*, 709 F.3d 44, 47 (D.C. Cir. 2013).  To the extent a motion is required to consider these materials as extra-record evidence, Plaintiffs so move.

tribes … that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties," *id.* § 800.3(f)(2).  Having failed to consult at all, Interior also breached the duties that follow consultation, including to adequately (1) identify any historical properties within the area, *id.* § 800.4; (2) assess the adverse effects of taking the Kings Mountain site into trust, *id.* § 800.5(a); and (3) resolve any adverse effects, *id.* § 800.5.

It is no answer to say that the Kings Mountain site sits outside what today are Indian lands, or that it is presently unknown whether any part of the site qualifies as "historic property" under the NHPA.  *See* 54 U.S.C. § 300308.  The requirement to consult with Indian tribes applies with full force outside "tribal lands."  36 C.F.R. § 800.2(c)(2)(ii)(A).  And the consultation requirement extends to any "historic properties that ***may exist***."  ACHP, *Consultation with Indian Tribes in the Section 106 Review Process: A Handbook* 17 (Dec. 2012) ["*Handbook*"] (emphasis added).

It is also no answer to say that Interior reasonably believed that no Cherokee cultural patrimony existed in the area.  Between October 1, 2017, and July 6, 2020, the Cherokee Nation's THPO—the official who coordinates NHPA consultations—responded to 525 requests concerning cultural resources in North Carolina, including eight in Cleveland County.  ECF No. 42-1 ¶ 7. Since 2013, federal agencies have also contacted the EBCI's THPO at least seven times to consult on Cherokee cultural and historical resources in Cleveland County.  ECF No. 41-2 ¶ 11.  This settled practice is not surprising given that the Cherokee ceded the land that today is the Kings Mountain site to North Carolina via treaty in 1777.  ECF No. 41-2 ¶ 8; ECF No. 42-1 ¶ 8.  Interior simply decided that, in this instance, it could not be delayed by adhering to this practice.  When agencies so flagrantly shirk their NHPA duties, the "practice is to vacate [the resulting] unlawful agency action."  *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019).  In *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (9th Cir. 2006), the court explained

that, because it was "undisputed that no consultation or consideration of historical sites occurred," the agency action "must be undone." *Id.* at 787–88. Similar cases abound. *E.g.*, *Sisseton-Wahpeton Oyate of the Lake Traverse Reservation v. U.S. Corps of Eng'rs*, No. 3:11-cv-03026, 2016 WL 5478428, at *14 (D.S.D. Sept. 29, 2016), *aff'd*, 888 F.3d 906 (8th Cir. 2018); *Confederated Tribes & Bands of the Yakama Nation v. U.S. Fish & Wildlife Serv.*, No. 1:14-CV-3052, 2015 WL 1276811, at *9 (E.D. Wash. Mar. 20, 2015); *Quechan Tribe of Fort Yuma Reservation v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1119–20 (S.D. Cal. 2010). The same result should follow here.

Vacatur is especially warranted because Interior's violations have yielded exactly the harm the NHPA is designed to avert. Interior proceeded on the assumption that no historic resources existed at the site even though—as explained above—records showed "an archaeological site recorded within the project location." ECF No. 41-2 ¶ 21. The THPOs for the Cherokee Nation and the EBCI "agree that it is likely that the Kings Mountain site contains Cherokee cultural resources." ECF No. 42-1 ¶ 12; *see* ECF No. 41-2 ¶ 24. That is because the Kings Mountain site is within historic Cherokee territory; the archaeological records described above show that artifacts existed at the Kings Mountain site; and other records identify prehistoric Cherokee artifacts as having been found within ten miles of Kings Mountain. ECF No. 41-2 ¶ 26.[11] Had Interior consulted with the Cherokee Nation as required by the NHPA, the Cherokee Nation THPO could have told Interior all of this, and Interior could have identified with greater precision the cultural resources at the Kings Mountain site and the risks to them that developing the site could entail.

