# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EASTERN BAND OF CHEROKEE INDIANS**, *et al.*, <br><br> **Plaintiffs,** <br><br> **and** <br><br> **THE CHEROKEE NATION,** <br><br> **Plaintiff-Intervenor,** <br><br> **v.** <br><br> **UNITED STATES DEPARTMENT OF THE INTERIOR**, *et al.*, <br><br> **Defendants,** <br><br> **and** <br><br> **THE CATAWBA INDIAN NATION,** <br><br> **Defendant-Intervenor.** | **Civil Action No. 20-757 (JEB)** |

## <u>MEMORANDUM OPINION</u>

"Las Vegas is the only place I know where money really talks — it says, 'Goodbye.'"  So says Frank Sinatra's character in the 1957 film <u>The Joker is Wild</u>.  Put differently: it's good to be in the casino business.

The Catawba Indian Nation are eager to get into that business.  Like many Native tribes, the Catawba's members face serious economic difficulties.  Like many tribes, the Catawba do not have a large tax base or other revenue stream, leaving them dependent on inconstant public funding.  And like many tribes, the Catawba believe that a casino and entertainment complex will help with both problems.  To that end, in 2018 the Tribe asked the Bureau of Indian Affairs, a part of the U.S. Department of Interior, to take a 16-acre parcel of land in North Carolina into

trust so that the Tribe could build a casino and entertainment complex there.  On March 12, 2020, the agency formally agreed.

Within days, Plaintiff Eastern Band of Cherokee Indians (EBCI), which has its own casinos in North Carolina, filed this action under the Administrative Procedure Act, asserting that BIA's decision violated a host of federal statutes and regulations.  The Catawba quickly intervened as Defendants to protect their project.  Concerned that the construction of the complex would destroy Cherokee historical artifacts or human remains — or perhaps pose a competitive gambling threat — Plaintiff then moved to preliminarily enjoin the transfer of land to the federal government.  This Court denied that motion, finding that because EBCI had not "shown that it is likely that Cherokee historical artifacts even exist at the [development] site," the Tribe had not established the requisite irreparable harm.  E. Band of Cherokee Indians v. U.S. Dep't of the Interior, No. 20-757, 2020 WL 2079443, at *5 (D.D.C. Apr. 30, 2020) (EBCI).

Although construction has commenced at the site, the litigation continues, and all Plaintiffs — including Intervenor-Plaintiff the Cherokee Nation (a distinct entity from EBCI) and twelve individual Plaintiffs who are members of EBCI — now move for summary judgment. The Government and the Catawba oppose and so cross-move.  Plaintiffs raise several close and complex questions of statutory and regulatory construction, and the Court certainly cannot fault them for rolling the dice here.  In the end, though, they come up with snake eyes, as on each claim they either lack standing or lose on the merits.  The Court will thus enter summary judgment for Defendants.

I.      **Background**

A.  Factual Background

Because this is an APA case, there is little (though not zero) factual dispute.  The Court

accordingly draws on its prior Opinion, which sets out many of the relevant facts here.  EBCI,

2020 WL 2079443, at *1–3.  It also preliminarily notes the high quality of briefing on both sides,

which greatly helped clarify the complex issues at stake, but also made declaring no simple task,

as the length of this Opinion attests.

1.  *1993 Settlement and Settlement Act*

Long before the arrival of the English colonists on our shores, the Catawba Indian

Nation's ancestors resided in what is now North and South Carolina.  Over the ensuing centuries,

a familiar and unfortunate drama played out, as the Tribe ceded nearly all of its aboriginal lands

in exchange for promises often broken.  See generally South Carolina v. Catawba Indian Tribe,

Inc., 476 U.S. 498 (1986).  Although that story certainly deserves more in-depth treatment in

another forum, we pick it up in 1980 when the Tribe, at that point not federally recognized,

commenced a series of lawsuits against the United States and South Carolina, asserting its rights

to certain lands in that state.  Id.; Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564

(Fed. Cir. 1993).  After trips up, down, and around the federal judiciary, in 1992 the parties came

to a comprehensive settlement, ending the disputes and restoring the Tribe's federal recognition.

That agreement is reflected in three different legal instruments.  First, the Tribe and South

Carolina executed a settlement agreement in 1993.  See Agreement in Principle, as reprinted in

Hearing on S. 1156 Before the S. Comm. on Indian Affairs, 103d Cong. 120 (1993).  In short,

this Settlement Agreement obliged the Tribe to relinquish its land claims, outlined the State's

obligations to the Tribe going forward, and established the legal regimes that would govern the

Tribe.  For instance, the Agreement required South Carolina to transfer title to the Catawba's existing reservation, which the state had held in trust, to the federal government, see Settlement Agreement § 14.1, and further provided that the State would pay (along with the feds) millions into several different trust funds for the benefit of the Tribe.  Id. §§ 5.1, 5.2, 13.  The Agreement also established detailed procedures by which the Catawba could acquire further land both as part of its reservation and outside of it.  Id. §§ 14, 15.

The Agreement's negotiators, which included members of South Carolina's congressional delegation, recognized that both state and federal legislation would be "necessary" to implement the agreement.  See Memorandum of Cooperation, as reprinted in Hearing on S. 1156 Before the Senate. Comm. on Indian Affairs, 103d Cong. 118 (1993).  To that end, in mid-1993, South Carolina enacted the Catawba Indian Claims Settlement Act, 1993 S.C. Act No. 142 (codified at S.C. Code Ann. § 27-16-10 et seq.).  Congress followed up in October with the Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub. L. No. 103-116, 107 Stat. 1118 (1993) (Settlement Act).  Both enactments noted the need for the legislation in order to effectuate the settlement, see S.C. Code. Ann. § 27-16-20(4); Pub. L. No. 103-116, § 2(a)(7), and the federal Settlement Act expressly stated that one of its purposes was "to approve, ratify, and confirm the Settlement Agreement . . . except as otherwise provided by this Act." Pub. L. No. 103-116, § 2(b).  Construing the terms of the federal Settlement Act is one of the Court's central tasks in this case.

2.  *The Catawba's Current Situation*

Today, the Catawba are the only federally recognized tribe headquartered in South Carolina.  Although most of its 3,000 or so members live in that state, "approximately 253 resid[e] in North Carolina."  U.S. Dep't of Interior, Proposed Findings of Fact and Conclusions

for Catawba Indian Nation Fee-to-Trust Land Acquisition Application 4 (Mar. 10, 2020), AR 3842 (Proposed Findings).

As noted above, the Tribe has significant economic troubles.  According to data from several years ago, its unemployment rate is over three times the averages in the Carolinas (13.8% to 4.3%), while its members' median household income is roughly two-thirds of the states' medians ($33,029 to about $47,000).  See U.S. Dep't of Interior, Decision Letter 12 (Mar. 12, 2020), AR 3866.  The Tribe's tax base is thus quite weak, and it lacks its own reliable revenue stream, leaving it heavily dependent on federal funding.  Id.; Application of the Catawba Indian Nation to Acquire 16.57 Acres +/- of Off-Reservation Trust Land at AR 456 (Sept. 17, 2018) (Discretionary Application).  When in the past that funding has dried up, the Tribe has been forced to cut programming for its members, such as after-school programs for its children and services for domestic-violence victims.  See Decision Letter at 12.  As is often true for entities in distress, the Tribe is caught in a vicious cycle: much of the reason it lacks sustainable revenue is that it lacks developable land, id. at 27, and it lacks developable land in large part given the debts it has increasingly incurred.  For instance, the Tribe recently had to transfer a sizeable parcel of fee-simple land to a local South Carolina school district just to cover the cost for tribal students to attend.  Id. at 12; Discretionary Application at AR 456.

3. *The Catawba's Casino Plans*

Seeking a much-needed economic foothold, in 2013 the Catawba requested the Department of the Interior to take into trust on its behalf a 16-acre parcel of land known as the Kings Mountain Site in Cleveland County, North Carolina.  See Decision Letter at 2.  The Tribe hoped to use that site, which is only 33 miles from its South Carolina headquarters, see Proposed Findings at 12, to conduct gaming and build an entertainment complex.  See Application of the

Catawba Indian Nation to Acquire 16.57 Acres +/- in Kings Mountain, North Carolina 4 (Aug. 30, 2013), AR 185 (Mandatory Application).

The Tribe argued that Interior was required to grant its application given the agency's obligations under the 1993 Settlement Act.  Id. at 1–3.  Interior, however, did not share that view.  In a 2018 memorandum, it concluded that the reservation-expansion provisions of the Settlement Act cited by the Tribe applied exclusively to land located in South Carolina and thus did not require Interior to grant the application.  See U.S. Dep't of Interior, Memorandum, Mandatory Trust Authority Under the Catawba Settlement Act 5 (Mar. 23, 2018), AR 434 (Mandatory Trust Memo).

After closing that door, however, the agency conspicuously opened a window.  As it explained, "Though the mandatory trust provisions of the Settlement Act are unavailing here, there are other avenues through which the Kings Mountain parcel may be brought into trust."  Id. "For example," it explained, "the Tribe may file a discretionary fee-to-trust application under" section 5 of the Indian Reorganization Act (IRA) and its implementing regulations.  Id.; see 25 U.S.C. § 5108; 25 C.F.R. Part 151.  Shortly thereafter, the Tribe did just that, asking Interior to take the same land into trust in its discretion, thereby enabling the Catawba "to construct a casino and mixed-use entertainment complex."  Decision Letter at 2.  It also asked Interior to confirm that the land would be eligible for gaming pursuant to the Indian Gaming Regulatory Act, 25 U.S.C. § 2719.  Id. at 1.  The Catawba estimated that, if allowed to proceed, "the complex would generate $72 million in income in its first year of operation, rising to $150 million in year five." EBCI, 2020 WL 2079443, at *1.  Perhaps more importantly, the development would create over "2,600 direct employment opportunities."  Id. (quoting Decision Letter at 27).

6

4. *Interior's Process*

In considering the Tribe's discretionary application, Interior undertook a lengthy project analysis aimed at satisfying the myriad statutory prerequisites to federal action, including those imposed by the National Environmental Policy Act and National Historic Preservation Act. Broadly speaking, NEPA mandates that agencies evaluate the potential environmental impact of any "major Federal action[]," 42 U.S.C. § 4332; 25 C.F.R. § 151.10(h), whereas NHPA requires similar consideration of effects on "historic propert[ies]," including "[p]roperty of traditional religious and cultural importance to an Indian tribe."  54 U.S.C. §§ 302706, 300308, 306108.

Pursuant to those obligations, the agency took a number of steps to ascertain whether any historic or cultural resources might be present at the Kings Mountain Site.  It conducted a search of the "historical and archaeological literature" and queried the National Register of Historic Places (using an online tool created by North Carolina) within a one-mile range of the site.  See Final Environmental Assessment: Catawba Indian Nation Trust Acquistion [*sic*] and Multi-Use Entertainment Complex 24 (March 2020), AR 2529.  That inquiry turned up "[n]o verified historic properties" and "[n]o eligible or potentially eligible historic properties" at the site.  Id. at 25.  Interior also contacted North Carolina's State Historic Preservation Office to see whether it knew of any historic resources present at the Kings Mountain Site.  See Letter from Ramona M. Bartos to Kim Hamlin (Feb. 22, 2019), AR 2975; Decision Letter at 33.  The SHPO likewise responded that it was "aware of no historic resources which would be affected by the project." Bartos Letter, AR 2975.

The agency accordingly forged ahead with its evaluation, and on December 22, 2019, it published its draft Environmental Assessment as required by NEPA and opened a thirty-day comment period.  See Decision Letter at 31; see also Draft Environmental Assessment: Catawba

Indian Nation Trust Acquisition and Multi-Use Entertainment Complex (Dec. 2019), AR 1763.