---

[11] That remains true even though the North Carolina Department of Transportation conducted ground-clearing activities at the site in 2005—because those activities did not reach "soils … with deep residuum" and would not have disturbed "Cherokee artifacts … [that] are likely to be deeper." *Id.* ¶ 24. There is "a significant chance" that any "human remains at the site … are intact." *Id.*

There is nothing to the argument (which Interior and the Catawba will likely make) that Interior's contacts with the EBCI satisfied its obligations to the Cherokee Nation.  Even if Interior had actually consulted with the EBCI (which it did not), "consultation with one tribe doesn't relieve the [agency] of its obligation to consult with any other tribe."  *Standing Rock*, 205 F. Supp. 3d at 32 (quoting *Quechan Tribe*, 755 F. Supp. 2d at 1112)*.*  Instead, Interior must "identify ***any*** Indian tribes … that might attach religious and cultural significance" to properties.  36 C.F.R. § 800.3(f)(2) (emphasis added).  And "Indian tribe" means "an[y] Indian tribe … that is [federally] recognized."  54 U.S.C. § 300309.  Today, 574 tribes are federally recognized, and no two are fungible.  *See Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs,* 85 Fed. Reg. 5462 (Jan. 30, 2020).  That includes the Cherokee Nation and the EBCI, which—though they share overlapping histories—are separate sovereigns with distinct governments, perspectives, and interests.  Indeed, the regulations underscore that agencies must recognize the "government-to-government relationship" with each tribe and consult "in a sensitive manner respectful of tribal sovereignty."  36 C.F.R. § 800.2(c)(2)(ii)(B)–(C).  That is why the BIA typically consults with both the Cherokee Nation and the EBCI prior to releasing a draft EA for land within Cherokee treaty and historical territory.  ECF No. 42-1 ¶ 9; ECF No. 41-2 ¶ 10.  Interior cannot chart a different course here simply because it was in a hurry.

Just as meritless is the argument that Interior acted reasonably because it contacted North Carolina's State Historic Preservation Officer ("SHPO"), who responded that he was "aware of no historic resources which would be affected by the project."  AR3887.  State officials have not—to say the least—been reliable protectors of Indian interests and rights.  That is exactly why agencies must consult with Indian tribes even outside tribal lands.  36 C.F.R. § 800.2(c)(2)(ii)(A).  Indeed, the ACHP's regulations specify that agencies "shall acknowledge that Indian tribes … possess

special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." 36 C.F.R. § 800.4(c)(1). The ACHP's Handbook underscores that "agency or contract archaeologists" cannot identify what properties may be significant to an Indian tribe. *Handbook* 20. "[U]nless an archeologist has been specifically authorized by a tribe to speak on its behalf …, it should not be assumed that the archaeologist possess[es] the appropriate expertise to determine what properties are or are not of significance to an Indian tribe." *Id.* Instead, the "appropriate individual to carry out such a determination is the representative designated by the tribe." *Id.* The Tenth Circuit has held that an agency failed to fulfill its Section 106 duty because it relied on "the SHPO['s] concurre[nce] in the [agency's] conclusion that there is no evidence [of] Indian traditional cultural properties." *Pueblo of Sandia v. United States*, 50 F.3d 856, 858 (10th Cir. 1995) (internal quotation marks omitted). This case calls for the same result.

### B.   Interior Violated the NHPA by Not Consulting with the EBCI.

The EBCI's experience differs only in that Interior tried to cover itself with a fig leaf. Interior never contacted the EBCI before issuing its Draft EA in December 2019—flouting the regulations providing that, when an agency's undertaking also triggers NEPA, the agency "should consider [its] section 106 responsibilities as early as possible in the NEPA process." 36 C.F.R. § 800.8(a)(1)–(2); ECF No. 41-2 ¶ 7. Only after the EBCI complained on January 22, 2020, and a full year after Interior had contacted North Carolina's SHPO, did Interior send a letter stating that it "[was] very interested in hearing from [the EBCI's THPO]." AR2481. For two related reasons, this belated letter did not satisfy Interior's NHPA obligations to the EBCI.