The Draft EA reported the agency's assessment that "[n]o known historic, cultural, religious, or

archaeological resources or paleontological resources would be affected" by the proposed

development.  See Draft EA at 36.  The agency thought it "unlikely that the area [would] yield[]

important paleontological specimens" because it was "highly disturbed," having "previously

[been] prospected for tin," used "as a soil borrow site" for another construction project, and later

graded (leveled) by the state Department of Transportation.  Id. at 19, 23–24; Letter from R.

Glen Melville to Russell Townsend (Jan. 30, 2020), AR 2481.  The Draft EA also noted that the

project, if approved, would abide by a number of archaeological "Best Management Practices"

aimed at "minimiz[ing] the potential adverse effect of construction activities to previously

unknown archaeological or paleontological resources in the case of inadvertent discovery."

Draft EA at 14.

Immediately after publishing the Draft EA, Interior notified EBCI via email and

"request[ed] [its] review and comments."  See ECF No. 13-2 (Declaration of Chester McGhee),

¶¶ 6–7, ECF pp. 3–4 ("I know EBCI is interested in the project, so I wanted to make sure you

were aware.").  EBCI responded several weeks later, objecting to the Draft EA on several

grounds.  See EBCI Comments on the Environmental Assessment for the Proposed Trust

Acquisition (Jan. 22, 2020), AR 2475.  EBCI first protested that the Draft EA had been

developed without consulting it as to the potential impact of the project on Cherokee cultural

resources, although Plaintiff did not state or suggest that any such resources existed at the Kings

Mountain Site. Id. at 1–2.  Interior followed up eight days later with a letter to EBCI's Tribal

Historic Preservation Officer Russell Townsend, seeking to "verify with [his] office that the

proposed project w[ould] not impact any specific sites having potential religious or cultural

significance" to EBCI.  See Melville Letter, AR 2481; see also id. ("BIA is very interested in hearing from your office regarding the project."); see also ECF No. 13-2 at ECF p. 9 (Email from Chester McGhee to Russell Townsend and Brian Burgess) ("We would very much like to know from your office if there are cultural sites significant to EBCI within the [site].").

Over the next few weeks, the agency and EBCI exchanged further email correspondence that culminated in a meeting here in Washington on February 10, 2020.  See ECF Nos. 14-7 (Briefing Emails); 14-2 (Declaration of Richard Sneed), ¶¶ 7–9, 13; 14-5 (EBCI Briefing Paper). At that meeting, EBCI Chairman Richard Sneed reiterated Plaintiff's concern that the "project could impact Cherokee cultural sites because the land is within [Cherokee] traditional territory." Sneed Decl., ¶ 15.  Those concerns were later raised again by Townsend in a March 15 email and letter to an Interior official.  See McGhee Decl. at ECF pp. 29, 36–37.  In this letter, Townsend mentioned (for the first time, as far as the Court can tell) that "according to [EBCI's] records there actually is an archaeological site recorded within the project location listed in the NC State Archaeological Site Inventory."  Id. at ECF p. 36.  The letter did not claim that the site involved Cherokee artifacts or remains, nor did it provide any further detail.

In any event, by that point Interior had already completed its Final EA and issued a Finding of No Significant Impact (FONSI), paving the way for the project to go forward under NEPA without a more detailed environmental impact statement.  See 40 C.F.R. § 1501.6. Specifically, the Final EA and FONSI were completed as of March 10, 2020.  See Proposed Findings at 1; see also Decision Letter at 12, 31; Finding of No Significant Impact Kings Mountain, NC Fee-To-Trust Casino Project Catawba Indian Nation (Mar. 12, 2020), AR 3893. The Final EA responded to EBCI's comments, explaining that Interior had "conclude[d] that no historic resources would be affected by the [p]roposed [p]roject" based on the process and

information discussed above.  See Final EA, App. M, at 8, AR 3238.  The agency also noted that it had "received no response from [Townsend] regarding the [project] prior to making a final decision on the Catawba Indian Nation's application."  Id.

Armed with the Final EA and FONSI, on March 12, 2020, Assistant Secretary for Indian Affairs Tara Sweeney granted the Catawba's discretionary fee-into-trust application, concluding in a lengthy opinion that the Tribe would be eligible to conduct gaming at the Kings Mountain Site under IGRA and instructing that the site be taken into trust for that purpose.  See Decision Letter.  Sweeney noted the agency's conclusion that the development would "not affect historic resources."  Id. at 33.

B.  Procedural History

Within days, on March 17, EBCI filed this suit against the Government and sought a preliminary injunction preventing the agency from taking the Kings Mountain Site into trust. See EBCI, 2020 WL 2079443, at *3.  The Catawba sought to intervene as Defendants to support the Government, which this Court permitted.  Id.

After hearing oral argument via teleconference (the pandemic having just begun), the Court denied EBCI's motion on the ground that it had failed to establish irreparable harm.  Id. EBCI argued that injunctive relief was necessary to ensure that it did not forever lose its NHPA and NEPA rights to consultation on whether Cherokee artifacts or remains exist at the Kings Mountain Site.  Id. at *4.  As the Court's Opinion explained, however, that was merely a procedural injury that could not, "standing alone . . . constitute irreparable harm."  Id. (citing Friends of Animals v. U.S. Bureau of Land Mgmt., 232 F. Supp. 3d 53, 67 (D.D.C. 2017)). EBCI, however, did offer a sufficiently concrete interest that is meant to be protected by NHPA and NEPA consultation rights — namely, the preservation of "cultural patrimony and/or human

remains" that would otherwise be destroyed by the casino's construction.  Id. (quoting ECF No. 2 (Pl. PI Motion) at 3).  But Plaintiff failed to establish that "such irreparable injury [was] likely in the absence of an injunction," Winter v. NRDC, 555 U.S. 7, 22 (2008), because, in the Court's view, it had "not shown that it is likely that Cherokee historical artifacts even exist at the Kings Mountain Site."  EBCI, 2020 WL 2079443, at *5 ("Given this thin record, the Court cannot conclude that it is likely that any EBCI resources exist on the parcel of land at issue.").  The Catawba had also agreed to halt construction and alert EBCI if any artifacts were uncovered, further mitigating the possibility of irreparable injury.  Id. at *6.  The Court consequently denied injunctive relief on those grounds alone.  Although transfer of the land thus went forward in early 2020, construction is still ongoing and will likely continue for at least six more months.  See ECF No. 68 (Notice Regarding Execution of Gaming Compact) at 1–2.  To date, no party has alerted the Court of any discoveries.

The litigation did not end, however; indeed, a number of additional parties have joined the fray.  One day after the Court denied injunctive relief, the Cherokee Nation — a distinct tribal entity from EBCI, though the two share a common history — sought to intervene as Plaintiff, asserting that the Government had also violated its separate consultation rights under NEPA and the NHPA by failing to contact it at all while analyzing the project.  See ECF No. 26 (Mot. to Intervene); ECF No. 33 (Cherokee Complaint), ¶¶ 136–40.  Several months later, after Defendants moved to dismiss, EBCI filed an Amended Complaint adding as Plaintiffs twelve enrolled members of the Tribe who live near the Kings Mountain Site.  See ECF No. 41 (Amended Complaint), ¶¶ 11–24.  The Cherokee, too, amended their Complaint.  See ECF No. 42.

EBCI and its members assert six different claims.  The first three allege that Interior's decision is contrary to law under the Administrative Procedure Act for several reasons, namely: (1) the 1993 Settlement Act categorically bars the Catawba from operating a casino under IGRA; (2) the Settlement Act similarly precludes the Catawba from having land taken into trust on their behalf under the IRA; and (3) the Kings Mountain Site is not eligible for gaming activities under IGRA's implementing regulations.  EBCI and its members' fourth claim, also arising under the APA, is that Interior arbitrarily ignored the sordid background of Wallace Cheves, a private businessman and the Catawba's partner in the casino venture.  Finally, Plaintiffs also maintain that Interior violated NEPA and the NHPA.  See ECF No. 52 (Pl. SJ Mot.) at 15–16.  The Cherokee Nation itself asserts only the last two causes of action (although EBCI and the Cherokee filed consolidated briefs).  Id. at 16.  The Federal Defendants and Catawba answered the Amended Complaints, and all parties have now moved and cross-moved for summary judgment.

After those motions were ripe for decision, the Court ordered Interior to supplement the administrative record with two agency memoranda referred to in its final decision documents. See Minute Order of March 16, 2021; Amfac Resorts, LLC v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) ("[A] complete administrative record should include all materials that might have influenced the agency's decision.") (citation and internal quotation omitted). The agency then moved for reconsideration of that Order on the ground that the identified materials were privileged.  See ECF No. 71.  In light of the Government's representation that the relevant memos "substantially overlap with" materials already in the record, id. at 4, the Court sees no need for protracted litigation of privilege issues, and it will therefore grant the

reconsideration motion and vacate its earlier Order.  That procedural hiccup overcome, the Court
is now ready to rule.

## II.    Legal Standard

The parties have cross-moved for summary judgment on the administrative record and
seek review of an agency decision under the APA.  See Sierra Club v. FERC, 867 F.3d 1357,
1367 (D.C. Cir. 2017) ("[B]ecause NEPA does not create a private right of action, we can
entertain NEPA-based challenges only under the [APA]."); Karst Env't Educ. & Prot., Inc. v.
EPA, 475 F.3d 1291, 1295 (D.C. Cir. 2007) ("NHPA actions must also be brought pursuant to
the APA.").  The summary-judgment standard set forth in Federal Rule of Civil Procedure 56(c),
therefore, "does not apply because of the limited role of a court in reviewing the administrative
record."  Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006) (citations omitted).
Rather, "when a party seeks review of agency action under the APA, . . . the district judge sits as
an appellate tribunal."  Rempfer v. Sharfstein, 583 F.3d 860, 865 (D.C. Cir. 2009) (quoting Am.
Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).  In other words, "[t]he
entire case on review is a question of law."  Id. (quoting Marshall Cty. Health Care Auth. v.
Shalala, 988 F.2d 1221, 1226 (D.C. Cir. 1993)).

The APA "sets forth the full extent of judicial authority to review executive agency
action for procedural correctness."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 513
(2009).  It requires courts to "hold unlawful and set aside agency action, findings, and
conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law."  5 U.S.C. § 706(2)(A).  Agency action is obviously "not in accordance
with law" if it violates some extant federal statute or regulation.  Arbitrary-and-capricious review
is somewhat more amorphous.  Agency action will fail that test if, for example, the agency

13

"entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

"'The scope of review [in an APA case] is narrow and a court is not to substitute its judgment for that of the agency,' provided the agency has 'examine[d] the data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Airmotive Eng'g Corp. v. FAA, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (second and third alterations in original) (quoting State Farm, 463 U.S. at 43). While the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given, [it] will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (citation omitted) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); then citing Colo. Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945)).

## III.   Analysis

Like the parties, the Court will begin with the thorniest questions presented here, which correspond to the first three claims set forth above: (1) whether the Catawba are generally eligible to game under IGRA; (2) whether the Catawba are eligible to benefit from Interior's land-into-trust authority under the IRA; and (3) whether the Kings Mountain Site is suitable for gaming under IGRA and its implementing regulations. The Court proceeds in this order because the first two issues require structurally similar analyses of the 1993 Settlement Act. Although all three questions are close, the Court ultimately finds that the answers come back "Yes, Yes, Yes" — a jackpot for Defendants. (For this reason, there is no need to address Defendants' additional

argument that Plaintiffs fall outside the "zone of interests" protected by the Settlement Act.  See

Judicial Watch, Inc. v. Kerry, 156 F. Supp. 3d 69, 75 (D.D.C. 2016), rev'd on other grounds, 844

F.3d 952 (D.C. Cir. 2016).)  The Court then proceeds in turn through the remaining APA,

NHPA, and NEPA claims.