First, sending a form letter that invites a tribe to produce information is not the "consultation" the NHPA demands. As the D.C. Circuit explained, under "Advisory Council regulations '[c]onsultation means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in

the section 106 process.'" *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 750 (D.C. Cir. 2019) (quoting 36 C.F.R. § 800.16(f)).  That is, consultation "is built upon the exchange of ideas, not simply providing information." *Secretary of the Interior's Standards & Guidelines for Federal Agency Preservation Programs Pursuant to the National Historic Preservation Act*, 63 Fed. Reg. 20,496, 20,504 (Apr. 24, 1998).  Hence, genuine consultation allows the tribe to participate in research design, to address concerns about confidentiality, and to raise its concerns as a partner, not just a member of the public directed to submit information it possesses.[12]  In *Pueblo of Sandia*, the Tenth Circuit found an NHPA violation where the agency simply "mail[ed] form letters" to tribes and "requested … information."  50 F.3d at 860.  And in *Quechan Tribe*, the court found an NHPA violation where the agency's invitation to "consult … amounted to little more than a general request for the Tribe to gather its own information … and disclose it."  755 F. Supp. 2d at 1118–19.  The same is true here.

Second, Interior's form letter was especially inadequate because, thereafter, Interior frustrated the EBCI's attempt to exercise its consultation rights.  On January 31, 2020, the day after receiving the letter, EBCI Principal Chief Richard Sneed requested a meeting with Assistant Secretary Sweeney.  AR2497; *see* ECF No. 41-1 ¶ 11.  In advance, the EBCI provided a briefing paper objecting to Interior's failure to conduct "any reasonable or good-faith effort to comply with the [NHPA's] implementing regulations."  AR2500.  And at the February 10 meeting, Chief Sneed reiterated that "real consultation must take place to protect Cherokee cultural resources in the

---

[12] For example, sensitive information about issues like "bur[ials] … might not appear in public facing reports," and statutes and agreements might bar the disclosure of sensitive and confidential information in public processes—such as the "agreement with the North Carolina Division of Archaeology" that prohibited the EBCI from making further disclosures about the contents of the State's archaeological files, which aimed to avoid "'treasure mapping' and leading looters to the site."  ECF No. 41-9, at 2–3; ECF No. 41-2 ¶ 23; *see* ECF No. 41-2 ¶ 21.

project area." ECF No. 41-1 ¶ 18.  Interior never responded.  Nor did it disclose that it intended to act—much less in just a month—before providing the consultation the EBCI had requested. Indeed, if Interior had just refrained from ***concealing*** its intended timeline, the EBCI could have drawn Interior's attention to the archaeological sites that it had ignored.  Interior did not fulfill its duties to "consult" by hosting a meeting at which it disregarded the EBCI's requests for consultation and failed to provide the information that was essential for the EBCI to protect its rights.  *See supra* at 14; *Pueblo of Sandia*, 50 F.3d at 860; *Quechan*, 755 F. Supp. 2d at 1118–19.

## VI.  Interior Violated NEPA (EBCI Count VI, Cherokee Count II).

In its rush to judgment, Interior also violated NEPA, for many of the same reasons already explained.  For "every … major Federal action[] significantly affecting the quality of the human environment," NEPA requires a detailed statement—known as an environmental impact statement, or EIS—addressing "the environmental impact of the proposed action," any "adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action."  42 U.S.C. § 4332(C)(i)–(iii).  An EIS must be prepared for any major federal action, unless the agency issues an environmental assessment, or EA, that reasonably makes a "finding of no significant impact," or FONSI.  40 C.F.R. § 1501.4(a), (e).  "If ***any*** significant environmental impacts might result from the proposed agency action[,] then an EIS must be prepared ***before*** agency action is taken."  *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 340 (D.C. Cir. 2002); *see* 42 U.S.C. § 4332(C).  Here, for two reasons, Interior violated NEPA.

### A.  Interior Violated NEPA by Failing to Prepare an Environmental Impact Statement.

First, Interior acted arbitrarily and capriciously in declining to prepare an EIS.  A court reviewing an agency's decision not to prepare an EIS must "ensure that no arguably significant consequences have been ignored."  *Standing Rock*, 440 F. Supp. 3d at 13 (quoting *Myersville*

*Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1322 (D.C. Cir. 2015)).  When examining

the adequacy of the FONSI and the EA upon which it was based, courts must determine "whether

the agency: '(1) has accurately identified the relevant environmental concern, (2) has taken a hard

look at the problem in preparing its [FONSI or EA], (3) is able to make a convincing case for its

finding of no significant impact, and (4) has shown that even if there is an impact of true

significance, an EIS is unnecessary because changes or safeguards in the project sufficiently

reduce the impact to a minimum.'"  *Id.* (quoting *Mich. Gambling Opposition v. Kempthorne*, 525

F.3d 23, 29 (D.C. Cir. 2008)).