    A.  IGRA

    The first issue raised by Plaintiffs involves the applicability of the Indian Gaming

Regulatory Act.  The Catawba, like all tribes, may only conduct "class II" and "class III gaming

activities" — with class III covering most of the games typically offered at casinos, see 25

U.S.C. §§ 2703(7)–(8) — as allowed by that statute.  Id. § 2710(a)(2) ("Any class II gaming on

Indian lands . . . shall be subject to the provisions of this chapter."); id. § 2710(d)(1) ("Class III

gaming activities shall be lawful on Indian lands only if such activities [meet IGRA's procedural

and substantive requirements].").  In addition to setting out the general conditions under which

such gaming may occur, IGRA also vests the federal government with substantial regulatory and

enforcement powers.  See Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 785–86 (2014).

    EBCI argues that section 14 of the Settlement Act makes IGRA inapplicable to the

Catawba, such that they may not benefit from its general authorization of Indian gaming on

Indian lands.  That section reads as follows:

> SEC. 14. GAMES OF CHANCE.
>
> (a) INAPPLICABILITY OF INDIAN GAMING REGULATORY
> ACT.—The Indian Gaming Regulatory Act (25 U.S.C. 2701 et seq.)
> shall not apply to the Tribe.
>
> (b) GAMES OF CHANCE GENERALLY.—The Tribe shall have
> the rights and responsibilities set forth in the Settlement Agreement
> and the [South Carolina] Act with respect to the conduct of games
> of chance. Except as specifically set forth in the Settlement
> Agreement and the [South Carolina] Act, all laws, ordinances, and
> regulations of [South Carolina], and its political subdivisions, shall

> govern the regulation of gambling devices and the conduct of
> gambling or wagering by the Tribe on and off the Reservation.

Pub. L. No. 103-116, § 14.

Plaintiffs argue that section 14(a), which states that IGRA "shall not apply to the Tribe,"

plainly and categorically prohibits the Catawba from gaming under the Act.  See Pl. SJ Mot. at

17.  That is an understandable first-blush reaction.  Yet it depends on "examining [that]

particular statutory provision in isolation" and ignoring the maxim that "[t]he meaning — or

ambiguity — of certain words or phrases may only become evident when placed in context."

FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000).  That is the case here.

Reading section 14(a) in its proper context reveals a critical ambiguity: it is not clear whether

section 14(a)'s IGRA ban applies outside of South Carolina.  Indeed, as the Court will presently

explain, the better construction is that section 14(a) makes IGRA inapplicable only in South

Carolina and says nothing about the law's applicability elsewhere.  At a minimum, the

Settlement Act is ambiguous on this question, and because it was "passed for the benefit of [an]

Indian tribe[]," that ambiguity must be "resolved in favor of the Indians."  Bryan v. Itasca

County, 426 U.S. 373, 392 (1976) (citation omitted).

Two key pieces of evidence suggest that section 14(a), despite its unqualified text, is

implicitly limited in effect to South Carolina.  First, section 14 has materially identical language

to a corresponding section of the Settlement Agreement that is best read as applying exclusively

in South Carolina.  Like section 14 of the Settlement Act, section 16.1 of the Settlement

Agreement states that IGRA "shall not apply to the Tribe."  Immediately following that sentence,

however, the Agreement sets out paragraph upon paragraph of rules specifying how the Tribe's

gambling will be regulated under South Carolina law.  Id. § 16.2–16.9.  (Those rules are

duplicated in the South Carolina Settlement Act.  See S.C. Code Ann. § 27-16-110.)  In context,

then, the intent of the Settlement Agreement seems to have been to establish a specific regime

for Catawba gambling in South Carolina that would supersede IGRA's more Tribe-friendly

framework — hence the need to clarify that an otherwise preemptive federal law, IGRA, would

not apply.  Put differently, the Settlement Agreement made clear that IGRA would not apply to

the Tribe because tribal gambling would <u>instead</u> be covered by specific rules set out in the

Settlement Agreement and/or state law.  Under that reading, the Agreement has nothing to say

about whether the Tribe would be permitted to game under IGRA outside of South Carolina.

That is unsurprising, as the Agreement is exclusively between South Carolina and the Tribe.  <u>See</u>

Settlement Agreement § 1 (naming parties to the Agreement).  There is no apparent reason why a

contractual arrangement between South Carolina and the Tribe would need to address whether

IGRA would apply outside the state, nor any indication that South Carolina was keen to ban the

Tribe from gaming altogether outside its borders.

        If that is right, then the words "[IGRA] shall not apply to the Tribe" in the Settlement

Agreement are best read as governing only gaming in South Carolina.  And given that

interpretation, the Court fails to see why the identical words of the federal Settlement Act,

lodged within a largely identical section of text addressing the same gaming issue, should be

construed any differently.  A key purpose of the federal Act, after all, was to "to approve, ratify,

and confirm the Settlement Agreement."  Pub. L. No. 103-116, § 2(b)(1).  To that end, where

Congress simply copied and pasted the Settlement Agreement's language, one should assume

that it meant to ratify the bargain struck in that Agreement.

        Second, although the text of section 14(a) itself does not suggest that it is limited to South

Carolina, nearby statutory text strongly implies that to be the case.  Consider section 14(b),

which also lacks any textual limitation to South Carolina, but in context <u>must</u> be read as limited

to just that one state.  Section 14(b) states that "all laws, ordinances, and regulations of [South Carolina], and its political subdivisions, shall govern the regulation of gambling devices and the conduct of gambling or wagering by the Tribe on and off the Reservation."  Pub. L. No. 103-116, § 14(b).  Because the phrase "off the Reservation," read in isolation, would apply nationwide, the plain text seems to provide that South Carolina law "shall govern [gambling] by the Tribe" in the other 49 states.  If that were true, however, absurd consequences would follow.  For instance, the Tribe could "apply to the South Carolina Department of Revenue for a special bingo license" to hold bingo games in North Carolina, which South Carolina would be required to grant, see S.C. Code. Ann. § 27-16-110(C), and which would result in income taxable only by South Carolina. Id.  Even if that regime were constitutional, which the Court doubts, but see United States v. Sharpnack, 355 U.S. 286, 294–97 (1958), it is not plausible that Congress intended to create such a bizarre law-school hypothetical by enacting section 14(b).  That absurd outcome is easily avoided, of course, by reading in an implicit limitation: "off the Reservation in South Carolina."  And as discussed above, that limitation makes perfect sense in light of Congress's goal of ratifying an agreement between South Carolina and the Tribe to govern their relationship.

If section 14(b) is implicitly limited to South Carolina, despite its plain text suggesting otherwise at first glance, then it makes sense to read section 14(a) the same way.  "Statutory construction is a holistic endeavor," Smith v. United States, 508 U.S. 223, 233 (1993) (cleaned up), which means that "unless the text clearly indicates otherwise, adjacent subsections on similar topics presumably have the same scope."  Stanford v. United States, No. 12-93, 2014 WL 2574492, at *3 (E.D. Ky. June 9, 2014) (citations omitted).  Plaintiffs insist that the text of section 14(a) is unavoidably unambiguous, since it states without qualification that IGRA "shall not apply" to the Catawba.  But just because a provision has no express textual geographic limit

does not mean that it unambiguously applies nationwide.  Section 14(b), as just discussed,

obviously has a limited scope — i.e., it governs the Tribe's activities only in South Carolina —

even though the phrase "off the Reservation" applies nationwide if read in isolation.  It is hardly

a stretch, then, to read section 14(a) as also implicitly restricted to South Carolina.  Again, the

Settlement Act is at least open to that interpretation.

That, it bears noting, was Interior's view back in 2018 when it invited the Catawba to

submit the discretionary land-into-trust application at issue here.  (The agency, oddly, did not

offer any statutory analysis on this point in its 2020 Decision Letter or in other contemporaneous

record documents.)  As it explained then, reading the isolated language of section 14(a) literally

would "potentially exclude the Tribe from a statutory scheme permitting games of chance on

territory outside of South Carolina without replacing it without an alternative approach," thereby

"crea[ting] an ambiguity."  Mandatory Trust Memo at 5 n.18.  Citing the famous Chevron U.S.A.

v. Nat. Res. Def. Council, 467 U.S. 837 (1984), Interior suggested that it would address that

ambiguity by "reasonably read[ing]" section 14(a) as this Court now does: as "replacing the

IGRA framework with the framework set forth in the Settlement Agreement for [South Carolina]

lands and those lands only."  Mandatory Trust Memo at 5 n.18.

That ambiguity alone is sufficient reason to read section 14(a) as barring the Tribe from

gaming under IGRA only in South Carolina.  This is not due to Chevron — after all, Interior did

not even cite its earlier footnoted musings in the decision under review here — but instead

because of the principle that, in light of the trust relationship between the United States and

Indians, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions

interpreted to their benefit."  Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985).

The Court's choice between "two possible constructions . . . must be dictated by [this] principle."

County of Yakima v. Yakima Indian Nation, 502 U.S. 251, 269 (1992); see Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1445 (D.C. Cir. 1988) ("[I]f [the relevant statute] can reasonably be construed as the Tribe would have it construed, it must be construed that way."). Applying that dictate here yields a straightforward result: section 14(a) is at a minimum ambiguous as to whether it bars the Catawba from gaming under IGRA outside of South Carolina; therefore, the Court is bound to construe it not to.

Likely recognizing the force of the Indian canon in this case, Plaintiffs scramble to obtain its protection as well. They cite a number of Ninth Circuit cases for the proposition that the canon does not apply where "all tribal interests are not aligned." Rancheria v. Jewell, 776 F.3d 706, 713 (9th Cir. 2015). Such is the case here, they maintain, since the interests of EBCI and the Catawba are in conflict: EBCI would be harmed by interpreting section 14(a) as allowing the Catawba to game under IGRA in North Carolina.

The status of this exception to the Indian canon is unsettled. Although "no D.C. Circuit cases . . . have adopted [it]," several "judges in this District have done so, citing [the same] Ninth Circuit case law." Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt, 442 F. Supp. 3d 53, 80 (D.D.C. 2020) (citing Connecticut v. U.S. Dep't of the Interior, 344 F. Supp. 3d 279, 314 (D.D.C. 2018) (applying the exception)); see also Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell, 75 F. Supp. 3d 387, 396 (D.D.C. 2014) (same); Forest Cty. Potawatomi Cmty. v. United States, 330 F. Supp. 3d 269, 280 (D.D.C. 2018) (same).

Even assuming the exception exists as a general matter, the Court does not believe it applies here. As Sault Ste. Marie Tribe explained, "All but one of the cases [that stand for] this exception dealt with statutes that benefit all Indians generally, such as IGRA. . . . The other case involved a treaty, and the tribe with countervailing interests was a signatory to — and

beneficiary of — the treaty."  442 F. Supp. 3d at 80 (last citing <u>Confederated Tribes of Chehalis</u>

<u>Indian Reservation v. Washington</u>, 96 F.3d 334, 338, 340 (9th Cir. 1996)).  When interpreting

such generally applicable enactments, it might well be appropriate to discard the Indian canon on

the theory that Congress would not have intended to benefit one Indian tribe if it would come at

the cost of another.  After all, the United States' trust duties are "owe[d] the same . . . to all

tribes."  <u>Confederated Tribes of Chehalis</u>, 96 F.3d at 340.  That rationale, however, evaporates

when considering a statute (like the Settlement Act) and a specific provision (like section 14)

that governs "only one tribe."  <u>Sault Ste. Marie Tribe</u>, 442 F. Supp. 3d at 80.  The Settlement Act

was enacted expressly "in recognition of the United States['] obligation to the" Catawba, <u>see</u>

Pub. L. No. 103-116, § 2(a)(8), and it implements a bargain between the Tribe and South

Carolina in which the Tribe accepted specific burdens in exchange for other benefits.  Those

burdens are inflicted on the Catawba and the Catawba alone, and the Court's task here is to

determine the extent of one of them: did Congress deprive the Tribe of their IGRA rights on

lands nationwide or only in South Carolina?  Given the principles behind the Indian canon, the

Court must assume Congress meant to do less, not more, damage to the only tribe directly

harmed by the provision at issue.