Measured against these standards, Interior's decision here falls far short, especially in the

EA's assessment of the project's impact on "cultural resources."  The NEPA regulations require

federal agencies to consider such impacts as one of ten factors bearing on a project's "intensity"—

and as this Court has explained, "any one of the[se] factors may be sufficient to require

development of an EIS."  *Id.* at 9 (quoting *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d

1075, 1082 (D.C. Cir.), *amended on reh'g*, 925 F.3d 500 (D.C. Cir. 2019))*.*  The Final EA, again,

asserts that no "known archaeological sites or cultural materials are currently located within" the

Kings Mountain site, based on information provided by the North Carolina SHPO.  AR2543.  That

information is the Final EA's only basis for concluding that the project's effect "on cultural

resources would not be significant."  *Id.*  But that premise is false.  The EBCI's THPO had—before

Interior published the Final EA—provided evidence that the information received from the North

Carolina SHPO was *incorrect*.  ECF No. 41-9, at 2 (noting that "there actually is an archaeological

site recorded within the project location listed in the NC State Archaeological Site Inventory");

*see* ECF No. 41-2 ¶ 21.  Underscoring the significance of that error, Interior's six-page FONSI

devoted a full paragraph, and the entirety of its discussion of "cultural resources," to recounting

the incorrect information from the State.  AR3895.  When an agency bases its decision on a premise that is demonstrably false, it breaches a core requirement of reasoned decision-making.  *See Indigenous Env't Network v. U.S. Dep't of State*, 347 F. Supp. 3d 561, 580–81 (D. Mont.) (failure to survey the affected land for cultural resources violated NEPA), *amended and supplemented*, 369 F. Supp. 3d 1045 (D. Mont. 2018); *Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1433, 1441 (C.D. Cal. 1985) (agency improperly limited inquiry into impact on cultural resources).

Interior's violation of NEPA both reinforces its violation of the NHPA and independently renders its decision unlawful.  On the one side, the BIA's *NEPA Guidebook* underscores that "[a]nalyses of the impacts to … historic properties are critical components of the EAs," and a "FONSI must not be issued before consultation under Section 106 of the National Historic Preservation Act … has been completed."  BIA, *NEPA Guidebook* §§ 6.4.7, 6.8, at 22–23 (Aug. 2012) ["*Guidebook*"], https://on.doi.gov/3jy2Vxs.  Interior's failure to consult with the Cherokee Nation and the EBCI, and to do so before issuing the Draft EA, thus violates the NHPA and NEPA.

On the other side, Interior's NEPA obligations are broader than its NHPA obligations. Under NEPA, Interior must consider any potential impacts on "cultural resources," regardless of whether they might qualify as "historic properties" under the NHPA.  40 C.F.R. § 1508.27(b)(3). Meanwhile, Interior's NEPA regulations specify that it must "consult, coordinate, and cooperate with relevant … tribal governments … concerning the environmental effects of any Federal action … related to the interests of [the tribal government]," 43 C.F.R. § 46.155, and the BIA's *NEPA Guidebook* affirms that the BIA "should involve tribal governments … in the ***development*** and review of EAs."  *Guidebook* § 6.2, at 17 (emphasis added).  NEPA thus required Interior to consult with the Cherokee Nation and the EBCI before issuing the Draft EA, separately from the NHPA.

This patent error is compounded by the Final EA's failure to consider the local effects of

the looming jurisdictional quagmire the Decision threatens.  *See* 40 C.F.R. § 1508.27(a) (requiring consideration of impacts on the "locality"); *id.* § 1508.27(b)(10) (asking whether "the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment").  The Final EA avers that if the property is taken into trust for the Catawba, "it would no longer be subject to City or County land use regulations but would be under the civil regulatory jurisdiction of the [Catawba] Nation and the federal government."  AR2553.  But as explained above, under the 1993 Act, "[j]urisdiction and status of all non-Reservation lands shall be governed by section 15 of the Settlement Agreement," including the application of South Carolina law.  1993 Act § 13(a).  While Interior has proclaimed that these provisions do not apply outside South Carolina, that view does not bind anyone else.  And if it is challenged, it is anyone's guess how the jurisdictional conflicts will be resolved.  *Cf.* 25 C.F.R. § 151.10(f) (requiring that Interior consider "[j]urisdictional problems and potential conflicts of land use which may arise").