In sum, as set out at length above, the Act's context and history strongly suggest that to

be the right assumption, as there is no evidence that either legislature had any reason to bar the

Catawba from gaming under IGRA outside of the Palmetto State.  Whether that view is the best

<i>de novo</i> interpretation, or only an available reading of an ambiguous statute, the outcome is the

same: the Catawba may game under IGRA at the Kings Mountain Site in North Carolina.

B.  IRA Section 5

Plaintiffs next argue that Interior acted contrary to law by using its authority under section 5 of the Indian Reorganization Act to take the Kings Mountain Site into trust on behalf of the Catawba.  Enacted in 1934, the IRA "reflected a new policy of the Federal Government" and "aimed to put a halt to the loss of tribal lands" by giving "Interior power to create new reservations" and "encourag[ing] [tribes] to revitalize their self-government."  Mescalero Apache Tribe v. Jones, 411 U.S. 145, 151 (1973).  To that end, section 5 of the Act broadly authorizes the agency to "acquire . . . any interest in lands . . . for the purpose of providing land for Indians," and it specifies that "[t]itle . . . shall be taken in the name of the United States in trust for the Indian tribe."  25 U.S.C. § 5108.

On EBCI's view, however, the 1993 Settlement Act renders the Catawba ineligible to benefit from that provision.  It contends that, properly understood, the Act displaces section 5's general federal land-into-trust authority by creating a specific land-acquisition scheme that governs the Tribe in its place.  Defendants unsurprisingly disagree, contending that the Act's specific land-acquisition procedures are best read as applying only in South Carolina, such that the Settlement Act leaves the IRA's general land-into-trust authority available as to lands in other states, including North Carolina.  See ECF Nos. 54 (Catawba SJ Mot.) at 6–8; 53 (Interior SJ Mot.) at 13–16.  The Court is thus dealt a similar hand here as with the IGRA issue: a dispute as to the geographic scope of a Settlement Act provision.  Retaining the courage of its earlier convictions, the Court will double down and side with Interior and the Catawba for essentially the same reasons as before: they have the better reading of the statute de novo, and even if they did not, the statute is ambiguous and must therefore be construed to the Tribe's benefit.

Section 9(a) of the Settlement Act provides that "[i]f the Tribe so elects, it may organize under the [IRA]" and further directs that "[t]he Tribe shall be subject to such Act except to the extent such sections are inconsistent with this Act." Pub. L. No. 103-116, § 9(a). The relevant "such section" of the IRA here is section 5, which authorizes Interior to "acquire . . . any interest in lands . . . within or without existing reservations . . . for the purpose of providing land for Indians." 25 U.S.C. § 5108. Interior used that authority to take the Kings Mountain Site into trust. See Proposed Findings at 2. The question here, then, is whether section 5 of the IRA is "inconsistent with" the Settlement Act, such that the Tribe is not "subject to" that section.

As a brief aside, the parties separately tangle over whether section 4(b) of the Settlement Act provides independent authority for taking land into trust on behalf of the Tribe. See Catawba SJ Mot. at 14; ECF No. 58 (Pl. Reply) at 29. That section states, "Notwithstanding any other provision of law, . . . the Tribe . . . shall be eligible for all benefits and services furnished to federally recognized Indian tribes and their members because of their status as Indians." Pub. L. No. 103-116, § 4(b). The Court sees no need to analyze section 4(b) here because of the well-worn interpretive rule that the specific governs the general. See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) ("[T]he canon has full application . . . to statutes . . . in which a general authorization and a more limited, specific authorization exist side-by-side."). As Interior recognized in its decision, whereas "Section 4(b) of the Settlement Act generally addresses the Nation's eligibility for federal benefits and services," it is section 9(a) that "specifically made the Nation subject to the terms of the IRA." Decision Letter at 22. With the more specific section 9 on point, section 4(b) adds nothing to the analysis.

Returning to whether section 5 of the IRA is "inconsistent with" any provision(s) of the Settlement Act, Plaintiffs (naturally) contend that the answer is yes. Their argument is, to a large

extent, a kind of field-displacement argument — *i.e.*, rather than use the off-the-rack land-acquisition provisions of the IRA, "the Catawba may acquire trust lands only via the bespoke system the 1993 Act creates." Pl. SJ Mot. at 23.

That logic makes sense as far as it goes. Sections 12 and 13 of the Settlement Act and various provisions of the Settlement Agreement do lay out a specific set of procedures and conditions to govern Interior's acquisition of land for the Tribe and the Tribe's acquisition of land for itself. See Pub. L. No. 103-116, §§ 12, 13; Settlement Agreement §§ 14.1–14.5, 14.8, 14.10–14.16, 15. And those provisions would be superfluous if Interior could acquire land for the Catawba using the general IRA land-into-trust process. Neither the Government nor the Catawba, in fact, disagree that the Settlement Act displaces section 5 of the IRA <u>to an extent</u>. <u>See</u> Catawba SJ Mot. at 6, 8; Interior SJ Mot. at 15 & n.8, 16. They simply assert that the displacement is limited to lands within South Carolina because the Settlement Act's land-acquisition rules apply only there. The dispute is thus a familiar one — *viz.*, over the geographic scope of certain Settlement Act provisions.

Same basic question, same basic answer. The land-acquisition rules established by the Settlement Act and Settlement Agreement are plainly addressed to acquisitions that occur within South Carolina. Most of those rules pertain to lands eligible to become part of the Tribe's "Expanded Reservation." See Pub. L. No. 103-116, § 12(b). On that front, the Agreement specifically identifies the metes and bounds of the eligible parcels of land, all of which are located in South Carolina. See Settlement Agreement §§ 14.3 (defining "Primary Expansion Zone"); 14.4 ("Secondary Expansion Zone"); 14.5 (stating that "Other Expansion Zone[s]" may be "approved by" South Carolina local and state governments). The Act and Agreement also provide for acquisition of "Non-Reservation Properties" by the Catawba in fee simple. See Pub.

L. No. 103-116, § 13; Settlement Agreement § 15.  Although they do not specifically identify

lands, context makes clear that only South Carolina lands are contemplated.  Per both the

Agreement and Act, the Tribe as fee-simple owner "shall be subject to the same obligations and

responsibilities as other persons and entities under State [defined as South Carolina], federal, and

local law," id. § 15.1, and the "the laws, ordinances, taxes, and regulations of [South Carolina]

and its subdivisions shall apply to such non-reservation properties in the same manner as [they]

would apply to any other properties held by non-Indians located in the same jurisdiction." Id. §

15.2; accord Pub. L. No. 103-116, § 13(b).  It would, again, be absurd to conclude that Congress

and South Carolina intended to subject "non-reservation properties" owned by the Tribe outside

South Carolina to that State's property and tax laws.  The only sensible reading, then, is that the

Agreement and Act's provisions governing the acquisition of "non-reservation properties" do not

authorize such acquisitions outside of South Carolina.  There is thus no conflict or inconsistency

between the Settlement Act's land provisions and Interior's background IRA authority when it

comes to lands outside of South Carolina.

Plaintiffs attempt to drum up such a conflict by pointing to two different provisions of the

Settlement Act.  The first states that the "[j]urisdiction and status of all non-Reservation lands

shall be governed by section 15 of the Settlement Agreement," which, as just discussed, states

that South Carolina law is to govern.  See Pub. L. No. 103-116, § 13(a) (emphasis added).  The

second provides that "[a]ll properties acquired by the Tribe shall be acquired subject to the terms

and conditions set forth in the Settlement Agreement." Id. § 12(f) (emphasis added).  EBCI

argues that "all" must mean "all" in both provisions, and so the Settlement Act and Agreement's

provisions must govern lands even if they are outside of South Carolina.

The Court cannot follow suit. As to the former provision, "all non-Reservation lands" cannot be read literally to mean all lands nationwide, as doing so would create the same untenable outcome of South Carolina law applying to lands outside of South Carolina. As to the latter, the Court is dubious that its language, which speaks of terms and conditions applicable to the <u>Tribe</u>'s acquisition of property, is in conflict with section 5's grant of authority to "the <u>Secretary of the Interior</u>[] . . . to acquire" lands to be held in trust on the Tribe's behalf. <u>See</u> 25 U.S.C. § 5108 (emphasis added). At any rate, section 12(f) appears in the middle of section 12 of the Settlement Act, which is titled "Establishment of Expanded Reservation" and, as discussed above, specifically identifies only South Carolina lands as eligible to become part of the Tribe's reservation. Again, then, the Court is hard pressed to read a phrase of the Settlement Act for all it is literally worth even though the words "all non-Reservation lands" and "all properties" could, in a vacuum, apply across the board. <u>Cf.</u> <u>Small v. United States</u>, 544 U.S. 385, 388 (2005) (declining to read phrase "convicted in any court" to include foreign courts because "even though the word 'any' demands a broad interpretation . . ., we must look beyond that word itself") (citing other similar cases). To the extent the reader is not convinced, the Court may fall back once again on the Indian canon. Because the Settlement Act's bespoke land-acquisition scheme can at the very least be reasonably read as applying (and therefore supplanting the IRA) only as to South Carolina lands, the Court must read it that way.

Plaintiffs raise two additional arguments on this front, neither of which moves the needle. First, they point to two statements in the legislative history. The first is from the House report, which notes that the Settlement Act "incorporates by reference . . . limitations on the applicability of . . . the Indian Reorganization Act contained in the Settlement Agreement and State Act." H.R. Rep. No. 103-257, pt. 1, at 20 (1993). This statement adds nothing to our

understanding of the question at hand, since, again, all agree that those instruments limit the applicability of the IRA to some significant extent.  If anything, this statement helps Defendants: if the federal Settlement Act merely "incorporates by reference" the limits on the IRA imposed by the State Settlement Act, then those limits must apply only within South Carolina, as the State Act's drafters would have had neither power nor reason to limit the federal government's authority to take land into trust outside the Palmetto State.

The other piece of history is a floor statement from Senator Fritz Hollings of South Carolina, in which he stated that the Settlement Act "permits only two types of lands.  First, the land held in trust by the United States as the expanded reservation.  Any other land . . . will be held in fee simple and have all the jurisdictional attributes of any other land in South Carolina." 139 Cong. Rec. 19,919 (1993).  "[F]loor statements by individual legislators," of course, "rank among the least illuminating forms of legislative history."  NLRB v. SW Gen., Inc., 137 S. Ct. 929, 943 (2017).  In any event, Senator Hollings's statement, like the statute itself, contemplates that the regime established by the Act addresses acquisitions only of land in South Carolina.  It thus offers no indication that the Settlement Act is inconsistent with section 5 of the IRA as to lands outside its borders.  Perhaps Plaintiffs mean to focus on the statement that the Act's land-acquisition scheme "permits only two types of lands," but, of course, that is literally true of the Act's procedures themselves; the question here is to what extent those procedures displace Interior's section 5 authority by establishing a more specific, superseding regime.

Second, Plaintiffs contend that Interior is guilty of double-dealing on the IRA section 5 issue.  Specifically, they argue that in the agency's 2018 decision denying the Catawba's mandatory trust application, Interior took the position that the Settlement Act bars it from taking land into trust for the Catawba outside South Carolina.  See Pl. SJ Mot. at 24.  But Interior did no

such thing.  Its 2018 decision, recall, expressly invited the Tribe to file a section-5-based trust application, see Mandatory Trust Memo at 5, a strange move if the agency thought it had no authority to grant such an application.  Interior's 2018 reasoning explains why the agency's views were and are internally consistent.  The Tribe's first application was "mandatory" in nature because it asserted that the agency was required to take the land into trust "pursuant to Section 12 of the Settlement Act," as opposed to under the IRA.  See Mandatory Application at 1.  In rejecting that application, Interior concluded that "the mandatory trust provisions of the Settlement Act" did not authorize acquisition of the Kings Mountain Site "because the text of the Settlement Act unambiguously limits the scope of those provisions to land acquired in South Carolina."  Mandatory Trust Memo at 1 (emphasis added).  That is exactly the position that Interior takes, and the Court adopts, in this case: the Settlement Act's acquisition rules do not apply outside of South Carolina; therefore, there is no conflict with the agency's separate, IRA land-acquisition authority as to such lands.  See Decision Letter at 26.