The Final EA also ignores the outsized cumulative impacts of the Catawba's casino development.  Contrary to the EA's offhand reference to "various ancillary area developments," AR2566, the Catawba and its casino developer appear poised to transform the area surrounding the Kings Mountain site.  Within the first five months after Interior's March 12 Decision, the developer's companies spent more than $3.4 million buying up 125 acres of land around the 16-acre Kings Mountain parcel, and they have set their sights on another neighboring tract as well. *See* Huguley, *Ownership of Land Around Kings Mountain Casino Project Taking Shape*, *supra*. Clearly, the plan here is to build much more than just a casino.  In artificially limiting its analysis of the "effect of the current project along with any other past, present, or likely future actions in the same geographic area," *TOMAC*, 433 F.3d at 864 (citing 40 C.F.R. § 1508.7), Interior failed to conduct a meaningful cumulative-impact analysis.  *See Grand Canyon Tr.*, 290 F.3d at 345.

**B.     Interior Violated NEPA by Failing to Properly Consider Alternatives.**

NEPA also requires consideration of "alternatives to the proposed action."  42 U.S.C.

§ 4332(C)(iii).   Reviewing courts "must determine whether the agency adequately discuss[ed]

reasonable alternatives to the proposed action and compare[d] the respective environmental

impacts." *Food & Water Watch v. USDA*, 451 F. Supp. 3d 11, 33 (D.D.C. 2020) (internal quotation

marks omitted).   "An alternative is reasonable if it is objectively feasible as well as reasonable in

light of [the agency's] objectives."   *Id.* at 50 (quotation marks omitted).  But the "[d]eference" due

to an agency's consideration of alternatives "does not mean dormancy"—and "the rule of reason

does not give agencies license to fulfill their own prophecies, whatever the parochial impulses that

drive them."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

The Final EA analyzed alternatives that result in Catawba development only on Cherokee

historical and treaty lands.  The goal of the Catawba's application to place the site into trust was

to open a gaming operation.  AR1372.  Because this was a discretionary application, Interior could

have directed the Catawba to explore alternatives to pursuing development in Cherokee territory.

But "it appears th[at Interior] dismissed out of hand any proposal which would have" changed the

location of the trust land.  *Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d

1069, 1088 (E.D. Cal. 2004).  There is no obvious reason—and certainly, none provided in the

Final EA—why the Catawba needed to pursue gaming in Cherokee aboriginal, historical, and

treaty territory.  *Cf.  Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664, 666 (7th Cir. 1997)

("One obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose and

need so slender as to define competing 'reasonable alternatives' out of consideration.").

**VII.   Plaintiffs Have Standing.**

Interior moved to dismiss the original complaints for lack of standing.  After the Cherokee

Nation and the EBCI amended (and added the Individual Plaintiffs), Interior did not reassert its

standing challenge.   This withdrawal was correct.   Plaintiffs have satisfied each element of standing: "injury in fact, causation, and redressability." *Amador Cnty. v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011).   For purposes of standing, courts "'assume the merits' in favor of the plaintiff." *Id.* (citation omitted).   As long as one plaintiff has standing for each claim, the Court may proceed. *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015).

### A.      Plaintiffs Have Standing to Raise EBCI Counts I to IV.

The EBCI and Individual Plaintiffs have established concrete harms that confer standing as to their claims under the 1993 Act, the IRA, and IGRA.   First, the EBCI has a classic pocketbook injury.   As the Final EA recognizes, taking the Kings Mountain site into trust to build a new casino will "cannibaliz[e]" the EBCI's gaming revenues.   AR2547; *see* ECF No. 41-1 ¶ 21–22.   That suffices for standing.   *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014).   The EBCI also has competitor standing.   As the D.C. Circuit has held, "economic actors 'suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or … allow increased competition.'" *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1015 (D.C. Cir. 2016); *see La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998).