C.  Restored-Lands Exception

EBCI's third and final contrary-to-law argument is that even if the Catawba may game under IGRA in North Carolina, and even if Interior may use the IRA to take land into trust for that purpose, the Kings Mountain Site in particular is still not eligible for IGRA gaming.  IGRA provides that "gaming regulated by [that statute] shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," unless those lands fit into one of several statutory exceptions.  See 25 U.S.C. § 2719(a).  Here, Interior concluded that the Kings Mountain Site fits under the "restored lands" exception, which exempts "lands . . . taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition."  Id. § 2719(b)(1)(B)(iii); see Decision Letter at 3.

Plaintiffs contend that this was wrong for three separate reasons: (i) the Kings Mountain Site cannot qualify as the Catawba's "restored lands" consistent with the Settlement Act; (ii) Interior applied the wrong regulation (25 C.F.R. § 292.12) to determine whether the lands qualify as "restored," and under the correct regulation (25 C.F.R. § 292.11(a)(1)) they do not; and (iii) even if section 292.12 sets forth the applicable standard, the Kings Mountain Site still does not satisfy its requirements and therefore cannot be "restored lands."  See Pl. SJ Mot. at 28–31. Although Plaintiffs play their hand well, Defendants hold the high card.

### 1. *Settlement Act*

EBCI's first argument may be quickly discarded.  The Tribe insists that, because the 1993 Settlement Act "restored [the Catawba] to Federal recognition," and that Act expressly authorized Interior to take certain lands into trust for the Tribe as part of its existing or expanded reservation, only those lands can be thought of as "part of the restoration of [the Catawba's] lands."  This argument flies in the face of numerous cases squarely holding that where legislation restoring a tribe to recognition identifies specific parcels to be taken into trust, that does not preclude other lands from also qualifying as restored.  See Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt, 116 F. Supp. 2d 155, 158, 162–64 (D.D.C. 2000) (rejecting argument that "only lands which were restored to the tribe as part of the act of restoring the tribe to federal recognition would qualify"); Oregon v. Norton, 271 F. Supp. 2d 1270, 1279 (D. Or. 2003) (same); see also Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Atty. for W. Dist. of Mich., 46 F. Supp. 2d 689, 700–01 (W.D. Mich. 1999) (rejecting argument that lands may only qualify as "restor[ed]" if specifically mandated by Congress); cf. City of Roseville v. Norton, 348 F.3d 1020, 1025 (D.C. Cir. 2003) (adopting broad interpretation

of restored-lands exception, but declining to specifically address "its application to Indian lands not acquired pursuant to a restoration act").

As these decisions have explained, whether lands taken into trust can be fairly described as "part of the restoration of lands" to a tribe may depend on a number of factors, including "the factual circumstances of the acquisition, the location of the acquisition, [and] the temporal relationship of the acquisition to the restoration." Confederated Tribes, 116 F. Supp. 2d at 164 (citing Grand Traverse, 46 F. Supp. 2d at 701). Depending on those factors, "lands bearing a significant connection to an Indian tribe" may well qualify as "part of the restoration of lands" even "in addition to lands specifically identified in a restoration act." Norton, 271 F. Supp. 2d at 1278. The statutory language, in other words, "implies a process rather than a specific transaction, and most assuredly does not limit restoration to a single event." Grand Traverse, 46 F. Supp. 3d 701. Plaintiffs provide no good reason to depart from these precedents, and the Court will not do so. (To the extent they contend that the Kings Mountain parcel does not have a "significant connection" to the Catawba based on the factors just mentioned, that argument is addressed below. See infra at 39–40.)

### 2. Which Regulation Applies?

EBCI's next two arguments look to Interior's regulations implementing the restored-lands exception. Per those rules, "if [a] tribe was restored by a Congressional enactment of legislation," as occurred for the Catawba, then for the lands at issue to qualify as "restored," "the tribe must show that either:

> (1) The legislation requires or authorizes the Secretary to take land into trust for the benefit of the tribe within a specific geographic area and the lands are within the specific geographic area; or

> (2) If the legislation does not provide a specific geographic area for the restoration of lands, the tribe must meet the requirements of § 292.12.

25 C.F.R. § 292.11(a).  Section 292.12, in turn, sets forth a number of showings that the Tribe must make in order to "establish" a sufficient "connection" to the lands at issue: a "modern connection[] to the land," "a significant historical connection to the land," and "a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration." (If these requirements are familiar, it is because Interior's drafting largely, though not entirely, drew upon the influential Grand Traverse opinion discussed above.  See Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, 29,365 (May 20, 2008) (promulgating the rules at issue).)  Here, Interior concluded that the Kings Mountain Site "me[t] the requirements of § 292.12" and for that reason qualified as restored lands for purposes of IGRA.  See Decision Letter at 6–11.

EBCI first contends that Interior chose the wrong regulation to apply.  On its view, the agency was not permitted to analyze whether the Kings Mountain Site met section 292.12's requirements because the trigger for applying that test was not met: "[T]he legislation does . . . provide a specific geographic area for the restoration of lands," 25 C.F.R. § 292.11(a)(2) (emphasis added), because, as discussed above, it "require[d]" that the Catawba's existing reservation would be taken into trust and specifically "authorize[d]" further trust acquisitions in designated "expansion zones."  See Pub. L. No. 103-116, §§ 12(a), (c).  Interior, according to EBCI, therefore should have asked instead only whether 292.11(a)(1) was met — i.e, only whether the Kings Mountain Site is "within [the] specific geographic area[s]" expressly "required" or "authorized" for trust acquisition by the restoring legislation.  See Pl. SJ Mot. at 30–31.  All agree, of course, that the Site (being in North Carolina) is not within the Tribe's

existing reservation or the Settlement Act's designated expansion zones (those being in South Carolina).

Plaintiffs' interpretation, it is important to note, posits that paragraphs (1) and (2) of section 292.11(a) are "mutually exclusive" pathways for lands to qualify as restored. See id. at 30. Either the legislation "requires or authorizes the Secretary to take land into trust . . . within a specific geographic area," which is equivalent to saying it "provide[s] a specific geographic area for the restoration of lands," or it does not so require or authorize and therefore does not so provide. In the former case, 292.11(a)(1) governs, and the lands at issue must be within that "specific geographic area" or else are not restored; in the latter, 292.11(a)(2) governs, and the lands must instead satisfy section 292.12's connections test or else are not restored. At the risk of repetition, then, if a tribe's restoring legislation "requires or authorizes the Secretary to take land into trust within a specific geographic area," then on EBCI's view that legislation necessarily "provides a specific geographic area for the restoration of lands," and only that area is eligible to qualify as restored.

An attentive reader might now feel a sense of _déjà vu_, and she would be right. If EBCI's interpretation were correct, it would mean that Interior's rules adopted the very restored-lands test that courts have unanimously rejected — namely, that if a restoration act identifies some particular parcel or parcels of land to be taken into trust, only that land may qualify as restored. See _supra_ at 29–30. Plaintiffs do not even gainsay this point. They admit that, under their construction, if the restoring legislation "enumerate[s] any particular lands to be taken into trust," then section 292.11(a)(1) is met and section 292.12's connection test is thus unavailable. See Pl. Reply at 15. In other words, the restoring legislation "provides a specific area for the restoration

of lands" whenever it authorizes or requires any piece or pieces of land to be taken into trust for

the benefit of the tribe at issue, and that area alone may qualify as restored.

    The Court cannot believe that Interior adopted that crabbed view of the "restored lands"

exception.  As an initial matter, consider how the agency summarized the rule at a high level in

its preamble:

> The regulation . . . articulates the requirement for the parcel to
> qualify as "restored lands." Essentially, the regulation requires the
> tribe to have modern connections to the land, historical connections
> to the area where the land is located, and requires a temporal
> connection between the acquisition of the land and the tribe's
> restoration.

73 Fed. Reg. at 29,354; see Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 53 (D.C.

Cir. 1999)  ("[T]he preamble to a regulation is evidence of an agency's contemporaneous

understanding of its proposed rules" and may serve "as a source of evidence concerning

contemporaneous agency intent.")  Interior thus mentioned only section 292.12's connections

test, as if that test was "essentially" the only test applicable.  If Plaintiffs were right, however,

then the connections test is not available any time restoration legislation identifies at least one

parcel of land to be acquired for the tribe.  As discussed above, that is not an uncommon

occurrence for restoration legislation.  On EBCI's view, then, Interior suggested that it would use

the connections test when, in fact, that test would frequently be inapplicable.  The Court

considers that oversight unlikely.

    More to the point, the agency knew when issuing section 292.11(a) that the narrow

approach EBCI now urges had been rebuffed by numerous courts, since Interior itself had

advanced that very interpretation of IGRA back in 2000 in the Confederated Tribes case.  See

116 F. Supp. 2d at 162 ("The Solicitor's opinion states that 'restored lands' . . . include only

those lands that are available to a restored tribe as part of its restoration to federal recognition.");

id. at 163 (restating the Government's position as "'restoration of lands' means only restoration of lands by Congress contemporaneous with the restoration of federal recognition, or in some other way connected to the Congressional act of restoration").  The United States had also advanced the same position in 1999 in the Grand Traverse litigation.  See 46 F. Supp. 2d at 700–01.  Both courts rejected that reading of the statute.  See Confederated Tribes, 116 F. Supp. 2d at 164 (calling Interior's view "unduly restrictive" considering "the plain meaning of the statute, the statutory context, and the principle of liberal construction in favor of Indians"); Grand Traverse, 46 F. Supp. 2d at 700–01.  After those decisions, in fact, the Government reversed itself in the ongoing Grand Traverse litigation, expressly adopting the broader interpretation of the restored-lands exception it had first fought against.  See Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y for W. Dist. of Mich., 198 F. Supp. 2d 920, 924, 935 (W.D. Mich. 2002), aff'd, 369 F.3d 960 (6th Cir. 2004).

It is theoretically possible that Interior (contrary to its actions here) then reversed itself again seven years later when promulgating the rules at issue here.  If it had done so, however, one would expect some evidence in the rulemaking record, and there is none.  The evidence, indeed, goes the other way.  In its statement of basis and purpose, the agency specifically cited Confederated Tribes and Grand Traverse as cases that "provide guidance for the interpretation of" the restored-lands exception.  See 73 Fed. Reg. at 29,365.  The agency even analyzed whether a certain component of the test it adopted in section 292.12 was "contradicted by [that] case law," ultimately concluding that it was not.  See id.; see also id. at 29,366 (stating that another change was made from the proposed to final regulation in order to "reflect advisories in case law").  These comments do not reflect an agency that had consciously, yet silently, decided to re-adopt an old position expressly rejected by multiple court decisions against it.

To be sure, if the text of the regulation were susceptible only to EBCI's construction, then the Court would have no choice but to adhere to it anyway. But that is not the case. Section 292.11(a) can be reasonably read to establish a scheme under which paragraphs 292.11(a)(1) and 292.11(a)(2) present two <u>non-exclusive</u>, alternative means of satisfying the restored-lands exception. On this reading, *contra* Plaintiffs', the phrase "the legislation requires or authorizes the Secretary to take land into trust . . . within a specific geographic area" is not equivalent to the phrase "the legislation . . . provide[s] a specific geographic area for the restoration of lands." Instead, the first phrase in section 292.11(a)(1) simply means that if the restoring legislation identifies an area or areas eligible to be taken into trust, then those lands qualify as "restored lands." The regulations then allow the <u>additional</u> use of the separate, broader section 292.12 test, unless an exception obtains — namely, that the restoring legislation already "provide[s] a specific geographic area for the restoration of lands" by clearly limiting the lands that may qualify. Under this view, just because a tribe's restoring legislation identifies a particular parcel of land, that does not itself disqualify all other lands from counting as restored; Congress must do something more to mandate that only certain lands are eligible (thereby rendering the connections test inapplicable).