Plaintiffs also have standing to vindicate their interest in maintaining their cultural sovereignty at Kings Mountain.   As detailed above, the site is within Cherokee historical territory and likely contains Cherokee artifacts.   ECF No. 41-1 ¶ 14; ECF No. 41-2 ¶¶ 14, 24; ECF No. 42-1 ¶¶ 4, 12.   The EBCI thus has a concrete interest in not disturbing the site.   *E.g.*, *Standing Rock*, 205 F. Supp. 3d at 35 (court may issue injunction when action "will likely injure a nearby site of cultural or historic significance to" tribe's members).   Interior's decision to approve the Catawba's application to build a casino threatens that interest.   Indeed, the Catawba have broken ground, so harm is imminent.   Jim Morrill, *Catawbas Break Ground on Kings Mountain Casino, Despite Lawsuit from Cherokees*, News & Observer (July 22, 2020), https://bit.ly/30CYr1i.

The Individual Plaintiffs also have standing.  All own property and live 3 to 14 miles from the site.  *See* Dover Decl. ¶ 3 (2.7 miles); Clark Decl. ¶ 3, Ex. D (13.7 miles).  All twelve oppose the construction and operation of the proposed casino, which they are concerned will generate a wide array of negative effects in their area.  These effects range from increased noise, air pollution, and traffic from the project itself, to higher crime and drug-abuse rates from the people a casino would attract, to reduced services and payments to the Individual Plaintiffs from the EBCI due to the gaming revenues it will lose.  Beaty Decl. ¶¶ 6–10; Dover Decl. ¶¶ 6–17; Landers Decl. ¶¶ 9–17; Arrowood Decl. ¶¶ 8–11, Ex. E; Clark Decl. ¶¶ 6–7; James McLeymore Decl. ¶¶ 6–11, Ex. F; John McLeymore Decl. ¶¶ 5–7, Ex. G; Stephen McLeymore Decl. ¶¶ 6–8, Ex. H; William D. McLeymore Decl. ¶¶ 5–7, Ex. I; William S. McLeymore Decl. ¶¶ 6–9, Ex. J.  The Individual Plaintiffs thus have Article III injury.  *See Patchak v. Salazar (Patchak I)*, 632 F.3d 702, 704 (D.C. Cir. 2011) (impact of proposed gaming facility on a plaintiff's way of life "constituted an injury-in-fact"), *aff'd sub nom. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209 (2012).

Article III's causation and redressability requirements are easily established.  "Because the Tribe may proceed with gaming only with secretarial approval of the [land-into-trust application], there is a direct causal connection between the Secretary's … approval and the alleged harm." *Amador Cnty.*, 640 F.3d at 378; *see Patchak I*, 632 F.3d at 704.  And Plaintiffs' injuries are redressable "because if [Plaintiffs] succeed[] on the merits …, the Secretary would have to reject the [land-into-trust application]."  *Amador Cnty.*, 640 F.3d at 378; *see Patchak I*, 632 F.3d at 704.

## B.     Plaintiffs Have Standing to Bring Their NHPA and NEPA Claims.

For much the same reasons, Plaintiffs have standing to raise an NHPA claim.  First, the Tribes seek to protect historic Cherokee territory and artifacts at the Kings Mountain site—an interest that supports NHPA standing.  The NHPA's "purpose … is to preserve historic sites for

public use.  A party dedicated to preserving such resources has standing."  *Role Models Am., Inc. v. Harvey*, 459 F. Supp. 2d 28, 38 (D.D.C. 2006), *aff'd sub nom. Role Models Am., Inc. v. Geren*, 514 F.3d 1308 (D.C. Cir. 2008).  Moreover, a plaintiff may rely on a procedural injury to establish standing "so long as the procedures in question are designed to protect some threatened concrete interest of his."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.8 (1992).  The Tribes' NHPA claims fit the bill.  The Tribes have a statutory interest in preserving Cherokee artifacts through before-the-fact consultation with Interior—and because Interior refused to consult, any Cherokee artifacts that exist at the Kings Mountain site have been put at risk.