The Court considers that interpretation, on the whole, the best *de novo* reading of section 292.11. First, and most important, it is wholly consistent with the rulemaking record and caselaw discussed above. Second, it gives meaning to the drafters' choice to use two different phrases in paragraphs (1) and (2). Paragraph (1) speaks only of legislation that "requires or authorizes [Interior] to take land into trust . . . within a specific geographic area." Paragraph (2), by contrast, speaks of legislation that "provide[s] a specific geographic area <u>for the restoration of lands</u>" (emphasis added). If the drafters had meant the two phrases to refer to entirely

overlapping universes of legislation, it would have been far simpler for paragraph (2) to just

repeat paragraph (1)'s "require or authorize" wording.

Third, the Court's construction is confirmed by the drafting history of section 292.11.

When first proposed by Interior, the draft of that section read, in relevant part, as follows:

> For lands to qualify as "restored lands[,]" . . . it must be demonstrated that:
>
>> (a) The legislation restoring the government-to-government relationship between the United States and the tribe requires or authorizes the Secretary to take land into trust within a specific geographical area and the lands are within the specific geographical area; or
>>
>> (b) If there is no restoration legislation, or if the restoration legislation does not provide geographic parameters for the restoration of lands, the tribe has a modern connection and a significant historical connection to the land and there is a temporal connection between the date of the acquisition of the land and the date of the Tribe's restoration . . . .

Gaming on Trust Lands Acquired After October 17, 1988, 71 Fed. Reg. 58,769, 58,774 (Oct. 5,

2006). In this version of the regulation, it is even more apparent that the two paragraphs are not

mutually exclusive, and that the drafters did not think that merely "requir[ing] or authoriz[ing]"

the trust acquisition of specific lands would limit the exception to only those lands. Under

paragraph (b), rather, section 292.12's connections test would be applicable unless the

restoration legislation "provide[d] geographic parameters for the restoration of lands" — *i.e.*,

geographically limited the lands eligible to qualify. One might argue, of course, that the

language change from the proposed rule to the final rule suggests a change in intended meaning.

But Interior's statements when promulgating the final rule counsel otherwise. The agency

expressly noted and explained in multiple places why it had "modified" or "reorganized" the

draft version of section 292.11. See 73 Fed. Reg. 29,364. It said nothing, however, about the

36

change from the phrase "provide geographic parameters for the restoration of lands" to "provide a specific area for the restoration of lands."  Id.

The Court does not mean to suggest that its reading of section 292.11(a) is perfect.  It does result in one textual oddity: what is Interior to do "if the legislation does . . . provide a specific geographic area for the restoration of lands" by, for example, expressly stating that only certain lands qualify?  The obvious answer is that Interior must abide by that legislative restriction and reject any attempt by a tribe to use lands outside that area for IGRA gaming.  But it is somewhat strange that Interior's drafters left that as a negative inference rather than expressly mandating that result.

Ultimately, the Court is not troubled enough by this aspect of its interpretation to find Plaintiffs' position more persuasive on the whole.  For one thing, section 292.11 is framed in terms of what an applying tribe "must show."  See 25 C.F.R. § 292.11.  As a result, the entire section carries a negative inference that is not expressly stated: if the tribe fails to make the required showings, the land does not qualify as restored.  The need to draw that sort of negative inference, then, is not out of place in the section.  Indeed, it fits rather well in this specific context.  The phrase "provide[s] a specific geographic area for the restoration of lands" is essentially question begging — the whole point of the regulation is to establish what areas qualify as "part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition."  Id. § 2719(b)(1)(B)(iii) (emphasis added).  If Congress's restoring legislation answers that question directly, which it would by expressly excluding certain lands, then the regulations are not much needed to tell Interior what to do.  As a result, it is not terribly strange for section 292.11(a) not to directly address what happens in that circumstance.

As the Supreme Court recently counseled in <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400 (2019),

agency regulations often present "hard interpretive conundrums."  <u>Id.</u> at 2415.  That is certainly

the case here, where no construction of section 292.11(a) is without blemish.  The Court's task,

however, is to undertake the "taxing inquiry" of "carefully considering" not only the regulatory

text, but also the "structure, history, and purpose of a regulation" in order to ascertain its

meaning.  <u>Id.</u> (cleaned up) (quoting <u>Pauley v. BethEnergy Mines, Inc.</u>, 501 U.S. 680, 707 (1991)

(Scalia, J., dissenting)).  Having done that, the Court concludes that under the best reading of

Interior's regulations, the agency did not err by applying section 292.12's connections test in

deciding whether the Kings Mountain Site qualifies as restored lands.  The 1993 Settlement Act

does not "provide a specific geographic area for the restoration of lands" within the meaning of

section 292.11(a)(2) because it does not geographically limit Interior's land-into-trust authority:

as discussed above, it allows Interior to use its section 5 authority nationwide (outside South

Carolina).  <u>See</u> <i>supra</i> at 28.  Section 292.12's connections test is thus applicable.

As a housekeeping matter, while Interior certainly could have articulated its interpretation

of section 292.11(a) more clearly in both the administrative record and its briefing here, the

Court notes that the interpretation it adopts appears to accord with the agency's view.  <u>See</u>

<u>Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 286 (1974) (courts may

"uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned")

(citing <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 196 (1947)).  In its Decision Letter, Interior stated

that the 1993 Settlement Act "does not include language that either requires or authorizes the

Secretary to take land into trust for the Nation within a specific geographic boundary; therefore,

the Nation must <u>also</u> meet the requirements of Section 292.12."  Decision Letter at 6 (emphasis

added).  From the use of the adverb "also," as opposed to something like "instead," the Court can

38

"reasonably discern" that the agency (correctly) viewed paragraphs 292.11(a)(1) and 292.11(a)(2) as non-exclusive alternatives rather than mutually exclusive pathways.  See also Interior SJ Mot. at 19 ("25 C.F.R. § 292.11(a)(1) does not apply, and the issue whether the site qualifies as 'restored lands' is governed by 25 C.F.R. § 292.11(a)(2).").

### 3.  *Section 292.12 Requirements*

Still seeking an ace in the deck, EBCI contends that even if section 292.12 is applicable here, Interior was wrong to conclude that the Kings Mountain Site meets one of its requirements. Specifically, Plaintiffs posit that the Site is not "located within the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population," 25 C.F.R. § 292.12(a), because the Catawba are "located within" only South Carolina and not North Carolina.  See Pl. SJ Mot. at 31.

No luck here either.  Per the terms of the regulation, "where the tribe is now located" for purposes of the restored-lands exception is "evidenced by" two factors: the tribe's "governmental presence" and "tribal population."  Both establish that the Catawba have significant North Carolina ties even as they are based primarily in South Carolina.  According to Interior's Decision Letter, as of November 2019, 253 registered members of the Catawba Nation lived in North Carolina.  See Decision Letter at 7.  That is by no means a trivial population; a fair number of the 560 or so federally recognized tribes have total populations of similar or lesser size. Congress seems to have agreed, as the 1993 Settlement Act identified several counties in North Carolina as part of the Tribe's federal "service area," including the county that contains the Kings Mountain Site.  See Pub. L. No. 103-116, § 3(9).  (Although there is no need to decide this question, this feature of the 1993 Act alone arguably renders the Tribe "located" in North Carolina.)  As to governmental presence, Interior's decision listed ten different governmental

services offered or programs by the Catawba to its members living in North Carolina.  See
Decision Letter at 7–8.

EBCI's twin counterarguments fail.  It first insists that the Tribe cannot be "located in"
North Carolina because that term must mean "settled in" or "resident in."  See Pl. SJ Mot. at 31–
32.  But the regulation's text itself makes clear that where a tribe is "located" is "evidenced" by
the tribe's governmental presence and tribal population; on Plaintiffs' view, the Court must
ignore those considerations and instead parse dictionary definitions.  Even if section 292.12(a)
did not give any clue as to how to apply the concept of location in this context, furthermore,
EBCI would still lose, as the undefined term "located" would be ambiguous and thus amenable
to reasonable interpretation by Interior.  See Kisor, 139 S. Ct. at 2415–16.

EBCI next takes aim at the services the Tribe provides to its North Carolina residents,
suggesting that it could and would provide each of those services to its members anywhere they
happen to reside.  See Pl. Reply at 18–19.  A "governmental presence," Plaintiffs claim, should
be made of stronger stuff.  It is not clear to the Court why the fact that the Tribe could provide
government services in other states means that it lacks a governmental presence in a state where
it actually does provide many services.  Even granting that dubious point, however, it does not
help EBCI here, as at least a few of the services the Catawba provide to their North Carolina
residents very likely could not be offered in other, farther-flung states.  For example, the Tribe
provides childcare assistance in North Carolina, which is easy enough given the short driving
distance; the Court doubts that the Tribe would provide childcare services to its members in
Connecticut or Idaho.  See Decision Letter at 7.  Same for the "Family Services Transit services"
the Tribe offers so that its North Carolina members may "access Family Services or the Indian
Health Service clinic," both of which are in South Carolina.  Id. at 8.

* * *

Thus ends this Court's consideration of the legal underpinnings of Interior's decision to take the Kings Mountain Site into trust for the Catawba, with Defendants going home with full pockets. The action now moves to Plaintiffs' assorted other challenges to that decision.

    D. Bad Actor

EBCI's next contention is something of a wild card. It claims that Interior acted arbitrarily because it "failed to consider important aspects of the problem," Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1910 (2020) (cleaned up) — namely, the "extensive history of illegal and corrupt activity" of the Catawba's main business partner, a casino developer named Wallace Cheves. See Pl. SJ Mot. at 33. One of IGRA's purposes, Plaintiffs note, is "shield[ing] [Indian gaming] from organized crime and other corrupting influences." 25 U.S.C. § 2702(2). And there is nothing in the agency record reflecting any consideration of Cheves's involvement.

Defendants respond that the background of Cheves — who has not been convicted of any crime — is not an "important aspect[] of the problem" that Interior was required to consider under the APA's arbitrary-and-capricious standard. Whether they are correct "turns on what [the] relevant substantive statute makes important." Detroit Int'l Bridge Co. v. Gov't of Canada, 192 F. Supp. 3d 54, 78 (D.D.C. 2016) (cleaned up) (quoting Oregon Natural Res. Council v. Thomas, 92 F.3d 792, 798 (9th Cir. 1996)). It is true that several "bad actor" provisions in IGRA reflect Congress's concern with preventing crime or corruption in Indian gaming. See 25 U.S.C. § 2711(e) (requiring disapproval of management contract between tribe and gaming operator if any involved person's "prior activities, criminal record if any, [etc.] pose a threat to . . . the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair,

or illegal practices, methods, and activities in the conduct of gaming"); id. § 2710(d)(2)(B)(ii)

(authorizing rejection of tribal gaming ordinance, which is necessary for gaming, if "the tribal

governing body was significantly and unduly influenced" by such person).

      The problem for Plaintiffs is that these provisions are not addressed to the Bureau of

Indian Affairs (the specific decisionmaker here).  Both, rather, are administered by the National

Indian Gaming Commission, a separate agency specifically created by IGRA "to monitor tribal

gaming and to promulgate the regulations and guidelines necessary to implement the statute."

Cayuga Nation v. Tanner, 448 F. Supp. 3d 217, 237 (N.D.N.Y. 2020); see United States ex rel.

Mosay v. Buffalo Bros. Management, Inc., 20 F.3d 739, 744 (7th Cir. 1994) (noting that sections

of IGRA "addressed to the Commission" are "enforceable . . . only by the . . . Commission" and

not by BIA).

      Seemingly recognizing this problem, Plaintiffs shift focus somewhat in their reply brief.

Instead of claiming that "Interior improperly applied IGRA," as they had at first, see Pl. SJ Mot.

at 33; Am. Compl., ¶¶ 243–49, EBCI maintains that Interior should have considered, as part of

its discretionary choice whether to take the Site into trust, the possibility that the NIGC would

hinder the Tribe's plans because of Cheves's allegedly sordid past.  See Pl. Reply at 42.