The Individual Plaintiffs likewise have standing.  All live within a short distance of the Kings Mountain site, and all are concerned that the construction could destroy Cherokee gravesites, human remains, ceramics, tools, and other cultural artifacts.  Arrowood Decl. ¶¶ 10–11; Beaty Decl. ¶ 10; Dover Decl. ¶ 17; Landers Decl. ¶ 16; James McLeymore Decl. ¶ 11; John McLeymore Decl. ¶ 7; William D. McLeymore Decl. ¶ 7; William S. McLeymore Decl. ¶ 9.  The Individual Plaintiffs thus allege a cognizable, remediable injury.  For "if the Secretary had taken into account the effect of the [proposed casino], he might have placed conditions on the transfer of the land to [the Catawba], conditions that might have ameliorated … damage to an historic site" to which the Individual Plaintiffs are linked by both blood and geography.  *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008).  Indeed, nearby landowners "are the people most directly affected by the challenged action"—and "if they do not have standing … then the [NHPA's] requirement for consideration of the effect of federal permits on historic places is merely a 'procedural calisthenic.'"  *Pye v. United States*, 269 F.3d 459, 468 (4th Cir. 2001); *see Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 176 (3d Cir. 2000).

Likewise, plaintiffs have standing to bring their NEPA claims.  "If a challenged [agency

action] causes individuals to reasonably fear health or environmental harms and thus prevents them from using or enjoying the aesthetic or recreational value of their area, their injury suffices for Article III standing." *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1049 (D.C. Cir. 2019); *see Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 301 F. Supp. 3d 50, 60–61 (D.D.C. 2018).   The Individual Plaintiffs clearly meet this standard.   They live "near where the federal action would occur and would feel the environmental effects of that action." *Lemon*, 514 F.3d at 1315; *see* Beaty Decl. ¶¶ 5–8 (hiking trails, air and water quality); Dover Decl. ¶¶ 6–10 (traffic, hiking trails, light pollution); Landers Decl. ¶ 14 (traffic); James McLeymore Decl. ¶¶ 6–7 (traffic, pollution); Stephen McLeymore Decl. ¶ 8 (traffic); William D. McLeymore Decl. ¶ 5 (traffic, pollution); William S. McLeymore Decl. ¶¶ 6–8 (traffic, hunting, pollution).   The Tribes, too, have an interest in maintaining the area's environmental integrity.   NEPA regulations require Interior to consider the "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources," and the "degree to which the action … may cause loss or destruction of significant scientific, cultural, or historical resources."  40 C.F.R. § 1508.27(b).  Interior's decision to take the Kings Mountain site into trust thus inflicted a concrete injury that NEPA protects against.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment to Plaintiffs.

Dated:  October 8, 2020

Respectfully submitted,

*/s/ Mary Kathryn Nagle*

Sara Elizabeth Hill (*pro hac vice*)
  Attorney General
Chad Harsha (*pro hac vice*)
  Secretary of Natural Resources
Paiten Taylor-Qualls (OBA No. 33285)
  Assistant Attorney General
CHEROKEE NATION
P.O. Box 948
Tahlequah, OK 74465-0948
(918) 456-0671
(918) 458-5580
sara-hill@cherokee.org
chad-harsha@cherokee.org
paiten-qualls@cherokee.org

*Attorneys for The Cherokee Nation*

Mary Kathryn Nagle (DC Bar No. 1033507)
Wilson Pipestem (OBA No. 16877)
Abi Fain (OBA No. 31370)
PIPESTEM LAW, P.C.
320 S. Boston Ave., Suite 1705
Tulsa, OK 74103
(918) 936-4705
wkpipestem@pipestemlaw.com
mknagle@pipestemlaw.com
afain@pipestemlaw.com

*Attorneys for The Eastern Band of Cherokee Indians and the Individual Plaintiffs*

Sam Hirsch (DC Bar No. 455688)
Zachary C. Schauf (DC Bar No. 1021638)
Allison M. Tjemsland (DC Bar No. 1720122)
Noah B. Bokat-Lindell (DC Bar No. 156032)
JENNER & BLOCK LLP
1099 New York Avenue, NW
(202) 639-6000
shirsch@jenner.com

*Attorneys for The Eastern Band of Cherokee Indians*

## **CERTIFICATE OF SERVICE**

I, Mary Kathryn Nagle, hereby certify that a copy of the foregoing was served electronically by the Court CM/ECF system on October 8, 2020, upon all counsel of record.

By:___*/s/ Mary Kathryn Nagle*_____