      The Court is not persuaded.  Section 5 itself says nothing about what Interior must

consider, only stating that "the Secretary . . . is authorized, in his discretion, to acquire . . . any

interest in lands . . . within or without existing reservations . . . for the purpose of providing land

for Indians."  25 U.S.C. § 5108.  As for the agency's regulations, just because they require it to

examine "the purposes for which the land will be used," 25 C.F.R. §§ 151.10(c), 151.11(a),

which Interior did, see Proposed Findings at 4, does not oblige it to analyze every possible issue

that might derail some of the tribe's plans, especially where those issues are beyond Interior's

control or outside its bailiwick.  Plaintiffs, for example, do not argue that Interior's decision was

arbitrary and capricious because it failed to analyze whether the Catawba would successfully

negotiate a favorable gaming compact with North Carolina, see 25 U.S.C. § 2710(d)(1)(C) (such

compact is necessary for gaming), yet their logic necessarily suggests that result.  The Court

cannot play along with this sort of nitpicking.  Cf. Pension Ben. Guar. Corp. v. LTV Corp., 496

U.S. 633, 646 (1990) ("If federal courts . . . were to require each agency to take explicit account

of" hypothetical issues beyond their authority, a "large number of agency decisions might be

open to judicial invalidation.").

Even assuming the agency did act arbitrarily by failing to consider whether NIGC would

prohibit the Catawba from gaming with Cheves as business partner, the error was harmless.  See

5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); PDK Labs. Inc.

v. DEA, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the

outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for

reconsideration.").  For one thing, Interior's land-into-trust analysis was subject to a crucial

caveat: in considering "the intended use of the land . . . for tribal economic development

purposes," it noted that such uses would "includ[e] an entertainment complex and gaming, to the

extent permissible under relevant law."  Proposed Findings at 4; see also id. ("The Department

understands that the Nation plans to conduct [IGRA] Gaming, to the extent permissible under

relevant law," on this location."); id. at 12 (noting that gaming would be "subject to any legal

limitations").  The agency thus essentially disclaimed any significant reliance on the precise

nature of the Tribe's activities at the proposed entertainment complex, which included plans not

only for gaming, but also for three restaurants, four lounges, a stage for live performances, and a

gift shop featuring Native artwork and products.  See Proposed Findings at 12–13; see also

Decision Letter at 37 n.218.  It is also worth noting that, a few months after the decision under review here, the NIGC approved the Catawba's gaming ordinance, see Letter re Catawba Indian Nation Gaming Ordinance (May 22, 2020), https://bit.ly/31IN5sw, despite IGRA's prohibition on doing so if the Tribe had been "significantly and unduly influenced in the adoption of such ordinance by" a bad actor, as EBCI alleges.  See 25 U.S.C. § 2710(d)(2)(B)(ii).  Thus, "even were [Interior] to redress its alleged error[], the final [outcome]," it seems, "would remain unchanged, making this the epitome of harmless error."  City of Portland v. EPA, 507 F.3d 706, 713 (D.C. Cir. 2007).

E.   NHPA

The next card EBCI and its members play — now joined by the Cherokee Nation as Plaintiffs — is to contend that Interior violated the National Historic Preservation Act.  That statute requires federal agencies "to consider the effect of their actions on certain historic or culturally significant sites and properties . . . and to seek ways to mitigate those effects." Narragansett Indian Tribal Hist. Pres. Off. v. FERC, 949 F.3d 8, 10 (D.C. Cir. 2020).  Historic properties are defined to include "property of traditional religious and cultural importance to an Indian tribe."  54 U.S.C. §§ 300308, 302706.  The NHPA, like the more-familiar NEPA, does not require any "particular preservation activities; rather, [the law] only requires that the [agency] consult [the appropriate parties] and consider the impacts of its undertaking."  Davis v. Latschar, 202 F.3d 359, 370 (D.C. Cir. 2000).  Those parties include affected Indian tribes.  See 54 U.S.C. § 306102(b)(4).

Here, it is undisputed that Interior did not consult at all with Plaintiff the Cherokee Nation.  See Interior SJ Mot. at 26–27.  The Cherokee argue that this omission violated the NHPA; the agency rejoins that it had no such duty.  See Pl. SJ Mot. at 35; Interior SJ Mot. at 22.

By contrast, the agency did engage in at least some back-and-forth with EBCI (a separate tribal entity) regarding the historic-preservation consequences of the Kings Mountain development. See supra at 8–9. Still, according to Plaintiffs, that too was insufficient under the Act. Id. at 39.

The Court need not decide either issue. It already held, in denying EBCI's motion for a preliminary injunction in this case, that the Tribe had not "shown that it is likely that Cherokee historical artifacts even exist at the Kings Mountain site." EBCI, 2020 WL 2079443, at *5. Although Plaintiffs have supplemented the record slightly, the Court reaches the same conclusion at this stage. Because it is not likely that Cherokee artifacts are on site, it is even less likely that any damage will occur to such historic properties as a result of the Catawba's construction activities. The upshot, as the Court will now explain, is that even if Interior violated NHPA, it did not inflict a cognizable Article III injury on any Plaintiff.

The well-worn doctrine of standing requires that a plaintiff show that she "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). EBCI and its members, to be clear, undisputedly have Article III standing to challenge Interior's decision under the Settlement Act and APA, based on economic, aesthetic, and environmental impacts caused by the Catawba casino. See Pl. SJ Mot. at 46–47; ECF No. 62 (Interior Reply) at 15. Standing for Plaintiffs' NHPA claim, however, cannot be based on those injuries because the construction and operation of the Catawba's casino is not "fairly traceable" to Interior's alleged NHPA violation or "likely to be redressed by" a favorable decision on that particular claim. The NHPA, after all, does not require Interior to take or not take any substantive actions. Plaintiffs therefore cannot show that had the Act been complied with, the casino would not have been built.

The law accounts for this sort of situation by creating a standing exception for "procedural rights" such as the right to NHPA consultation: a person "accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." Lujan v. Defs. of Wildlife, 504 U.S. 555, 572 n.7 (1992). The catch is that the "procedures in question [must be] designed to protect some threatened concrete interest of [the plaintiff] that is the ultimate basis of his standing." Id. at 573 n.8; see City of Waukesha v. EPA, 320 F.3d 228, 234 (D.C. Cir. 2003). For NEPA, by way of example, the relevant concrete interest must be a "particularized environmental interest." Fla. Audubon Soc'y v. Bentsen, 94 F.3d 658, 665 (D.C. Cir. 1996) (emphasis added); see also Lemon v. Geren, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (plaintiffs "would feel the environmental effects of [the challenged] action if it went forward"). For the NHPA, similarly, it must be along the lines of "damage to an historic site" in which a plaintiff has a particularized interest. Lemon, 514 F.3d at 1315; Pye v. United States, 269 F.3d 459, 468 (4th Cir. 2001) (finding standing where "the challenged action may lead to trespassing, vandalism, and looting of historic sites").

Aiming to fit within this framework, Plaintiffs base their NHPA standing on what they allege is a "grave risk that [Cherokee] cultural patrimony," to which both EBCI and the Cherokee lay claim, "will be destroyed" by the Kings Mountain development. See Pl. Reply at 42; see also ECF No. 2 (Pl. PI Mot.) at 3 (arguing that "cultural patrimony and/or human remains found on these 16.57 acres will be completely lost"). That is indeed a concrete injury protected by NHPA's provisions regarding consultation with tribes. Plaintiffs, however, must still show "that it is substantially probable that the procedural breach will cause [that] injury." Waukesha, 320 F.3d at 234. They cannot "substitute speculation for substantial probability, and hope that doing so will carry them across the causation bridge." San Juan Audubon Soc'y v. Wildlife

46

Servs., Animal & Plant Health Inspection Serv., 257 F. Supp. 2d 133, 141 (D.D.C. 2003).  Here,

for two main reasons, the Court finds that the claimed risk to Cherokee remains and artifacts falls

on the speculative side of the line.

      First, the Court has already found, on an indistinguishable factual record, that it is not

"likely that Cherokee resources . . . exist on . . . the proposed gaming site."  EBCI, 2020 WL

2079443, at *5.  If that is so, then there cannot be a substantial risk of damage to such artifacts.

In reaching its earlier conclusion, the Court considered three pieces of evidence adduced by

EBCI's Tribal Historic Preservation Officer Russell Townsend:

- "The Kings Mountain site is within the Cherokee treaty and historical territory," ECF No. 1-1 (March Declaration of Russell Townsend), ¶ 8;
- "[Pre-historic Cherokee ceramics" have been discovered "about ten miles from Kings Mountain," ECF No. 14-4 (April Declaration of Russell Townsend), ¶ 5; and
- A "historical pottery kiln and prehistoric lythic scatter," i.e., "human made stone tools," were previously discovered on the "Kings Mountain Site."  Townsend Mar. Decl., ¶ 17.

The Court was not persuaded by this "thin record."  EBCI, 2020 WL 2079443, at *5.  As it

recounted, the proposed development site "is a highly disturbed area" that has been "previously

prospected for tin," used "as a soil borrow pit during the construction of a nearby road," and

"graded" back to a level surface.  Id. at *6 (cleaned up and citations omitted).  Townsend's

answer to that point was conditional and speculative; he noted only the "potential" that "cultural

features" might still be present "if they are deeper in the subsurface matrix than the impacts

caused by" that 2005 work.  See id. at *5; Townsend Mar. Decl., ¶ 18.  The Court also explained

why Townsend's evidence fell short of establishing any real probability of harm.  Although the

site is in historic Cherokee territory, that territory covers much of the Southeastern United States.

EBCI, 2020 WL 2079443, at *5.  As to the previously discovered stone tools, Townsend did not

claim that they were Cherokee nor offer any proof that they were found on the proposed

construction site itself, since the "Kings Mountain site" appears to be about twice as large as the

parcel being taken into trust and built upon.  Id.  And although he did point to Cherokee artifacts

ten miles away, that was ten miles away from "Kings Mountain," the nearby North Carolina city,

not the site contemplated here.  In sum, on the record before the Court at the preliminary-

injunction stage, Plaintiff had not established a "likel[ihood] that any [Cherokee] resources exist

on the parcel of land at issue."  Id.

       At the present summary-judgment stage, Plaintiffs have not improved their hand.  All

they have added is new declarations from both Townsend and the Cherokee Nation's historic-

preservation officer, Elizabeth Toombs, neither of which offers any new facts or evidence.

Instead, based on the same materials discussed in the two's earlier affidavits — and thus the

same evidence that was before this Court — Townsend and Toombs have changed the wording

of their analysis.  For example, whereas in March 2020, Townsend averred that "[a]ny buried

cultural features . . . have a potential to be intact," Townsend Mar. Decl., ¶ 18, he now states that

"[s]ome of the Cherokee artifacts that are likely to exist at the Kings Mountain Site are likely to

be" intact.  See ECF No. 41-2 (July Declaration of Russell Townsend), ¶ 24.  Along the same

lines, Townsend earlier cautioned that EBCI "cannot determine whether Cherokee religious or

cultural sites exist at the proposed location."  Townsend Mar. Decl., ¶¶ 15, 18.  Now, he avers

that "the Kings Mountain Site is likely to contain Cherokee cultural resources."  Townsend July

Decl., ¶ 26.  This shift is not merely from one affidavit to another.  Townsend offered the same

circumspect analysis he earlier gave to this Court in a March 2020 letter and email to Interior.

See McGhee Decl. at ECF pp. 29, 36–37.  And EBCI's original Complaint acknowledged that he

was "unable to determine whether this final agency action will destroy or harm Cherokee

religious or cultural sites." ECF No. 1, ¶ 68. Townsend offers no explanation why his assessment is different now even though it is based upon the same evidence he evaluated back then. See July Townsend Decl., ¶ 26.

Toombs, too, has changed her tune. She initially professed concern only for "the potential for adverse impacts upon religious or cultural items" as a result of the Catawba's development. See ECF No. 17-2 (April Declaration of Elizabeth Toombs), ¶ 8. In her latest affidavit, without citing any new facts or evidence, she now "agree[s] that it is likely that the King's [*sic*] Mountain site contains Cherokee cultural resources." ECF No. 42-1 (July Declaration of Elizabeth Toombs), ¶ 12.

It is well established that "on summary judgment, a party cannot establish standing with conclusory allegations of an affidavit." Humane Soc'y of the United States v. Perdue, 935 F.3d 598, 603 (D.C. Cir. 2019) (internal quotation marks omitted) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)). That principle, to be fair, is not 100% applicable to the predictive judgments offered by those with relevant expertise. Yet given that both Townsend and Toombs have significantly upped the ante on their assessments without offering any additional factual basis for doing so, it seems to the Court that their new affidavits essentially "opin[e] that the construction activities [will] result in [damage] without citing any supporting evidence," thereby falling short of Plaintiffs' "burden" to present "record evidence establishing standing." Texas Indep. Producers & Royalty Owners Ass'n v. EPA, 410 F.3d 964, 972–73 (7th Cir. 2005). Put differently, it is hard to avoid the conclusion that the newly strengthened statements are little more than a reaction to the Court's earlier Opinion. In that sense, their speculative assessments are conclusory and do not move this Court from its earlier conclusion

that, as a matter of law, there is no more than a small chance that Cherokee cultural patrimony is

present at the casino-development site.

Whatever those odds are, moreover, the odds that really matter for standing here — that

Cherokee cultural patrimony will be irrevocably destroyed by the Catawba's construction — are

much longer still.  That is because, even if there are artifacts in the construction zone, the

Catawba have "agreed to use certain best practices and undertake enumerated mitigation

measures" during construction, EBCI, 2020 WL 2079443, at *6, to prevent damage to any

paleontological or archaeological specimens "inadvertently discovered."  Final EA at 16.  The

Court previously summarized those measures:

> If any [protected tribal] resource is discovered during the
> construction process, "work within 50 feet of the find shall be halted
> until a professional archeologist . . ., or paleontologist if the find is
> paleontological in nature, can assess the significance of the find in
> consultation with the BIA, other appropriate agencies and the
> [Cherokee] Nation."  Final EA at 18. Under the applicable
> regulations, the agency expert shall also notify EBCI's THPO of the
> find. See 36 C.F.R. § 800.13(b)(3); see also Final EA at 16 (listing
> EBCI THPO Townsend as contact).  If the find is significant, the
> THPO shall meet with the archeologist (or paleontologist) to
> "determine the appropriate course of action." Id. at 16–17 . . . .
> Separately, the EBCI THPO will also be contacted if human remains
> are uncovered.  Id. Assuming that such remains are Native
> American, the construction process will halt until "the THPO and
> [an agency] representative have made the necessary findings as to
> the origins and disposition." Id. at 17.

EBCI, 2020 WL 2079443, at *6 (citations modified).  While there are of course no guarantees, in

these particular circumstances, the mitigation measures go a long way toward "assur[ing] . . . that

any significant resources will be preserved if they are discovered during the construction

process." Id. at *7.  At a minimum, they substantially reduce the risk that Cherokee artifacts, if

encountered during construction, will be "completely lost."  Pl. PI Mot. at 3.  That takes an

already small risk of injury down to a true longshot — in legal terms, below the "substantial

probability" threshold necessary to establish future injury under Article III.  Plaintiffs

accordingly lack standing to press their NHPA claims.

    F.  <u>NEPA</u>

Plaintiffs are now down to their final chip: the claim that Interior violated NEPA by (i)

failing to prepare an Environmental Impact Statement and (ii) not adequately considering project

alternatives.  Plaintiffs might hope that their lack of success so far makes them overdue for a win

here.  The cards, however, tell a different story.

    1.  *Environmental Impact Statement*

If a project will "significantly" affect the "quality of the human environment," NEPA

requires that the agency complete a detailed EIS.  <u>See</u> 42 U.S.C. § 4332(C).  To determine

whether or not there will be such significant effects, however, the agency first prepares a shorter

Environmental Assessment, or EA, which discusses the need for the proposed action, the

alternatives, the environmental impacts, and the agencies and persons consulted.  <u>See</u> 40 C.F.R.

§ 1501.5.  If the EA concludes that there will be no significant environmental impact, the agency

may forgo completing a full EIS and instead issue a "Finding of No Significant Impact," or

FONSI.  <u>See</u> <u>id.</u> §§ 1501.5(c)(1); 1501.6.  That is what Interior did here.  <u>See</u> FONSI, AR 3898;

Final EA, AR 2504.

Plaintiffs challenge the agency's decision not to produce an EIS on several grounds.  First

and foremost, they argue that Interior wrongly found that no significant impact would occur to

Cherokee "cultural resources."  Pl. SJ Mot. at 42–43; <u>see</u> 40 C.F.R. § 1502.16(a)(8) (requiring

agencies to consider project's effect on cultural resources as one "environmental

consequence[]").  Plaintiffs, however, lack standing to press this particular NEPA claim.  The

only concrete injury they allege that could undergird their procedural right to greater

consideration of the casino's impact on cultural resources is one the Court just found unlikely to occur: damage to artifacts or remains during construction.  For the same reason, Plaintiffs also lack standing as to their related argument that NEPA, separate from the NHPA, required Interior to consult them while drafting its EA and FONSI.  See Pl. SJ Mot. at 43; Pl. Reply at 39.

Plaintiffs next maintain that the agency "fail[ed] to consider the local effects of the looming jurisdictional quagmire the Decision threatens."  Pl. SJ Mot. at 43–44.  Points for creative phrasing, but this argument is a nonstarter.  Their concern is apparently that other government actors beside the United States (say, North Carolina or a county government) might read section 15 of the Settlement Act, which states that "jurisdiction and status of all non-Reservation [Catawba] lands" falls under South Carolina law, see Pub. L. No. 103-116, § 15 (emphasis added), in a literalist vacuum, leading to conflict over whether South Carolina law governs.  The Court has already explained why this reading of the Act is absurd.  See supra at 25–26.  But even assuming that some lawyer somewhere might go for it, faulting Interior for failing to consider that remote possibility is the epitome of impermissible NEPA flyspecking. See Birckhead v. FERC, 925 F.3d 510, 515 (D.C. Cir. 2019) ("Our role is not to 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor, but instead simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious.") (cleaned up and citation omitted).

Next, EBCI and the Cherokee contend that the agency neglected to consider certain impacts on the "locality" from the casino development, including "pollution," "harm to recreation at nearby state parks," and additional "crime."  See Pl. Reply at 39–40.  All of these arguments are past post (i.e., late) for two reasons.  First, Plaintiffs "did not raise these particular

objections to the [Draft] EA" during the 30-day comment period Interior provided.  Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004).  The Cherokee did not submit any comments, and EBCI's six pages of comments did not even glancingly refer to pollution, recreation, or crime.  See EBCI Comments, AR 3317.  Plaintiffs "have therefore forfeited any objection to the EA on [these] ground[s]."  Pub. Citizen, 541 U.S. at 764–65; see Sierra Club v. FERC, 827 F.3d 36, 51 (D.C. Cir. 2016).  Second, even had Plaintiffs preserved these arguments by raising them to the agency, they did not bring them up here until their reply brief.  "Courts in this Circuit have generally held that issues not raised until the reply brief are waived," Bloche v. Dep't of Def., 414 F. Supp. 3d 6, 23 n.5 (D.D.C. 2019) (citation and internal quotation marks omitted), although the term forfeited is more appropriate here.  See United States v. Miller, 890 F.3d 317, 326 (D.C. Cir. 2018) ("Forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right.")

Plaintiffs last argue that Interior did not properly analyze the "cumulative impacts" of its decision to take the Kings Mountain parcel into trust because it did not assess the effects of further development around the casino that would predictably follow.  See Pl. SJ Mot. at 44.  The only source they cite, however, is a September 2020 newspaper article, which itself reports that sales of nearby land to developers took place over summer 2020.  See Collin Huguley, Ownership of Land Around Kings Mountain Casino Project Taking Shape, Charlotte Bus. J. (Sept. 28, 2020), https://bit.ly/3nmd6Ym.  Yet "[t]he scope of [this Court's NEPA] review is limited to the administrative record that was before the agency at the time it made its decision," which was March 2020.  Rock Creek Pack Station, Inc. v. Blackwell, 344 F. Supp. 2d 192, 201 (D.D.C. 2004) (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743–44 (1985)).  At that time, the agency reported that "[p]er the City of Kings Mountain and the Cleveland County

Planning departments, there [we]re no major new development projects proposed, planned or currently being constructed in the project study area."  Final EA at 58, AR2563 (assessing "cumulative impacts" of the project).  Plaintiffs offer no reason to think the agency's assessment on that score, as of March 2020, was arbitrary or capricious.

2.  *Alternatives*

Even when an agency properly confines its environmental inquiry to an EA, that document must still "include a brief discussion of reasonable alternatives to the proposed action" as well as their environmental effects.  Myersville Citizens for a Rural Cmty., Inc. v. FERC, 783 F.3d 1301, 1323 (D.C. Cir. 2015) (citing precursor to 40 C.F.R. § 1501.5).  "[T]he discussion of environmental effects of alternatives need not be exhaustive.  What is required is information sufficient to permit a reasoned choice."  Birckhead, 925 F.3d at 515 (quoting Nat. Res. Def. Council, Inc. v. Morton, 458 F.2d 827, 836 (D.C. Cir. 1972)) (alteration in original).  The Final EA prepared by the agency here contained a thorough (60-pages-plus) analysis of three alternatives to the Catawba's proposed casino and entertainment complex at the Kings Mountain Site: a smaller entertainment complex with less parking; a truck stop; and no action.  See Final EA at 19–21.

Plaintiffs maintain that Interior should have also considered another alternative: taking land into trust for the Catawba that is not "in Cherokee aboriginal, historical, [or] treaty territory."  Pl. SJ Mot. at 45; Pl. Reply at 40–41.  But as Interior explained in its EA, "Evaluating any other parcels . . . [was] beyond the scope and control of the BIA action."  Final EA, App. M at 8.  After all, the Catawba had petitioned the agency to take the Kings Mountain parcel into trust, and Interior's regulations required it to act on the Tribe's application.  See Final EA at 5; 25 C.F.R. § 151.12.  A proposed alternative of development on another parcel was thus

functionally equivalent to the no-action alternative, which Interior fully analyzed.  Even if that were not so, here the agency "reasonably chose to confine its goal simply to addressing [the Tribe's] proposal," and it thus did not act unreasonably by evaluating only alternatives of "(1) rejecting the proposal; (2) approving the proposal 'as is,' or (3) approving the proposal with some degree of modification."  <u>Theodore Roosevelt Conservation Partnership v. Salazar</u>, 661 F.3d 66, 73–74 (D.C. Cir. 2011).  The Court also notes that much of the Southeastern United States is historical Cherokee territory.  <u>EBCI</u>, 2020 WL 2079443, at *5; ECF No. 8-1 (Royce Map).  The alternative of building a facility outside those vast lands, especially for a Tribe located in the Carolinas, was not "objectively reasonable" or "feasible," and for that independent reason need not have been analyzed.  <u>See</u> <u>Nat'l Parks Conservation Ass'n v. United States</u>, 177 F. Supp. 3d 1, 18 (D.D.C. 2016).

## IV.  Conclusion

To the undoubted relief of the reader who has made it thus far, the Court is out of gambling metaphors.  It will, therefore, simply restate its conclusions once more: Interior did not violate the Settlement Act or IGRA by taking the Kings Mountain parcel into trust for the Catawba; the agency properly applied its IGRA regulations; it did not act arbitrarily by failing to consider the background of Wallace Cheves; Plaintiffs lack standing to press their NHPA claims and those NEPA claims that overlap; and their remaining NEPA claims fail.  The Court will accordingly enter summary judgment on all counts for the Defendants.  An Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  April 16, 2021